UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID WILLIAMSON, CHASE
HANSEL, KEITH BECHER,
RONALD GORDON, JEFFERY
KOEBERL, CENTRAL FLORIDA
FREETHOUGHT COMMUNITY,
SPACE COAST FREETHOUGHT
ASSOCIATION, and HUMANIST
COMMUNITY OF THE SPACE
COAST,

      Plaintiffs,

v.                                                    Case No. 6:15-cv-1098-Orl-28DCI

BREVARD COUNTY,

      Defendant.

_____

AMENDED STIPULATION OF FACTS
REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

     Plaintiffs and Defendant stipulate to the facts below.  Neither side, however, concedes

that all the facts below are material or relevant.  And each side contends that there are

additional material facts with respect to which there is no genuine dispute.  *See* Plaintiffs'

and Defendant's Motions for Summary Judgment.

     Per the Court's direction, the parties have amended this Stipulation to correct and

agree upon supporting record citations.  No substantive changes have been made to the

Stipulation.  Plaintiffs took initial responsibility for preparing the citations in all paragraphs

other than 64, 69, 125–26, 131, 140, 152, 171–72, 193–94, and 197–277, for which

Defendant initially prepared the citations.

All "A" citations are to Plaintiffs' Appendix of Exhibits in Support of Motion for Summary Judgment, or Plaintiffs' Appendix of Supplemental Exhibits in Opposition to Defendant's Motion for Summary Judgment.  All "Def. A-" exhibits are references to documents in the Court's courtesy copy of the Defendant's Appendix to the Defendant's Motion for Summary Judgment; all "Def. MSJ Ex." citations are references to the numbered exhibits attached to the Defendant's Motion for Summary Judgment; and all references to a party's last name followed by the words "at," the party's initials, and "Ex." are references to exhibits attached to that party's deposition, for example, "Williamson, at Ex. DW-77."

### Brevard County

1.     Defendant Brevard County ("the County") is a political subdivision of the State of Florida.  A36/A93 ¶ 104 (First Amended Complaint and County's Answer).

2.     The Brevard County Board of County Commissioners ("the Board") is the legislative and governing body of Brevard County.  A36/A93 ¶ 105 (First Amended Complaint and Answer).

3.     The Board has the power to carry on county government.  A36/A93 ¶ 106 (First Amended Complaint and Answer).

4.     The Board's powers include the "establishment and adoption of policy."  A36/A93 ¶ 107 (First Amended Complaint and Answer) (quoting Brevard Cty. Charter § 1.5).

5.     The Board's powers further include the power to adopt its own rules of procedure and to levy taxes.  A36/A93 ¶ 108 (First Amended Complaint and Answer).

6.     The Board takes official action by adopting, amending, or repealing ordinances, resolutions, and motions.  A36/A93 ¶ 109 (First Amended Complaint and Answer).

7.     "A resolution means an expression of a temporary character, or a provision for the disposition of the administrative business of the Board."  A37/A93 ¶ 110 (First Amended Complaint and Answer) (quoting Brevard Cty. Charter § 2.10.1).

8.     The Board has five Commissioners, each of whom represents — and is elected by the voters residing in — one of five numbered single-member Districts that make up the County.  A37/A93 ¶ 111 (First Amended Complaint and Answer).

9.     Under Florida Statutes § 125.15, "[t]he county commissioners shall sue and be sued in the name of the County."  A37/A93 ¶ 112 (First Amended Complaint and Answer).

### *Board Meetings*

10.     To carry out its responsibilities, the Board regularly conducts meetings in its main board-room, called the "Government Center Commission Room."  A37/A93 ¶ 113 (First Amended Complaint and Answer).

11.     The board-room meetings are designated as "regular," "zoning," "budget," or "organizational" meetings.  A37/A93 ¶ 114 (First Amended Complaint and Answer).

12.     These board-room meetings are open to the public, are carried live on cable television, and are available for public viewing on the Board's website.  A37/A93 ¶ 115 (First Amended Complaint and Answer).

13.     People can also watch board-room meetings on a ceiling-mounted television set up in a lobby just outside the entrance to the main board-room.  Def. A-1 (Whitten Aff. ¶ 27).

14.     Board-room meetings are typically opened with a religious invocation.  A45/A97 ¶ 177 (First Amended Complaint and Answer).

15.     The Board also periodically holds "workshop" meetings and other special meetings outside its main board-room.  A37/A93 ¶ 117 (First Amended Complaint and Answer).

16.     The non-board-room meetings are typically not opened with an invocation.  A37/A93 ¶ 118 (First Amended Complaint and Answer).

17.     The non-board-room meetings are thus not at issue in this lawsuit.  A37 ¶ 119 (First Amended Complaint).

18.     The main board-room is approximately sixty feet wide and seventy feet deep.  A38/A93 ¶ 120 (First Amended Complaint and Answer).

19.     In the main board-room, the audience sits in rows of seats that face a raised seating area.  A38/A94 ¶ 121 (First Amended Complaint and Answer).

20.     During Board meetings, the five County Commissioners, the County Manager, and the County Attorney sit in the raised seating area.  A38/A94 ¶ 122 (First Amended Complaint and Answer).

21.     During Board meetings, the County Commissioners and the audience face each other.  A38/A94 ¶ 123 (First Amended Complaint and Answer).

22.     There are approximately 196 seats for the audience in the main board-room (called the "Commission Room"), which has a total capacity of 270.  A38/A94 ¶ 124 (First Amended Complaint and Answer).

23.     The seats for the audience are arranged in approximately eleven rows ascending from the raised seating area to the rear of the commission room.  A38/A94 ¶ 125 (First Amended Complaint and Answer).

24.     Each row has approximately eighteen seats, approximately nine on each side of a center aisle.  A38/A94 ¶ 126 (First Amended Complaint and Answer).

25.     The main board-room is small enough that a person standing alone can see and be seen from one end of it to another.  A38/A94 ¶ 127 (First Amended Complaint and Answer).

26.     County Commissioners can see audience members in the main board-room during Board meetings.  A38/A94 ¶ 129 (First Amended Complaint and Answer).

27.     Attendance at Board meetings can vary, from fewer than ten people to a full main board-room.  A850:14-23 (Fisher Depo.); A881:10-15 (Bolin Lewis Depo.); A907:3-7 (Nelson Depo.); A958 No. 2 (County's Responses to Interrogatories).

28.     County Commissioners sometimes talk to members of the public in the board-room before meetings begin.  A771:13-19 (Barfield Depo.); A804:20-23 (Anderson Depo.); A851:2-13 (Fisher Depo.); A907:8-16 (Nelson Depo.); A929:4-11 (Infantini Depo.).

29.     At Board meetings, with extremely rare exceptions, agenda items other than opening invocations are secular in nature.  Def. A-1 (Whitten Aff. ¶ 8).

30.     At its meetings, the Board sometimes considers and votes on matters that affect only one person or a small group of people.  A804:24-805:2 (Anderson Depo.).

31.     The Board sometimes votes on requests for zoning amendments or zoning classification changes that affect only one particular property.  A805:3-7 (Anderson Depo.).

32.     The Board sometimes votes on requests to grant or vacate easements affecting particular properties or locations.  A805:18-21 (Anderson Depo.).

33.     The Board sometimes votes on requests by individual restaurants for permission to sell alcoholic beverages.  A805:22-25 (Anderson Depo.).

34.    Any member of the public who has signed up to do so is allowed to speak on a regular agenda item before the Board votes on the item.  A94 ¶ 135 (Answer to First Amended Complaint).

35.    Typically, after the opening invocation, the Pledge of Allegiance, and (at some meetings) the approval of minutes of past meetings, the first item on a Board-meeting agenda is "Resolutions, Awards, and Presentations."  A39/A94 ¶ 136 (First Amended Complaint and Answer).

36.    Children sometimes appear before the Board to be honored during the "Resolutions, Awards, and Presentations" section of Board meetings.  A806:1-4 (Anderson Depo.).

37.    For example, members of high-school girls' sports teams appeared before the Board at its March 31, 2015 meeting to be honored for winning championships; a high-school student appeared before the Board at its May 12, 2015 meeting to accept a resolution celebrating the fiftieth anniversary of her school; and elementary-school children appeared before the Board at its May 26, 2015 meeting to be honored for winning a speech contest. A39/A94 ¶ 138 (First Amended Complaint and Answer).

38.    Children who attend Board meetings so that they can receive such honors are typically sitting in the main board-room during the opening invocation.  A806:5-9 (Anderson Depo.).

39.    Children also sometimes attend Board meetings to watch someone be honored during the "Resolutions, Awards, and Presentations" segment of the meetings.  A806:10-14 (Anderson Depo.).

40.     Children who attend the Board meetings for this reason are typically sitting in the main board-room during the opening invocation.  A806:15-18 (Anderson Depo.).

41.     County employees also sometimes appear before the Board to be honored during the "Resolutions, Awards, and Presentations" section of Board meetings.  A40/A95 ¶ 143 (First Amended Complaint and Answer).

42.     The employees who attend the Board meetings so that they can receive such honors are typically sitting in the main board-room during the opening invocation.  A806:24-807:3 (Anderson Depo.).

### *Selection of Invocation Speakers*

43.     The invocation speaker for each Board meeting is typically a volunteer cleric invited by Commission staff members or, in some cases, an individual Commissioner.  A44/A96 ¶ 170 (First Amended Complaint and Answer).

44.     The invocation speakers are invited for the specific task of giving an invocation to open the meetings.  A44/A96 ¶ 169 (First Amended Complaint and Answer).

45.     The five Commissioners' offices take turns inviting speakers, following a rotation system.  A44/A96 ¶ 171 (First Amended Complaint and Answer).

46.     Commissioners or their staff use County phones, email systems, and/or mail facilities to invite, communicate with, and schedule potential or scheduled invocation speakers, and in some cases to provide them with instructions or to thank them for delivering invocations.  A729:4-6 (Smith Depo.); A776:10-23 (Barfield Depo.); A815:21-816:21 (Anderson Depo.); A885:11-24 (Bolin Lewis Depo.); A910:12-911:13 (Nelson Depo.);

A932:22-934:1 (Infantini Depo.); A952 No. 1 (County's Answers to Requests for Admissions); A972-96 (sample communications with invocation speakers).

47.    The County phone, email, and mail systems and supplies that are used for these tasks are paid for with County funds.  A729:22-730:2 (Smith Depo.); A777:3-7 (Barfield Depo.); A817:1-5 (Anderson Depo.); A886:8-12 (Bolin Lewis Depo.); A911:14-18 (Nelson Depo.); A934:2-7 (Infantini Depo.); A953 No. 3 (County's Answers to Requests for Admissions).

48.    The County officials or employees who perform these tasks are paid with County funds.  A953 No. 2 (County's Answers to Requests for Admissions).

49.    Invocation speakers do not receive financial compensation for delivering invocations.  Def. A-1 (Whitten Aff. ¶ 2).

50.    Occasionally, the Commissioners have difficulty finding someone to give an opening invocation.  A810:15-18 (Anderson Depo.); A886:18-23 (Bolin Lewis Depo.); A911:24-912:4 (Nelson Depo.); A997-1002 (communications from County staff).

51.    As a result, occasionally a moment of silence is held in lieu of an invocation. A322-29 (invocation summary); A886:24-887:4 (Bolin Lewis Depo.); A912:5-9 (Nelson Depo.).

52.    The Commissioners and their staff do not review drafts of invocations before they are given.  A969-70 ¶¶ (g), (h) (County's Responses to Document Requests).

### *Identities of Invocation Speakers and Nature of Invocations*

53.    Of the 195 invocations given before the Board from January 1, 2010 through March 15, 2016, all but seven were given by Christians or contained Christian content. A322-29 (invocation summary).

54.    Of those seven, six were given by Jews, and one was generically monotheistic. A322-29 (invocation summary).

55.    Of the invocations given before the Board from January 1, 2010 through March 15, 2016, five were delivered by Catholics.  A322-29 (invocation summary); A41/A96 ¶ 158 (First Amended Complaint and Answer).

56.    The invocations are generally, but not always, given by a cleric from the faith-based community.  Def. A-1 (Whitten Aff. ¶¶ 9-10); A42/A96 ¶ 160 (First Amended Complaint and Answer).

57.    Non-clergy who delivered opening invocations have included police officers (on September 26, 2013 and January 6, 2015); staff members of a Congressman's office (on May 6, 2010, February 3, 2011, April 4, 2013, and April 2, 2015); a state judge (on September 23, 2014); County Commissioners (on October 12, 2010, August 21, 2012, November 27, 2012, May 12, 2015, October 20, 2015, December 15, 2015, and March 15, 2016); aides to the Commissioners (on April 1, 2010, August 5, 2010, September 28, 2010, November 4, 2010, and December 2, 2010); and a lay leader of the Church of Jesus Christ of Latter-day Saints (on March 4, 2014).  A42/A96 ¶ 160 (First Amended Complaint and Answer); A329 (invocation summary).

58.     While most of the clergy-given opening invocations are given by leaders of houses of worship, some of them are not.  A42/A96 ¶ 162 (First Amended Complaint and Answer).

59.     For example, opening invocations have been given by the chaplain of a minor-league baseball team (on September 16, 2014); chaplains of a jail and prison ministry (on February 4, 2010, February 18, 2014, and August 18, 2015); a chaplain of a hospice (on March 23, 2010); hospital chaplains (on September 6, 2011 and March 5, 2015); a chaplain of a private school (on March 22, 2011 and April 3, 2014); chaplains of veterans' organizations (on November 29, 2011, January 24, 2012, and August 7, 2014); the chaplain of the Brevard County Sheriff's Office (on July 7, 2015 and March 1, 2016); a chaplain of a city police department (on May 26, 2016); the chaplain of the Florida Federation of Republican Women and the Brevard Federated Republican Women (on March 29, 2016); a university's campus minister (on May 3, 2016); a rabbi affiliated with two higher-education institutions (on May 5, 2016); and a retired minister (on May 18, 2010).  A42/A96 ¶ 163 (First Amended Complaint and Answer); A329 (invocation summary); A1187 (supplemental invocation summary).

