IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID WILLIAMSON, et al., ,

    Plaintiffs,                               CASE NO. 6:15-CV-1098-ORL-28 DAB

vs.

BREVARD COUNTY,

    Defendant.
_____/

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF BREVARD COUNTY'S MOTION FOR SUMMARY JUDGMENT**

    Defendant, Brevard County, by and through its undersigned attorney, hereby files its court-requested Supplemental Memorandum of Law in Support of Brevard County's Motion for Summary Judgment as follows:

    **ISSUE:** Can post-enactment oral testimony, written statements and personal opinions by individual County Commissioners be considered by the Court in determining whether invidious discrimination was the sole motivating factor underlying the adoption of Resolution 2015-101 by the unanimous vote of the Board of County Commissioners?

    **SHORT ANSWER:** The Federal Courts only consider contemporaneous and pre-decision statements or writings of individual decision-makers in the analysis of whether discriminatory intent was the sole motivating factor underlying an official action of a legislative body.

**BRIEF SUMMARY OF FACTS RELEVANT TO THE ISSUE**

    On May 9, 2014, and again on July 22, 2014, Plaintiff David Williamson (an Orange

County resident), wrote to Brevard County on behalf of the Central Florida Freethought Community, Inc. (hereafter "CFFC") requesting the County Commission to allow a member of CFFC to deliver a secular invocation at a Brevard County Commission meeting. (Stip. ¶¶112, 113) CFFC is an affiliate of the American Humanist Association and a chapter of the Freedom From Religion Foundation (FFRF). (Stip. ¶¶88,104) Nothing in the record before the court suggests that CFFC is a religious or religiously-based organization.  All but one of the individual Plaintiffs are members of the Plaintiff Humanist Community of the Space Coast, an organization which has the avowed purpose "to advance secular values and secular humanism." (Stip. ¶131; Def. A-2 ¶15, Ex. E)

On August 19, 2014 the County Commission voted to authorize the Chairperson to respond with a letter offering CFFC or one of its members to present an invocation during the "Public Comment," a secular section of the Commission meeting agenda preceding the deliberative business items on the agenda. (Stip. ¶¶114-117, A679-681) The only comments made by Commissioners at that meeting were an inquiry from Commissioner Infantini to constituent/ speaker David Kearns asking where he got information that only a specific suite of religions perform invocations at board meetings; suggesting that he research something other than the newspaper; and that she does not have a specific religion. (A566-567, Commission 8-19-14 minutes)  At that meeting, Commissioner Anderson explained the rotating commissioner invocation selection and invitation process; that a commissioner, not the Board, can invite anyone for an invocation; that there was no Board endorsement of religion by picking a Catholic to come in; that is what the Constitution says and sometimes atheist people try to skew that; that the Board does not establish or prohibit free exercise of religion; that if Mr. Kearns thinks Christianity is not under attack, look at Iraq now; if anyone wants to give an invocation, he will

look at it; that he was fine with the letter and did not know how someone could be offended by something they do not believe to exist.  Commissioner Fisher stated the Board is giving them the opportunity to speak under Public Comment and Commissioner Nelson asked the County Attorney if he had reviewed the letter, to which inquiry the County Attorney indicated that he did not agree with the interpretation of law given by the CFFC, but tracked the actual law in the letter written in behalf of Commissioner Bolin. (A566-567, Commission 8-19-14 minutes)

      The authorized letter set forth an informal pre-meeting prayer policy which eventually led to a later formal policy enacted by Resolution 2015-101 ("the Resolution").  (Stip. ¶115, A679-81; ¶131, Def. A-2)  The August 19, 2014 letter specifically stated that during the Public Comment section of the agenda, "you and your organization are free to speak their views and *beliefs*, or even a closing supplication." (Emphasis supplied) (Stip. ¶115, A681)   As the Commission was to later note in paragraph 35 of the Resolution, the section of the Board's written policy titled "Rules for Decorum for Public Comment"—extant since 2005 and republished in Resolution 14-219, amending Resolution 05-332 (A573, 580-582)—states that "it is the policy of the Board of County Commissioners to respect minority views as well as differing opinions, conclusions, backgrounds *and beliefs*" and that "'[t]he underlying purpose for the policy is the Board's finding 'that input from differing perspectives enriches public discussion and helps to build a better consensus.'" (Emphasis supplied) (Stip. ¶131, Def. A-2, ¶35)  Finally, paraphrasing from the *Town of Greece* opinion, the letter stated that a violation of the Establishment Clause is not "'made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where any member of the public' is permitted to offer views reflecting his or her own convictions."  (Stip. ¶115, A681)

