1

```
1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3
    - - - - - - - - - - - - - - - X
4   DAVID WILLIAMSON, CHASE        :
    HANSEL, KEITH BECHER, RONALD   :
5   GORDON, JEFFERY KOEBERL,       :  Case No.:
    CENTRAL FLORIDA FREETHOUGHT     :  6:15-cv-1098-Orl-28DCI
6   COMMUNITY, SPACE COAST         :
    FREETHOUGHT ASSOCIATION, and   :
7   HUMANIST COMMUNITY OF THE      :  Orlando, Florida
    SPACE COAST,                   :  October 5, 2016
8                                  :  10:00 a.m.
          Plaintiffs,              :
9                                  :
    vs.                            :
10                                 :
    BREVARD COUNTY,                :
11                                 :
          Defendant.              :
12  - - - - - - - - - - - - - - - X

13    TRANSCRIPT OF DEFENDANT'S AND PLAINTIFFS' MOTIONS FOR
                    SUMMARY JUDGMENT
14       BEFORE THE HONORABLE JOHN ANTOON II
              UNITED STATES DISTRICT JUDGE
15

16  APPEARANCES:

17   Counsel for Plaintiff:        Alex J. Luchenitser
                                   Bradley Girard
18
     Counsel for Defendant:        Scott L. Knox
19                                 Cristina T. Berrios
                                   Diana E. Yuan
20                                 Matthew Soss

21
    Proceedings recorded by mechanical stenography.
22  Transcript produced by computer-aided transcription.

23
    Court Reporter:  Suzanne L. Trimble, CCR, CRR, RPR
24                   Federal Official Court Reporter
                     401 West Central Boulevard, Suite 4600
25                   Orlando, Florida 32801
                     e-mail: trimblecourtreporter@gmail.com
```

*2*

```
1                    P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  This is in the matter of

3    David Williamson, Chase Hansel, Keith Becher, Ronald Gordon,

4    Jeffery Koeberl, Central Florida Freethought Community, Space

5    Coast Freethought Association, and the Humanist Community of

6    the Space Coast v. Brevard County, Case

7    No. 6:15-civil-1098-Orlando-28DCI.

8            Will counsel please state your name for the record.

9            MR. LUCHENITSER:  Yes.  Alex Luchenitser with

10   Americans United For Separation of Church and State for

11   Plaintiffs, and we have Bradley Girard also with Americans

12   United for Plaintiffs.  And in the audience we have some of

13   the Plaintiffs, David Williamson, Keith Becher, Ron Gordon;

14   board members of Plaintiff Central Florida Freethought

15   Community, Joseph Richardson and Jocelyn Williamson; and then

16   three members of Central Florida Freethought Community, Steve

17   Schwartz, Steve Brady, and Ellen Foster.

18           THE COURT:  Okay.

19           MR. KNOX:  My name is Scott Knox.  I'm representing

20   Brevard County, the defendant, and with me I have Diana Yuan,

21   the assistant county attorney, and Cristina Berrios, who is

22   also an assistant county attorney.  Visiting with us are Alex

23   Esseesse back here, who is a law clerk with the county

24   attorney's office, and Matthew Soss, who is an assistant

25   county attorney.  They've never been to federal court before.
```

1    So they're here for the first time.

2          THE COURT:  Well, welcome.  And thank you for

3    traveling on the Plaintiffs' side all the way from Washington,

4    and on the county side, although not far away, from Brevard

5    County which is under hurricane warning.

6          We will watch the weather, and I'm sure you'll get

7    out of here on time to make your flight home to Washington and

8    a safe trip back to Viera.

9          I routinely ask questions during arguments on

10   summary judgment.  I'll probably do that more in this case

11   than I normally do.  So don't be unnerved if I interrupt you.

12   I'll give you as much time as you need to make your arguments,

13   but I think it's important that I have a complete

14   understanding of the law, the facts, and your arguments.

15         By the way, your stipulated facts have been very

16   helpful; however, I noticed a disclaimer that was included

17   saying, We're not sure of the citations, or something to that

18   effect, at least you're not going to stand behind them.

19         So what I would like you to do is within the next

20   ten days edit that stipulation and make sure you include

21   correct citations to the record and give it to me in Word

22   form.  So I can use it more efficiently here.

23         Now, I did not see who filed the first motion.  Who

24   filed the first motion?  Or do you have any preferences as to

25   who goes first?

*4*

1          MR. LUCHENITSER:  I guess, I think we're the

2     Plaintiffs.  We prefer to go first.

3          THE COURT:  Okay.  Go ahead.

4          MR. LUCHENITSER:  Thank you.  May it please the

5     Court, I will cover everything but the Florida state

6     constitutional claims, and then Mr. Girard will handle the

7     argument of the Florida state constitutional claims, if

8     dividing the argument like that is acceptable.

9          THE COURT:  I'm interested only to the extent that

10    the analysis would be different from the analysis under the

11    Federal Constitution.

12         MR. LUCHENITSER:  Right.  That's mainly what

13    Mr. Girard's argument is going to cover.  And we really

14    appreciate the Court rescheduling this hearing so that

15    Mr. Girard could attend.

16         Brevard County's practice of barring atheists,

17    humanists, and other nontheists from delivering opening

18    invocations at its county commission meetings is

19    quintessential religious discrimination.  In the County's

20    practice of directing audience members to rise for invocation

21    is religious coercion.

22         The County's practices violate four clauses of the

23    United States Constitution, establishment, free exercise, free

24    speech, and equal protection clauses.  And the County's

25    practices also violate three clauses of the Florida

**5**

1    Constitution, the establishment, no aid, and equal protection

2    clauses.  We will --

3        THE COURT:  You know, the landscape has changed

4    greatly in this area with the decision in *Town of Greece*.  Let

5    me ask you a question right off.  Don't you agree after *Town*

6    *of Greece* that there is a requirement that you prove -- that a

7    plaintiff must prove in a legislative prayer case some

8    discriminatory intent?  Do you agree with that?  I know you

9    don't like it, but do you agree with it, that's what *Greece*

10   says.

11       MR. LUCHENITSER:  Discriminatory intent or facially

12   discriminatory practice, and I suppose if a practice is

13   facially discriminatory, it must have some discriminatory

14   intent.

15       THE COURT:  But only if it is a long-term

16   established practice, right?

17       MR. LUCHENITSER:  Right.  Or if it's a policy

18   that's -- as you have here, we have a facially

19   discriminatory --

20       THE COURT:  That's the difference, isn't it?  In

21   this case, you have an express policy.

22       MR. LUCHENITSER:  That's correct.

23       THE COURT:  That takes this case out from under the

24   holdings of any other cases, doesn't it?  Well, maybe not.

25   Maybe there was one that excluded certain religions, but it

1    makes it a different kind of case, doesn't it?

2          MR. LUCHENITSER:  Right.  What the policy does by

3    discriminating against atheists, humanists, and other

4    nontheists, the policy engages exactly in what the *Town of*

5    *Greece* prohibited, and it does what was struck down by the

6    Eleventh Circuit in the *Pelphrey* case.

7          In the *Pelphrey* case, you had a practice where

8    certain religious denominations were excluded from giving

9    invocations and the Court said that that was a clear

10   constitutional violation.

11         So here you have the exact same thing.  You have a

12   policy that allows people who believe in a monotheistic

13   religion to give invocations, but people who do not believe in

14   God, who believe in humanism or atheism -- and the courts have

15   held that both humanism and atheism are religions that are

16   entitled to the protections of the Establishment Clause.  All

17   nontheists are prohibited from giving invocations, and that's

18   religious discrimination.

19         THE COURT:  Right.  It was *Pelphrey* that actually

20   eliminated certain religions from its list of invocation

21   speakers.  Right?

22         MR. LUCHENITSER:  That's correct.

23         THE COURT:  And the Court said that the selection of

24   invocation speakers based on an impermissible motive won't

25   stand under *Marsh*, and *Marsh* in that respect survives *Town of*

1    *Greece*, doesn't it?

2          MR. LUCHENITSER:  That's correct.  That's correct.

3    So I mean, mainly they're two sides of the same coin.  If

4    there's an express discriminatory motive, you have a

5    violation, or if the policy expressly discriminates based on

6    religious lines, you have a violation, because *Greece* said

7    that bias against minority religions is prohibited, that the

8    selection policy for picking invocation speakers must be

9    neutral with respect to religion.

10          THE COURT:  Well, if a discriminatory intent is

11    required, what, if any, daylight is there between your claims,

12    your equal protection claims and your Establishment Clause

13    claims?

14          MR. LUCHENITSER:  Well, we allege violations of both

15    clauses.  The equal protection claim -- I mean, the claims are

16    similar.  I think that's certainly true.  The equal protection

17    claim you --

18          THE COURT:  That was the effect of *Town of Greece*,

19    wasn't it?  It made them similar, almost merging them, I would

20    think, as with regard to what's required --

21          MR. LUCHENITSER:  Right.  I think one striking thing

22    about this case is we have alleged violations of Florida

23    constitutional clauses, and in a lot of ways these four

24    clauses prohibit similar conduct.  And I think that just shows

25    that this policy of the Count's is offensive to the whole --

1  to fundamental principles that flow throughout our

2  Constitution, to fundamental principles that are expressed in

3  several clauses, the First Amendment, as well as the Equal

4  Protection Clause.

5      THE COURT:  What effect does *Town of Greece* have and

6  the recent decision, the *Lund* case from the Fourth Circuit, on

7  your claim of coercion?

8      MR. LUCHENITSER:  Sure.  Sure.  We think the *Lund*

9  case is contrary to *Town of Greece*.  *Town of Greece* made a --

10     THE COURT:  So did Judge Wilkinson, I think.

11     MR. LUCHENITSER:  Yes, yes.  *Lund* was a deeply

12  divided two-to-one decision, and we understand that this past

13  Monday a petition for rehearing en banc was filed.  So I think

14  while you can never, you know, put odds on an en banc petition

15  being granted, but I think the odds here are pretty good of it

16  being granted, given that you had Judge Wilkinson, you know,

17  who is not thought of as a very liberal judge, dissented here,

18  and I think you have a -- if you look at the composition sort

19  of as a whole, compared to the -- you know, who the two people

20  of majority were, I think there's a good chance that the whole

21  circuit might rehear this, this case.

22     But back to *Town of Greece*, *Town of Greece* says that

23  analysis would be quite different if the town there had asked

24  audience members to stand, if the board members had asked

25  audience members to stand, if they had asked audience members

1   to bow their heads.  The Court emphasized that board members

2   should not solicit audience members to take part in the

3   invocation.  The Court emphasized that the board members there

4   did not do so, and, here, the board is doing the exact

5   opposite.  The board members are asking the audience to stand

6   for invocations.

7           THE COURT:  Well, no.  They're doing it before that,

8   based on the videos I watched.  The videos I watched, they

9   asked them to stand to introduce the person who is going to

10  give the invocation.

11          MR. LUCHENITSER:  Yeah.  I think that's --

12          THE COURT:  I don't know if that always happens, but

13  the videos I saw, they -- I had not seen that before, but they

14  ask everybody to stand, and then they introduce the speaker,

15  and then they let the speaker talk about the organization with

16  which they're affiliated.  Is that right?

17          MR. LUCHENITSER:  That's right.  I think that's how

18  it generally happens.  I think there might be some variation

19  in terms of the exact order and sequence, depending on who the

20  chair is and what commissioners was doing the introduction of

21  the speaker, but I think the way Your Honor described it is

22  how it happens most of the time.

23          But anyway, the board asks the audience to stand,

24  you know, before the invocation takes place, whether it's

25  immediately before the invocation or before the speaker is

1    introduced, and that is just contrary to what *Town of Greece*

2    says.

3         And another thing *Town of Greece* said was that the

4    course of effect -- part of the reason there was no coercion

5    there was that any person in the town was eligible to give an

6    invocation themselves.  And, here, you have the -- the first

7    thing that we challenge is the discriminatory selection

8    policy, which prohibits the atheists and humanists from giving

9    invocations themselves.  So that increases the coercive force

10   of the effect to stand because they know that they're being

11   asked to participate in something that they cannot be

12   permitted to give themselves.

13        And in the *Lund* case, you don't have a second

14   violation that -- or, at least according to the Fourth Circuit

15   majority, you don't have a violation that enhanced the

16   coercive force of the request to stand.

17        So let me -- shall I go back to the religious

18   discrimination?