60.     All of the invocations given before the Board from January 1, 2010 through March 15, 2016 had at least some theistic content.  A330-536 (invocation transcripts); Def. A-1 (Whitten Aff. ¶ 30).

61.     The opening invocation delivered by a police officer on January 6, 2015 consisted principally of the reading of a 1968 speech by Robert F. Kennedy that had no religious content.  After reciting the speech, the police officer closed the invocation with a few religious references: "God bless you all," "God bless the United States of America," and a

10

request for prayer for fallen police officers.  A43/A96 ¶ 165 (First Amended Complaint and

Answer).

62.    Although it concluded with a religious prayer, the first half of the opening

invocation delivered by a Catholic deacon on May 28, 2015 lacked religious content.  The

deacon said in the invocation's first half:

> Teddy Roosevelt was a man who had a reputation for being frank and direct. In 1900, a year before he entered the White House, he made these words:
>
>> No community is healthy where it is ever necessary to distinguish one politician from his fellow because he is honest.  Moreover, it is not enough that a public official should be honest.  No amount of honesty will avail if he is not also brave and wise.  The weakling and the coward cannot be saved by honesty alone.
>
> Leadership requires two virtues that seem very simple until they become very inconvenient, and these are honesty and courage.  All of you have earned the right to be here today by winning the trust of the people of Brevard.  But along with that honor comes a duty of humility, integrity, and public service.

A43/A96 ¶ 166 (First Amended Complaint and Answer).

63.    On August 21, 2012, Commissioner Trudie Infantini delivered the following

opening invocation:

> Let us pray.  Heavenly father, as we the elected body for the citizens of Brevard County conduct the people's business, I pray that you guide us in the decisions we make and help us remember these words of our Founding Fathers as written in our Declaration of Independence:  "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."  Please guide the Commission to be mindful of the rights and the freedoms of all the individuals.  Amen.

A43-44/A96 ¶ 163 (First Amended Complaint and Answer); A414 (invocation transcript).

*Invocation Procedures*

64.   For each of the Board's board-room meetings, the first item listed on the agenda is the "Call to Order," the second item listed is the "Invocation," and the third item listed is the Pledge of Allegiance.  A45/A97 ¶ 177 (First Amended Complaint and Answer); Def. A-1 (Whitten Aff., Ex. A).

65.   The selected invocation speaker's name often appears on the agenda.  A45/A97 ¶ 178 (First Amended Complaint and Answer).

66.   Typically, at the beginning of each meeting, the County Commissioner who has selected the invocation speaker introduces the speaker.  A45/A97 ¶ 179 (First Amended Complaint and Answer); Def. A-1 (Whitten Aff. ¶ 17).

67.   Prior to the invocation, some Board chairpersons ask the audience to stand for a prayer and the Pledge of Allegiance.  Def. A-1 (Whitten Aff. ¶ 11).

68.   The audience is asked to stand out of respect for the religion of the person giving the invocation and to remain standing for the Pledge of Allegiance.  A913:12-17 (Nelson Depo.).

69.   Some chairpersons simply stand, and the Commissioners and the audience usually follow suit.  Def. A-1 (Whitten Aff. ¶ 11); Barfield Tr. 14:14-18.

70.   All the Commissioners stand for the invocation.   A731:21-23 (Smith Depo.).

71.   All audience members typically stand for the invocation.  A860:15-18 (Fisher Depo.).

72.   On occasion, some audience members do not stand.  Def. A-1 (Whitten Aff. ¶ 12).

73.     There is no evidence in the record that Commissioners' decisions on items before the Board have been influenced by whether a person participated in or stood for the invocation, or that Commissioners have otherwise treated citizens differently as a result of a citizen's standing or not standing for the invocation.  Def. A-1 (Whitten Aff. ¶¶ 13-15).

74.     The invocation speaker speaks from a lectern at the front of the main board-room. Def. A-1 (Whitten Aff. ¶ 17).

75.     The lectern in the main board-room has no County seal.  Def. A-1 (Whitten Aff. ¶ 18).

76.     The invocation speaker usually faces the Commissioners.  Def. A-1 (Whitten Aff. ¶¶ 19-20).

77.     Often, at the invitation of the Commissioner who introduces the invocation speaker, the invocation speaker spends up to a few minutes providing some information about their house of worship or organization and its activities before commencing the opening invocation.  A45/A97 ¶ 182 (First Amended Complaint and Answer); A707 ¶ 5 (Resolution No. 2015-101); Def. A-1 (Whitten Aff. ¶ 19).

78.     At the conclusion of the invocation, a Commissioner usually asks the audience to join in the Pledge of Allegiance, turns toward the flag, and leads the Pledge of Allegiance. Def. A-1 (Whitten Aff. ¶ 21).

79.     At the conclusion of the Pledge, the Board chair or the Commissioner who invited the invocation speaker typically thanks the speaker, and the invocation speaker then leaves the lectern.  Def. A-1 (Whitten Aff. ¶ 22).

80.   The County does not give any award, plaque, or certificate to invocation speakers. Def. A-1 (Whitten Aff. ¶ 23).

81.   There is no County or Board rule or regulation requiring attendees of Board meetings to remain in the main board-room during the invocation, or prohibiting members of the public from entering or leaving the main board-room at any time during a meeting.  Def. A-1 (Whitten Aff. ¶¶ 25-26).

### *The Plaintiffs*

82.   Five individuals are plaintiffs in this case: Keith Becher, Chase Hansel, Jeffery Koeberl, David Williamson, and Ronald Gordon.  Three organizations are plaintiffs in this case: Humanist Society of the Space Coast ("HCSC"), Space Coast Freethought Association ("SCFA"), and Central Florida Freethought Community ("CFFC").  A9-36 ¶¶ 9-103 (First Amended Complaint).

83.   Plaintiffs Becher, Hansel, Koeberl, and Gordon are residents of Brevard County. A108 ¶ 1 (Becher Decl.); A123 ¶ 1 (Hansel Decl.); A134 ¶ 1 (Koeberl Decl.); A159 ¶ 1 (Gordon Decl.).  Plaintiff Williamson is a resident of Seminole County.  A144 ¶ 1 (Williamson Decl.).

84.   Plaintiffs Hansel and Gordon own homes in Brevard County and pay property taxes to Brevard County.  A123 ¶ 1 (Hansel Decl.); A159 ¶ 1 (Gordon Decl.).

85.   All five individual plaintiffs identify as atheists.  Plaintiffs Becher, Hansel, Koeberl, and Williamson also identify as Secular Humanists.  A108 ¶ 2 (Becher Decl.); A123 ¶ 2 (Hansel Decl.); A134 ¶ 2 (Koeberl Decl.); A144 ¶ 2 (Williamson Decl.); A160 ¶ 2 (Gordon Decl.).

14

86.   As described by the American Humanist Association ("AHA"), "Humanism is a progressive philosophy of life that, without theism and other supernatural beliefs, affirms our ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater good of humanity."  A307 (AHA webpage).

87.   The AHA further states that "Humanism encompasses a variety of nontheistic views (atheism, agnosticism, rationalism, naturalism, secularism, and so forth) while adding the important element of a comprehensive worldview and set of ethical values — values that are grounded in the philosophy of the Enlightenment, informed by scientific knowledge, and driven by a desire to meet the needs of people in the here and now."  A304 (AHA webpage).

88.   Plaintiff CFFC is an affiliate of the AHA.  A149 ¶ 16 (Williamson Decl.).

89.   A document entitled Humanist Manifesto III sets forth a detailed statement of basic Humanist beliefs.  A310-11.

90.   Among the Humanist beliefs set forth in Humanist Manifesto III are the following:

a.   "Humanism is a progressive philosophy of life that, without supernaturalism, affirms our ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater good of humanity."

b.   "The lifestance of Humanism—guided by reason, inspired by compassion, and informed by experience—encourages us to live life well and fully.  It evolved through the ages and continues to develop through the efforts of thoughtful people who recognize that values and ideals, however carefully wrought, are subject to change as our knowledge and understandings advance."

c. "Knowledge of the world is derived by observation, experimentation, and rational analysis.  Humanists find that science is the best method for determining this knowledge as well as for solving problems and developing beneficial technologies.  We also recognize the value of new departures in thought, the arts, and inner experience—each subject to analysis by critical intelligence."

d. "Humans are an Integral part of nature, the result of unguided evolutionary change.  Humanists recognize nature as self-existing.  We accept our life as all and enough, distinguishing things as they are from things as we might wish or imagine them to be.  We welcome the challenges of the future, and are drawn to and undaunted by the yet to be known."

e. The Humanist Manifesto III "is part of an ongoing effort to manifest in clear and positive terms the conceptual boundaries of Humanism, not what [Humanists] must believe but a consensus of what [Humanists] do believe."

A310.

91.   The individual plaintiffs' atheistic and Humanist beliefs are strongly held and very important to them, having a place in their lives equal to the significance that theistic beliefs have in the lives of Christians, Jews, and adherents of other monotheistic faiths.  A114 ¶ 14 (Becher Decl.); A125-26 ¶ 9 (Hansel Decl.); A140 ¶ 15 (Koeberl Decl.); A149 ¶ 15 (Williamson Decl.); A161 ¶ 7 (Gordon Decl.).

92.   All the individual plaintiffs view their atheistic or Humanist beliefs as a "religion" as defined under the law and for purposes of how they should be classified with respect to

religion.  A114 ¶ 14 (Becher Decl.); A125-26 ¶ 9 (Hansel Decl.); A140 ¶ 15 (Koeberl Decl.);

A149 ¶ 15 (Williamson Decl.); A161 ¶ 7 (Gordon Decl.).

93.    Plaintiffs Becher, Koeberl, and Williamson are ordained as Humanist clergy by the

Humanist Society; Mr. Becher and Mr. Williamson are Humanist Celebrants, and Mr.

Koeberl is a Humanist Celebrant and Chaplain.  A109-10 ¶ 5 (Becher Decl.); A135 ¶ 5

(Koeberl Decl.); A145-46 ¶ 5 (Williamson Decl.); A253-62 (ordination certificates and

endorsement letters).

94.    Plaintiffs HCSC, SCFA, and CFFC are organizations for nontheists.  A114 ¶ 17

(Becher Decl.); A126 ¶ 12 (Hansel Decl.); A150 ¶ 17 (Williamson Decl.).

95.    Their members are principally atheists, agnostics, Humanists, and other nontheists.

A114 ¶ 17 (Becher Decl.); A126 ¶ 12 (Hansel Decl.); A150 ¶ 17 (Williamson Decl.).

96.    HCSC and SCFA are headquartered in Brevard County and most of their members

reside in Brevard County.  A114 ¶¶ 16-17 (Becher Decl.); A126 ¶¶ 11-12 (Hansel Decl.).

CFFC is headquartered in Seminole County and has members throughout Central Florida,

including many in Brevard County.  A149-50 ¶¶ 16-17 (Williamson Decl.).

97.    HCSC, SCFA, and CFFC regularly hold meetings at which their members discuss

nontheistic beliefs and get to know other nontheists; educational and outreach events that

teach about nontheism; community-service events; and celebratory events.  A115-17 ¶¶ 19-

22 (Becher Decl.); A127-28 ¶¶ 14-17 (Hansel Decl.); A150-51 ¶¶ 19-21 (Williamson Decl.).

98.    Plaintiff Becher is President and Organizer of HCSC and a member of the boards

of directors of HCSC, SCFA, and CFFC.  A110 ¶ 8 (Becher Decl.).  Plaintiff Hansel is

President of SCFA and a member of SCFA's board of directors.  A124 ¶ 5 (Hansel Decl.).

Plaintiff Koeberl is Vice-President and Co-Organizer of HCSC and a member of the boards of directors of HCSC and SCFA.  A137 ¶ 9 (Koeberl Decl.).  Plaintiff Williamson is the founder and Chair of CFFC and a member of its board of directors.  A147 ¶ 8 (Williamson Decl.).

99.    As leaders of the organizational plaintiffs, plaintiffs Becher, Hansel, Koeberl, and Williamson conduct meetings and events, lead discussions of nontheistic beliefs at meetings, organize community-service events, spearhead public outreach, and act as their organizations' principal contacts.  A117 ¶ 24 (Becher Decl.); A128 ¶ 19 (Hansel Decl.); A137-38 ¶ 10 (Koeberl Decl.); A152 ¶ 23 (Williamson Decl.).

100.   Thus, plaintiffs Becher, Hansel, Koeberl, and Williamson serve roles for the organizational plaintiffs similar to that of a congregational leader of a church or synagogue. A117 ¶ 24 (Becher Decl.); A128 ¶ 19 (Hansel Decl.); A137-38 ¶ 10 (Koeberl Decl.); A152 ¶ 23 (Williamson Decl.).

101.   Plaintiff Gordon is a member of SCFA.  A160 ¶ 4 (Gordon Decl.).

102.   The individual plaintiffs engage in community service based on their nontheistic beliefs, read and study seminal texts about their belief systems, follow leading authors of such texts, and have special days of the year on which they observe their beliefs.  A111-14 ¶¶ 9-13 (Becher Decl.); A124-25 ¶¶ 4-8 (Hansel Decl.); A137-40 ¶¶ 10-14 (Koeberl Decl.); A148-49 ¶¶ 13-14 (Williamson Decl.); A160-61 ¶¶ 5-6 (Gordon Decl.).