On August 28, 2014, the Board received a letter from the Anti-Defamation League protesting the Board's offer to CFFC. (Stip. ¶121, A687-688)  On November 6, 2014, the Board instructed the Chair to send a letter response 1) rejecting the ADL's claim that a local atheist had been barred from delivering a prayer; 2) raising the Board's concern that substituting an atheist prayer during a traditional faith-based invocation segment of the meeting "could be easily construed, either overtly or by implication, as evidencing vicarious disdain, scorn or disrespect for the beliefs of our faith-based community" as well as an endorsement of secular humanism in violation of the Establishment Clause; and 3) rejecting the ADL's suggestion that the Board violate the prayer censorship prohibition laid out in the *Town of Greece* case.  (Stip. ¶122-124, A690-692)  The letter also highlighted the secular nature of the Board's business meeting while suggesting that "the separation between faith and secular presentations on different parts of the agenda recognizes both elements of the community and is entirely consistent with, and symbolic of, the very stated goal of both the Anti-Defamation League and the CFFTC—the literal separation of church and a secular state." (Stip. ¶122, A692).

On January 26, 2015, Americans United for Separation of Church and State (AUSCS); the American Civil Liberties Union (ACLU); and FFRF sent a joint letter requesting that the County Commission Chair allow Plaintiffs Williamson and Hansel to be added to the list of invocation givers. (Stip. ¶125-127)  There is no indication anywhere in the Record before this court that FFRF, AUSCS or ACLU is a religious organization.  On May 26, 2015, a second joint letter from those same organizations was sent to the Commission Chair demanding that the five individual Plaintiffs—all of whom are FFRF members—Plaintiff CFFC (an FFRF chapter), and Plaintiff Space Coast Freethought Association (whose organizer is an FFRF member) be permitted to deliver nontheistic invocations at the opening of County Commission meetings.

(Stip. ¶¶104; 129, A699-701; 207,220) Neither of the two joint letters from the FFRF, AUSCS and ACLU suggested or indicated the existence of an attorney-client relationship between the letters' signatories and any of the individuals or corporate entities named in the letter. (Stip. ¶¶121, A687-688; 129, A699-701)

On July 7, 2015, the County Commission, without comment by the Commissioners, responded to the May 26, 2015, AUSCS, ACLU and FFRF letter by adopting Resolution 2015-101 setting forth factual findings and conclusions incorporated into a formal pre-meeting invocation policy. (Stip. ¶¶131-133, Def. A-2)  The August 19, 2014, and November 6, 2014, letters described above—the latter citing avoidance of a violation of the Establishment Clause as a purpose for the informal pre-meeting prayer policy—together with the recitals and numbered paragraphs in Resolution 2015-101, set forth the legislative history, legislative findings and factors motivating the County Commission to adopt the Resolution. (Stip. ¶122, A690-692; 114-117, A679-681; 131-133, Def. A-2)   Two recitals and three specific findings in the Resolution succinctly summarize the Commission's underlying purpose and intent for enactment of the formal policy set forth in section 2 of the resolution.[1]

---

[1] **"WHEREAS,** the Board has previously responded in writing to requests made by atheists seeking to perform a pre-meeting prayer and, in so doing, has identified an informal policy addressing the issue of pre-meeting prayer; and...

**WHEREAS**, the Board wishes to formalize a policy on invocations that is not hostile to faith-based religions and that does not endorse secular humanism or non-belief over traditional faith-based religions comprised of constituents who believe in God…"(Stip. 131-133, Def. A-2)

33. The letter to Mr. Williamson reflects a longstanding practice of the Board to provide a limited public forum under the Public Comment section of its business agenda at regular meetings of the Board, which occurs twice during the course of a regular meeting-once after the consent portion of the business agenda has been acted upon and a second time at the end of the meeting. The limited public forum during Public Comment implements Article I, section 5 of the Florida Constitution which provides that "the people shall have the right ... to instruct their representatives, and to petition for redress of grievances."