19        THE COURT:  Let me ask you a couple more questions

20   before you go back.  I know you've organized your argument.

21        MR. LUCHENITSER:  Sure.

22        THE COURT:  I'll let you finish after I ask you.

23        MR. LUCHENITSER:  I'm happy to just answer your

24   questions.

25        THE COURT:  Yeah.  In the stipulated facts it said,

1   as I understood them, that there were over -- just over 200

2   speakers.  They all were from Christian organizations or had

3   Christian content, except one was secular, and five or six

4   were Jewish.  Is that right?

5          MR. LUCHENITSER:  That's, that's correct.

6          THE COURT:  The point I'm trying to clarify is at

7   another point, and I don't remember whether it was the

8   resolution or elsewhere, they said that there had been a

9   Muslim invited to attend -- not attend, but to give the

10  invocation.

11         MR. LUCHENITSER:  Yeah.  Let me just clarify that.

12  So the first thing Your Honor said, the stipulation -- there

13  wasn't one speaker that was secular.  There was one speaker

14  who ended his invocation with a monotheistic religious

15  statement, but we just don't know what denomination of

16  monotheism the speaker was affiliated with.

17         THE COURT:  In other words, he could have been a

18  member of any monotheistic --

19         MR. LUCHENITSER:  Right.  With respect to the Muslim

20  speaker, if there was a Muslim speaker, it would have been

21  before 2010.

22         THE COURT:  Okay.  I'll ask Mr. Knox about that.

23         MR. LUCHENITSER:  Right.

24         THE COURT:  You know, in your prayer for -- maybe I

25  shouldn't use the word *prayer*.

1        In your request for relief you asked me to order the

2   County to allow your clients to give invocations.  Now, how

3   would -- how do you envision such an order?  What would it

4   say?

5        MR. LUCHENITSER:  Well, I think Your Honor would be

6   fine just tracking the language of the proposed relief that we

7   put in the Complaint and the end of our opening brief, and

8   then hopefully we can work the details out with the County in

9   terms of the timing of when the Plaintiffs would be permitted

10  to give invocations, and, hopefully, we wouldn't have to come

11  back, but it's interesting you mention, Is it improper to use

12  prayer for relief?  One of the points we make is that an

13  invocation or prayer doesn't have to be theistic.  And, you

14  know, the fact, the word *prayer* isn't only used to cover

15  religious entreaties reflected by the fact that it's used in

16  other contexts, such as the legal context of prayer for

17  relief.

18       THE COURT:  The County uses the word *monotheistic*,

19  and they use the word *faith based* usually in conjunction with

20  community.  Is there anywhere in the record a definition of

21  either of those things, other than the commissioners'

22  comments?

23       MR. LUCHENITSER:  I'm not sure that there is.  Like

24  I said, I think the definition of monotheistic is -- I don't

25  think there's any dispute about what that means.  It's just

1   somebody who believes in one god.

2          THE COURT:  It's not limited to the Abrahamic

3   religions, though, I would guess.

4          MR. LUCHENITSER:  I don't think it is.  I think as

5   long as --

6          THE COURT:  Do you think that's what the County

7   contemplated, though, when they used that term?

8          MR. LUCHENITSER:  That's a good question.

9          THE COURT:  Better to ask Mr. Knox.

10         MR. LUCHENITSER:  Right.  I mean, there are

11  non-Judeo-Christian and non-Muslim religions that believe in

12  one god.  When we deposed the county commissioners, many of

13  them said they wouldn't invite invocation speakers from

14  various minority religions, and certainly some of those

15  religions are religions where the believers believe in more

16  than one god.  I would have to think carefully about whether

17  some of those religions fit into the concept of monotheistic,

18  but believe in only one god.

19         THE COURT:  The Hindus are polytheistic, aren't

20  they?

21         MR. LUCHENITSER:  I'm sorry?

22         THE COURT:  Hindus or Hinduism is a polytheistic --

23         MR. LUCHENITSER:  Yes, Hindu is a polytheistic and

24  Native American religions.  I believe that some commissioners

25  testified -- at least testified that they weren't sure if they

*14*

1    would allow someone from a Native American religion.  I'm not

2    sure --

3          THE COURT:  They said, as I recall, they would have

4    to investigate.

5          MR. LUCHENITSER:  Right.  I don't think any of them

6    said they wouldn't allow a Native American religion, but

7    that's -- I mean there's differences within Native American

8    religions.  I think some of them are thought of as

9    polytheistic.  Some of them may be thought of as monotheistic.

10         But the point is that if -- at least from many of

11   the commissioners, if a speaker didn't fit into the Abrahamic

12   monotheistic tradition, they either wouldn't invite that

13   speaker, or they would have to investigate that speaker more

14   closely to decide to invite them.

15         And the criteria they would look at is, well, do

16   these beliefs reflect the beliefs of the predominant majority

17   of the county's residents?  And that's not a problem.

18         But what the County is doing here that entangles the

19   County with religion is the County is making judgments about

20   what sort of beliefs are acceptable to its community, what

21   sort of beliefs are not acceptable, what sort of beliefs are

22   held by most people who live in Brevard County, and all those

23   kinds of judgments are exactly the kinds of judgments that the

24   Establishment Clause says a government body should not make; a

25   Government body should not become entangled in religion such

*15*

1    as --

2          THE COURT:  That was part of the reasoning in *Town*

3    *of Greece*, wasn't it?

4          MR. LUCHENITSER:  That's right.  *Town of Greece* said

5    one reason that -- probably the main reason that invocations

6    should not be limited to non-sectarian invocations was that to

7    determine what's sectarian and not sectarian --

8          THE COURT:  That's not anything new.  The courts

9    have warned for a long time against -- from the beginning

10   probably -- against government entanglement with religion,

11   haven't they?

12         MR. LUCHENITSER:  Yeah.  That's correct.  I mean,

13   there's cases going pack -- there's a case called *Engel v.*

14   *Vitale*, case called *Lee v. Weisman*, where the Court said that

15   government should not prescribe the content of prayers.

16   Government shouldn't compose prayers.  Government shouldn't

17   determine what kind of prayers are acceptable and what kind of

18   prayers are not acceptable.

19         So here the County is saying that monotheistic

20   prayers are acceptable, but nontheistic prayers, humanist

21   prayers, atheist invocations, those kind of openings are not

22   acceptable.  And that's an improper form of entanglement that

23   violates the Establishment Clause.

24         THE COURT:  I wanted to ask you about -- my last

25   question for you at this point -- not that I might not have

1    others later, but right now, for right now this is my final

2    question.

3              The County makes much over comments that are

4    included in your organizational clients' websites.  Can you

5    tell me how those messages are collected?  The County refers

6    to them as *mocking* and --

7              MR. LUCHENITSER:  Sure.  First, let me say that the

8    messages that the County is citing aren't actually on the

9    websites of the Plaintiff organizations, but they're mainly

10   looking at the -- I think really only exclusively looking at

11   the websites of the organizations that our Plaintiff

12   organizations are affiliated with.

13             THE COURT:  Okay.  So those do not come from

14   Plaintiffs' websites?

15             MR. LUCHENITSER:  Yes.  These are -- the comments

16   are the Freedom From Religion website, and then there are

17   some -- most of the comments, the shorter comments, are in the

18   Freedom From Religion Foundation website, and then there's

19   a -- I think some -- they also take issues with some things in

20   the American Humanists Association website.

21             THE COURT:  Which is not a party either.

22             MR. LUCHENITSER:  Neither one of those are parties.

23   And a lot of the comments on the Freedom From Religion

24   Foundation website are just things that their members put up.

25   It's kind of like a message board.

1     THE COURT:  Yeah.  That's what I was gonna ask.  I

2  don't engage in social media much myself, other than my cell

3  phone, texting, but as I understand it, people can post things

4  on places that other people can see, and it's kind of an

5  open-ended deal.  Is that what this is?

6     MR. LUCHENITSER:  I'm not 100 percent sure if that's

7  exactly what it is.  I don't know if it's -- I don't think

8  it's a totally open message board, but at least for many of

9  the comments on the Freedom From Religion Foundation website,

10  they just invite their members to --

11     THE COURT:  So these are comments by members and not

12  necessarily comments endorsed by the organizations?  Is that a

13  fair description?

14     MR. LUCHENITSER:  Yeah.  I mean I don't know if

15  Freedom From Religion Foundation screens them all and only

16  puts comments up that it endorses or is it just -- I'm not

17  sure --

18     THE COURT:  Okay.

19     MR. LUCHENITSER:  -- if they do or not.

20     THE COURT:  Okay.

21     MR. LUCHENITSER:  Let me -- let me -- larger

22  point --

23     THE COURT:  Your point is that it's not your

24  clients.  It's the organizations with which they're

25  affiliated.

*18*

1          MR. LUCHENITSER:  Right.  Let me just address why --

2     the County argues that these comments by non -- that these

3     comments and postings on non-plaintiff websites are relevant

4     because the County thinks that these comments show that the

5     Plaintiffs, when giving invocations, would make such comments

6     in the invocations.  So not only is this guilt by kind of a

7     chain of attenuated association, but the Plaintiffs understand

8     what is proper in an invocation and what is not proper.  The

9     Plaintiffs understand that it's -- the invocation -- the

10    purpose of an invocation is to solemnize the proceedings, to

11    give a unifying, positive, uplifting message that brings

12    everyone together, that puts the county commissioners in the

13    right state of mind for providing commission business.  We --

14          THE COURT:  And also that can't be used to

15    proselytize or integrate other religions.

16          MR. LUCHENITSER:  That's right.  That's right.  The

17    Plaintiffs understand all that, and each Plaintiff has twice

18    declared under penalty of perjury that they will not give any

19    improper invocations, that they will comply with the rules set

20    forth in *Greece*.  They will not proselytize, that they will

21    not disparage.

22          THE COURT:  Now, I recall that there was reference

23    to an invocation that actually was made by one of the

24    Plaintiffs.  Is that right?

25          MR. LUCHENITSER:  Yeah.  There was an invocation.

1     THE COURT:  Mr. Williamson, I think.

2     MR. LUCHENITSER:  Mr. Williamson's invocation that

3  the portion of Mr. Williamson's statement that Mr. -- that the

4  County took issue with was actually a preface to the

5  invocation.  It was not part of the invocation itself.  And it

6  was in response to some statements that the County

7  commissioners in that locality had made that denigrated

8  nontheists.

9     THE COURT:  Okay.

10    MR. LUCHENITSER:  But, again, Mr. Williamson --

11    THE COURT:  Is that in the record?

12    MR. LUCHENITSER:  Yeah.  That's in the record.

13 That's in Mr. Williamson's supplemental declaration.  He

14 explains that and he --

15    THE COURT:  But there are other counties in Florida

16 who have allowed members of your organizational clients to

17 give invocations.  Is that right?

18    MR. LUCHENITSER:  That's right.  Our client Central

19 Florida Freethought Community, their members have given about

20 30 invocations throughout Florida.  In many instances

21 invocation givers were invited back to give future

22 invocations.  So generally the communities that have heard

23 these invocations, they've been happy with the invocations.

24    An example of one of these invocations is given on

25 the first page of our reply brief.  It was an invocation that

1  was given by Jocelyn Williamson, who is in the audience, who

2  is a board member of a Plaintiff, Central Florida Freethought

3  Community, and I think that's a very good example of an

4  uplifting, unifying, positive message that I don't -- I don't

5  see how anybody can be offended by or have a problem with a

6  message like that, and that's the kind of message that our

7  Plaintiffs would give.

8          And, you know, I think if only the commissioners

9  would have given our clients an opportunity to give these

10  invocations, I think they would have been happy with what they

11  heard, and we wouldn't have had to have this lawsuit.

12          THE COURT:  Okay.  Thank you, sir.  You can tell me

13  what else you want me to know.

14          MR. LUCHENITSER:  Let's see.  We covered -- I mean,

15  I think we've covered the discrimination.  Let me, in terms

16  of -- our lead claim is that this policy of the County

17  discriminates based on religion in violation of the

18  Establishment Clause, and this violates the Establishment

19  Clause in two ways.  First, there's general -- there's a long

20  line of Establishment Clause cases that say government bodies

21  cannot discriminate based on religion in general, and then

22  *Town of Greece* takes that principle, applies it in the

23  invocation context, and says that government bodies cannot

24  discriminate in selecting invocation speakers.