103.   All of the individual plaintiffs are members of the Freedom From Religion Foundation ("FFRF") or AHA.  A110-11 ¶ 8, A114 ¶ 16 (Becher Decl.); A137 ¶ 9 (Koeberl Decl.); A147 ¶ 9, A149 ¶ 16 (Williamson Decl.); A160 ¶ 4 (Gordon Decl.); *see also* Hansel

Tr. at 8:16-9:1 (this record cite does not make clear that plaintiff Hansel is currently an FFRF member, but he has confirmed that he is).

104.   CFFC is a chapter of FFRF.   A149 ¶ 16 (Williamson Decl.).

105.   The websites of FFRF and AHA contain some articles and posts, and some plaintiffs have read texts relating to their belief systems containing some statements, that are critical of theistic religions and could offend or be viewed as hostile by some adherents.   *See* A709 ¶¶ 19-20 (Resolution No. 2015-101); books cited at A15 ¶ 29, A20 ¶ 44, A24 ¶ 58, A28 ¶ 71 (First Amended Complaint).

106.   Many of the plaintiffs and plaintiffs' members have felt discriminated against and negative treatment as a result of their atheistic beliefs.   A114 ¶ 15 (Becher Decl.); A126-28 ¶¶ 10, 16 (Hansel Decl.); A151 ¶ 21 (Williamson Decl.); A161 ¶ 8 (Gordon Decl.).

107.   Plaintiffs Becher and Williamson have attended Board meetings, where the audience was invited to rise for invocations.   A117-18 ¶ 25 (Becher Decl.); A155 ¶ 33 (Williamson Decl.).

108.   All five individual plaintiffs have watched Board meetings or portions on television or the internet.   A117-18 ¶ 25 (Becher Decl.); A130 ¶ 25 (Hansel Decl.); A141 ¶ 20 (Koeberl Decl.); A155 ¶ 35 (Williamson Decl.); A163 ¶ 15 (Gordon Decl.).

109.   All five individual plaintiffs intend to attend Board meetings in the future.   A117-18 ¶ 25 (Becher Decl.); A130 ¶ 25 (Hansel Decl.); A141 ¶ 20 (Koeberl Decl.); A155 ¶ 35 (Williamson Decl.); A163 ¶ 15 (Gordon Decl.).

110.   To benefit the Board, serve their community, and combat anti-atheist prejudice by demonstrating how nontheists can contribute to society, the plaintiffs would like to give

19

opening invocations at Board meetings.  A118-19 ¶ 27 (Becher Decl.); A129 ¶ 21 (Hansel

Decl.); A141 ¶ 17 (Koeberl Decl.); A152 ¶ 24 (Williamson Decl.); A161 ¶ 9 (Gordon Decl.).

111.  Nontheists have delivered invocations at many governmental meetings around the

country.  A221-51 (compilation of nontheistic invocations).

### Requests by Nontheists to Give Opening Invocations and Board Responses

112.  On May 9, 2014, plaintiff Williamson sent the Board the letter attached as Exhibit

43 to Plaintiffs' Summary-Judgment Motion, making the following request on behalf of

plaintiff CFFC:

> [I]t is clear that local government meetings should include Humanist invocations as
> well as those from any other religious minorities.  Therefore, **we respectfully request
> the opportunity to offer invocations at your meetings.**

A660-61 (emphasis in original).

113.  On July 22, 2014, plaintiff Williamson sent the Board the letter attached as Exhibit

44 to Plaintiffs' Summary-Judgment Motion, making the following request on behalf of

plaintiff CFFC:

> [T]his letter demands that Brevard County permit a member of our organization to
> deliver an invocation and to ensure its selection procedures for invocations comport
> with the Constitutions of Florida and of the United States.

A663-65.

114.  The Board held a meeting on August 19, 2014, and plaintiff Williamson's letters

were addressed at this meeting.  A46/A97 ¶ 189 (First Amended Complaint and Answer).

115.  At the August 19 meeting, the Board unanimously approved a motion providing

that a response letter — which was appended to the agenda item, signed by then-Board-Chair

Mary Bolin Lewis, and dated August 19, 2014 — be sent to plaintiff Williamson.  A47/A98 ¶

195 (First Amended Complaint and Answer).  A copy of the agenda item, with the response

letter, is attached as Exhibit 46 to Plaintiffs' Summary-Judgment Motion.  A679-81.

116.  The August 19 letter was sent to plaintiff Williamson shortly after the August 19

meeting.  A47/A98 ¶ 196 (First Amended Complaint and Answer).

117.  The August 19 letter stated, in part:

> The Invocation portion of the agenda is an opening prayer presented by members of
> our faith community.  The prayer is delivered during the ceremonial portion of the
> County's meeting and typically invokes guidance for the County Commission from
> the highest spiritual authority, a higher authority which a substantial body of Brevard
> constituents believe to exist.  The invocation is also meant to lend gravity to the
> occasion, to reflect values long part of the County's heritage and to acknowledge the
> place religion holds in the lives of many private citizens in Brevard County.

> Your website leads us to understand your organization and its members do not share
> those beliefs or values which, of course, is your choice under the laws of the United
> States.  However, this Commission chooses to stand by the tradition of opening its
> meetings in a manner acknowledging the beliefs of a large segment of its
> constituents. . . .

> . . .  You or your Brevard members have the opportunity to speak for three minutes on
> any subject involving County business during the Public Comment portion of our
> meeting.  County business clearly includes the subject of pre-meeting prayers at
> County Commission meetings.  As a practical matter, there are no restrictions on
> what is said during those three minutes.  During Public Comment presentations, this
> Board has politely listened to Bible readings; political points of view of all varieties;
> and some of our citizens' sharpest critiques and criticisms of County staff and the
> County Commission, among other things.

> During that segment, members of your organization are free to speak their views and
> beliefs, or even a closing supplication.  You or your members are also free to invoke
> whatever authorities they choose, including but not limited to, those you have quoted
> on your website. . . .

A680-81.

118.  In August and September 2014, plaintiff Gordon sent emails to District 3

Commissioner Trudie Infantini informing her that he was an atheist and offering to give an

invocation at a Board meeting; Commissioner Infantini did not accept plaintiff Gordon's offer.  A162-63 ¶¶ 12-14 (Gordon Decl.).  A copy of plaintiff Gordon's correspondence with Commissioner Infantini is attached as Exhibit 47 to Plaintiffs' Summary Judgment Motion.  A683-85.

119.  On August 21, 2014, the Rev. Ann Fuller (not a plaintiff in this case) sent an email to all five members of the Board.  In the email, Rev. Fuller informed the Board that she is a Brevard County resident, "ordained clergy," and a "known humanist in the community."  She added that she has "served Brevard County humanists as a Community Minister since 2006 affiliated with the UU [Unitarian Universalist] Church of Brevard in West Melbourne and the UU Congregation of Cocoa"; has "officiated countless humanist weddings, funerals, and child dedications for both UUs in our community and humanists"; and gave an invocation some years ago at the ceremonial groundbreaking for a senior center at the invitation of the Brevard County Parks and Recreation Department.  She requested "an opportunity to give an invocation at an upcoming board meeting."  A50/A99 ¶ 209 (First Amended Complaint and Answer).

120.  The same day, District 3 Commissioner Infantini responded to Rev. Fuller through an email that stated, in relevant part:

> I am willing to have most anyone offer an invocation.  However, by definition, an invocation is seeking guidance from a higher power.  Therefore, it would seem that anyone without a "higher power" would lack the capacity to fill that spot. . . .

> Further, I welcome "freethinkers" being the only "freethinker" on the board.  It just doesn't seem like the invocation is the correct place for it is all.

A50/A99 ¶ 210 (First Amended Complaint and Answer).

22

121.   On or about August 28, 2014, the Board received a letter from the Anti-Defamation League ("ADL") objecting to the Board's decision on the issue of nontheistic invocations.  A51/A99 ¶ 216 (First Amended Complaint and Answer).  A copy of this letter is attached to Plaintiffs' Summary Judgment motion as Exhibit 48.  A687-88.

122.   At a November 6, 2014 meeting, the Board unanimously approved a motion providing that a response letter — signed by then-Board-Chair Mary Bolin Lewis, and dated November 6, 2014 — be sent to the ADL.  A51/A99 ¶ 217 (First Amended Complaint and Answer).  A copy of the agenda memo and the response letter is attached to Plaintiffs' Summary Judgment Motion as Exhibit 49.  A690-92.

123.   The November 6 letter was sent to the ADL shortly after the November 6 meeting. A51/A99 ¶ 218 (First Amended Complaint and Answer).

124.   The November 6 letter stated, in part:

> [Y]our suggestion to allow atheists to provide the invocation would, in fact, show hostility toward the faith-based community . . . .  Therefore, this Board has no desire to follow your suggested action since that action could be easily construed, either overtly or by implication, as evidencing vicarious disdain, scorn or disrespect for the beliefs of our faith-based community.
>
> . . .  It follows that the Board's decision to avoid hostility toward the faith-based community precludes any claim of discrimination.  Indeed, if your characterization of secular humanism as a religion is valid, modifying the county's time-honored pre-meeting tradition by affording a secular humanist the opportunity to recite a secular "prayer" during the faith-based invocation portion of the Board's agenda could be perceived as [] endorsing a specific religion—*secular humanism*—in violation of the Establishment Clause because all Board actions at the meeting held following such a *secular "prayer"* invariably involve an underlying *secular purpose*.  Atheists or secular humanists are still afforded an opportunity to speak their thoughts or supplications during the secular business portion of the agenda under "public comment."

A691.

125.  On January 26, 2015, Ayesha Khan, then Legal Director for Americans United for Separation of Church, sent a letter signed by her to the Board titled "Nontheists' Delivery of Opening Invocations."  A694-97.  The first paragraph of that letter stated that "the Board of County Commissioners of Brevard County has long maintained a policy of having its meetings opened with an invocation by a religious leader from the community.  To date, all of the invited individuals have been theists, i.e., believers in a deity; requests from nontheists have been denied on the ground that belief in a higher power is a precondition to offering the invocation.  In light of the recent change in the Board's leadership, we write on behalf of several national legal organizations to ask that you reconsider this limitation."  A694.

126.  The signature block of the January 26, 2015 letter included Americans United for Separation of Church and State ("AU"), FFRF, the American Civil Liberties Union, and the American Civil Liberties Union of Florida, and set forth the name of a representative for each one of those organizations.  A697.

127.  The January 26, 2015 letter to the Board requested that plaintiffs Williamson and Hansel, as well as non-plaintiff Rev. Fuller, be granted the opportunity to deliver an opening invocation at a Board meeting.  A52/A99 ¶ 220 (First Amended Complaint and Answer).  A copy of this letter (not including exhibits to it) is attached to Plaintiffs' Summary Judgment Motion as Exhibit 50.  A694-97.

128.  Neither the Board nor any Commissioner responded to the January 26, 2015 letter. A52/A99 ¶ 221 (First Amended Complaint and Answer).

129.  On May 26, 2015, AU, FFRF, the American Civil Liberties Union, and the American Civil Liberties Union of Florida sent another letter to the Board requesting that

plaintiffs Williamson, Hansel, Becher, Gordon, and Koeberl, or other representatives of

plaintiffs CFFC, SCFA, and HCSC, be granted the opportunity to deliver an opening

invocation at a Board meeting.  A52/A99 ¶ 222 (First Amended Complaint and Answer).

The letter stated, "We now supplement our January 26, 2015 letter."  A699.  A copy of this

letter is attached to Plaintiffs' Summary Judgment Motion as Exhibit 51.  A699-701.

130.   The County Attorney sent a letter to the plaintiffs' counsel on May 28, 2015,

stating that he would bring the May 26 letter before the Board at its next meeting on July 7,

2015.  A99 ¶ 223 (Answer to First Amended Complaint).  A copy of this letter is attached to

Plaintiffs' Summary Judgment Motion as Exhibit 52.  A703.

131.   At the July 7, 2015 Board meeting, the Board responded to the May 26, 2015 letter

by adopting Resolution 2015-101.  Def. A-2.

A true and correct copy of Brevard County Commission Resolution 2015-101 and all

exhibits attached to that resolution is set forth as Exhibit DW-77 to the Williamson

Deposition filed in this case.  Def. A-2.  Resolution 2015-101 contains "Findings" and

"Conclusions" sections that are incorporated into an opening-invocation policy.  The

"Findings" and "Conclusions" sections of Resolution 2015-101 include the following

statements:

> 18. FFRF sponsors a webpage that invites persons to sign up for the opportunity to post "Your Godless quotes" on a "cyberboard campaign" designed to allow participants to proclaim that they are "a freethinker and why."

> 19. Apparently, the FFRF staff then selects certain "Godless quotes" to post on their website at their www.ffrf.org/out/staffpicks page of that website. Many of the quotes selected for the FFRF "staff picks" page are openly scoffing, mocking, demeaning, extremely hostile and even hateful toward traditional faith-based monotheistic religions, such as those that are represented before the Board during the invocation

presented at any regular Board meeting. Examples of these quotes posted as of June 21, 2015 . . . include:

    a. "Religion is the most devastating weapon ever used against humanity";

    b. "Superman is objectively better than Jesus, because Superman will save you whether you believe in him or not."

    c. "God-The most vengeful, jealous, pernicious, unloving dead beat Dad ever. Who also has superpowers to see and hear everything you do. Really? Who wants to sign up for that?"

    d. "The Bible is just a story. It's not even a very good one."

    e. "The church is a charity in precisely the same way that a tapeworm is a weight loss program."

    f. "I am a nonbeliever because there is historical and empirical proof that all religions are evil."