35. The underlying policy for the Public Comment section of the business agenda is set forth in Resolution 14-219. In accordance with that policy, "[p]ersons speaking under the public comment portion of the agenda may address topics or issues under the jurisdiction or control of the County Commission or that are relevant to business of the County Commission" and "to those items where the Board has traditionally expressed a position for the betterment

Apart from the August 19, 2014, and November 6, 2014, letters from the County Commission Chairperson and related staff agenda memoranda, the only record of contemporaneous or pre-Resolution enactment statements by Commissioners-elect or sworn Commissioners addressing the pre-meeting prayer issue are:

1) a November 13-14, 2014, email inquiry to, then, *Commissioners-elect* Smith and Barfield responding to CFFC's question about what position they would take on the County Commission invocation policy; (Stip. ¶162, A1043)

2) a February 9, 2015, Facebook post expressing Commissioner Barfield's personal view of an opening invocation delivered by Pastor Matt Stallbaum. (Stip. ¶162, A1047)

3) a July 7, 2015, newspaper article—posted online following the meeting where Resolution 2015-101 was adopted—purporting to quote Commissioner Smith's comments summarizing the pre-meeting prayer policy; the policy's purpose of avoiding "hostility" toward faith-based religion and a possible Florida Constitution violation should the Board supplant

---

of the community interest." The Board's existing policy notes that "it is the policy of the Board of County Commissioners to respect minority views as well as differing opinions conclusions backgrounds *and beliefs."* The underlying purpose for the policy is the Board's finding "that input from differing perspectives enriches public discussion and helps to build a better consensus." [Emphasis supplied]

36. Based upon findings 1 through 37, above, the Board finds that yielding to FFRF and AUSCS views by supplanting traditional ceremonial pre-meeting prayer before the Board's secular business agenda at regular Board meetings-a segment reserved for the acknowledgement and interaction with the county's faith-based community-with an "invocation" by atheists, agnostics or other persons represented by or associated with FFRF and AUSCS could be viewed as County hostility toward monotheistic religions whose theology and principles currently represent the minority view in Brevard County. The Board concludes that such action may be deemed to violate the Constitution of the State of Florida.

37. Based upon findings 1 through 37, the organizations requesting the substitution of Secular Humanists or atheists to conduct a pre-meeting invocation by displacing representatives of the minority faith-based monotheistic community which has traditionally given the pre-meeting prayer, could be viewed as the Board endorsement of Secular Humanist and Atheist principles in view of:

    a. the overwhelmingly secular nature of the Board's business meeting following the invocation; and
    b. the evidence suggesting that the requesting organizations are engaged in nothing more than a carefully orchestrated plan to promote or advance principles of Secular Humanism through the displacement or elimination of ceremonial deism traditionally provided by monotheistic clerics giving pre-meeting prayers. (Stip. 131-133, Def. A-2)

atheist or agnostic secular invocations for the traditional faith-based invocations; and the Commissioner's personal feelings about the meaning of "a godly invocation" and supplanting "a godly invocation" with a secular invocation delivered by atheists or agnostics (Stip. ¶153, A1027)

## CASE LAW ANALYSIS

In free exercise, establishment clause and free speech cases where determination of the motivation or object of a law or official action is at issue, the United States Supreme Court analysis is guided by the Court's equal protection cases. *Church of Lukumi Babalu Aye v. City of Hialeah*, 113 S. Ct. 2217, 2230 (U.S. 1992)(In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases), citing *Walz v. Tax Comm'n of New York City*, 90 S.Ct. 1409, 1425 (Harlan, concurring)(In establishment clause cases, the determination of neutrality in application of a law requires an equal protection mode of analysis); *Niemotko v. Maryland*, 71 S. Ct. 325(U.S. 1977)(City's arbitrary denial of Jehovah witnesses application for license to use park used by other religions was a violation of equal protection, free speech and free exercise)

Citing to the seminal *Arlington Heights v. Metropolitan Housing Development Corp*, 97 S. Ct. 555 (1977), the *Church of Lukumi Babalu Aye* Court noted that "in equal protection cases, we may determine the city council's object from both direct and circumstantial evidence." Notably, the *Arlington Heights* Court's equal protection analysis of direct and circumstantial evidence was preceded by the caveat that:

> "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. (*Footnote omitted*) In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality."