25          And first of all, you know, humanism, atheists,

1   atheism are considered to be religions protected by the

2   Establishment Clause.

3           THE COURT:  Considered by the Supreme Court.

4           MR. LUCHENITSER:  The Supreme Court.  There's a case

5   that has -- that said that humanism is a religion, the *Torcaso*

6   *v. Watkins* case, and in the *Greece* case the Court emphasized

7   that atheists and nonbelievers were allowed by the *Town of*

8   *Greece* to give invocations.

9           And there's an Eleventh Circuit case, *Glassroth v.*

10  *Moore*, which we cited in our brief, that states that atheism

11  should be treated with that -- the lack of any affirmative

12  belief in a god should be treated as a religion for purposes

13  of the Establishment Clause, and there are other cases from

14  other circuits, including the Seventh Circuit, that also

15  expressly state that atheism should be treated as religion for

16  purpose of the Establishment Clause.

17          But even if, you know, for some reason the Court

18  doesn't follow these authorities, and says, Well, we shouldn't

19  treat humanism and atheism as a religion, the Establishment

20  Clause also prohibits government from discriminating between

21  religion and non-religion.  So even if you don't treat our

22  clients' belief as religion, you still have unconstitutional

23  discrimination in violation of the Establishment Clause.

24          Let's see.  We -- and Your Honor also raised the

25  issue of a discriminatory purpose here.  And here the County's

1   resolution itself reflects a discriminatory purpose.  The

2   County's invocation policy praised -- the resolution that

3   enacted the policy praised quote/unquote faith-based

4   monotheistic religions, while depicting humanism negatively.

5           And the county commissioners testified that the

6   county's invocation practice, quote, *honors the Christian*

7   *community*, unquote, quote, *shows the board's support for*

8   *Christianity*, unquote, and, quote, *endorses faith-based*

9   *religions*.

10          So not only do you have a facially discriminatory

11  selection policy that inherently reflects an improper purpose,

12  but you have actual direct evidence of an improper

13  discriminatory purpose here.

14          We've already talked about entanglement some.  You

15  know, the County's -- we've talked about some of the ways that

16  the County's conduct entangles itself with religion, for

17  example, by making judgments about what kind of religious

18  beliefs are acceptable to the Brevard County community and

19  what kind of beliefs aren't.

20          Another example of the improper entanglement is that

21  the resolution setting forward the County's policy contains a

22  five-page dissection of the beliefs of secular humanists and

23  atheist and humanist organizations.

24          THE COURT:  Now, I said I wasn't going to interrupt

25  you.

*23*

1       MR. LUCHENITSER:  No problem.

2       THE COURT:  But one of the things that I can hear

3  Mr. Knox saying in response to that is, We haven't

4  discriminated.  We have allowed you to go to the public

5  comments section of meeting and give an invocation there.

6       What do you say to that?

7       MR. LUCHENITSER:  Well, Your Honor, what we say is

8  this is just another version of separate but equal.  What the

9  County is doing in this argument of the County is -- you see

10  it in much of its briefing.  The County is intentionally

11  dividing its citizens into two classes, religious monotheistic

12  believers and everyone else.

13       And the County intentionally wants to treat the

14  monotheistic believers differently and give them a more

15  prominent, a high elated role in the meetings.  I mean, not

16  only in such -- you know, dividing people into groups is

17  really antithetical to, you know, fundamental principles of

18  our constitutional order and our pluralistic society, that,

19  you know, we'll go through all of the clauses, but, you know,

20  all four federal clauses we talk about prohibit divisions

21  along religious lines, and that's exactly what the County does

22  in telling -- saying, Monotheists can give opening

23  invocations, while nontheists are relegated to the public

24  comment period.

25       And not only is this separate treatment, but it's

*24*

1   not even equal treatment.  The opening invocation takes place

2   at the beginning of the meeting.  It's -- that part of the

3   meeting is the ceremonial part of the meeting.  The public

4   comment --

5           THE COURT:  You know, *Town of Greece* made it a point

6   to say that the audience was an adult audience, and when I

7   looked at the videos, I saw that there were lots of children

8   there during the portion of the meeting called *resolutions* and

9   *presentations* or something like that, the very beginning of

10  the meeting.  And is that a -- is the fact that children are

11  there significant?

12          MR. LUCHENITSER:  Yes, it is.  I mean, that

13  highlights the coercive impact of the request to stand by the

14  county commissioners because the Supreme Court has made clear

15  in its public school prayer cases that children are

16  particularly vulnerable to religious indoctrination and

17  coercion because children are more susceptible to peer

18  pressure.

19          So typically the children who are being honored are

20  present at the beginning of the meetings when the invocation

21  is given.  So the children are being coerced to rise by these

22  directives from their county's government's leaders.  And I

23  think -- it's important that these directives come from the

24  commissioners themselves, as opposed to just a guest speaker

25  or chaplain, because when a commissioner, when a government

1  official makes a request such as, you know, Everybody stand or

2  Please stand, many people are going to treat that as a command

3  because, you know, it's their government telling them what to

4  do.

5       And especially, I think children are especially, you

6  know, likely to view that as a command, and likely people who

7  are at these meetings have business with the county board --

8  they might be seeking a zoning variance or a liquor license or

9  something else affecting their property or their particular

10 neighborhood.  So they might be in a position where they are

11 going to need to speak to the commission later in the meeting,

12 and then the commission is going to vote on the issue they

13 speak about.

14      THE COURT:  Well *Greece* seemed to say that you have

15 to have some evidence that people were treated differently,

16 didn't it?

17      MR. LUCHENITSER:  That's correct, and we -- I'll

18 admit we don't have that here, other than the invocation

19 selection policy itself.

20      THE COURT:  I was wondering whether you put any

21 significance on the -- on what seems, to me, to be an unusual

22 practice that I mentioned earlier, and that's having people

23 rise for the introduction of the person ordinarily from a

24 church to give the invocation.

25      MR. LUCHENITSER:  Yeah.  I mean that -- I suppose

1    that could signal, I mean, that the County wants the audience

2    to give some sort of form of respect to the particular

3    representative of the religion who is appearing.  I mean,

4    there's actually testimony from one of the commissioners

5    that's confirmed, it's also in the stipulation, that the

6    purpose of the request to stand is to respect the religion of

7    the invocation speaker.  So the fact that the request is

8    typically made before the introduction, I think, accentuates

9    that.

10              THE COURT:  But there are some other differences

11   between the invocation and the comments made under the public

12   comments section, and I will continue to refer to invocation

13   as being that which appears at the beginning of the meeting

14   and not what occurs during the public comments.

15              But are the invocation speakers limited in time?

16              MR. LUCHENITSER:  Yes.  There's a difference in the

17   time limits.  The invocation speakers receive up to five

18   minutes, while the public comment speakers receive up to three

19   minutes.

20              A couple of more differences are -- well, one of

21   these isn't really a difference.  Anyone can also give a

22   Christian or other monotheistic invocation during the public

23   comment period.  So what that means is that monotheists really

24   get two opportunities to present a quote/unquote invocation

25   while nontheists only receive one, but it's also questionable

1   whether something can even be properly thought of as an

2   invocation, or at least a governmental invocation, during the

3   public comment period because, I mean, *Greece*, the *Town of*

4   *Greece* case explains that, you know, the very purpose of the

5   invocation is to, you know, bring the commissioners in the

6   right state of mind at the beginning of the meeting, and *Town*

7   *of Greece* contemplates the invocation being given at the

8   beginning of the meeting.  So we're not sure if it's even

9   proper to treat --

10          THE COURT:  Well, there's some other differences --

11          MR. LUCHENITSER:  That's right.

12          THE COURT:  -- too.

13          MR. LUCHENITSER:  That's right.

14          THE COURT:  My understanding is that the County at

15   some point -- I'm going to ask Mr. Knox about this.  At some

16   point they changed the procedure of giving public comments and

17   bifurcated the public comments portion of the meeting, moving

18   the first portion to some time after the resolution

19   presentation segment of the meeting and then the other segment

20   to the end of the meeting.  Is that right?

21          MR. LUCHENITSER:  That's right, Your Honor.  At the

22   time --

23          THE COURT:  That was during -- that was after

24   Mr. Williamson made his initial request to give an invocation.

25   Is that right?

1          MR. LUCHENITSER:  That's right.  It was after the --

2          THE COURT:  Okay.  So I want to ask you this:  Do I

3     have in the record here how the public comments portion of the

4     meeting works?  In other words, it's my understanding that

5     people sign up to make public comments, and it's done on a

6     first-come-first-serve basis.  Correct?

7          MR. LUCHENITSER:  That's correct.  There are two

8     resolutions that are both in the record that cover how public

9     comment works.  There's a -- if you don't mind, I'll grab the

10    appendix.

11         THE COURT:  No.  That's all right.  I just want to

12    make sure I understand it.

13         MR. LUCHENITSER:  Yeah.

14         THE COURT:  I think I do.

15         MR. LUCHENITSER:  Yeah.  So, yeah, the way it works

16    is the public comment starts after the resolution of the

17    board's presentation section.  It can last up to 30 minutes.

18    If it's not done within 30 minutes, then it's completed at the

19    end of the meeting, and speakers fill out cards if they want

20    to speak in public comment, and the way the order of speaker

21    is selected is by, you know, what card goes in first.

22         Let me see.  And a couple of other differences -- I

23    might have already covered this -- the opening invocation is

24    the ceremonial part of the meeting, a solemn part of the

25    meeting.  The public comment isn't always so solemn.

1        People speak about all kinds of things, such as

2   policies governing feral cats.  You know, sometimes just -- I

3   mean, I think the policy says that people are welcome to say

4   just about anything during the public comment, as long as it

5   relates to county business.

6        I don't know how often Your Honor has been to

7   meetings at your local town or county board, but sometimes you

8   have people in public comment saying all kinds of crazy

9   things.  You might have some people that are kooks, just go

10  there every time and just give their spiels.

11       So if there are people who are in the audience, they

12  might not be paying a whole lot of attention during public

13  comment, unless they know somebody is speaking about something

14  that they're particularly interested in.

15       Let me see if there are any other differences.

16       So, you know, the commission asks the audience to

17  stand at the -- for the opening invocation.  They all rise,

18  and they -- at least some of the commissioners testified that

19  if somebody were to give an Atheist invocation during public

20  comment, that those commissioners wouldn't stand or wouldn't

21  ask the audience to rise for that.

22       So not only are those speaking opportunities -- not

23  only is the County's argument that, Well, they can say their

24  peace, they can make their statements during public comment,

25  not only is that argument improper as a matter of law because

1   it's a version of separate but equal, but factually the

2   opportunities are far from equal.  Okay.

3          Let's see.  We -- I think we're -- yeah, we talked

4   about the entanglement, the coercion, the request to rise.  I

5   think we've -- yeah, we've covered -- we've covered that, just

6   to, you know, wrap up the -- there the -- if you look at the

7   language in *Greece* covering coercion, and there's a paragraph

8   governing what's coercive and what isn't, the Court -- I think

9   that passage makes pretty clear that the government officials

10  should not be asking citizens to rise for the invocations, and

11  that's exactly what the County is doing here.

12         And the County is doing so in the coercive context

13  of a small boardroom, where sometimes the meetings are

14  attended by less than ten people.  The commissioners and the

15  audience members can see who is standing, who isn't.

16  Sometimes the audience members cast disapproving looks on the

17  people who do not stand, and then, as I mentioned before, the

18  audience members may be present at the meetings, to speak on

19  issues that the vote will -- that the board will vote on.

20         THE COURT:  I understand.

21         MR. LUCHENITSER:  Right.  Right.  So I think that's

22  it for the Establishment Clause.  Let me cover the other

23  federal constitutional clauses, and then I'll cover the free

24  exercise, free speech, equal protection clauses, and then I'll

25  briefly say a word about relief, and then unless Your Honor

1  has other questions I will turn it over to Mr. Girard for the

2  Florida Constitution.

3         So for Free Exercise and Free Speech Clauses, the

4  County's policy prohibiting nontheists from giving opening

5  invocations violates both clauses.  The Free Exercise Clause

6  bars governmental bodies from making adoption or profession of

7  any religious belief a precondition for taking part in

8  governmental affairs.  Likewise, the Free Speech Clause

9  prohibits the government from denying citizens opportunities

10 to take part in governmental activities based on their beliefs

11 or affiliations.

12        And the County violates these principles by

13 conditioning participation in the governmental function, of

14 solemnizing public meetings and profession of belief in God,

15 excluding the Plaintiffs on account of their beliefs or

16 affiliations.