20. FFRF has engaged in this cyberboard campaign at least back to September of 2014 where other hostile quotes were posted at www.ffrf.org/out/stack/stack/2/. The same types of scoffing, mocking and hostile comments appeared on that page. (See Composite Exhibit I) Examples of those statements (the first of which omits the full spelling of a common epithet) include:

    a. "Your God is an a____, for the Bible tells me so."

    b. "Ditch God belief and re-join the real world."

    c. "I view religion like cancer. Just because a bunch of people have it doesn't make it a good thing."

    d. "How can I be good without God? I am not a socio-path."

    e. "History shows that as scientific knowledge increases, the need for the supernatural decreases."

. . . .

30. CFFC-affiliated speakers giving invocations at other local government meetings have exploited the opportunity to proselytize and advance their own beliefs while disparaging the beliefs of faith-based religions.

36. . . . the Board finds that yielding to FFRF and AUSCS views by supplanting traditional ceremonial pre-meeting prayer before the Board's secular business agenda at regular Board meetings—a segment reserved for the acknowledgement and interaction with the county's faith-based community—with an "invocation" by atheists, agnostics or other persons represented by or associated with FFRF and AUSCS could be viewed as County hostility toward monotheistic religions whose theology and principles currently represent the minority view in Brevard County. The Board concludes that such action may be deemed to violate the Constitution of the State of Florida.

37. . . . the organizations requesting the substitution of Secular Humanists or atheists to conduct a pre-meeting invocation by displacing representatives of the minority faith-based monotheistic community which has traditionally given the pre-meeting prayer, could be viewed as the Board endorsement of Secular Humanist and Atheist principles in view of:

> a. the overwhelmingly secular nature of the Board's business meeting following the invocation; and
> b. the evidence suggesting that the requesting organizations are engaged in nothing more than a carefully orchestrated plan to promote or advance principles of Secular Humanism through the displacement or elimination of ceremonial deism traditionally provided by monotheistic clerics giving pre-meeting prayers.

38. All of the organizations seeking the opportunity to provide an invocation have tenets or principles paying deference to science, reason and ethics, which, in most cases, are the disciplines the Board must consider, understand and utilize when acting upon secular items presented for consideration during the Board's secular business agenda.

39. Therefore, the Board finds that deferring consideration or presentation of a secular humanist supplication during the Public Comment portion of the agenda immediately after the consent agenda—which is the first item on the secular business agenda is acted upon—does not deny or unreasonably restrict the opportunity of the requesting parties to present their Secular Humanist or atheistic invocations, supplications, instruction, petitions for redress of grievances or comments, all of which can be presented during the portion of the agenda reserved for secular business matters.

Def. A-2.

132. At its July 7, 2015 meeting, the Board unanimously approved Resolution No. 2015-101. A53/A100 ¶ 224 (First Amended Complaint and Answer). A copy of this resolution, without exhibits, is attached as Exhibit 53 to Plaintiffs' Summary Judgment Motion. A705-16. The exhibits were filed as part of Exhibit B to the County's Answer to Plaintiffs' original Complaint (Doc. Nos. 24-3 to 24-11, filed July 29, 2015).

133. Resolution No. 2015-101 adopted a formal policy that "allows the traditional faith-based invocation prior to the beginning of the Board's secular business agenda and

subsequent 'secular invocations' during the Public Comment section of that secular agenda."
A53/A100 ¶ 225 (First Amended Complaint and Answer) (quoting A705).

134.   The resolution states, "the Board wishes to formalize a policy on invocations that is not hostile to faith-based religions and that does not endorse secular humanism or non-belief over traditional faith-based religions comprised of constituents who believe in God." A53/A100 ¶ 226 (First Amended Complaint and Answer) (quoting A706).

135.   The resolution asserts, "For at least the past forty-four years, the Brevard County Board of County Commissioners has observed the tradition of calling for a ceremonial invocation in the form of a short prayer delivered prior to the commencement of the Board's business agenda at regular meetings of the Board."  A53/A100 ¶ 227 (First Amended Complaint and Answer) (quoting A706 ¶ 1).

136.   The resolution further states:

   4. On a rotating basis, individual Board members have predominately selected clerics from monotheistic religions and denominations—including Christian, Jewish and Muslim—to present the invocation.

   5. Prior to the invocation, in recognition of the traditional positive role faith-based monotheistic religions have historically played in the community, the Board through one or more of its member[s], typically interacts with the presenting cleric by offering the cleric the opportunity to tell the Board, meeting attendees and the viewing audience something about their religious organization, which may include the organization's location and ongoing and future programs or events that might be of interest to the community at large.

   6. Virtually all invocations and opportunities to speak afforded to clerics during the invocation segment prior to a regular meeting last less than five minutes.

A53-54/A100 ¶ 228 (First Amended Complaint and Answer) (quoting A707).

137.   The resolution further asserts:

> supplanting traditional ceremonial pre-meeting prayer before the Board's secular business agenda at regular Board meetings—a segment reserved for the acknowledgement and interaction with the county's faith-based community—with an "invocation" by atheists, agnostics or other persons represented by or associated with [Freedom From Religion Foundation] and [Americans United for Separation of Church and State] could be viewed as County hostility toward monotheistic religions whose theology and principles currently represent the minority view in Brevard County.

A54/A100 ¶ 229 (First Amended Complaint and Answer) (quoting A714 ¶ 36).  The

resolution also asserts that

> the substitution of Secular Humanists or atheists to conduct a pre-meeting invocation by displacing representatives of the minority faith-based monotheistic community which has traditionally given the pre-meeting prayer, could be viewed as the Board endorsement of Secular Humanist and Atheist principles in view of:
>
> > a. the overwhelmingly secular nature of the Board's business meeting following the invocation; and
> >
> > b. the evidence suggesting that the requesting organizations are engaged in nothing more than a carefully orchestrated plan to promote or advance principles of Secular Humanism through the displacement or elimination of ceremonial deism traditionally provided by monotheistic clerics giving pre-meeting prayers.

A714-15 ¶ 37.

138.   The resolution contains a detailed analysis of the beliefs of Secular Humanists and

organizations with which plaintiffs are affiliated.  A708-13.

139.   The resolution thus amends prior Board resolutions concerning public comment by

adding a paragraph that includes the following sentences:

> Secular invocations and supplications from any organization whose precepts, tenets or principles espouse or promote reason, science, environmental factors, nature or ethics as guiding forces, ideologies, and philosophies that should be observed in the secular business or secular decision making process involving Brevard County employees, elected officials, or decision makers including the Board of County Commissioners, fall within the current policies pertaining to Public Comment and must be placed on the Public Comment section of the secular business agenda.  Pre-

meeting invocations shall continue to be delivered by persons from the faith-based community in perpetuation of the Board's tradition for over forty years.

A54/A100 ¶ 230 (First Amended Complaint and Answer) (quoting A715-16).

140.  The resolution also states, as paragraph 39:

39. Therefore, the Board finds that deferring consideration or presentation of a secular humanist supplication during the Public Comment portion of the agenda immediately after the consent agenda—which is the first item on the secular business agenda is acted upon—does not deny or unreasonably restrict the opportunity of the requesting parties to present their Secular Humanist or atheistic invocations, supplications, instruction, petitions for redress of grievances or comments, all of which can be presented during the portion of the agenda reserved for secular business matters.

Def. A-2 ¶ 39.

141.  At the time that the Board's August 19, 2014 letter was approved, the "Public Comment" section of a Board meeting occurred at the end of each regular Board meeting. A48/A98 ¶ 198 (First Amended Complaint and Answer).

142.  On December 16, 2014, the Board passed a resolution moving up the first thirty minutes of the "Public Comment" section so that it occurs after the "Resolutions, Awards, and Presentations" and "Consent Agenda" sections of each regular Board meeting.  A48/A98 ¶ 199 (First Amended Complaint and Answer).

143.  Under the December 16 resolution, if the "Public Comment" section is not concluded within thirty minutes, the remainder occurs "at the conclusion of business specified on the regular commission agenda."  A48/A98 ¶ 200 (First Amended Complaint and Answer).

144.  As stated in Resolution 2015-101, "The Board does restrict each Public Comment speaker to three minutes of speaking time."  A54/A100 ¶ 231 (First Amended Complaint and Answer) (quoting A714 ¶ 34).

145.  Typically, some members of the audience leave a Board meeting before the first "Public Comment" section begins.  A807:16-19 (Anderson Depo.).

146.  At a typical meeting, most of the audience has left before the beginning of the second "Public Comment" section (if it is held at all).  A723:18-25 (Smith Depo.).

147.  "As a practical matter, there are no restrictions on what is said" during "Public Comment" (A680 (August 19, 2014 letter from Board)), and speakers have discussed topics such as the County's feral-cat policy (A600 (meeting minutes)), the naming of streets (A615 (meeting minutes)), and governmental conspiracy theories (A615-16 (meeting minutes)).

148.  A person speaking during the "Public Comment" section of a Board meeting would be permitted to give a Christian prayer during his or her remarks.  A724:1-9 (Smith Depo.); A771:20-24 (Barfield Depo.); A808:18-22 (Anderson Depo.); A851:14-18 (Fisher Depo.); A929:15-20 (Infantini Depo.).

149.  No plaintiff has ever delivered a secular invocation during the "Public Comment" section of a Board meeting.  Plaintiffs' Responses to Requests for Admissions Nos. 2-3 (Ex. 2 to County's Summary Judgment Motion).

***Statements of and Communications with County Commissioners Concerning Invocations***

150.  The five current Commissioners on the Board are Curt Smith, Jim Barfield, Robin Fisher, Andy Anderson, and Trudie Infantini.  A720:21-23 (Smith Depo.); A769:21-23 (Barfield Depo.); A803:3-5 (Anderson Depo.); A848:23-25 (Fisher Depo.); A926:18-20 (Infantini Depo.).  Commissioners Fisher, Anderson, and Infantini have been Commissioners since 2008.  A803:6-8 (Anderson Depo.); A849:1-4 (Fisher Depo.); A926:21-25 (Infantini Depo.).  Commissioners Smith and Barfield became members of the Board in November

31

2014.  A720:24-721:1 (Smith Depo.); A769:24-770:1 (Barfield Depo.).  They succeeded

Mary Bolin Lewis and Chuck Nelson, who were Board members when it approved the

August 19, 2014 and November 6, 2014 letters described above.  A681, A692 (letters);

A906:9-10 (Nelson Depo.).

151.  Resolution No. 2015-101 was sponsored by Commissioner Smith.  A55/A100 ¶

232 (First Amended Complaint and Answer).

152.  In his deposition, Commissioner Smith testified as follows:

> Q And so if allowing atheists to give the invocation could be viewed as board
> endorsement of atheism does allowing Christian invocations mean that the board
> endorses Christianity?
>
> A It endorses faith-based religions. That's why we have Jewish and that's why if we
> had Hindus or Buddhists or anybody else in my district they would be welcome,
> also."

A741:4-11 (Smith Depo.).

153.  Commissioner Smith told a newspaper reporter that "[t]he invocation is for

worshipping the God that created us" and that atheists and agnostics "are not going to take

the place of the godly invocation.  Absolutely not."  A750:22-751:10 (Smith Depo.).

154.  Commissioner Smith testified that "the God that created us" is "[t]he one and only

true God.  The God of the Bible."  A751:11-14 (Smith Depo.).

155.  Commissioner Smith told a radio reporter, in reference to the atheists and

Humanists who want to give opening invocations, "If they were a religion and they honored

the word of God, they would have every opportunity to speak to us during that period that we

set aside to honor God."  A751:19-752:10 (Smith Depo.).

156.   Commissioner Smith testified that the "word of God" is set forth "[i]n the Bible. The Holy Bible."  A752:11-13 (Smith Depo.).

157.   Commissioner Smith placed on his Facebook page the posts attached to Plaintiffs' Summary Judgment Motion as Exhibits 80-83 (A1011-18) and sent the emails attached to Plaintiffs' Summary Judgment Motion as Exhibits 84 and 85 (A1019-25).  A754:22-758:17 (Smith Depo.).

158.   Commissioner Smith's Facebook posts included a post calling Islam "a religion of hatred" (A1016) and a post stating, "It's either 'One Nation Under God,' or bite my ass and just leave!" (A1018).  A756:5-13, A758:7-17 (Smith Depo.).

159.   Commissioner Smith would not invite a Wiccan, a Satanist, a Rastafarian, a deist, a polytheist, or anyone who does not believe in a monotheistic religion to deliver an opening invocation at a Board meeting.  A725:16-25, A726:25-727:20 (Smith Depo.).

160.   Commissioner Smith would examine more closely the beliefs of Sikhs and practitioners of Native American religions to determine whether to invite them to deliver an opening invocation at a Board meeting.  A726:6-19 (Smith Depo.).

161.   Commissioner Barfield is the current Chair of the Board.  A770:2-3 (Barfield Depo.).

162.   Commissioner Barfield issued via Twitter or Facebook the tweet and posts attached to Plaintiffs' Summary Judgment Motion as Exhibits 89-92 (A1042-49) and sent the emails attached to Plaintiffs' Summary Judgment Motion as Exhibits 93 (A1050-51) and 110 (A1088-89).  A792:17-797:12 (Barfield Depo.).

163.  Commissioner Barfield tweeted, concerning the invocation issue, "let each commish select a pastor . . . .  Atheist[s] do not count."  A793:7-19 (Barfield depo.); A1043 (tweet).