*97 S.Ct. at 563. See also*: *Covalt v. Carey Canada, Inc.*, 860 F.2d 1434, 1439 (7th Cir. 1988) (Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice)

In *Arlington Heights* the Court noted that, disproportionate impact is not irrelevant, but is not the sole touchstone to invidious discrimination. *97 S.Ct. at 563* "Determining whether invidious discriminatory purpose was a motivating factor" underlying an official action or decision violating the equal protection clause "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may exist." *97 S.Ct. at 564-565* There were six types of evidence identified by the *Arlington Heights* Court:  1) as a starting point, the impact of the official action, though disproportionate impact is not the sole touchstone of invidious discrimination (*97 S.Ct. at 563)*; 2) the historical background of the decision, particularly if it reveals a series of official actions take for invidious purposes, citing to *Griffin v. County School Board*, 84 S. Ct. 1226, 1233 (U.S. 1964)(a showing that different persons are treated differently is not enough, without more, to show a denial of equal protection);  3) the specific sequence of events leading up to the challenged decision if those events shed light on the decisionmaker's purpose; 4) departures from the normal procedural sequence; 5) substantive departure from factors usually considered important by the decisionmaker that strongly favor a decision contrary to the one reached; and 6) legislative or administrative history, especially contemporary statements by members of the decision-making body, meeting minutes or reports. *97 S.Ct. at 565* In *Church of Lukumi Babalu Aye*, the Court reaffirmed its position that "[t]hese objective factors bear on the question of discriminatory object." *113 S.Ct. at 2231*.

> **A. Contemporaneous Statements by Decisionmakers in Free Exercise, Free Speech and Equal Protection Cases Involving Religion**

The evidentiary factors the federal courts are to consider, as set forth in *Arlington* include

*contemporaneous* statements of the decision makers. In the case at bar the Court has asked counsel to provide authority on the issue as to whether the Court can consider the Commissioners statements or writings <u>other than</u> those that were *contemporaneous* with the enactment of the County's informal and formal pre-meeting prayer policies in the Court's consideration of whether an impermissible motive existed for the Board's enactment of those policies. Give this Court's request, the issue of what constitutes a *contemporaneous* statement is paramount. The U.S. Supreme Court decisions in *Church of Lukumi Babalu Aye* and *Niemotko* demonstrate what the Court meant by *contemporaneous* statements and how that factor is applied in equal protection, free speech and free exercise cases.

In *Church of Lukumi Babalu Aye*, the Court considered the actions of the City of Hialeah City Council prior to completing the issuance of all necessary licenses and permits for the construction of a Santerian church, whose Pastor had "announced plans to establish a house of worship as well as a school, cultural center, and museum" with the stated goal "to bring the practice of the Santeria faith, including its ritual of animal sacrifice into the open." Before the city permitting process had been completed the City Council calling an emergency public meeting to begin the process of enacting a resolution expressing Hialeah residents' concern "that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety" and reiterating the City's "commitment to a prohibition against any and all acts of any and all religious groups which are inconsistent with public morals, peace or safety." At that meeting the Council also passed an emergency ordinance incorporating Florida criminal laws prohibiting animal cruelty. The City Attorney then sought and received a Florida Attorney General's Opinion asking if the Florida animal cruelty law prohibited a religious group from sacrificing an animal in a religious ritual and whether the city could enact ordinances making

9

religious animal sacrifice unlawful. After receiving the Attorney General's opinion that ritual sacrifice was prohibited, the City enacted a second resolution declaring it city policy to oppose the ritual sacrifices of animals and the City's intent to prosecute any person who did so. Subsequently, the City enacted three additional ordinances addressing the issue of religious animal sacrifice, the effect of which was to make it an unlawful practice within the city's corporate limits.