17        And the County's discriminatory policy further

18 violates the Equal Protection Clause.  The Equal Protection

19 Clause prohibits governmental bodies from treating citizens

20 differently based on their religious beliefs.  Religion is a

21 suspect classification that triggers strict scrutiny under the

22 Equal Protection Clause, and strict scrutiny also applies when

23 the government disfavors a discrete and insular minority that

24 has been subjected to a history of purposeful unequal

25 treatment or relegated to a position of political

1    powerlessness.

2         The County's refusal to permit nontheists to present

3    invocations plainly triggers strict scrutiny because it

4    discriminates based on religion.  And strict scrutiny is also

5    proper because nontheists have long faced invidious

6    discrimination and have been relegated to political

7    powerlessness.  And the County cannot come close to satisfying

8    strict scrutiny here because it does not set forth any

9    legitimate -- any compelling government interest that is being

10   advanced through narrowly tailored means by its policy.

11        Let me now say a word about the relief requested.

12   The briefs cover the permanent injunction in the declaratory

13   judgment we request, and as we explained to the Court at the

14   status conference we held in August, the parties have reached

15   a settlement agreement on what the amount of the damages

16   should be if the Plaintiffs prevail on the issue of liability.

17        Now, one thing that we did not make clear at the

18   status conference that I would like to make clear now is that

19   the settlement agreement provides that if the Plaintiffs do

20   prevail on the issue of liability, the agreement should be

21   incorporated into the final judgment, and the agreement allows

22   the parties to file the agreement with the court, if the Court

23   rules that the County is liable for any damages.

24        So we would respectfully ask the Court that if the

25   Court grants summary judgment in the Plaintiffs' favor and

*33*

1    finds on our favor on the issue of liability, that the Court

2    refrain from entering a final judgment right away, but,

3    instead, give the parties an opportunity to promptly file the

4    settlement agreement with the court.

5           THE COURT:  You're always free to remind me of that.

6           MR. LUCHENITSER:  I'm sorry?

7           THE COURT:  You're always free to remind me of that.

8           MR. LUCHENITSER:  Okay.  Sure.  When do I -- when

9    would be a good time to remind you of that?

10          THE COURT:  If you got an order without a judgment,

11   okay.

12          MR. LUCHENITSER:  All right.  We will do that.  And

13   let me just make sure for the stipulation, your

14   instructions --

15          THE COURT:  Because I think the relief is not your

16   monetary relief.  That's not before me and not nearly as much

17   of a concern for me as the injunctive relief you seek,

18   because, well, you understand that courts would be reluctant

19   to order a government to allow any number or raw number or

20   percentage or classification of people to deliver invocations.

21   I mean, I would be doing -- I would be entangling the courts

22   in the same --

23          MR. LUCHENITSER:  Yeah.  I understand Your Honor's

24   concern.  I don't think you have to get into those kinds of

25   details in your -- if you do rule in our favor in the

1    injunction where I think you -- I mean, as I said before, I

2    think you would be just fine tracking the language we proposed

3    to you at the end of our opening brief.

4            THE COURT:  Okay.

5            MR. LUCHENITSER:  But we can --

6            THE COURT:  We're not there yet.  I may ask -- if we

7    get there, I may ask for counsel's assistance.  Thank you,

8    sir.

9            MR. LUCHENITSER:  Thank you, Your Honor.  So now I

10   will turn it over to Mr. Girard for the Florida Constitution.

11           MR. GIRARD:  Good morning, Your Honor.  Bradley

12   Girard for the Plaintiffs.

13           THE COURT:  Good morning.

14           MR. GIRARD:  May it please the Court.

15           THE COURT:  Yes, sir.

16           MR. GIRARD:  As explained in our briefs, the Florida

17   Establishment Clause and Equal Protection Clause are analyzed

18   the same as their federal counterparts, and so I would like to

19   address just Florida's no aid clause.

20           Brevard County's policy straightforwardly violates

21   the no-aid clause because the County spends County funds in a

22   way that benefits monotheistic religions and religious

23   organizations and does so to the exclusion of everyone else.

24           The First District Court of Appeal concluded in

25   *Council For Secular Humanism v. McNeil*, in 2010, that, quote,

1  *The overriding purpose of the no-aid provision is to prohibit*

2  *the use of state funds to promote religious or sectarian*

3  *activities*, end quote.

4       Brevard's policy not only violates that clear

5  prohibition but does so explicitly.  In the context of opening

6  invocations, as explained by the Eleventh Circuit in *Lakeland*,

7  courts first determine if the government's invocation policy

8  spends government funds.  If so, the Court looks to a

9  five-factor test from *McNeil*.  I will address these in turn.

10      The first step is to determine if the Government

11 spends funds on the challenged policy.  Here, Plaintiffs have

12 shown, and the County does not contend otherwise, that the

13 County -- that the County funds are spent in carrying out the

14 invocation process.  The County uses its e-mail and phone

15 systems to organize invocators, pays for postage to send

16 letters, and uses a number of paid employees to invite

17 invocation givers, communicate with them, and create a

18 schedule.

19      Because the County is spending county funds, the

20 analysis then moves to the factors outlined in McNeil, which

21 really get to the core prohibition of the no-aid clause.  And

22 when applied to invocations, as the Court did in *Lakeland*, it

23 becomes clear as to why Brevard's policy violates the clause.

24      The five factors look to whether the government

25 funded program is used to promote the religion of the

1   provider, is significantly sectarian in nature, involves

2   religious indoctrination, requires participation and religious

3   ritual, or encourages the preference of one religion over

4   another.

5          Brevard County's policy openly violates three of

6   these factors.  The first factor the policy violates is that

7   the policy is sectarian in nature.  The County has stated that

8   its policy exists to pay homage to the faith-based community,

9   and even more, has stated it's paying homage to monotheistic

10  faiths specifically.

11         THE COURT:  They actually say that in the

12  resolution, don't they?

13         MR. GIRARD:  They do actually say that, Your Honor.

14  That's at paragraph 5 of the resolution, at appendix 707.  The

15  language says -- the paragraph says that, quote, *Prior to the*

16  *invocation, in recognition of the traditional positive role*

17  *faith-based monotheistic religions have historically played in*

18  *the community*, end quote, the invocation givers are given the

19  opportunity to tell the audience not only about their

20  organizations but even about some of the organizations' future

21  events.

22         And in addition, for example, Commissioner Curt

23  Smith said during his deposition that he would not consider

24  inviting anyone who did not believe in a monotheistic religion

25  to give an opening invocation, and that's at A727.

1          Now, that goes next -- that goes nicely into the

2    next factor, which is that the policy is used to promote the

3    religion of the providers.  Beyond getting the exclusive

4    opportunity to present an invocation to the citizens who

5    attend the meetings or watch them on TV or online, the

6    invocation givers are given an opportunity to advertise their

7    organizations, and these are opportunities that they take.

8          For example, on April 1, 2014, Charles Knight said

9    at the beginning of his invocation, quote, *I'm the minister at*

10   *the Eau Gallie Church of Christ.  That's in Melbourne,*

11   *Florida.  I just want to invite all of you to come and join us*

12   *if you ever have the opportunity.  You can check us out online*

13   *at www.EauGallieChurchofChrist.com*, end quote.

14         In addition, Pastor Pete Inman opened his invocation

15   on February 4, 2016, quote, *I pastor an amazing church down in*

16   *Melbourne called Lighthouse Assembly, been the pastor there*

17   *since the beginning of the 2000, 16 wonderful years.  It's a*

18   *wonderful family church, no games, no politics, no*

19   *foolishness, just loving on God, loving on people, inviting*

20   *folks to the party.  So if you're not going somewhere, check*

21   *us out.  We can easily be found on the web.*

22         Now these pictures are virtually distinguishable

23   from the run-of-the-mill advertisement, and this advertising

24   opportunity provides a real benefit to the organizations.  As

25   we showed at appendix 1146, for Plaintiffs to provide

1  comparable advertising for their organizations at the same

2  time slot, they would have to pay $200 for each 30-second ad

3  spot.

4         The third factor that the County violates is that

5  most --

6         THE COURT:  Well, yeah.  These meetings are not that

7  well attended ordinarily.  I suppose sometimes they fill the

8  house, but most often there's just a few people, but they put

9  this on -- they put these meetings on a website, including the

10  invocation, don't they?

11         MR. GIRARD:  They do.  They do.  And they are shown

12  on local public access television.  So not only is it the

13  people in the audience, but you can go on the Brevard County

14  website and watch them at any point.  And of course that's not

15  the case for Plaintiff organizations or Plaintiffs.  They

16  don't have that opportunity.

17         Now, the third factor that the County violates is

18  that it most certainly encourages the preference of one

19  religion over another.  The County has consistently defended

20  its practice as an opportunity to honor monotheistic religions

21  and refusing to allow our --

22         THE COURT:  Didn't one of the commissioners say it

23  was to honor Christianity?

24         MR. GIRARD:  One of the commissioners said to honor

25  Christianity specifically.  That is true.  And the actual

1  policy itself is a little bit broader and says monotheistic

2  faith-based organizations or faith-based religions.

3        So giving them the benefit of the doubt, we'll say

4  just monotheistic religions, but even that is way too much.

5  That preferences one religious group over another.

6        In refusing to allow our clients to give the

7  invocation, the County is publically celebrating one religious

8  outlook, while telling others they are not important enough to

9  the community to be included.

10        Aside from refusing to allow equal participation by

11  atheist and secular humanists, a number of commissioners

12  stated that they would refuse to allow participation in the

13  opening invocation by a variety of minority faith groups as

14  well.

15        At A774 Commissioner Jim Barfield said that he would

16  not be willing to invite a polytheist because he doesn't feel

17  that polytheists are representative of his community.

18        THE COURT:  Which district is he in?

19        MR. GIRARD:  Commissioner Barfield, I believe, is

20  District 3 -- 2, District 2.

21        THE COURT:  Which is what?

22        MR. GIRARD:  I am not sure what towns are in -- at

23  A854 Commissioner Robin Fisher said he isn't sure if he would

24  allow a Hindu, and that he would have to, quote, *ask more*

25  *questions there*, end quote, because he is, quote, *not positive*

*40*

1    *on that one*, end quote.

2         THE COURT:  He's the north part of the county, I

3    think.

4         MR. GIRARD:  He is in the north part of the county.

5    That's right.  And former Commissioner Mary Bolin Lewis stated

6    that her requirement was that the religion of the invocation

7    giver was a, quote, *God-fearing religion*.  That was a

8    prerequisite to be included in the invocations under former

9    Commissioner Mary Bolin Lewis.

10        Now when these three factors from *Lakeland* and

11   *McNeil* are analyzed, it's clear the County's exclusionary

12   policy advances religion and so violates the no-aid clause.

13        On the other hand, if the policy was, as *Town of*

14   *Greece* requires, open to all-comers, then the County wouldn't

15   be throwing its support behind one religious outlook to the

16   exclusion of others.

17        Again, as explained in *McNeil*, quote, *The overriding*

18   *purpose of the no-aid provision is to prohibit the use of*

19   *state funds*, here county funds, *to promote religious or*

20   *sectarian activities*.

21        The County does precisely that, but by enjoining the

22   County from discriminating in its selection, this Court can

23   ensure that the opening invocation is not an opportunity to

24   praise or benefit specific religions at the expense of others,

25   but instead an opportunity for a solemnizing statement that

*41*

1   puts legislatures in the right state of mind for the difficult

2   business of governance, and we feel that that would bring it

3   in line with Florida's no-aid clause, and if Your Honor has no

4   other questions --

5            THE COURT:  Thank you, Mr. Girard.

6            MR. GIRARD:  Thank you.

7            THE COURT:  We're going to take a break because this

8   lady down to my right has a very important job, and I don't

9   like to keep her working more than about 90 minutes.  I'm sure

10  that the argument from the County will take us well into that

11  time frame.

12           Who has not been in the federal courthouse before,

13  the two of you?  Well, I'm gonna invite you back.  In fact,

14  I'll invite you ladies back, too, and you, Mr. Girard.  We're

15  going to take a 15-minute break.

16           (Recess at 11:02 a.m., until 11:17 a.m.)

17           THE COURT:  Before we start, Mr. Knox, I want to

18  ask -- be seated.  I wanted to ask Mr. Luchenitser, what, if

19  any, weight to the comments of the individual commissioners

20  who voted to send the letter in August and who voted on the

21  resolution have.