164.  Commissioner Barfield would not invite a Satanist, a Rastafarian, a deist, or a polytheist to deliver an opening invocation at a Board meeting.  A772:21-774:7, A774:18-20 (Barfield Depo.).

165.  Commissioner Barfield explained that some of these groups would be rejected on the ground that their beliefs are not "representative of our community."  A774:22-23 (Barfield Depo.); *see also* A773:12-14 (Barfield Depo.).

166.  Commissioner Barfield is uncertain as to whether he would invite a Wiccan or a Native American shaman to deliver an opening invocation at a Board meeting.  A772:15-20, A774:12-17 (Barfield Depo.).

167.  Commissioner Fisher was the Chair of the Board at the time the Board approved Resolution No. 2015-101.  A716 (resolution).

168.  Commissioner Fisher agreed during his deposition that "allowing Christian invocations show[s] the Board's support for Christianity."  A867:4-6 (Fisher Depo.).

169.  Commissioner Fisher would not invite a Wiccan, a Satanist, or a deist to deliver an opening invocation at a Board meeting.  A853:4-17, A854:7-23 (Fisher Depo.).

170.  Commissioner Fisher would examine more closely the beliefs of Rastafarians, Hindus, and polytheists to determine whether to invite them to deliver an opening invocation at a Board meeting.  A853:19-854:6, A854:24-855:3 (Fisher Depo.).

171.   Some Commissioners testified that they had never been asked by members of various minority religions for permission to deliver an invocation (Anderson Tr. 15:20-16:14; Bolin-Lewis Tr. 9:3-12; Fisher Tr. 10:18-25) or that they did not believe that there were any adherents of certain minority religions in their respective single-member County Commission districts, from which each Commissioner ordinarily draws his or her invocators (Smith Tr. 10:12-11:24; Anderson Tr. 56:18-24; Barfield Tr. 7:25-8:20; Bolin-Lewis Tr. 7:20-8:5).

172.   Some Commissioners testified that members of minority religions whom they would not select to deliver an opening invocation would be allowed to appear during "Public Comment" to give an invocation.  A725:22-25, A726:25-727:15 (Smith Depo.); A854:7-23 (Fisher Depo.).

173.   Former Commissioner Bolin Lewis was the Chair of the Board when it approved the August 19, 2014 and November 6, 2014 letters described above.  A681, A692 (letters).

174.   Ms. Bolin Lewis testified that the Board's opening-invocation practice is a "long-standing tradition of honoring the Christian community" and that allowing nontheists to take part "would be a dishonor to the Christian community."  A895:14-20 (Bolin Lewis Depo.); *accord* A885:2-3, A896:12-13, A898:3-20 (Bolin Lewis Depo.).

175.   Ms. Bolin Lewis would not invite a Wiccan, a Satanist, or a deist to deliver an opening invocation at a Board meeting.  A882:17-883:2 (Bolin Lewis Depo.).

176.   Ms. Bolin Lewis would examine more closely the beliefs of Hindus, polytheists, and practitioners of traditional Native American religions to determine whether to invite them to deliver an opening invocation at a Board meeting.  A883:3-19 (Bolin Lewis Depo.).

177.   At the Board's August 19, 2014 meeting, in response to the comments of a speaker who advocated in favor of plaintiff CFFC's request to give opening invocations, Commissioner Anderson said, "For you to say that Christianity isn't under attack, I'd like you to look over at Iraq right now and let me know if Christianity is not under attack." A47/A98 ¶ 192 (First Amended Complaint and Answer).

178.   At the August 19 meeting, during the discussion of CFFC's request, Commissioner Anderson subsequently said, "I need all the prayer in my life I can get." A47/A98 ¶ 193 (First Amended Complaint and Answer).

179.   At the August 19 meeting, during the discussion of CFFC's request, Commissioner Anderson further said:

> I just never understood the concept on — and this is no personal slight to anybody — how you could possibly be offended by something that you do not believe exists.  I just never understood that.

A47/A98 ¶ 194 (First Amended Complaint and Answer).

180.   Commissioner Anderson placed on his Facebook page the posts attached to Plaintiffs' Summary Judgment Motion as Exhibits 94-96 (A1052-58).  A840:9-841:17 (Anderson Depo.).

181.   Commissioner Anderson's Facebook posts included the following post:

**Atheism**

The belief there was once absolutely nothing.  And nothing happened to the nothing until the nothing magically exploded (for no reason), creating everything and everywhere.  Then a bunch of the exploded everything magically rearranged itself (for no reason whatsoever), into self-replicating bits which then turned into dinosaurs.

**And they mock your beliefs.**

A840:9-16 (Anderson Depo.); A1053 (Facebook post).

36

182.   At the Board's August 19, 2014 meeting, in response to a speaker's comments that certain religions are not invited to give opening invocations before the Board, Commissioner Infantini stated that, in selecting invocation speakers,

> My staff and I, we search — I mean I don't have any specific religion — we will go anywhere to find somebody.  No, not anywhere.  Okay, correct, not anywhere.  Not anywhere.  There are certain places.

A46-47/A98 ¶ 191 (First Amended Complaint and Answer).

183.   Commissioner Infantini is uncertain as to whether she would invite a Satanist to deliver an opening invocation at a Board meeting.  A930:22-931:5 (Infantini Depo.).

184.   Former Commissioner Nelson would examine more closely the beliefs of Wiccans to determine whether to invite them to deliver an opening invocation at a Board meeting.  A908:11-23 (Nelson depo.).

185.   The Commissioners received emails from constituents supporting their invocation policy.  A1064-1113 (emails).

186.   All five current Commissioners agreed with views expressed in at least some of these emails.  A743:9-750:17 (Smith Depo.); A788:21-792:12 (Barfield Depo.); A833:19-839:5 (Anderson Depo.); A871:7-875:8 (Fisher Depo.); A941:4-15 (Infantini Depo.).

187.   Four of the five current Commissioners agreed with an email stating, "I fully support the policy of asking God to bless our meetings.  The Bible is the only book that identifies who the God of creation is.  I personally do not know who [nontheists] are going to ask to bless the meetings[,] for all other God[]s would not be a blessing."  A745:24-746:10 (Smith Depo.); A790:7-18 (Barfield Depo.); A836:18-837:4 (Anderson Depo.); A872:13-20 (Fisher Depo); A1070 (email).

188.  Board Chair Barfield and former Board Chair Fisher agreed with an email lauding them for "standing firm [t]o up[]hold Christian values in our community."  A792:1-12 (Barfield Depo.); A873:24-874:8 (Fisher Depo.); A1087 (email).

189.  Commissioner Anderson agreed with an email praising him as "a faithful Christian soldier."  A838:21-839:5 (Anderson Depo.); A1097 (email).

190.  The Commissioners also received from opponents of the Board's invocation policy a number of emails.  A1115-36 (emails).

191.  All five current Commissioners, as well as former Commissioners Bolin Lewis and Nelson, are Christians.  A760:18-19 (Smith Depo.); A798:2-3 (Barfield Depo.); A842:20-21 (Anderson Depo.); A875:20-22 (Fisher Depo.); A899:13-16 (Bolin Lewis Depo.); A921:17-18 (Nelson Depo.); A947:8-9 (Infantini Depo.).

### *Statistical Information Concerning Religious Affiliations*

192.  According to the *2010 U.S. Religion Census: Religious Congregations & Membership Study* published by the Association of Statisticians of American Religious Bodies ("ASARB"), only 34.9 percent of Brevard County residents were affiliated with a religious congregation as of 2010.  *See County Membership Report: Brevard County, Florida,* Association of Religion Data Archives (2010), http://www.thearda.com/rcms2010/r/c/12/rcms2010_12009_county_name_2010.asp; Def. A-28 (Grammich Aff. ¶ 16(a)).

193.  This ASARB study reported statistics for 236 religious groups, providing information on the number of their congregations and adherents within each state and county in the United States.  Clifford Grammich, Kirk Hadaway, Richard Houseal, Dale E. Jones,

Alexei Krindatch, Richie Stanley, and Richard H. Taylor supervised the collection.  These data originally appeared in *2010 U.S. Religion Census: Religious Congregations & Membership Study*, published by ASARB.  *See id.*; *Sources for Religious Congregations and Membership Data: Maps and Reports: Data Sources*, Association of Religion Data Archives, http://www.thearda.com/RCMS2010/RCMS_Notes.asp (last visited May 12, 2016).

194.  As used in the ASARB study, the term "congregational adherents" includes all full members, their children, and others who regularly attend services.  The 2010 reports contain incomplete counts of congregations and adherents belonging to the eight largest historically African-American denominations.  These denominations are not included in the 2000 reports and are largely missing from the 1990 and 1980 report.  Def. A-25, ¶ 51.

195.  According to ASARB data, Brevard County ranks in the bottom four percent of the top 125 most populous counties in the United States and the bottom sixteen percent of all counties in the United States with respect to percentage of residents affiliated with a religious congregation.  Def. A-28 (Grammich Aff. ¶¶ 16(h), (j)).

196.  The Pew Research Center's 2014 U.S. Religious Landscape Study reported that 70 percent of Florida adults identify themselves as Christians, 3 percent identify themselves as Jewish, 3 percent identify themselves as atheists, 4 percent identify themselves as agnostics, and 17 percent identify themselves as "nothing in particular."  *See Religious Landscape Study: Adults in Florida*, Pew Research Center, http://www.pewforum.org/religious-landscape-study/state/florida/ (last visited Aug. 22, 2016); *About the Religious Landscape Study*, Pew Research Center, http://tinyurl.com/PewForumAbout (last visited Aug. 22, 2016).

*Additional Facts*

197.  The Brevard County Board of County Commissioners (hereinafter "County Commission") opens Commission meetings with an invocation typically presented by a cleric or representative of the faith-based community. Def. A-1 (Whitten Aff. ¶ 9).

198.  The invocation takes place before the Pledge of Allegiance, and prior to the "Resolutions, Awards, and Presentations" section of the agenda, which includes presentation of recognition and honors to community activities and organizations. Def. A-1 (Whitten Aff. ¶ 9 and attached Ex. A).

199.  The County Commission's purpose for the invocation is recognition of the contribution of the faith-based community to the county. Def. A-2 (Williamson, at Ex. DW-77).

200.  Each Commissioner, on a rotating basis, selects an invocation-speaker.  A44/A96 ¶ 171 (First Amended Complaint and Answer).  Often the invocation-speaker is a cleric from the Commissioner's district.  Smith Tr. 9:9-11:24; Anderson Tr. 56:18-24; Barfield Tr. 7:25-8:20; Bolin-Lewis Tr. 7:20-8:5.

201.  Some Commissioners have lists of local clergy in their districts who have given invocations in the past.  Fisher Tr. 8:19-9:9; Bolin Lewis Tr. 7:20-8:5; Smith Tr. 9:9-10:6.

202.  At Brevard's opening invocations, the speakers have predominately been representatives from the many Christian denominations in the County. Williamson, at Ex. DW-56.

203.   On occasion, a representative of the faith-based community cannot be arranged or fails to show up and either an audience member is called upon or a Commissioner volunteers to deliver the invocation. Def. A-1 (Whitten Aff. ¶ 10).

204.   To the parties' knowledge, all the opening invocations delivered at County Commission meetings have appealed to or invoked a divine authority.  A330-536 (invocation transcripts); Def. A-1 (Whitten Aff. ¶ 30).

205.   CFFC is a Central Florida organization headquartered in Seminole County for atheists, freethinkers, and other nontheists.  One of CFFC's purposes is "advocating for the constitutional principle of separation of state and church and educating the public on the value of a secular government." Williamson, at Ex. DW-8.

206.   CFFC is an affiliate of the American Humanist Association. Williamson, at Ex. DW-9.

207.   CFFC is an FFRF chapter. A149 ¶ 16 (Williamson Decl.). FFRF's bylaws provide that all members of FFRF chapters must also be members of FFRF, and that FFRF rebates part of its chapter members' dues. Def. A-15 (Williamson, at Ex. DW-30).

208.   FFRF has also asked Plaintiff Williamson to speak in its behalf on issues relating to nontheism and separation of church and state issues and Williamson has appeared on an FFRF-hosted radio talk show. Def. A-16 (Williamson, at Ex. DW-34); Def. A-17 (Williamson, at Ex. DW-44).

209.   All of the individual Plaintiffs are atheist or agnostic and do not profess a belief in the existence of God. A108 ¶ 2 (Becher Decl.); A123 ¶ 2 (Hansel Decl.); A134 ¶ 2 (Koeberl Decl.); A144 ¶ 2 (Williamson Decl.); A160 ¶ 2 (Gordon Decl.).

210.   Plaintiff Williamson has attended two County Commission meetings.  At one of these meetings, he spoke during public comment in favor of allowing secular invocations during the opening invocation. A154-55 ¶¶ 31-32 (Williamson Decl.); Williamson Tr. 42:14-43:4.

211.   All of the individual Plaintiffs except Gordon identify as Secular Humanists. A108 ¶ 2 (Becher Decl.); A123 ¶ 2 (Hansel Decl.); A134 ¶ 2 (Koeberl Decl.); A144 ¶ 2 (Williamson Decl.); A160 ¶ 2 (Gordon Decl.).

212.   Plaintiffs Williamson, Becher and Koeberl are also Humanist Celebrants and, in Koeberl's case, he is also a Humanist Chaplain.  These three plaintiffs were ordained with these designations by the Humanist Society, an adjunct organization of the American Humanist Association. A109-10 ¶ 5 (Becher Decl.); A135 ¶ 5 (Koeberl Decl.); A145-46 ¶ 5 (Williamson Decl.); A253-62 (ordination certificates and endorsement letters).