It is in the context of the foregoing events that the Supreme Court considered minutes and taped excerpts from the Hialeah City Council's emergency meeting and declared that the evidence demonstrated "significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice." Specifically the Court honed in on the *contemporaneous* hostile statements made at the emergency meeting by four city councilmen,[2] the city's police chaplain,[3] the city attorney[4] and deputy city attorney. The Court's neutrality inquiry into the history and contemporaneous comments of the Commissioners at the time of the first resolution and emergency ordinance, but prior to the enactment of the last resolution and three additional ordinances, led the Justices to conclude that "[t]he ordinances had as their object the suppression of religion." 113 S.Ct. at 2231.

---

[2] "When Councilman Martinez, a supporter of the ordinances, stated that in prerevolution Cuba "people were put in jail for practicing this religion," the audience applauded… Councilman Cardoso said that Santeria devotees at the Church "are in violation of everything this country stands for." Councilman Mejides indicated that he was "totally against the sacrificing of animals" and distinguished kosher slaughter because it had a "real purpose." The "Bible says we are allowed to sacrifice an animal for consumption," he continued, "but for any other purposes, I don't believe that the Bible allows that." The president of the city council, Councilman Echevarria, asked: "What can we do to prevent the Church from opening?" *113 S.Ct. at 2231*

[3] The chaplain of the Hialeah Police Department told the city council that Santeria was a sin, "foolishness," "an abomination to the Lord," and the worship of "demons." *Ibid.*

[4] The city attorney commented that Resolution 87-66 indicated: "This community will not tolerate religious practices which are abhorrent to its citizens . . ." *Ibid.*

The *Niemotko* Court reached a similar result where the facts reviewed by the Court included at a hearing on two Jehovah's witnesses appeal before the City of Have de Grace city council challenging the denial of their application to use city public park facilities for Bible talks. Although there were no ordinances or promulgated standards prohibiting the use of the park for that purpose, the City customarily required a permit for such uses from the city's Park Commissioner, who had refused the Jehovah's witnesses permit application.  In concluding that "the use of the park was denied because of the City Council's dislike for or disagreement with the Witnesses or their views," the Court focused on what was said at the hearing before the City Council and noted that "[t]he only questions asked of the Witnesses *at the hearing* pertained to their alleged refusal to salute the flag, their views on the Bible, and other issues irrelevant to the unencumbered use of the public parks*"* [Emphasis supplied] *71 S.Ct. at 328.*

### B.  Contemporaneous Statements by Lawmakers in Establishment Clause Cases

In Establishment Clause cases, the analysis as to whether the federal courts can consider post-enactment as opposed to contemporaneous statements made by lawmakers in determining the underlying secular purpose of a statute or ordinance is essentially the same as the analysis in the cases cited in part A of this memorandum.  That analysis has been provided by the United States Supreme Court in two "religion" cases, *Edwards v. Aguillard*, 107 S. Ct. 2573(U.S. 1987) (Louisiana "Creationism Act" held facially invalid for lack of a clear secular purpose), and *Wallace v. Jaffree*, 105 S.Ct. 2479 (U.S.1985) (Alabama statute authorizing one minute period of silence for meditation or voluntary prayer violates Establishment Clause for lack of secular legislative purpose).

In *Edwards* the Court indicated that a court's finding of improper purpose behind a statute is appropriately determined by the statute on its face; its legislative history; its interpretation by a

responsible administrative agency; the plain meaning of the statute's words, enlightened by their context and the *contemporaneous* legislative history; the historical context of the statute; and the specific sequence of events leading to passage of the statute.  107 S.Ct. at 2583 [citing to *Arlington Heights* v. *Metropolitan Housing Dev. Corp*., 429 U.S. 252 (1977) and *Wallace v. Jaffree*]  As to the contemporaneous legislative analysis, the Court highlighted contemporaneous statements made by the state senator sponsoring the bill  sponsor during legislative hearings held prior to enactment.[5]  However, the Court rejected the relevance of postenactment court-filed affidavits and reiterated its position in *Wallace v. Jaffree* where the Court found "postenactment elucidation of the meaning of a statute to be of little relevance in determining the intent of the legislature **contemporaneous** to the passage of the statute." *107 S.Ct. at  2584(FN 19)*   In *Edwards*, those postenactment statements took the form of court-filed affidavits from scientific experts which, according to the Court, would "not illuminate the contemporaneous purpose of the Louisiana Legislature when it made the law"—even though "[t]he Louisiana Legislature did hear and rely upon scientific experts in passing the bill." *107 S.Ct. at 2584*  The judicial policy reasons for that decision were elucidated by the 7th Circuit Court of Appeal in *Covalt v. Carey Canada, Inc.*, 860 F.2d 1434 (7th Cir. 1988) where the court noted: "Legislative history generated in the course of litigation has even less utility, for it may be designed to mislead, to put an advocate's slant on things."  *860 F.2d at 1449*