22           MR. LUCHENITSER:  I believe those are evidence of

23  improper purpose, of a purpose of endorsing Christianity and

24  monotheism in general.

25           THE COURT:  So they can be considered?

*42*

1          MR. LUCHENITSER:  Yes.

2          THE COURT:  Okay.  Thank you.  Mr. Knox.

3          MR. KNOX:  May it please the Court.  My answer to

4     that is a little different, Your Honor.

5          THE COURT:  I suspected it would be.

6          MR. KNOX:  This is a legislative body, a body, and

7     its decisions are made as a body.  The individual opinions the

8     commissioners have are individual opinions.  When they get

9     together to make law or a regulations, they're combined.  They

10    compromise.  They make changes to things that they may not

11    agree with.

12         THE COURT:  A long time ago the Court started to

13    shift from focusing on legislative history, and that was one

14    of the reasons, the justifications for it, but is it different

15    in this situation where the people who voted -- and first of

16    all, there are only five of them, I think, right?

17         MR. KNOX:  Yes, sir.

18         THE COURT:  They all or substantially all of them

19    made comments explaining their votes.  Doesn't that have --

20    isn't that a different kind of situation than we would have

21    looking at legislative history from behind a congressional

22    act?

23         MR. KNOX:  No.  Your Honor, I think it's a little

24    different because they weren't asked to explain their vote.

25    They were asked their opinions as to whether -- what they

1   were -- the kind of question they were asked was --

2           THE COURT:  Let me ask you this.  Let me ask you

3   this.  Wouldn't, if as -- and I'm sure you -- I'm sure you

4   agree with Plaintiffs that *Town of Greece* now has added an

5   element to prove an Establishment Clause violation, and that's

6   intent.

7           MR. KNOX:  That's correct.

8           THE COURT:  Okay.  Wouldn't those statements be

9   evidence of animus or intent?

10          MR. KNOX:  I don't think so, Your Honor, no.  And

11  the reason is, number one, there's only three of them that

12  ever said anything about being supportive of this or that or

13  the other thing.  On the current board, okay, the ones that

14  actually passed the resolution --

15          THE COURT:  That's why my question encompassed the

16  August letter as well.

17          MR. KNOX:  Well, that may be true, but the current

18  board is the one that passed the resolution, not the two

19  prior.

20          THE COURT:  I'm sure Plaintiffs take the position

21  that the August letter was also policy, even although not in

22  the form of a resolution.  I hear you.  I knew that was gonna

23  be your answer.  And it may be correct.  I don't know.

24          MR. KNOX:  And the reason I brought that up is

25  because the one case is pretty clear on what the function of

*44*

1    the board acting together is; it's a deliberative body.  It's

2    the body itself that makes the decisions.  It's them that

3    makes the determination as to what goes into the resolution,

4    and it's -- and it's them that reflects their intent in that

5    resolution.

6            So I would also like to address the separate but

7    equal thing that has obviously been brought to your attention.

8            THE COURT:  With regard to the public comment

9    section versus the invocation?

10           MR. KNOX:  Yes, sir.  Yes, sir.  This is a little

11   different situation than a lot of the -- all of the cases

12   really that they've talked about, except *Town of Greece* and

13   the *Lund* situation.

14           Every single case where there's been a violation of

15   the Establishment Clause that they refer to in their motions

16   and in their memorandum of law all involve an exclusion of a

17   particular religious group from what otherwise would be a

18   limited public forum that was open for a specific subject

19   matter.

20           And to give you an example, you have the *Lamb's*

21   *Chapel* case where there's a -- I believe that one was the one

22   where they had a decision to keep a group from using a school

23   facility for showing films involving good behavior and

24   character and things like that.  And it was open for other

25   organizations to do the same thing, sort of the same kind of

**45**

1    films, but they denied the *Lamb's Chapel* that right, the same

2    right.

3              That's not what's happened here.  What's happened

4    here is we have a situation where we have a limited public

5    forum which allows the County to set the agenda.  They set the

6    invocation first, the pledge of allegiance second, and then

7    they go on to the consent agenda, and then we have the first

8    public comment.  I know you asked that question before.

9    That's how it works.

10             THE COURT:  And then you have the public comments

11   and then what?

12             MR. KNOX:  And then there's a second public comment

13   at the end, which actually --

14             THE COURT:  What comes after the first public

15   comment?

16             MR. KNOX:  First public comment comes right after

17   the consent agenda, which is the first --

18             THE COURT:  What comes after that?

19             MR. KNOX:  Then it's the regular deliberative agenda

20   right after that, where they talk about item one, item two,

21   item three on the agenda.  It may be whatever it is that

22   they're considering that day.

23             So the real legislative work that they begin comes

24   right after the public comment, which is why it's so important

25   that these kinds of groups that have discussions about subject

1    matter involves things that the board of county commissioners

2    considers during their meeting, during the deliberative

3    portion of their meeting, should come before they make those

4    decisions.

5            These folks, if you look you their invocations, they

6    virtually all talk about reason, ethics, science, knowledge,

7    as the things that should be used in making decisions, and I

8    think about two-thirds of the ones that they actually have in

9    the record show that.  It's a pattern that they show.

10           And we can't -- we can't -- the County cannot

11   endorse any kind of religion, even a non-religion.

12           THE COURT:  Well, you do endorse religion, don't

13   you?  Specifically in your resolution, don't you endorse

14   religion?

15           MR. KNOX:  I don't think they're endorsing --

16   they're endorsing --

17           THE COURT:  You don't want to offend the Christian

18   community or what you call the faith-based community, which I

19   really need you to explain.  I have no idea what that means.

20           MR. KNOX:  Okay.  Well, I can do that for you.

21           THE COURT:  Tell me what -- let's start with that.

22           MR. KNOX:  I'll do that for you.  If you look at

23   Commissioner Anderson's deposition on page 59 I asked him

24   about an exhibit that's attached to the resolution, which is

25   the Composite Exhibit B, and that's some statistical data that

1  came from the association -- ARDA is the name, nickname, and

2  one of those pages sets forth a list of different faith-based

3  institutions in the county.  There's a list.  They're all --

4  every kind of conceivable faith-based institutions on that

5  list.

6          And when I asked Mr. Anderson about that, I asked

7  him, *Is this the list of faith-based community participants in*

8  *the county?*

9          And he said, *Yes*.  That's what they use.

10          And Mr. Luchenitser objected to that because he said

11  that Mr. Anderson didn't have any personal knowledge.  Then I

12  established that he had seen that as part of the agenda

13  package when they passed the resolution.  So he knew that, as

14  well as did the other commissioners.  So that list of

15  faith-based organizations is what they use.  They don't all

16  get to come before the board because there's a huge list of

17  them.

18          There's nothing that says in *Town of Greece* or *Lund*

19  or any --

20          THE COURT:  They didn't use that before the

21  resolution.  They used it after.

22          MR. KNOX:  Well, they used -- organizations that are

23  on that list were the ones that they used.  I mean, that --

24          THE COURT:  Before the resolution?

25          MR. KNOX:  Well, not before the resolution, I mean,

*48*

1    but those organizations do appear on that list.

2             THE COURT:  So we have the practice and the letter

3    to Mr. Williamson -- well, first of all, we have *Town of*

4    *Greece*, then we have the letter, then we have the resolution

5    that refers to this faith-based community.

6             MR. KNOX:  That's correct.  That's correct.  And

7    it -- if you look at it from that perspective, it actually

8    expands the faith-based community they can refer to for

9    purposes of asking for invocators.

10            And several of the commissioners indicated that they

11   would invite --

12            THE COURT:  Why would -- why would they be allowed

13   to limit it to just those organizations?  You're gonna rely on

14   *Coleman* I think, right, for that?

15            MR. KNOX:  Well, *Coleman* says you need a -- you can

16   require a religious -- religious credentials, and that -- I

17   would rely on that.  But I also would rely on the *Town of*

18   *Greece,* which basically said, If you're a predominant religion

19   and your town is Christian, there's nothing that says you

20   can't have just Christian, Christian clerics come up and give

21   your --

22            THE COURT:  Who says that?

23            MR. KNOX:  *Town of Greece*.

24            THE COURT:  No, it doesn't.

25            MR. KNOX:  I think it does, Your Honor.

1          THE COURT:  No, it doesn't.  It says -- what I

2     understand -- you correct me if I'm wrong.  I don't need to

3     dispute you so plainly, but I thought what *Town of Greece* said

4     was that they welcomed other people, that they had sent the

5     clerk -- charged the clerk with finding people, and the clerk

6     restricted her or his search to the people on -- the

7     organizations that were in the town directory, and they

8     happened to all be Christian.

9          But the case went on to say and emphasize and

10    Justice Alito also referred to the fact that it was open to

11    other organizations, I think even including -- I think they

12    even invited a Wiccan to come and speak.  So this case is far

13    different from *Town of Greece*.

14         MR. KNOX:  Well, Your Honor, I would -- I would beg

15    to differ with you because I think factually I'm a little bit

16    different than what you're saying in this case.  I think the

17    fact that we've had at least two commissioners say that they

18    would have asked all -- they can ask any faith to come up and

19    give an invocation.  It's just a matter of where they're gonna

20    give it.  Are they gonna give it at the beginning, or are they

21    gonna give it at public comment?

22         THE COURT:  That's the difference.

23         MR. KNOX:  That's the difference.

24         THE COURT:  But you agree with me that in what I

25    just said, distinguishing the facts of this case from *Greece,*

1  right?

2          MR. KNOX:  I agree to that extent, yes.

3          THE COURT:  Yes.

4          MR. KNOX:  However, I would --

5          THE COURT:  You think you can cure that by making --

6  because you're opening up a different part of the meeting to

7  these people that you don't want to include -- when I say *you*,

8  I'm not talking about you personally, Mr. Knox -- the County

9  wants to include in the first part.

10         MR. KNOX:  Right.  Because it's always been a

11 traditional faith-based religious prayer at the beginning of

12 the meeting, and that's what they've continued to do.  That's

13 what *Greece* said is okay.  However, as you point out, they

14 all -- they do allow other people in, but here's the language

15 that they used, if you read it carefully, it says --

16         THE COURT:  Who is *they*?

17         MR. KNOX:  The Court, Justice Kennedy.  The issue is

18 whether a member of the public was welcome, in turn, to offer

19 an invocation reflecting his or her own convictions.  The *in*

20 *turn* is what, in my mind, makes it a little different because

21 they don't say it has to be at the beginning of the meeting,

22 as long as they have an opportunity to do it.  Invocations --

23         THE COURT:  Oh wow.  I didn't -- do you have any

24 support for that interpretation?

25         MR. KNOX:  Well --

1        THE COURT:  In turn --

2        MR. KNOX:  Let me go --

3        THE COURT:  I would think it would be in sequence,

4   not that it would go to a different part of the meeting.

5        MR. KNOX:  Well, Your Honor, if it's a faith based

6   invocation, which is what the Supreme Court has said an

7   invocation is -- I mean, the Plaintiffs in this case are very

8   good about picking the Supreme Court definition for religion

9   to include non-religion but not so good about taking the

10  definition of the Supreme Court of an invocation to mean an

11  appeal to a divine authority.  If you're appealing to a divine

12  authority, and that's what an invocation is, that's what the

13  first part of the meeting is about.

14       What my board has done to avoid appearing to be

15  hostile to that group is to move these kinds of invocations

16  that rely on science, knowledge, and things like that, to the

17  portion of the meeting where they apply those principles.  So

18  as not to displace the faith-based community that's

19  traditionally been there.

20       THE COURT:  Well, the faith-based community, as

21  you've defined, has not traditionally been there.  It arrived

22  with the adoption of the resolution, resolution 2015-101.  In

23  the year 2015, that's when that arrived.

24       MR. KNOX:  I'll agree with that, Your Honor, but

25  that's also -- that's an expanded group of the faith-based

1   community.  It's now expanded to include virtually any

2   religion that's in the county.  If there's -- now, the other

3   issue that came up --

4         THE COURT:  If it's expanded to include any religion

5   in the county, then why doesn't it include secular humanism.

6         MR. KNOX:  Because secular humanism is not

7   necessarily a religion for all purposes.

8         THE COURT:  Well, it is.  According to the Supreme

9   Court it is.

10         MR. KNOX:  It may be for the Supreme Court, but the

11   Supreme Court said an invocation is an appeal to divine

12   authority, which secular humanism does not do.