213.   Under the heading "Inspiration/Reflection, Introduction," an "interim version" of a "Handbook for Celebrants" published by the Humanist Society states:

> Also known as an Invocation and Benediction, the humanist provides an Inspiration and Reflection.  An Invocation is generally done at the beginning of an event and involves a prayer to bring a higher power and blessing into the ceremony.  Humanists won't be invoking any higher power, and this may seem like false advertising.  If anyone is uncomfortable with the term, an Inspiration may be a better term.  The Celebrant should keep in mind the purpose of the ceremony and the audience and speak in a manner that puts the audience in the right frame of mind for the event.

Def. A-8 (Williamson Ex. "DW-17"); Williamson Tr. 57:3-12, 73:23-25, 75:7-76:3.

214.   Plaintiffs Williamson, Becher, Koeberl, and Hansel are also members of the American Humanist Association (AHA). A110-11 ¶ 8 (Becher Decl.); A137 ¶ 9 (Koeberl

Decl.); A147 ¶ 9 (Williamson Decl.) (these record cites do not make clear that plaintiff Hansel is an AHA member, but he has confirmed that he is).

215.   AHA advocates use of reason, ethics, knowledge, compassion, and science in decision-making. Def. A-9 (Williamson, at DW-16, DW-26).

216.   AHA maintains a website on which it posts articles.  One of these articles is "Some Reasons Why Humanists Reject the Bible," by non-party Joseph C. Sommer.  That article states, among other things, that the Bible "was written solely by humans in an ignorant, superstitious and cruel age"; that "because the writers of the Bible lived in an unenlightened era, the book contains many errors and harmful teachings" and "numerous contradictions"; that "biblical myths support the belief, which has been held by primitive and illiterate people throughout history, that supernatural beings frequently and arbitrarily intervene in this world"; that "in the light of experience and reason, the Bible's claims about supernatural occurrences do not warrant belief"; that "by treating this mistake-ridden book as the word of God, humanity has been led down many paths of error and misery throughout history"; and that "if the Bible was actually written by fallible humans who lived in an unenlightened era," it would "perpetuate the ideas of an ignorant and superstitious past — and prevent humanity from rising to a higher level." Def. A-11a (Williamson, at Ex. DW-21); Def. A-11 (Williamson, at Ex. DW-18) .

217.   Plaintiffs Hansel, Becher, and Koeberl have expressed admiration for the writings of Professor Lawrence Krauss.  Professor Krauss is an astrophysicist and cosmologist.  In an interview included in his book *A Universe from Nothing*, Professor Krauss referred to himself

as an "anti-theist" and stated the following in response to the question "If you get rid of God, then does life lose all purpose?"

> "For me it certainly doesn't—quite the opposite.  I would find little purpose living in a world ruled by some divine Saddam Hussein-like character, as my late friend Christopher Hitchens put it, who not only makes all the rules, but punishes those who disobey them with eternal damnation.  I find living in a universe without purpose to be amazing, because it makes the accident of our existence and our consciousness even more precious—something to be valued during our brief moment in the sun."

Pls.' First Am. Compl. ¶¶ 30, 45, 71; Koeberl Tr. 22:4-13, 23:1-8; Koeberl, at Ex. JK-6.

218.  Plaintiffs Hansel, Becher, Gordon and Koeberl all have expressed admiration for the writings and statements of atheist Richard Dawkins.  In one of his books, *The God Delusion*, Dawkins wrote:

> The God of the Old Testament is arguably the most unpleasant character in all fiction: jealous and proud of it; a petty, unjust, unforgiving control-freak; a vindictive, bloodthirsty ethnic cleanser; a misogynistic, homophobic, racist, infanticidal, genocidal, filicidal, pestilential, megalomaniacal, sadomasochistic, capriciously malevolent bully. . . .  Thomas Jefferson—better read—was of a similar opinion, describing the God of Moses as "a being of terrific character—cruel, vindictive, capricious, and unjust."

Pls.' First Am. Compl. ¶¶ 29, 44, 58, 72; Becher Tr. 17:22-18:11; Becher, at Ex. KB-3.

219.  These four Plaintiffs also have expressed admiration for Sam Harris, a nontheist author.  In one of his books, *Letter to a Christian Nation*, Harris wrote:

> "Of course, the Church's position on abortion takes no more notice of the details of biology than it does of the reality of human suffering.  It has been estimated that 50 percent of all human conceptions end in spontaneous abortion, usually without a woman even realizing that she was pregnant.  In fact, 20 percent of all recognized pregnancies end in miscarriage.  There is an obvious truth here that cries out for acknowledgment: if God exists, He is the most prolific abortionist of all."

Pls.' First Am. Compl. ¶¶ 29, 44, 58, 72; Gordon, at Ex. RG-7.

220.   All of the individual Plaintiffs are members of FFRF.  FFRF attorney Andrew Seidel is listed on the signature pages of the January 26, 2015 letter from AU to the Brevard County Board of County Commissioners as well as the May 26, 2015 follow-up letter from AU to the County Commission. A694-701 (letters); Williamson Dep. Tr. 93:1-2; Koeberl Dep. Tr. 13:10-11; Gordon Dep. Tr. 8:7-9; Becher Dep. Tr. 15:15-16:4; *see also* Hansel Dep. Tr. 8:14-9:1 (this record cite does not make clear that plaintiff Hansel is currently an FFRF member, but he has confirmed that he is).

221.   CFFC utilizes lawyers provided by FFRF. Williamson Dep. Tr. 26:1-13.

222.   FFRF has stated that it "was initially founded for the very purpose of protesting government prayer at city and county meetings," and FFRF characterized as "hostile" the United States Supreme Court's decision in *Town of Greece v. Galloway.* Becher, at Ex. KB-1.

223.   A May 5, 2014 FFRF news release responding to the *Town of Greece* decision stated: "'If the Supreme Court won't uphold the Constitution, it's up to us — it's up to you' is the response of the Freedom From Religion Foundation to the high court's ruling May 5 that judicially blessed sectarian prayer at official government meetings." Becher, at Ex. KB-1.

224.   The May 5, 2014 FFRF news release offered certificates to citizens "who succeed in delivering secular 'invocations' at government meetings," and the "individual judged to give the 'best' secular invocation" would be invited to open FFRF's own annual convention with the invocation. Becher, at Ex. KB-1.

225.   FFRF called this the "Nothing Fails Like Prayer Award" contest, to be held

annually "until the *Greece* decision is overturned." Becher, at Ex. KB-1.

226.   A "goal" expressed in FFRF's May 5, 2014 news release "is to show that

government bodies don't need prayer to imagined gods, or religion or superstition, to

govern—they need to be guided by reason." Becher, at Ex. KB-1.

227.   FFRF's May 5, 2014 news release contains the following statement:

> FFRF Co-President Annie Laurie Gaylor notes that despite the approval of sectarian
> governmental prayer by five Supreme Court Justices, there is no requirement for
> government bodies to open with prayer. Citizen request has stopped the practice of
> government prayer throughout the country and can continue to do so.
>
> "We'd like to see secular citizens flood government meetings with secular
> invocations that illustrate why government prayers are unnecessary, ineffective,
> divisive, embarrassing and exclusionary of the 20-30 percent of the U.S. population
> today that identifies as nonreligious," Gaylor said.

Becher, at Ex. KB-1.

228.   CFFC maintains an archive of secular invocations on its website, and Williamson,

along with other CFFC members, has performed secular invocations at government meetings.

Williamson Dep. Tr. 57:18-58:11; Williamson, at Ex. DW-60 at 5, 11, 38, 43.

229.   In a September 8, 2015 email to a nineteen-year-old person interested in delivering

a Jedi invocation, Plaintiff Williamson wrote:

> Your age is no issue for me, but you should be prepared for this to be a news story.
> Can't say how big, but your name will likely make the papers  perhaps more.  Are
> you prepared for that?  Will it be a problem for you at work or home?  If so, don't
> feel like you are letting me down by backing out.  The goal here (for me, anyway) is
> to mock these invocations and show them for what they are   a pep rally for a closed
> group of Christians who don't want anyone else's mythology confused with their
> own.
>
> My second concern after you is for the Jedi.  If they are in for this, they will also be
> contacted about this request by the media.  Glad to explain the potential outcomes of

> this as I am with you.  It is likely to be met with resistance and the option to litigate
> could come.  Alternately, they may say yes and the Jedi invocation becomes the first
> one ever.  That would be even cooler than shutting down an invocation in my
> opinion.

At deposition, when asked, "Was that your feeling at the time?" about the above statement

from the September 8, 2015 "Jedi invocation" email, Plaintiff Williamson stated, "At that

moment that was my frustration being expressed, yes."  Williamson Tr. 147:24-148:10; Def.

A-27 (Williamson, at Ex. DW-62).

230.  Six months after the *Town of Greece* decision, Plaintiff Williamson sent an email

on behalf of CFFC regarding a complaint CFFC received about possible illegal use of school

property.  The email stated:

> As with government prayer and bible distributions, we want to first work hard to stop
> it [*sic*] violations before we seek equitable treatment for ourselves unless we need
> absolutely have to.  I am personally averse to renting school space for recurring
> atheist/humanist events even though I know it is legal and we should test the forum.
> We've given in (so to speak) on invocations, but I'm still holding fast on this one.

Def. A-19 (Williamson, at Ex. DW-38).

231.  After a school district responded to a request by The Satanic Temple to distribute

its materials through channels that had been used to distribute Bibles, the school district

closed the distribution forum. Williamson, at Ex. DW-74.   FFRF attorney Seidel wrote that

Plaintiff Williamson then "coined a new phrase: 'Lucien's Law.'" Williamson Dep. Tr.

165:6-15.  According to Mr. Seidel, "Lucien's Law states that governments will either (1)

close open forums when The Satanic Temple asks to speak, or (2) censor The Satanic

Temple, thereby opening itself to legal liability." Williamson, at Ex. DW-74.

232.  Plaintiff Williamson admits that he was the individual who came up with the name

"Lucien's Law" for the strategy described by Mr. Seidel, though Mr. Williamson did not

describe the strategy the same way that Mr. Seidel did.  Williamson, at Ex. DW-74;

Williamson Dep. Tr. 164:8-19, 165:5-25.

234.  In a November 13, 2014 email to an individual identified as "Hemant," Plaintiff

Williamson wrote this:  "Hemant, we should coin a phrase: 'Lucien's law' or something:

When all else fails, count on the Satanists to resolve state/church disputes—the nuclear

option." Williamson, at Ex. DW-75.

234.  About what the "nuclear option" is, Plaintiff Williamson has stated: "It would be

when there's a -- when there's a -- it would be the actual application of Lucien's Law.  But

the state/church dispute doesn't exist in the invocation process because there's no question of

whether or not those should be allowed or not.  That's not the case in Orange County Public

Schools.  Orange County Public Schools was allowing distribution of religious materials

which as I understand it is not permitted by law whereas invocations can be given."

Williamson Tr. 168:2-12.

235.  CFFC expressed its views about reinstitution of pre-meeting prayer in Winter

Gardens, Florida after the *Town of Greece* decision in an "action alert!" that stated:

> Government prayers turn nonbelievers into political outsiders in our own community.
> The practice is inappropriate, unnecessary, and divisive.  It is coercive for a city
> government to ask its citizens to participate in prayer.

> And Winter Garden has a history of being coercive towards nonbelievers.  Last
> August, Mayor John Rees and Police Chief George Brennan ejected a local citizen
> and member of CFFC who refused to stand for the invocation and Pledge of
> Allegiance.  FFRF wrote a letter, and after backlash, the commission voted to replace
> the invocation with a moment of silence.

> The proposal on the agenda Thursday would walk back that progress, inflicting
> prayer on Winter Garden's citizens once again.

Def. A-24 (Williamson, at Ex. DW-41).

236.   The Brevard County Commission responded to the May 26, 2015 AU, ACLU, and FFRF letter on behalf of Plaintiffs from Plaintiffs' counsel by adopting Resolution 2015-101. A706 (resolution).

237.   The "Findings" section of Resolution 2015-101 includes these statements:

> 8. According to *The Association of Religious Data Archives* (ARDA) *County Membership Report, Brevard County*, in 2010 the population of Brevard County was 543,376.  (See attached Exhibit B)
>
> 9. According to the ARDA report, cited above, out of the 543,376 people living in Brevard County in 2010, only 189,430 people (including church members, their children and others who regularly attend services) claimed to be adherents to any religious faith, which was 34.9% of the County's total population. (See attached Exhibit B)

Def. A-2 (Williamson, at Ex. DW-77 (footnotes omitted)).

238.   ARDA is an association that has staff at Pennsylvania State University and other universities.  Def. A-2 (Williamson, at Ex. DW-77, Ex. B); Def. A-25, ¶ 47.

239.   The ARDA website indicates that the data in the ARDA report, including data showing that only 34.9% percent of the total County population are "congregational adherents (full members, their children and others who regularly attend services)," "originally appeared in '2010 U.S. Religion Census: Religious Congregations & Membership Study' published by the Association of Statisticians of American Religious Bodies (ASARB), C. Grammich, et. al. Def. A-2 (Williamson, at Ex. DW-77, Ex. B); Def. A-28 (Grammich Aff. ¶ 10).

240.   ARDA's "adherent" data taken from the "2010 U.S. Religion Census: Religious Congregations & Membership Study" published by the Association of Statisticians of American Religious Bodies (ASARB), C. Grammich, et. al., reports percentages of adherents

affiliated with a religious congregation, but not percentages of people professing religious belief in God or a divine higher authority.  Def. A-25, ¶ 51.

241.  ARDA's "adherent" data taken from the "2010 U.S. Religion Census: Religious Congregations & Membership Study" published by the Association of Statisticians of American Religious Bodies (ASARB), C. Grammich, et. al., contains incomplete counts of congregations and adherents belonging to the eight largest historically African-American denominations.  Def. A-25, ¶ 51.