---

[5] "The legislative history documents that the Act's primary purpose was to change the science curriculum of public schools in order to provide persuasive advantage to a particular religious doctrine that rejects the factual basis of evolution in its entirety. The sponsor of the Creationism Act, Senator Keith, explained during the legislative hearings that his disdain for the theory of evolution  resulted from the support that evolution supplied to views contrary to his own religious beliefs. According to Senator Keith, the theory of evolution was consonant with the "cardinal principle[s] of religious humanism, secular humanism, theological liberalism, aetheistism [sic]." 1 App. E-312 -- E-313; see also 2 App. E-499 -- E-500. The state senator repeatedly stated that scientific evidence supporting his religious views should be included in the public school curriculum to redress the fact that the theory of evolution incidentally coincided with what he characterized as religious beliefs antithetical to his own." 107 S. Ct. at 2582

In *Wallace v. Jeffrey* the U.S. Supreme Court held that an Alabama statute allowing voluntary school prayer violated the Establishment Clause because it intended to convey a message of state approval of prayer in public schools. In analyzing the secular purpose under the secular purpose prong of the three-prong test set forth in *Lemon v. Kurtzman*, the Court looked to unrebutted evidence of the contemporaneous actions of the bill's sponsor who, without objection, had "inserted into the legislative record a statement indicating that the legislation was an effort to return voluntary prayer to the public schools." *107 S.Ct. at 2490-91*  Due to the absence of any other identified secular purpose for the law, the Court held that the statute constituted endorsement of religion by the school district in violation of the Establishment Clause.  *107 S.Ct. at 2490-91*

## Conclusion

Under the foregoing cases, only contemporaneous statements or actions of the County Commissioners should be considered in determining the motivating purpose underlying the enactment of Resolution 2015-101.  Distilled to its essence, the evidence of actions leading up to and contemporaneous with the enactment of Resolution 2015-101 reveals several secular purposes that have nothing whatsoever to do with discrimination, including avoidance of an Establishment Clause or Florida Constitution violation, compliance with the *Town of Greece* principles and the conformity of the Plaintiffs' request to a pre-existing "Rules for Decorum for Public Comment" policy encouraging the presentation of "differing beliefs"—in this case secular humanist beliefs—which the County Commission deemed consistent with the existing policy applicable to the Public Comment portion of the agenda, which takes place just prior to the secular and deliberative business portion of the meeting in contrast to the ceremonial portion of the limited public forum set aside at the beginning of the meeting.  The Board acted in a manner

entirely consistent with the *Town of Greece* Court's guiding principles which require looking at the prayer opportunity "as a whole" and deems no Establishment Clause violation to occur where, "as here, any member of the public is welcome, in turn, to offer an invocation reflecting his or her own convictions." *Town of Greece, 134 S.Ct. at 1811*  Where else on a County Commission meeting, other than Public Comment, could <u>any</u> *member of the public…**in turn**…*offer an invocation reflecting his or her own convictions or *beliefs*?

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 28, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and served on all parties using the CM/ECF system.

>    *s/Scott L. Knox*
>    Scott L. Knox, Trial Counsel
>    Florida Bar No. 211291
>    OFFICE OF THE COUNTY ATTORNEY
>    2725 Judge Fran Jamieson Way
>    Viera, FL 32940
>    Phone: 321.633.2090
>    Facsimile: 321.633.2096
>    scott.knox@brevardcounty