13         THE COURT:  Well, do you agree that there are

14   different definitions from the Supreme Court and Appellate

15   Courts as to what an invocation is?

16         MR. KNOX:  I would say that I haven't seen more than

17   one of the Supreme Court, which is an appeal to divine

18   authority.  And if that's what we're looking at as an

19   invocation, then the secular humanists or the atheists don't

20   qualify to give a religious prayer because they don't believe

21   in divine authority.

22         THE COURT:  Well, that makes sense if you limit it

23   to that, if you limit it in that way.

24         MR. KNOX:  So what my --

25         THE COURT:  The commissioner who sponsored the

*53*

1    resolution said that an invocation is worshipping the God that

2    created us, the one and only true God.  But you're saying

3    that's not what is meant by the resolution, that the

4    resolution is something different from that?

5            MR. KNOX:  Well, the resolution referred to an

6    invocation in the sense the *Town of Greece* referred to an

7    invocation, and also in the sense that the Supreme Court has

8    always defined invocations.

9            And we've given the opportunity to anybody who is a

10   secular humanist or atheist to come before the board and

11   present their version of what they would think that an

12   invocation would be.  So we have everybody covered.  And they

13   don't in that way go back and become hostile to the existing

14   faith-based community who has always done the invocation, and

15   as a consequence, it's our belief --

16           THE COURT:  I guess, the counties who allow these

17   people to -- or, the other governmental entities who allow

18   these people to give invocations take a different view as to

19   what constitutes an invocation.

20           MR. KNOX:  Well, they take a different view of it,

21   and there are a lot of different reasons that they do that,

22   including fear of litigation, which they have been hit with in

23   some cases, and some small cities don't have budgets to defend

24   themselves against litigation.  So rather than either have a

25   prayer at all or open it up to other types of invocations,

1    that's what they do.

2            And as far as hostility, Your Honor, I would point

3    out one fact that was not really mentioned here.  The original

4    letters that came in from Mr. Williamson were from

5    Mr. Williamson, first, himself and then representing CFFC,

6    which is the organization he's with, and CFFC is a chapter of

7    the Freedom From Religion Foundation, which is what the board

8    of county commissioners referred in its resolution about the

9    issues that were hostile toward religion.

10           Freedom From Religion Foundation was then a

11   participant in the next letter that came to the county

12   commissioner demanding the right for Mr. Williamson to have an

13   opportunity, along with several other members of FFRF, to

14   present invocations.  So when the county commission looked at

15   this issue, they looked at FFRF as one of the people or the

16   organizations that were involved in making the request on

17   behalf of their members and individuals and chapters, which is

18   why you see FFRF -- quotes from their website in the

19   resolution.

20           And another kind of interesting matter is the --

21   there's a case cited in the Plaintiffs' brief for the

22   proposition that the county has engaged in viewpoint

23   discrimination, which I think has kind of a bearing on the

24   limit of public forum aspect of this case.  And that was the

25   case involving the Hastings Law Center out in California where

1   a group of -- a Christian society wanted to become recognized

2   as an organization on the campus, and the Hastings

3   administration said no because the Christian society didn't

4   let in everybody as members.  They wouldn't let in -- they

5   only had people who were believers, in their view, in their

6   organization.  So they couldn't become recognized as a -- as

7   an organization for the law school.

8           And what the Court said in that case was, That's

9   okay.  We can exclude the Christian group because they don't

10  conform to what the State has said -- that their

11  discrimination laws say, and because of that they can be

12  treated as an outside organization, but one of the reasons

13  that they are able to do that in that case, which the Court

14  referred to, is the fact that the social media now is so

15  available to people that these people's views can be expressed

16  on social media, and everybody can pick it up.

17          So it, kind of, put through viewpoint discrimination

18  out the window at that point because they said, For this group

19  in California, that because this group is excluded, we

20  wouldn't have otherwise done that, except for the fact that

21  they have social media available to them.

22          We're pretty much in the same situation here.  With

23  these groups they clearly had websites all over the place.

24  They have lots of information on all the websites.

25          And we've gone a step further in the sense that we

1    have not excluded them at all and put them in a different part

2    of the agenda.  So they have the right to say what they want

3    in our meetings in the public forum.  They're not outside the

4    public forum.

5              And I would point out in the *Hastings* case Justice

6    Kennedy said that, A limited public forum will exclude some

7    speakers in order to function efficiently.  And we are not

8    excluding them in this case.  We're allowing them to speak but

9    just in a different part of the agenda.

10             In a limited public forum, the County has the

11   ability to make decisions on who speaks on what issues and

12   what subject matter.  The subject matter of the invocation is

13   a religious prayer.  The subject matter of the secular

14   invocation is secular matters relating to the things that they

15   talk about, in terms of reason, science, knowledge, and things

16   that -- they're precepts that you see in a pattern of all

17   their prayers -- not all, but two-thirds, at least, that I saw

18   in the record.

19             It's the pattern of prayer that determines whether

20   there's a violation of a constitutional provision, the

21   Establishment Clause, and the pattern of prayer can't be

22   overcome, in my view, by a simple affidavit saying that they

23   promise not to do that in the future.  And that's what they

24   said -- they claimed here.

25             THE COURT:  Well, isn't that what happened in -- was

*57*

1    it *Town of Greece* that said that, you know, they had a

2    requirement that they not proselytize or denigrate other

3    religions?

4            MR. KNOX:  That's absolutely true.

5            THE COURT:  What's wrong with that?

6            MR. KNOX:  There's nothing wrong with that, but the

7    point is, when you're --

8            THE COURT:  You think they might violate it.  You

9    know, don't you agree that it's been violated by members of

10    the faith-based community in some of the invocations that

11    they've given?

12            MR. KNOX:  Yeah, I believe --

13            THE COURT:  Certainly proselytizing, and there were

14    comments about other religions, as well.  So, I mean, if it's

15    good for the goose, why isn't it good for the gander?

16            MR. KNOX:  Well, it's good for the goose under the

17    invocation.  It's good for the gander under the public

18    comments.  That's the difference.  They can -- they can do

19    that.

20            THE COURT:  You can denigrate religion --

21            MR. KNOX:  No, you can't.

22            THE COURT: -- under the invocation portion of the --

23            MR. KNOX:  No.

24            THE COURT:  -- program, but not the on the other?

25            MR. KNOX:  The county commission cannot sensor

1    content.

2              THE COURT:  Right.

3              MR. KNOX:  Okay.

4              THE COURT:  That's what you're doing, isn't it?

5              MR. KNOX:  But if they do make those kinds of

6    comments and that becomes an issue with that particular group

7    -- I think most of these invocations, if you look through

8    them -- I think there were five identified in the pleadings

9    and in the facts, statement of facts, that are contested by

10   the Plaintiffs in this case that didn't fit the mold of what

11   the *Town of Greece* case would like to see.

12             But *Town of Greece* had the same situation.  They had

13   several of those invocations that were the same kind of thing.

14   They denigrated other religions or they're proselytizing, but

15   there were a minimal number of them, and it didn't impact the

16   overall pattern of prayer that was being -- that was being

17   giving to --

18             THE COURT:  Let me ask you something.  If the

19   patriarch of the Greek Orthodox Church or Pope Francis came

20   and wanted to give an invocation, would they fall in the

21   faith-based community because they are not on the list that

22   you have?

23             MR. KNOX:  The Greek Orthodox Church is on the list.

24             THE COURT:  Huh?

25             MR. KNOX:  The Greek Orthodox Church is on the list,

1   and so is the Catholic Church.

2          THE COURT:  So it's by what organization they belong

3   to?

4          MR. KNOX:  Right.  Well, that's the list that

5   they're now looking at, but that's also -- those are all

6   religious prayers of some kind.  Those are not secular prayers

7   in the sense -- not secular prayers, but secular invocations,

8   in the sense that the secular -- the pattern of secular

9   invocations that you see in the record are -- fundamentally

10  talk about secular matters.

11         THE COURT:  Let me ask you.  The resolution talks

12  about monotheism doesn't it?

13         MR. KNOX:  As a background it does, yes.  But you

14  notice that the policy changes it to not just monotheism.  It

15  goes to groups in the faith-based community, which is the list

16  of communities that are now in the record.

17         THE COURT:  Does that include the three Hindu

18  temples in Melbourne?

19         MR. KNOX:  It includes -- I think Hindus were

20  mentioned in the deposition, and the commissioner didn't say

21  no to Hindus.  Nobody has ever asked them from the Hindu

22  community to come in and give one.

23         THE COURT:  They said they would have to

24  investigate.

25         MR. KNOX:  Right.  And I'm not sure where those

1    Hindu temples are.  If they're in Melbourne, they may be in

2    District 3.  They could be in District 5.  I'm not sure which

3    one it is in.

4            And some of the commissioners don't know whether

5    some of these organizations have temples or churches or

6    organizational buildings in their Districts.  It's just not

7    known to them.  So they pretty much follow their tradition of

8    getting either --

9            THE COURT:  All these people would need to do is get

10   on that list of faith-based --

11           MR. KNOX:  That's true.  I'm certain if they came in

12   and asked -- some of the commissioners indicated they would

13   hear them.  They'd just put them in on the list.  They would

14   put them on if they came in and asked, but nobody has asked.

15           THE COURT:  They would put them --

16           MR. KNOX:  That they would give them that

17   opportunity, if they came in and asked, but nobody has ever

18   asked them.  They just follow their tradition of going to the

19   group that they normally go to.

20           They had their -- I don't know how they pick them.

21   I wasn't really clear from the way that the depositions went

22   because they don't -- most of the commissioners themselves

23   don't pick the people.  It's usually their staff that go out

24   and get people for them and tell them who it's going to be

25   before the meeting.  That's generally how it works.

1          And there was no inquiry as to how that happens and

2    who does what or if they have lists or what the situation is

3    there.

4          THE COURT:  What are the requirements for being

5    included on that list of faith-based organizations?

6          MR. KNOX:  Well, as of the date of the resolution,

7    if you're on Exhibit B to the resolution, you're on that list

8    of faith-based community.

9          THE COURT:  I know, but what does it take to get on

10   the list, if an organization wants to get on the list?

11         MR. KNOX:  I'm sure that if they just come in and

12   ask, they can be placed on the list.  No one inquired about

13   that.  So there's nothing in evidence --

14         THE COURT:  Nothing in the record.

15         MR. KNOX:  -- to tell us what that's all about.

16         THE COURT:  On page 10 of the resolution it refers

17   to organizations, and, I guess, you've already answered my

18   question.  My question was going to be:  If an atheist or

19   secular humanist didn't belong to one of the organizations

20   identified on page 10, would they be excluded?

21         I guess what you're saying is you have to belong to

22   a group to be included.

23         MR. KNOX:  No.  What I'm saying is this:  What this

24   resolution does is say, If you're going to present something

25   that talks about nature, science --

1          THE COURT:  Shinto, Shintoism would be excluded

2     because they talk about nature.

3          MR. KNOX:  It depends on whether they're on the

4     other list, the faith-based community list, which I can't tell

5     you if it is or isn't.

6          THE COURT:  You can be on the list if you -- if an

7     organization believes in nature and science and ethics, if

8     that organization is on the list, they can give the

9     invocation.  If they are not on the list, they cannot.  So you

10    really have to be part of the organization that's on the list.

11         MR. KNOX:  No.  They can give an invocation, just

12    not at the beginning of the meeting.

13         THE COURT:  Well, okay.  I'm gonna put that

14    distinction aside.  I understand that you've made that point,

15    and that's a central part of what the resolution does.

16         But they would certainly be excluded from giving the

17    invocation, which I always thought meant the message at the

18    beginning of a meeting, not somewhere else in the meeting, but

19    in the beginning of the meeting.

20         Well, go on.

21         MR. KNOX:  Okay.  If I can get to the coercion

22    argument for a moment, Your Honor.

23         I went through the *Lund* case and the *Greece* case and

24    identified between the two cases about 24 different factors

25    that they considered in what has to be a fact-sensitive

1    analysis of whether there's coercion.  Of those 24, the only

2    one that implicates any potential violation in the Brevard

3    County case is the issue of whether people are asked to stand

4    or not.

5         If you go through each one of the invocations that

6    were given in Brevard County, which the Plaintiff has supplied

7    to you, which there were 195 of them, there's about 120

8    instances where people were asked to stand for the invocation

9    and the pledge of allegiance; there's 60 where nobody was

10   asked at all to stand; and the remaining portion were where

11   people were asked to stand just for the invocation.