242.  The last two pages of Docket No. 58 (filed by the County on May 9, 2016), which are also available at Def. A-26, are entitled "Religious Congregations by County and Group: 2010" and were copied from pages 125 and 126 of the "2010 U.S. Religion Census: Religious Congregations & Membership Study."  A table appearing on those two pages sets forth data relating to Brevard County.  The data shown in the Brevard County table includes "Religious Group"; "Number of Congregations"; "Number of Attendees"; "Number of Communicant, Confirmed, or Full Members"; and "Adherents," broken down into three categories entitled "Number of Adherents," "% of Total Pop." and "% of Total Adh." Def. A-26.

243.  The document entitled "2010 U.S. Religion Census: Religious Congregations & Membership Study," published by the Association of Statisticians of American Religious Bodies (ASARB), C. Grammich, et. al., was used as a source in footnote 1 of Justice Alito's concurring opinion in *Town of Greece v. Galloway*. *See Town of Greece v. Galloway*, 134 S. Ct. 1811, 1828 n.1 (2014), which reads: "See Assn. of Statisticians of Am. Religious Bodies, C.

Grammich et al., 2010 U.S. Religion Census: Religious Congregations & Membership Study 400-401 (2012)." Def. A-25, ¶¶ 53, 55.

244.  According to ASARB data, Brevard County ranks in the bottom 4% in "congregational adherent" percentage out of the 125 most populous counties in the United States and ranks in the bottom 16% of all counties, or county equivalents, nationwide. Def. A-28 (Grammich Aff. ¶¶ 16h, 16j).

245.  Section 2 of Resolution 2015-101, reads as follows:

Section 2. Amendment of Resolution 05-332.

Resolution 05-332, as amended by Resolution 14-219, is hereby amended by adding a new section 9.l(c) to read as follows:

"(c) The Board's findings and conclusions set forth in the Resolution Adopting a Formal Policy Relating to Traditional Ceremonial Pre-Meeting Prayer, enacted on July 7, 2015, are hereby incorporated into this policy. In view of the requests by secular, humanist, atheist and Secular Humanist organizations to provide a secular, Secular Humanist or an atheist invocation, the Board hereby clarifies the intent of the Board's existing policies allowing Public Comment to include individual or representative comments intended to instruct the Board; to petition for redress of grievances; to comment upon matters within the control, authority and jurisdiction of the Board; and to comment on matters that are relevant to business of the County Commission, as well as matters upon which the Board has traditionally expressed a position for the betterment of the community interest.  Secular invocations and supplications from any organization whose precepts, tenets or principles espouse or promote reason, science, environmental factors, nature or ethics as guiding forces, ideologies, and philosophies that should be observed in the secular business or secular decision making process involving Brevard County employees, elected officials, or decision makers including the Board of County Commissioners, fall within the current policies pertaining to Public Comment and must be placed on the Public Comment section of the secular business agenda. Pre-meeting invocations shall continue to be delivered by persons from the faith-based community in perpetuation of the Board's tradition for over forty years.

Def. A-2 (Williamson, at Ex. DW-77 at 10-11).

246.  Since the enactment of Resolution 2015-101 by the Brevard County Commission, none of the Plaintiffs has ever appeared or requested to appear before the County Commission to deliver a secular invocation during the Public Comment section of the agenda in accordance with Resolution 2015-101. Def. MSJ Ex. 2 (Pls.' Resp. to DFRFA ¶ 2).

247.  The website InvocationsOnline.com is registered to plaintiff Williamson in his capacity as an officer of plaintiff Central Florida Freethought Community. Def. A-30, ¶ 4.

248.  CFFC's website address is http://cflfreethought.org/, and the website has a link to CFFC's Facebook page.  The address of the Facebook page is https://www.facebook.com/CFLFreethought/. Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 11).

249.  CFFC has a Twitter account, the address of which is https://twitter.com/cflfreethought.  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 12).

250.  A retweet from @hemantmehta appeared on the CFFC Twitter page on December 5, 2014, stating: "In Lake Worth (Florida), An Athiest's Invocation Offered Thanks to Allah, Zeus, Satan, Buddha, Krishna, and Thor tinyurl.com/kzllquu." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 13a).

251.  A tweet from @cflfreethought appeared on the CFFC Twitter page on December 3, 2014, stating: "Are we having fun yet? FL decides to allow Satanic Temple display in the capitol. au.org/media/press-re…" Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 13b).

252.  A tweet from @cflfreethought appeared on the CFFC Twitter page on September 18, 2014, stating: "Even if it were disrespectful, it is perfectly legal to sit through the Pledge of 'Religiance.' patheos.com/blogs/friendly…" Def. A-22, ¶ 13d (Def. MSJ Ex. 2, Pls.' Resp. DFRFA ¶ 13d).

253.   A tweet from @cflfreethought appeared on the CFFC Twitter page on September 17, 2014, stating: "Coral Springs caves to pressure from Chaz Stevens & @FFRF, discontinues invocations before city commission meetings. patheos.com/blogs/friendly…" Def. A-22, ¶ 13e (Def. MSJ Ex. 2, Pls.' Resp. DFRFA ¶ 13e).

254.   Chaz Stevens is known to Plaintiff Williamson as a political activist who has asked to perform Satanic prayers. Williamson Tr. 157:16-22.

255.   A tweet from @cflfreethought appeared on the CFFC Twitter page on September 16, 2014, stating: "Lucien's Law remains unbroken. @FFRF @AndrewLSeidel @satanicpsalms ffrf.org/news/news-rele…" Def. A-22, ¶ 13g (Def. MSJ Ex. 2, Pls.' Resp. DFRFA ¶ 13g).

256.   The Central Florida Freethought Community has a Facebook account, the address of which is https://www.facebook.com/CFLFreethought. Def. A-22, ¶ 14 (Def. MSJ Ex. 2, Pls.' Resp. DFRFA ¶ 14).

257.   A post appeared on the CFFC Facebook page on September 16, 2015, stating: "It would be nice if it were our awesome secular invocations that were shutting down forums, but the Devil made them do it. Chaz Stevens (state/church activist and Pabst Blue Ribbon Festivus Pole creator) is one of our freethought heroes." Def. A-22, ¶ 15a (Def. MSJ Ex. 2, Pls.' Resp. DFRFA ¶15a).  This post provides a link to an article entitled, "Two Fla. cities drop government prayers from meetings," which has appeared on the FFRF webpage located at http://ffrf.org/news/news-releases/item/24003-two-fla-cities-dropgovernment-prayers-from-meeting and is attached to the County's Summary Judgment Motion as page A004 of Exhibit 2.  Def. A-22, ¶ 15b (Def. MSJ Ex. 2, Pls.' Resp. DFRFA ¶ 15b).

258.   The content of the article entitled "Two Fla. Cities drop government prayers from meetings" reads as follows:

**Two Fla. cities drop government prayers from meetings**

*September 16, 2015*
FFRF welcomes the news that two Florida cities, Coral Springs and Deerfield Beach, have recently dropped their invocations at city meetings in favor of a moment of silence. In both cases, FFRF sent letters to back up local activist Chaz Stevens, who started a Satanist Church in Deerfield Beach and petitioned the cities to allow him lead a Satanist prayer.

Coral Beach changed its mind this week, voting to end its longstanding policy of opening meetings with a religious invocation. Noting that the recent Supreme Court decision *Greece v. Galloway* requires cities to allow prayer from all faiths or no faith, Mayor Skip Campbell said, "I don't think our citizens would be in favor of Satanic invocations before City Commission meetings."

The Deerfield Beach City Commission also dropped prayer earlier this year in favor of a moment of silence after Stevens asked to deliver an invocation. Commissioner Gloria Battle threatened to leave if Stevens was permitted to give his invocation.

Commissioner Joe Miller, on the other hand, said that he believed in God and Jesus, but said that "doesn't mean I don't welcome my Jewish brother and my nonbelieving brother . . . We are elected to serve the public, atheists, Satanists, Jewish, everyone." Miller echoed FFRF's position on the matter when he said he couldn't favor keeping the invocation on the basis of tradition, noting, "There are many traditions in the early years of our city that are not a great precedent for how to move forward in a multicultural society."

Stevens has his sights set on other Florida cities' invocations, including Pompano Beach.

FFRF, along with Americans United, the ACLU, and the ACLU of Florida, is also currently involved in a lawsuit against another Florida government body, the Brevard County Board of County Commissioners, which excludes nonbelievers from offering invocations.

FFRF is a national nonprofit state/church watchdog with more than 23,000 members, including over 1,100 members and a chapter in Florida.

Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 15b, A006).

259.  A post appeared on the CFFC Facebook page on September 17, 2015, stating: "Coral Springs caves to pressure from Chaz Stevens & @FFRF, discontinues invocations before city commission meetings. http://t.co/JifLu6163P." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 17a).

260.  This post referenced and linked to an article on the "Friendly Atheist" webpage entitled, "Instead of Saying Yes to Twerking Satanist, Florida Commissioners Drop Invocations Altogether," which was located at http://www.patheos.com/blogs/friendlyatheist/2015/09/17/instead-of-saying-yes-to-twerking-satanist-florida-commissioners-drop-invocations-altogether/ and is attached to the County's Summary Judgment Motion as pages A008–09 of Exhibit 2.  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 17b).

261.  A post appeared on the CFFC Facebook page on January 8, 2015, stating: "Attention Brevard Residents: As you know, the Brevard County Board of County Commissioners refused to allow our members to deliver the opening invocation at their Board Meetings. If you: Attend, or have attended, Board meetings OR if you lead a local non-theistic organization and would like to deliver a secular invocation at a Board meeting, AND Would be interested in participating in litigation against the Board, email david@cflfreethought.org." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 23a).

262.  FFRF has a Twitter account, the address of which is https://twitter.com/FFRF. Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 28).

263.  A tweet appeared on the FRRF Twitter page on October 16, 2014, stating: "'Religion is like a blind man looking in a black room for a black cat that isn't there, and

finding it.' –Oscar Wilde  ffrf.org/news/day/16/10…" Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 31a).

264.   A tweet appeared on the FRRF Twitter page on October 16, 2014, stating: "'‘God's plan' is often a front for men's plans and a cover for inadequacy, ignorance, and evil.' –Mary Daly,... fb.me/4v8T9YtzK."  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 31b).

265.   A tweet appeared on the FRRF Twitter page on November 16, 2014, stating: "'All religions, without exception, have done humanity more bad than good.' –José Saramago, Nobel Prize winning… fb.me/6Ugzq8BIH." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 31c).

266.   A tweet appeared on the FRRF Twitter page on November 15, 2014, stating: "'The only true divinity is humanity.' —William Pitt, politician and freethinker, Letter on Superstition, 1733.... fb.me/1qsfuzCcS." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 31d).

267.   A tweet appeared on the FRRF Twitter page on January 21, 2015, stating: "Benson Cartoons / Arizona Republic / bit.ly/1E2f31L" with an associated image portraying a militant brandishing a weapon with a word bubble that reads: "I MAY NOT AGREE WITH YOU, BUT I WILL DEFEND TO YOUR DEATH MY DIVINE RIGHT TO KILL YOU."  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 31f).

268.   Page B014 of Exhibit 2 to the County's Summary Judgment Motion is a timeline photo of Georges Bizet that was posted on the FFRF Facebook page on October 25, 2013, with an associated caption that reads: "'Religion is a means of exploitation employed by the strong against the weak; religion is a cloak of ambition, injustice and vice…. Truth breaks free, science is popularized, and religion totters; soon it will fall, in the course of centuries-- that is, tomorrow. . . .   In good time we shall only have to deal with reason.' –Georges Bizet,

composer and freethinker, from Bizet, by William Dean. Collier Books, 1962." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 33b).

269.   Page B015 of Exhibit 2 to the County's Summary Judgment Motion is a timeline photo on the FFRF Facebook page retrieved on September 29, 2015 of Thomas Paine, with an associated caption that reads: "'Whenever we read the obscene stories, the voluptuous debaucheries, the cruel and tortuous executions, the unrelenting vindictiveness, with which more than half the Bible is filled it would be more consistent that we call it the word of a demon than the word of God. It is a history of wickedness that has served to corrupt and brutalize.' –Thomas Paine, The Age of Reason (1792)."  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 33c).

270.   Page B016 of Exhibit 2 to the County's Summary Judgment Motion is an album photo posted on June 8, 2012 in an FFRF Facebook album entitled "HHS Mandate Counterprotest" of a sign that reads: "Stand up for the Constitution or Bend Over for the Bishops."  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 33d).

271.   Page B017 of Exhibit 2 to the County's Summary Judgment Motion is a photo from an FFRF Facebook album dated January 7, 2015 that reads: "'The men who committed the atrocities of September 11 were certainly not "cowards," as they were repeatedly described in the Western media, nor were they lunatics in any ordinary sense. They were men of faith — perfect faith, as it turns out — and this, it must finally be acknowledged, is a terrible thing to be.'  Sam Harris, The End of Faith: Religion, Terror, and the Future of Reason." Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 33e).

272.   FFRF maintains, on its website, a page entitled "Out of the Closet Campaign," which states, "Although the nonreligious — including one in five U.S. citizens — is a significant segment of the world population, many Americans have never knowingly met a nonbeliever.  You can help dispel myths, educate and promote reason by adding your voice, face and message to FFRF's friendly neighborhood freethinker campaign.  This is your chance to proclaim you're a freethinker and why." Freedom From Religion Foundation, *Out of the Closet Campaign*, https://ffrf.org/out/ (last visited Oct. 7, 2016); Def. A-2 (Williamson, at Ex. DW-77, ¶¶ 19-20).