12        Currently the board, as Mr. Barfield testified,

13   doesn't ask anybody to stand.  They just stand themselves.  If

14   people stand, that's fine.  If they don't, that's fine too.

15        Nobody has ever been disciplined, told they can't

16   stay in the room, treated badly or differently, and

17   Mr. Whitten, the county manager who has sat there for many

18   years, has never seen that happen.  There's no evidence

19   anywhere else that's ever happened.  There's nobody who's

20   asked to do the sign of the cross.  No one has been told they

21   have to leave if they stand up or if they don't stand up.

22   Basically, there's no attention paid to it one way or the

23   other.

24        Nobody knows why you don't stand up.  You maybe have

25   a broken leg.  You may be disabled.  It may be any number of

*64*

1    reasons you don't stand up.

2        Fundamentally I just don't think the coercion

3    argument is there at all.

4        And I think the factor that the county commission is

5    trying to deal with here is they have a tradition that's gone

6    on for years and years and years that involves a religious

7    prayer, and now they have a group who wants to come in and do

8    a secular prayer.

9        And in Brevard County, the County has transitioned,

10   pretty much, from a community that used to have a much larger

11   faith base than it does now.  Now there is a much higher

12   secular percentage of people in Brevard County than there are

13   people who go to church regularly.  I think we identified that

14   at 34.9 percent in the documents that you have in front of

15   you.

16       And that is one of the things that the board was

17   sensitive to.  They didn't want to seem like they were being

18   hostile to that particular group of people who were the ones

19   giving the faith-based invocations, and when we get the letter

20   from the Freedom From Religious Foundation and the Americans

21   United For Separation of Church and State and the ACLU on

22   behalf of both Mr. Williamson and CFFC, which is a chapter of

23   FFRF, the board wanted to look into whether there was going to

24   be any basis for hostility.

25       So all of the quotes that you see from the FFRF

*65*

1   website and from the secular humanist website that reflect

2   hostility toward religion was a concern to them, which is why

3   they sort of reached their compromise in saying, Well, we can

4   do yours over on the secular part of the agenda because that's

5   where your principles are more applicable to what we do and

6   just retain what we already have for the faith-based

7   community.  So we each have an opportunity.

8           THE COURT:  What if they don't get on in the first

9   30 minutes?

10          MR. KNOX:  Then that's -- I can tell you as an

11   officer of the court, they never tried, number one.  Number

12   two, we've never ever had to go to the second public comment

13   because that 30 minutes has always been used -- never been

14   used up.  There just aren't that many people that show up for

15   public comment.

16          And if you looked an at their secular invocations,

17   virtually all of them are less than three minutes.  So they

18   would be able to fit their invocation in somewhere in that

19   first 30 minutes for the most part.  Unless there's some

20   really rare circumstance where we have a huge turnout for

21   public comment, which I haven't seen yet.

22          THE COURT:  Well, I didn't anticipate you focusing

23   on *Coleman*, but isn't what *Coleman* said, that it's okay to

24   limit your selection to members of the clergy, as long as it's

25   without regard to the message to be given?  Isn't that in a

1   nutshell?

2         MR. KNOX:  Well, the fundamental ruling in *Coleman*,

3   I thought, was that you are entitled to restrict your -- you

4   can require religious credentials in order to give the

5   invocation.  That's fundamentally what it was.

6         What happens at that point is whatever that person

7   comes up and says is what he says.  They can't sensor it.

8         THE COURT:  No one was restricted, quote, *based on*

9   *religious perspective of the organization, even religious*

10  *perspectives do not teach what would generally be considered a*

11  *belief in the existence of God*.  I think that's what that

12  might be.

13        MR. KNOX:  That sounds like *Town of Greece*.

14        THE COURT:  Hamilton County, okay.

15        MR. KNOX:  And the issues that have been verified

16  through the discovery in this case is that the board's

17  instincts about the hostility aspect of this case, which the

18  *Good News Club* case from the Supreme Court basically said, If

19  you're trying to avoid a violation of the Establishment

20  Clause, which involves -- certainly, could involve hostility

21  or proselytization, if you let it happen.

22        By trying to avoid that Establishment Clause

23  violation, they made note of the fact that there are several

24  things about the FFRF that were hostile and several things

25  about secular humanism that are hostile.

1              All of the Plaintiffs in this case are either

2      members of FFRF or CFFC, which is a chapter of FFRF, meaning

3      that you actually have to be members of the FFRF to be in that

4      organization; or they are members of the American Humanist

5      Association, which is another organization that the Plaintiffs

6      admit in the statement of facts has published many articles

7      that could be viewed as hostile to religion.

8              So they looked at all of those factors --

9              THE COURT:  No. Just be totally objective about it.

10     Don't religious organizations criticize people who are

11     not religious?

12             MR. KNOX:  I'm going to be totally objective.

13     That's my next statement.  Because one of the things that we

14     see also --

15             THE COURT:  They go back and forth.

16             MR. KNOX:  No. Everything you see in the

17     stipulation, that from -- I think it's from paragraph 283

18     through 301 shows some of that very hostility you're talking

19     about.  There's hostility between the two groups.

20             THE COURT:  Right.

21             MR. KNOX:  So the county commission is trying to

22     avoid that hostility.  They don't want to stay away from that

23     hostility because that's where they get in trouble if one

24     is --

25             THE COURT:  Really, in a nutshell, what you're

1    telling me, Mr. Knox, is I just need to look and see whether

2    it's okay for you to limit the people who speak at invocation

3    to -- it's okay for you to limit them to the people who are on

4    that list, the members of the list.

5            MR. KNOX:  Yes, as to the first invocation, yes.

6            THE COURT:  And you think that that's an okay

7    approach for the County to take, as long as they let them

8    speak at the public comments?

9            MR. KNOX:  Yes, I think that's true.

10           THE COURT:  Yeah.  Okay.  I understand your

11   argument.

12           MR. KNOX:  Okay.  Well, I've got one more argument,

13   which is --

14           THE COURT:  Well, I'm all ears.

15           MR. KNOX:  That's on the state law, state

16   constitutional provision, and all I have to do there, I think,

17   Your Honor, is refer you to the *Lakeland* case, which is the

18   *Atheists of Florida v. City of Lakeland*, where the Court found

19   when Lakeland expended 12 to 15 hundred dollars per year to

20   arrange for invocational speakers to solemnize the

21   proceedings, it didn't constitute any pecuniary benefit either

22   directly or indirectly to any religious organization.

23           So you never get to the other four factors that

24   Mr. Girard spoke about because they don't get past the first

25   factor.  They don't consider that to be an expenditure for the

1    benefit of religion.

2           And apart from that, I think I'm done, Your Honor.

3           THE COURT:  Okay.  Well, maybe not quite.  Hold on a

4    second.  You can have a chair.

5           MR. KNOX:  Thank you.

6           THE COURT:  Okay.

7           MR. LUCHENITSER:  Yes.  Your Honor, there's a few

8    things I would like to cover in rebuttal.  But first, let me

9    ask you, do you have any specific questions based on your

10   exchanges with Mr. Knox?

11          THE COURT:  Well, I have to confess.  I didn't

12   completely understand the exhibit to the resolution was the

13   defined pool from which the County was now selecting its

14   speakers.

15          MR. LUCHENITSER:  Yeah.  I don't think the record

16   actually reflects that.  I don't think the resolution says

17   that, and if you look at the testimony --

18          THE COURT:  He eliminated about 30 minutes of

19   questions from me by saying that because I took that as being

20   the case.

21          MR. LUCHENITSER:  If you look at the testimony of

22   the commissioners, they all -- they don't all do it the same

23   way.  Some of them -- I think one commissioner testified he

24   just asks people he knows to give invocation.  Some other

25   commissioners testified that their staff had lists of past --

1    THE COURT:  Now we're talking post-resolution or

2    pre-resolution?

3    MR. LUCHENITSER:  Well, the lists apparently were

4    compiled before the resolution was passed, but they were still

5    using those lists to select invocation speakers, and some of

6    the commissioners testified that some of the

7    non-Christian-Judeo religions that may be on that list -- I

8    would have to go back and check on the list, but there were

9    some groups that they either wouldn't allow to give

10   invocations or weren't sure if they would allow to give

11   them -- allow them to give invocations.  So I don't think the

12   record really reflects that that list is --

13   THE COURT:  That's an important fact, and I'm sorry

14   I didn't appreciate the County's position because that

15   really -- it affects the analysis, doesn't it?

16   MR. LUCHENITSER:  It would affect the analysis, but

17   I don't -- I just don't think the record reflects that that's

18   what the policy is.

19   Let's see.  Your Honor, asked, Can comments of --

20   can the individual comments of the commissioners be

21   considered.  I think yes, here, for a couple of reasons.

22   First, it's the commissioners who are selecting in the role of

23   individual commissioners who the invocation speakers are.  So

24   the individual commissioner's comments show what purpose the

25   commission advances through its invocation policies via the

1     actions of their -- of the individual commissioners.

2              Second, some of those comments were from sponsors of

3     the resolution 2015 -- the sponsor, Commissioner Smith, of

4     resolution 2015-101, I mean, some of the comments that I think

5     are --

6              THE COURT:  I know, but if Mr. Knox is correct that

7     I shouldn't consider comments of individual commissioners,

8     then the comment of that commissioner, Commissioner Smith I

9     think, would be included.

10             MR. KNOX:  Well, there's actually -- there's a

11    Supreme Court case called *Edwards v. Aguillard*.  I think it's

12    spelled A-g-u-i-l-l-a-r-d.  It might be two G's and one L, but

13    I think it's one G and two L's.

14             It's, I believe it's a 1987 case concerning

15    creationism in the public schools, and I believe that case --

16    hopefully I'm not confusing this with something else -- but I

17    believe that case expressly gave special weight to statements

18    made by a legislature who sponsored the law that was being

19    challenged and was struck down there.

20             So there's cases.  There's Supreme Court cases that

21    go back and forth on this issue of, you know, do you look at

22    statements of individual legislatures or statements of

23    sponsors.  So it's not -- it's not really that clear cut.

24    There's some inconsistency in the law, I think, but that case,

25    at the very least, says that you can look at what the sponsors

1   said.

2          Let's see.  So let me try to address this whole

3   limited public forum issue.  While we don't think that the

4   invocation, the opening invocation, is a limited public forum,

5   even if -- even if it was, viewpoint discrimination is clearly

6   prohibited in public fora, and the *Rosenberger* case says that

7   treating atheistic and theistic speech differently, including

8   excluding atheistic speech, would be a form of viewpoint

9   discrimination.

10          So even if there was limited public forum here, the

11   County has defined it in a manner that's unconstitutional from

12   its inception by excluding nontheistic speech, and Mr. Knox

13   mentioned the *Christian Legal Society v. Martinez* case.  That

14   case actually concluded that there was no viewpoint

15   discrimination because all organizations were treated equally.

16          The Christian society was not treated any

17   differently from any other organization because any

18   organization had to allow anybody to come to its meetings and

19   be a member, even if the person didn't agree with the

20   organization's fundamental principles.

21          And the case actually said that, In determining

22   whether there's viewpoint discrimination, you don't look at

23   whether there are alternate channels of communication.  In

24   other words, alternative channels of communications cannot

25   justify viewpoint discrimination in the particular forum that

1    the government has defined.

2           Let's see.  So Mr. Knox raised the issue of does

3    *Greece* define invocation as only covering appeals to divine

4    authority.  Well, I think it certainly does not do that.  It,

5    in fact, recognizes that an atheist or nonbeliever can give an

6    invocation.  So if it recognizes that, then the Court

7    certainly didn't contemplate that all invocations must be to a

8    divine authority.

9           And there's also a line in *Greece* where the Court is

10   distinguishing its earlier decisions in the school context, in

11   particular *Lee v. Weisman* in the Santa Fe case, and the Court

12   there says, A religious invocation was held impermissible in

13   the public school context.  So by using the term *religious*

14   *invocation*, the Court recognizes that you can have a

15   nontheistic or nonreligious invocation.

16          Let's see what else, if anything, I have.

17          You know, me and Mr. Knox argued that there are many

18   ways in which religious coercion can be shown, and that the

19   only thing that we are raising is the request to stand.