273.   Brevard County Commission Resolution 2015-101 sets forth eleven comments out of hundreds made by people on the FFRF "Out of the Closet" webpage.  Def. A-2 (Williamson at Ex. DW-77, ¶¶ 19-20).

274.   Page C001 of Exhibit 2 to the County's Summary Judgment Motion is a timeline photo posted on the Facebook page of the American Humanist Association on December 7, 2009, of two cats — one with its head bowed and the other looking straight ahead — that reads: "Atheist cat finds your prayer cute but ultimately futile."  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 39a).

275.   Page C003 of Exhibit 2 to the County's Summary Judgment Motion is a timeline photo posted on the Facebook page of the American Humanist Association on July 5, 2012, with the following quotes on the face of the photo: "'You're NOTHING without me' 'If you even THINK about leaving me…' 'You don't DESERVE me.' 'You'll never find ANYONE good as me.' 'YOU brought this upon yourself.' 'I know best.' 'You're a TERRIBLE person, and you need me to be better.' 'You're not WORTHY of my love.' 'I'm only doing this

because I LOVE you.' 'Don't listen to ANYONE who doesn't understand what we have' — God."  Def. MSJ Ex. 2 (Pls.' Resp. DFRFA ¶ 39c).

276.  Brevard County Commissioners received constituent emails supporting the Board's invocation policy. A1065-A1113.

277.  The constituent emails to the Commissioners in support of the Board's invocation policy variously characterized the requests to perform secular invocations at the beginning of Board meetings as an "onslaught"; being "bullied into submission"; "naysayers" trying to "shut down a 'tradition'"; an agenda "to end the invocation at meetings"; a "destruction of principles"; a "brazen attack";  "forced correctness"; an attempt to "change what has been a tradition for 44 years"; "slipping away of values and beliefs"; and an attempt to "'hijack' the invocation" and "remove all references to the Almighty from our government."  A1065; A1067; A1071; A1077; A1087; A1089; A1091; A1093; A1097; A1111.

### *Statements Made During Invocations*

278.  Pastor Dennis Myers delivered the invocation at the October 7, 2010 Board meeting.  During that invocation, he stated:

> First I'd like to start off by reading some scripture.  Romans 13, starting verse number 1.  It says let every soul be subjected to the higher powers, for there is no powers but of God.  The powers that be are ordained of God.  Whosoever therefore resisteth the power resisteth the ordnance of God.  And they that resist shall receive to themselves judgment.

A350 (invocation transcript).

279.  Pastor Dave Cannon delivered the invocation at the January 25, 2011 Board meeting.  During that invocation, he stated:

> I pray, Father, that each one here would humbly acknowledge that without you we can do nothing.  And I pray that each one would seek you humbly to guide and direct in the business that's done here today.

A361 (invocation transcript).  He was subsequently invited to return and deliver another

invocation.  A392 (invocation transcript).

    280.  Clayton Gilliams delivered the invocation at the August 4, 2015 Board meeting.

During his invocation, he stated:

> My prayer is not that important.  It's the God that I'm praying to who is.  And, if we keep him as our number one priority, we'll all be with him one day.

A512 (invocation transcript).

    281.  Father Dimitri Tsigas delivered the invocation at the November 3, 2015 Board

meeting.  During that invocation, he stated:

> We have turned our back on you, Lord, excluding the Bible, prayer, and the truth of our nation's Christian foundations from our children's education, for judges and politicians have twisted our freedom of religion into freedom from religion.  We plead for your mercy.  Help us restore the Bible, prayer, and the truth of our nation's Christian foundations to our schools.

A522 (invocation transcript).

    282.  Pastor Joshua Harris delivered the invocation at the November 5, 2015 Board

meeting.  During that invocation, he stated:

> [L]et, Lord, this city, this community, God, this place, Brevard County be a place where we praise you and worship you and adore you and people come to know Jesus as their personal Lord and Savior.

A524 (invocation transcript).

### *Statements Made by Past Invocation Speakers*

    283.  Pastor Gary Montecalvo of Destiny Christian Church presented the invocation at

the November 13, 2012 Board Meeting.  A422 (invocation transcript).  On November 24,

2015, he posted to Facebook a link to an article that stated that a "HARD TRUTH" about Islam is that "Muhammad Was Once A Refugee Taken in By The Jewish City of Medina. Within Five Years, He Had Driven Out, Executed, or Enslaved Every Jew Living In Medina."  A1207–09.

284.  On November 14, 2015, Rev. Montecalvo posted a photo on Facebook stating, "ISLAM IS EVIL It really is as simple as that."  A1213.

285.  On October 3, 2015, Rev. Montecalvo shared a post on Facebook stating, "this may seem technical for some, but ISLAM IS NOT A RACE it is an ideology hostile to all others, so fearing that it will destroy your culture, your nation, your business, your faith, your family is reasonable and rational, not a 'phobia' reflex.  it has nothing to do with peace." A1214.

286.  Pastor Jim Lilley of West Melbourne Community Church presented the opening invocation at the July 24, 2012 Board meeting.  A411 (invocation transcript).  On April 14, 2015, WM Community Church posted an article on its Facebook page entitled, "9-Year-Old Pregnant from ISIS Gang Rape, Could Die if She Delivers Baby," accompanied by a comment that stated, "Following in the foot steps of their prophet."  A1217.

287.  Pastor Tim Finlayson of Brevard Worship Center presented the opening invocation at the February 16, 2016 Board meeting.  A533 (invocation transcript).  On June 30, 2015, he retweeted the statement, "Any philosophy that does not line up with God's Word is the wrong philosophy."  A1219.

288.  Pastor Daniel Barton of Bowe Gardens Baptist Church presented opening invocations at the Board meetings of March 20, 2012, May 13, 2014, and March 31, 2015.

A401, A472, A503 (invocation transcripts).  The "What We Believe" statement on the website of Bowe Gardens Baptist Church states, among other things, that the Christian God is the "one and only one living and true God"; that "[t]here is no salvation apart from personal faith in Jesus Christ as Lord"; that "[t]he unrighteous will be consigned to Hell, the place of everlasting punishment"; that it is "the duty of every child of God to seek constantly to win the lost to Christ"; that "Christians should oppose . . . all forms of sexual immorality, including adultery, homosexuality, and pornography"; and that "[e]very Christian should seek to bring . . . government . . . under the sway of the principles of righteousness."  A1221–26.

289.   Pastor Michael Duffy of Christ Church of Hope delivered the opening invocation at the Board meeting of February 2, 2012.  A396 (invocation transcript).  The "Statement of Faith" on the website of Christ Church of Hope states, among other things, that "whoever does not believe in [Jesus Christ] stands condemned already because he has not believed in the name of God's one and only son."  A1229.

290.   Pastor Greg Le Sieur of Christ Lutheran Church delivered the opening invocation at the Board meeting of November 15, 2011.  A389 (invocation transcript).  The "Our Beliefs" statement on the website of Christ Lutheran Church states, among other things, that the Bible is "the only infallible guide to truth"; that "there is only one true God"; and that "[t]hose who have believed in Christ will enter into the eternal joys of heaven while unbelievers will be sent away into everlasting condemnation."  A1231–34.

291.   Pastor Le Sieur stated in an October 2, 2011 sermon, "Jesus is the ONLY savior of the world. . . .  [T]he way to heaven is ONLY through Jesus Christ.  We're saved ONLY by

grace, ONLY through faith in his name."  V15-1 at 6:05 (audio recording).  In the same

sermon, he stated, "Buddha[']s . . . way out [is] like a man in a smoke-filled room trying to

convince himself not to care about breathing anymore."  V15-1 at 12:28 (audio recording).

In a March 16, 2014 sermon, he stated, "Buddha was no savior.  He died. . . .  [H]e was so

heavy I'm surprised he didn't die of cholesterol."  V17 at 20:08 (video recording).

292.   Pastor Rich Lively of the Church at Viera delivered the opening invocation at the

Board meeting of May 27, 2014.  A473 (invocation transcript).  The "What We Believe"

statement on the website of the Church at Viera states, among other things, that "those

persons who die without faith in Jesus Christ spend eternity in Hell."  A1237.

293.   Pastor Eric Ball of E3 Ministries delivered the opening invocation at the Board

meeting of October 2, 2014.  A485 (invocation transcript).  The "About E3" page on the

website of E3 Ministries states, among other things, that without "A PERSONAL

RELATIONSHIP WITH CHRIST . . . a person will perish for eternity in separation from

God in a place called hell."  A1239.

294.   The "Our Beliefs" statement on the website of First Pentecostal Church of Palm

Bay, whose pastor—David Myers—presented an invocation at the April 5, 2011 Board

meeting (A368 (invocation transcript); A552 (Board-meeting minutes)), and whose Senior

Minister—Tim Ritchie—presented an invocation at the October 23, 2012 Board meeting

(A420 (invocation transcript)), states, among other things, that "there is one true and living

God" and that there is "eternal life for believers and eternal punishment for unbelievers."

A1241–42.

295.   The "What We Believe" statement on the website of Freedom Christian Center, whose pastor—Tim Franklin—presented invocations at the August 2, 2011, March 6, 2012, and November 6, 2014 Board meetings (A376, A400, A488 (invocation transcripts)), states, among other things, that those who are not "saved to everlasting life . . . will be consigned to everlasting punishment in the lake which burns with fire and brimstone."  A1246.

296.   Notes from the April 20, 2016 sermon by Tim Franklin of Freedom Christian Center (posted on the church's website) state that other religions "babble on" and "do not know God."  A1249.

297.   The "Doctrinal Statement" on the website of Grace Bible Church, whose pastor—Dave Cannon—presented invocations at the January 25, 2011 and December 1, 2011 Board meetings (A361, A392 (invocation transcripts)) states, among other things, that those who are "unsaved" will be sent "to eternal punishment" after death.  A1254.

298.   The "Beliefs" webpage of Grace Church of Melbourne, whose pastor—Aaron Olinsky—presented an invocation at the July 23, 2013 Board meeting (A443 (invocation transcript)) states, among other things, that "[a]fter living one life on earth, the unbelievers will be judged by God and sent to Hell where they will be eternally tormented with the Devil and the Fallen Angels."  A1258.

299.   The "Our Beliefs" webpage of the Lockmar Baptist Church, whose pastor—Mark Van Bever—presented invocations at the August 3, 2010 and September 14, 2010 Board meetings (A343, A348 (invocation transcripts); A547 (Board-meeting minutes)), states, among other things, that "[t]hose who reject Christ will spend eternity in hell."  A1261.

300.   The statement of beliefs on the website of the St. Andrew United Methodist Church, whose pastor—"Charlie" Mark Charles—presented invocations at the January 28, 2014 and November 17, 2015 Board meetings (A460, A525 (invocation transcripts)), states, among other things, that "all humans need to be in relationship with God in order to be fully human."  A1264.

301.   The "Statement of Faith" on the website of Victory Baptist Church, whose youth pastor—Cody Frazier—presented an invocation at the February 23, 2010 Board meeting (A543 (Board-meeting minutes)), states, among other things, that "the souls of the unbelievers remain, after death, in conscious punishment and torment" until they are "cast into the Lake of Fire . . . to suffer everlasting conscious punishment and torment"; that "any form of homosexuality, lesbianism, bisexuality, . . . fornication, adultery and pornography are sinful perversions"; and that "[d]ivorce and remarriage is regarded as adultery except on grounds of fornication."  A1269.


It is so stipulated on behalf of Plaintiffs.

By:   /s/ Alex J. Luchenitser                                      Date: October 11, 2016
        Alex J. Luchenitser (Trial Counsel)

Alex J. Luchenitser (Trial Counsel)*
Bradley Girard*
Americans United for Separation of Church and State
1901 L Street NW, Suite 400
Washington, DC 20036
Tel.: 202-466-3234 x207 / Fax: 202-466-3353
luchenitser@au.org / girard@au.org

Nancy G. Abudu
Florida Bar #111881
Daniel B. Tilley
Florida Bar #102882
ACLU of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
Tel.: 786-363-2707 / Fax: 786-363-1108
nabudu@aclufl.org / dtilley@aclufl.org

Rebecca S. Markert*
Andrew L. Seidel*
Freedom From Religion Foundation, Inc.
304 W. Washington Ave.
Madison, WI 53703
Tel.: 608-256-8900 / Fax: 608-204-0422
rmarkert@ffrf.org / aseidel@ffrg.org

Daniel Mach*
ACLU Program on Freedom of Religion and Belief
915 15th Street NW
Washington, DC 20005
Tel.: 202-548-6604 / Fax: 202-546-0738
dmach@aclu.org

*Appearing *pro hac vice*.

It is so stipulated on behalf of Defendant.

By: _____     Date: October 11, 2016
     Scott L. Knox

Scott L. Knox, Trial Counsel
Florida Bar No. 211291
OFFICE OF THE COUNTY ATTORNEY
2725 Judge Fran Jamieson Way
Viera, FL 32940
Phone: 321.633.2090
Facsimile: 321.633.2096
Scott.knox@brevardcounty.us

**CERTIFICATE OF SERVICE**

I certify that on October 11, 2016, I electronically filed this document with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the defendant.

By: ___/s/ Alex J. Luchenitser_____         Date: October 11, 2016
           Alex J. Luchenitser (Trial Counsel)

Alex J. Luchenitser (Trial Counsel)*
Americans United for Separation of Church and State
1901 L Street NW, Suite 400
Washington, DC 20036
Tel.: 202-466-3234 x207
Fax: 202-466-3353
luchenitser@au.org
*Appearing *pro hac vice*.