20          And I think *Greece* made clear that a request to

21   stand from government officials is improper.  Just because

22   there are other ways in which a government body can improperly

23   coerce in the invocation -- in the invocation context, doesn't

24   mean that it's okay -- the fact that the board isn't doing

25   those other things doesn't mean it's okay for them to violate

1    the constitution in the way they are.

2           Finally, I believe that Mr. Knox thought that the

3    second, the second public comment period at the end of the

4    meeting never actually takes place, but there were some

5    commissioners who -- or at least one commissioner testified

6    that by the time that they had -- almost everybody has left

7    when you do get to that second public comment period, and I

8    actually think that that was included in the stipulation, so

9    which suggests that there were times when you get to that

10   second public comment period.

11          Mr. Girard passed me some notes.  Is it okay if I

12   grab them and take a look to see if there's anything there I

13   should cover?  I'm just looking at these notes trying to make

14   sure I understand.  Yeah.

15          At one point, you know, Mr. Knox referred to the

16   comments on the Freedom From Religion Foundation and American

17   Humanists Association's websites.  And while we think, you

18   know, any connection between our clients and those comments is

19   highly attenuated, the County's policy prevents invocation by

20   any nontheists, regardless of what organization they may be

21   associated with or not.

22          Let's see.  Let me just chat with Mr. Girard briefly

23   to see if there's anything else here I don't understand that I

24   should cover.

25          Going back to the issue of does the County rely on

1  that list which was taken from the study done by that -- the

2  AR -- the Association of Religious Data Archives group, the

3  County regularly has various chaplains of various groups like

4  the sheriff's office or more recently the Republican -- I

5  think the Brevard Federation for Republican Women.

6          THE COURT:  The congressman's office.

7          MR. LUCHENITSER:  Yeah, the congressman's office and

8  various --

9          THE COURT:  Have those been post-resolution?

10         MR. LUCHENITSER:  Yeah.  Some of them have been

11 post-resolution.

12         THE COURT:  So if that is their policy, they're not

13 following it.

14         MR. LUCHENITSER:  Right, right, they're not.  I

15 mean, those --

16         THE COURT:  I'll go back.  In fact, I'll try to do

17 that before you leave.

18         MR. LUCHENITSER:  Yeah.  There's actually kind of a

19 sequence of -- I think we mentioned in our opposition brief or

20 in our reply brief that something like five out of the last

21 ten, at the time of the filing of the brief -- something like

22 five of the last ten invocation speakers were people who

23 weren't affiliated with a particular religious congregation

24 but were in the category of chaplains or just affiliates of

25 groups like the --

*76*

1          THE COURT:  Baseball --

2          MR. LUCHENITSER:  -- police department.

3          THE COURT:  There was a baseball team chaplain,

4   wasn't there?

5          MR. LUCHENITSER:  Yeah.  There was a baseball team

6   chaplain.  I think that that is all I have, unless Your Honor

7   has more questions.

8          Would it be acceptable for Mr. Girard to give a very

9   brief rebuttal on the Florida No-E Clause?

10          THE COURT:  Sure.

11          MR. GIRARD:  Your Honor, just briefly on the

12   *Lakeland* issue raised by --

13          THE COURT:  Before you start, let me just have a

14   moment.  Go ahead, Mr. Girard.  I'm sorry.

15          MR. GIRARD:  Mr. Knox says that *Lakeland* answers

16   this question here because *Lakeland* -- the Court found that

17   the town was spending 12 to 15 hundred dollars, but couldn't

18   find any benefit and because that's the case, then we don't

19   move on to the five factors.

20          That's wrong because what the Court in *Lakeland* did

21   was it did find first that the city was spending the money.

22   Again, Brevard does not contend otherwise.  So it does move to

23   the factors.

24          Now, under that analysis, the Court in *Lakeland*

25   said, Well, we can't find any benefit or any -- another way of

1   putting it is, any aid that these religious organizations get

2   from giving the invocation.

3          But here, we've shown through the application of

4   these three factors that's very much the case.  Not only do

5   they have advertising time, they get advertising time that

6   goes out on TV; it goes on the Internet; and it's in a policy

7   where the County has said, You are the favored groups who get

8   this time, and the other groups are not.

9          And that is a very -- a very serious benefit and one

10  that we have put enough in the record to show for our clients,

11  for these organizations, to get that same benefit they would

12  have to pay for advertising spots, and they don't do that.  So

13  I just wanted to clarify that issue in *Lakeland*.

14          THE COURT:  Sure.

15          MR. GIRARD:  Thank you.

16          MR. LUCHENITSER:  Your Honor, just too, in terms of

17  the record, where the most recent invocation speakers are

18  listed, that's page A1187.

19          THE COURT:  Okay.  Well, you know, if we take the

20  view of the Supreme Court, which we have to do, that atheism

21  and secular humanism are religions -- that's right, isn't it,

22  Mr. Knox?  Don't they say that?

23          MR. KNOX:  I would agree with you.

24          THE COURT:  Then in a 1961 case, *McGowan v.*

25  *Maryland*, the Court says, This interchange emphasizes that the

1   delegates did not consider opening prayers as proselytizing

2   activity or symbolically placing the government's official

3   seal of approval on one religion.  Rather, the Founding

4   Fathers looked at invocations as conduct whose effect

5   harmonized with the tenants of some or all religions.

6          And then in *Marsh v. Chambers*, it says from the

7   Fifth Circuit, *Either dictionary definition cited by the*

8   *majority nor our own precedence require an interpretation of*

9   *invocation as benediction grounded in religion.*

10          In *Doe v. Santa Fe* -- let me see if I'm getting

11   these right.  Yeah, that's *McGowan*.

12          From the Sixth Circuit, the words *invocation* and

13   *benediction* have dictionary definitions that describe the

14   terms in both the secular and nonsecular way.  *The secular*

15   *purpose of formally opening and closing the ceremonies is more*

16   *over a genuine secular purpose, unlike the practice in* <u>*Stone*</u>

17   *in which an avowed secular purpose could not disguise an*

18   *undeniably wholly religious purpose.*

19          And there are other cases which, including *Town of*

20   *Greece,* I believe -- I would have to go back and check -- but

21   which refer to secular invocation.  But we don't even get

22   there, I guess, if we defined atheism and secular humanism as

23   religions, then that would certainly be included.

24          Well, I'm going to take advantage of the legal

25   talent I have here.  I asked them to do a couple of things.

1  But first I want to find that resolution where we referred to
2  the list.
3          Maybe you can help me, Mr. Knox.  You have all of
4  those assistants there.  Tell me exactly where in the
5  resolution the --
6          MR. KNOX:  It would be Composite Exhibit B.
7          THE COURT:  No. I'm looking in the resolution
8  itself.
9          MR. LUCHENITSER:  Your Honor, the only place I'm
10 seeing it mentioned, the Exhibit B, is page A707, page 2 of
11 the resolution, paragraph 8.
12         THE COURT:  Page 2, paragraph 8?
13         MR. LUCHENITSER:  Yeah.  I would have to look
14 through it all to see if it's mentioned elsewhere, but I don't
15 recall it being mentioned elsewhere.
16         THE COURT:  Yeah.  Is it any where else, Mr. --
17         MR. KNOX:  Yeah.  It's in -- there's two components
18 to the list, two parts of the list on Composite Exhibit B to
19 the resolution.
20         THE COURT:  No. I want to know where in the
21 resolution --
22         MR. KNOX:  Is a reference to it?
23         THE COURT:  -- it defines faith-based community by
24 that list put out by the --
25         MR. KNOX:  I don't think it does in the resolution.

1    I think that was Commissioner Anderson's testimony.

2          THE COURT:  Oh, so in order to consider that as the

3    definition, I would have to look at Commissioner Anderson's

4    testimony?

5          MR. KNOX:  Well, he said that that was -- what I

6    asked him was, Are those organizations on the list of

7    organizations in the county?

8          And he said, Yes.

9          THE COURT:  Let's be clear about this because that

10   really threw me off when you said in your argument that the

11   resolution defined -- I'm not saying you said this.  It was my

12   understanding that you said this:  That the faith-based

13   community was defined by the list put out by a group called

14   the ARDA, the Association of Religious Data Archives, and I

15   asked you a series of questions about how you would define the

16   faith-based community and how people would be selected.  And

17   it was my understanding that that's how this resolution

18   defined faith-based community.

19         MR. KNOX:  Well, no, it doesn't.  It doesn't, per

20   se.

21         THE COURT:  Okay.  Then I misunderstood perhaps.

22         MR. KNOX:  But I would point out to Your Honor that

23   Exhibit A -- the Defendant's Exhibit A26 to your appendix

24   actually has the entire piece of information that's referred

25   to in Composite Exhibit B.

1      THE COURT:  Well, I'm not worried about that.  I'm

2  worried about the resolution defining that list as the

3  faith-based community.

4      MR. KNOX:  It does not define the faith-based

5  community.

6      THE COURT:  I knew about the exhibits, and I read

7  the resolution, and I came in here not believing that there

8  was a definition of faith-based community in the resolution,

9  and I think there's not.

10      MR. KNOX:  You're right.  You're correct about that.

11      THE COURT:  Okay.  That takes one thing off the list

12  of things I want you to do.  I want you to give me a short

13  brief on whether I may consider the statements of

14  commissioners to establish motive, intent, animus, in the

15  context of a five-person -- or, I shouldn't say five-person --

16  a town or county commission where the people who actually

17  sponsored or voted for the policy were the authors of the

18  statements.

19      MR. KNOX:  Your Honor, can I get clarification?

20  When you say *the policy*, are you referring to the resolution

21  itself?

22      THE COURT:  The resolution and the letters that went

23  out, which seemed, to me, to establish policy.  I haven't

24  heard anything else.  It was a unanimous vote, and it set the

25  parameters for what the Commission was going to consider, and

1    it was, I believe, in response to request made and an inquiry

2    made by the Anti-Defamation League who was not happy with the

3    County's practice at the time.

4         MR. KNOX:  Okay.

5         THE COURT:  Well, and I've already answered the last

6    question, which is the definition of invocation.  I've got

7    that.

8         You can expand on it, but in doing so, limit it to

9    Supreme Court and Eleventh Circuit law.  You look puzzled.

10        MR. LUCHENITSER:  I'm sorry.  Just to clarify, in

11   the supplemental brief we can discuss more the definition of

12   invocation but only --

13        THE COURT:  If you can help me find other -- well,

14   let me just withdraw that request.  I'll do that.  You don't

15   need to bother with it.

16        I have seen nothing but consistent references to

17   invocation as not necessarily being religious to the exclusion

18   of atheist and secular humanist.  The definitions I see either

19   are expressly inclusive or by inference inclusive.

20        MR. LUCHENITSER:  And, Your Honor, these would be

21   simultaneous briefs from each side?

22        THE COURT:  Yeah.

23        MR. LUCHENITSER:  Any timetable?

24        THE COURT:  What do you want?

25        MR. LUCHENITSER:  I'm supposed to be on vacation for

1   the next two weeks.  So what about October 28th?  Is that too

2   far out?

3            THE COURT:  Is that okay with you, Mr. Knox?

4            MR. KNOX:  That's fine, Your Honor.

5            THE COURT:  Okay.  Let me double back again on the

6   definition of invocation.  If you find anything that's

7   inconsistent with what I just gave you, tell me.  You don't

8   need to brief it, just tell me.

9            Anything else I can help you with?

10           MR. KNOX:  I think we're good, Your Honor.

11           MR. LUCHENITSER:  Any page limit, Your Honor?  Just

12   keep it short?

13           THE COURT:  You know, there's a big controversy.  I

14   think the Supreme Court was trying to limit pages, and they

15   got some blowback.  The fewer the pages the better.  I'll put

16   it that way.  It's not a very broad issue.

17           Well, thank you very much for your arguments and

18   your papers, and it was nice meeting all of you.  Be safe in

19   the weather.  I hope you get home safe and sound, all of you.

20           MR. LUCHENITSER:  Thank you, Your Honor.

21           MR. KNOX:  Thank you, Your Honor.

22           MS. BERRIOS:  Thank you, Your Honor.

23       (WHEREUPON, this matter was concluded at 12:24 p.m.)

24

25                              *   *   *

*84*

1

2                        CERTIFICATE OF REPORTER

3

   I certify that the foregoing is a correct transcript of the
4  record of proceedings in the above-entitled matter.

5    /s/ Suzanne L. Trimble                        3/17/17
     Suzanne L. Trimble, CCR, CRR, RPR              Date
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25