**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
George C. Young Courthouse and Federal Building
401 West Central Boulevard
Orlando, FL 32801
www.flmd.uscourts.gov

Elizabeth M. Warren                                                                           Benjamin C. Wynn
Clerk of Court                                                                        Orlando Division Manager


**DATE:**         December 29, 2017

**TO:**           Clerk, U.S. Court of Appeals for the Eleventh Circuit

---

**DAVID WILLIAMSON, CHASE HANSEL,**
**KEITH BECHER, RONALD GORDON,**
**JEFFERY KOEBERL, CENTRAL FLORIDA**
**FREETHOUGHT COMMUNITY, SPACE**
**COAST FREETHOUGHT ASSOCIATION and**
**HUMANIST COMMUNITY OF THE SPACE**
**COAST,**

              **Plaintiffs,**

**v.**                                                      **Case No:  6:15-cv-1098-Orl-28DCI**

**BREVARD COUNTY,**

              **Defendant.**

---

**U.S.C.A. Case No.:**          **\*\*\*USCA Case Number TE\*\*\***

- Honorable John Antoon II, United States District Judge appealed from.

- Appeal filing fee was not paid. Upon filing a notice of appeal, the appellant must pay the district clerk all required fees. The district clerk receives the appellate docket fee on behalf of the court of appeals.  If you are filing informa pauperis, a request for leave to appeal in forma pauperis needs to be filed with the district court.

- Copy of Notice of Appeal, docket entries, judgment and/or order appealed from.


                    ELIZABETH M. WARREN, CLERK

                    By:     s/J.V., Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID WILLIAMSON, et al.,                    Case No. 6:15-cv-1098-Orl-28DCI

      Plaintiffs,

v.

BREVARD COUNTY,

      Defendant.

_____/

## DEFENDANT BREVARD COUNTY'S NOTICE OF APPEAL

COMES NOW, Defendant Brevard County, by and through its undersigned attorney,
hereby files and serves its Notice of Appeal. Pursuant to Rule 3 of the Federal Rules of Appellate
Procedure, Defendant Brevard County hereby appeals this Court's Order (Doc. 105) entered on
September 30, 2017 (to the extent the Court denied Defendant Brevard County's Motion for
Summary Judgment (Doc. 54) and granted Plaintiffs' Motion for Summary Judgment (Doc. 55))
and corresponding Final Judgment (Doc. 115) entered on November 29, 2017 to the United States
Court of Appeals for the Eleventh Circuit.

                    Respectfully submitted,

                    */s/ Frank Mari*_____
                    Michael J. Roper, Esquire
                    Florida Bar No. 0473227
                    mroper@bellroperlaw.com
                    Secondary: phermosa@bellroperlaw.com
                    Frank M. Mari, Esquire
                    Florida Bar No. 93243
                    fmari@bellroperlaw.com
                    Secondary: nlehman@bellroperlaw.com
                    Bell & Roper, P.A.
                    2707 E. Jefferson Street
                    Orlando, FL  32803
                    Telephone: (407) 897-5150
                    Facsimile: (407) 897-3332

1

Attorney for Defendant Brevard County

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2017, the undersigned electronically filed a true and correct copy of the foregoing with the Clerk of the Court by using CM/ECF.

*/s/ Frank Mari*_____
Michael J. Roper, Esquire
Florida Bar No. 0473227
mroper@bellroperlaw.com
Secondary: phermosa@bellroperlaw.com
Frank M. Mari, Esquire
Florida Bar No. 93243
fmari@bellroperlaw.com
Secondary: nlehman@bellroperlaw.com
Bell & Roper, P.A.
2707 E. Jefferson Street
Orlando, FL  32803
Telephone: (407) 897-5150
Facsimile: (407) 897-3332
Attorney for Defendant Brevard County

APPEAL, CLOSED

# U.S. District Court
# Middle District of Florida (Orlando)
# CIVIL DOCKET FOR CASE #: 6:15-cv-01098-JA-DCI

Williamson et al v. Brevard County

Assigned to: Judge John Antoon II

Referred to: Magistrate Judge Daniel C. Irick

Cause: 42:1983 Civil Rights Act

Date Filed: 07/07/2015

Date Terminated: 10/16/2017

Jury Demand: Defendant

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**David Williamson**

represented by **Daniel B. Tilley**
ACLU Foundation of Florida, Inc.
Suite 340
4500 Biscayne Blvd
Miami, FL 33137
786/ 363-2700
Email: dtilley@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
ACLU Foundation of Florida, Inc.
Suite 340
4500 Biscayne Blvd
Miami, FL 33137
786/363-2707
Email: nabudu@aclufl.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
Americans United for Separation of
Church & State
1310 L Street NW, Suite 200
Washington, DC 20005
202/466-3234
Fax: 202/466-3353
Email: luchenitser@au.org
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
Freedom From Religion Foundation, Inc.

PO Box 750
Madison, WI 53701
608/256-8900
Fax: 608/204-0422
Email: aseidel@ffrf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
Americans United for Separation of
Church & State
Ste 400
1901 L St NW
Washington, DC 20002
202/466-3234
Fax: 202/466-3353
Email: girard@au.org
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
American Civil Liberties Union
Foundation
915 15th St., 6th Floor
Washington, DC 20005
202/548-6604
Fax: 202/546-0738
Email: dmach@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
Freedom From Religion Foundation, Inc.
PO Box 750
Madison, WI 53701-0750
608/256-8900
Fax: 608/204-0422
Email: rmarkert@ffrf.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chase Hansel**                     represented by **Daniel B. Tilley**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Keith Becher**                  represented by  **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
Americans United for Separation of
Church & State
1310 L Street NW, Suite 200
Washington, DC 20005
202/466-3234
Fax: 202/466-3353
Email: girard@au.org
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Gordon**                  represented by **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**

(See above for address)
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jeffery Koeberl**                    represented by   **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Central Florida Freethought**        represented by   **Daniel B. Tilley**
**Community**                                          (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nancy Gbana Abudu**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Alex J. Luchenitser**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Andrew L. Seidel**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Bradley Girard**
                                                       (See above for address)
                                                       *TERMINATED: 08/14/2017*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Daniel Mach**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Rebecca Susan Markert**
                                                       (See above for address)
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Space Coast Freethought Association**   represented by   **Daniel B. Tilley**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Nancy Gbana Abudu**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
(See above for address)
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Humanist Community of the Space Coast**          represented by   **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*PRO HAC VICE*

ATTORNEY TO BE NOTICED

**Bradley Girard**
(See above for address)
*TERMINATED: 08/14/2017*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Brevard County**              represented by    **Cristina Teresa Berrios**
                                                  Orange County Government
                                                  201 South Rosalind Avenue, 3rd Floor
                                                  PO Box 1393
                                                  Orlando, FL 32802-1393
                                                  321/633-2090
                                                  Fax: 321/633-2096
                                                  Email: cristina.berrios@ocfl.net
                                                  *TERMINATED: 10/13/2017*
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Michael J. Roper**
                                                  Bell & Roper, PA
                                                  2707 E Jefferson St
                                                  Orlando, FL 32803
                                                  407/897-5150
                                                  Fax: 407/897-3332
                                                  Email: mroper@bellroperlaw.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Scott L. Knox**
                                                  Brevard County Attorney's Office
                                                  Bldg C-Suite 308
                                                  2725 Judge Fran Jamieson Way

Viera, FL 32940-6605
321/633-2090
Fax: 321/633-2096
Email: scott.knox@brevardcounty.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Diana E. Yuan**
Brevard County Attorney's Office
Bldg C-Suite 308
2725 Judge Fran Jamieson Way
Viera, FL 32940-6605
321/633-2090
Fax: 321/633-2096
Email: diana.yuan@brevardcounty.us
*ATTORNEY TO BE NOTICED*

**Frank Mari**
Bell & Roper, PA
2707 E Jefferson St
Orlando, FL 32803
407/897-5150
Email: fmari@bellroperlaw.com
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

| | | |
|---|---|---|
| **Brevard County** | represented by | **Scott L. Knox** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Keith Becher** | represented by | **Daniel B. Tilley** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Nancy Gbana Abudu** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Alex J. Luchenitser** |
| | | (See above for address) |

*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Central Florida Freethought Community**      represented by      **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Ronald Gordon**      represented by      **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Chase Hansel**                    represented by **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

| | | |
|---|---|---|
| **Humanist Community of the Space Coast** | represented by | **Daniel B. Tilley** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

| | | |
|---|---|---|
| **Jeffery Koeberl** | represented by | **Daniel B. Tilley** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Space Coast Freethought Association**                    represented by    **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**David Williamson**                    represented by    **Daniel B. Tilley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nancy Gbana Abudu**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex J. Luchenitser**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Andrew L. Seidel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Mach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Susan Markert**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/07/2015 | 1 | COMPLAINT (Injunctive Relief Sought) against Brevard County (Filing fee $ 400, receipt number ORL45186) filed by Keith Becher, Humanist Community of the Space Coast, Chase Hansel, David Williamson, Central Florida Freethought Community, Ronald Gordon, Jeffery Koeberl, Space Coast Freethought Association. (Attachments: # 1 Exhibit 1-10, # 2 Civil Cover Sheet)(IGC) (Entered: 07/07/2015) |
| 07/07/2015 | 2 | SUMMONS issued as to Brevard County (c/o District 1 County Commissioner Robin Fisher(Chair). (mailed to attorney) (IGC) (Entered: 07/07/2015) |
| 07/07/2015 | 3 | NOTICE to counsel, Alex J. Luchenitser, Joshua Hoffer, Rebecca S. Markert, Andrew L. Seidel, And Daniel Mach of Local Rule 2.02 Re 1 Complaint (signed by deputy clerk). (IGC) (Entered: 07/07/2015) |
| 07/08/2015 | 4 | **RELATED CASE ORDER AND NOTICE of designation under Local Rule 3.05 - track 2. Notice of pendency of other actions due within 14 days from the date of this order. Signed by Judge John Antoon II on 7/8/2015. CTP(DJD)** (Entered: 07/08/2015) |
| 07/08/2015 | 5 | **INTERESTED PERSONS ORDER Certificate of interested persons and corporate disclosure statement due within 14 days from the date of this order. Signed by Judge John Antoon II on 7/8/2015. CTP(DJD)** (Entered: 07/08/2015) |
| 07/13/2015 | 6 | NOTICE of pendency of related cases re 4 Related case order and track 2 notice per Local Rule 1.04(d) by Brevard County. Related case(s): no (Knox, Scott) (Entered: 07/13/2015) |
| 07/13/2015 | 7 | CERTIFICATE of interested persons and corporate disclosure statement re 5 Interested persons order by Brevard County. (Knox, Scott) (Entered: 07/13/2015) |
| 07/13/2015 | 8 | PROOF of service by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson (Tilley, Daniel) Modified on 7/14/2015 (JET). (Filer has been contacted to refile using the correct event code.) (Entered: 07/13/2015) |

| | | |
|---|---|---|
| 07/13/2015 | 9 | MOTION for Andrew L. Seidel to appear pro hac vice with Written designation and consent to act filed by All Plaintiffs. Local Counsel: Daniel B. Tilley. Non-Resident Counsel: Andrew L. Seidel. (Tilley, Daniel) Modified on 7/14/2015 (JET). (Entered: 07/13/2015) |
| 07/13/2015 | 10 | MOTION for Rebecca S. Markert to appear pro hac vice with Written designation and consent to act filed by All Plaintiffs. Local Counsel: Daniel B. Tilley. Non-Resident Counsel: Rebecca S. Markert. (Tilley, Daniel) Modified on 7/14/2015 (JET). (Entered: 07/13/2015) |
| 07/14/2015 | 11 | RETURN of service executed on 07/09/2015 by All Plaintiffs as to Brevard County, by service on County Commission Chairman Robin Fisher. (Tilley, Daniel) Modified on 7/15/2015 (JET). (Entered: 07/14/2015) |
| 07/14/2015 | 12 | MOTION for Alex J. Luchenitser to appear pro hac vice by All Plaintiffs. (Tilley, Daniel) Motions referred to Magistrate Judge David A. Baker. Modified on 7/15/2015 (JET). (Entered: 07/14/2015) |
| 07/14/2015 | 13 | MOTION for Joshua G. Hoffer to appear pro hac vice by All Plaintiffs. (Tilley, Daniel) Motions referred to Magistrate Judge David A. Baker. Modified on 7/15/2015 (JET). (Entered: 07/14/2015) |
| 07/14/2015 | 14 | MOTION for Daniel Mach to appear pro hac vice by All Plaintiffs. (Tilley, Daniel) Motions referred to Magistrate Judge David A. Baker. Modified on 7/15/2015 (JET). (Entered: 07/14/2015) |
| 07/15/2015 | 15 | **ORDER granting 9 motion to appear pro hac vice; granting 10 motion to appear pro hac vice; granting 12 motion to appear pro hac vice; denying 13 motion to appear pro hac vice; granting 14 motion to appear pro hac vice. Signed by Magistrate Judge David A. Baker on 7/15/2015. (LAK)** (Entered: 07/15/2015) |
| 07/16/2015 | 16 | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Alex J. Luchenitser, appearing on behalf of All Plaintiffs(Filing fee $150, receipt number ORL045536.) Related document: 12 MOTION for Alex J. Luchenitser to appear pro hac vice. (JET) (JET). (Entered: 07/16/2015) |
| 07/16/2015 | 17 | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Joshua G. Hoffer, appearing on behalf of All Plaintiffs (Filing fee $150, receipt number ORL045537.) Related document: 13 MOTION for Joshua G. Hoffer to appear pro hac vice. (JET) (JET). (Entered: 07/16/2015) |
| 07/20/2015 | 18 | CERTIFICATE of interested persons and corporate disclosure statement re 5 Interested persons order by All Plaintiffs. (Tilley, Daniel) Modified on 7/21/2015 (JET). (Entered: 07/20/2015) |
| 07/20/2015 | 19 | NOTICE of pendency of related cases re 4 Related case order and track 2 notice per Local Rule 1.04(d) by All Plaintiffs. Related case(s): no (Tilley, Daniel) Modified on 7/21/2015 (JET). (Entered: 07/20/2015) |
| 07/20/2015 | 20 | NOTICE to the defendant of 4 Related case order and track 2 notice by All Plaintiffs (Attachments: # 1 Court's Related Case Order and Track Two Notice)(Tilley, Daniel) Modified on 7/21/2015 (JET). (Entered: 07/20/2015) |

| 07/21/2015 | 21 | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Andrew L. Seidel, appearing on behalf of Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson (Filing fee $150, receipt number ORL45628) Related document: 9 MOTION for Andrew L. Seidel to appear pro hac vice. (IGC) (IGC). (Entered: 07/21/2015) |
|---|---|---|
| 07/21/2015 | 22 | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Rebecca S. Markert, appearing on behalf of Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson (Filing fee $150, receipt number ORL45627) Related document: 10 MOTION for Rebecca S. Markert to appear pro hac vice. (IGC) (IGC). (Entered: 07/21/2015) |
| 07/23/2015 | 23 | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Daniel Mach, appearing on behalf of Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association (Filing Fee $150, receipt number 45869) Related document: 14 MOTION for Daniel Mach to appear pro hac vice. (IGC) (IGC). Modified to reflect fee paid on 7/30/2015 (IGC). (Entered: 07/23/2015) |
| 07/29/2015 | 24 | ANSWER and affirmative defenses to 1 Complaint with Jury Demand , COUNTERCLAIM against All Plaintiffs by Brevard County. (Attachments: # 1 Exhibit Index, # 2 Exhibit A, # 3 Exhibit B-1, # 4 Exhibit B-2, # 5 Exhibit B-3, # 6 Exhibit B-4, # 7 Exhibit B-5, # 8 Exhibit B-6, # 9 Exhibit B-7, # 10 Exhibit B-8, # 11 Exhibit B-9)(Knox, Scott) Modified on 7/29/2015 (JET). (Entered: 07/29/2015) |
| 07/30/2015 | 25 | Unopposed MOTION to Appear Telephonically at Case Management Report Meeting by All Plaintiffs. (Luchenitser, Alex) Motions referred to Magistrate Judge David A. Baker. Modified on 7/30/2015 (JET). (Entered: 07/30/2015) |
| 07/30/2015 | 26 | NOTICE of ERROR and Corrected Pleading Title by Brevard County re 24 Answer to Complaint and Counterclaim (Knox, Scott) Modified on 7/31/2015 (JET). (Entered: 07/30/2015) |
| 07/30/2015 | 27 | **ENDORSED ORDER granting 25 Motion to Appear Telephonically. Signed by Magistrate Judge David A. Baker on 7/30/2015. (Baker, David)** (Entered: 07/30/2015) |
| 08/19/2015 | 28 | AMENDED COMPLAINT against Brevard County (Injunctive Relief Sought) filed by All Plaintiffs. (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11)(Luchenitser, Alex) Modified on 8/19/2015 (JET). (Entered: 08/19/2015) |
| 09/02/2015 | 29 | ANSWER and affirmative defenses with Jury Demand to 28 Amended Complaint by Brevard County.(Knox, Scott) (Entered: 09/02/2015) |

| 09/10/2015 | 30 | CASE MANAGEMENT REPORT. (Luchenitser, Alex) (Entered: 09/10/2015) |
|---|---|---|
| 09/18/2015 | 31 | **CASE MANAGEMENT AND SCHEDULING ORDER.** Signed by Judge John Antoon II on 9/18/2015. (BRS) (Entered: 09/18/2015) |
| 09/18/2015 | | Set scheduling order deadlines: Amended Pleadings due by 10/27/2015, Joinder of Parties due by 10/27/2015, Discovery due by 4/1/2016, Dispositive motions due by 5/3/2016, Pretrial statement due by 9/1/2016, All other motions due by 8/15/2016, Jury Trial set for 10/3/2016 at 09:00 AM in Orlando Courtroom 6 B before Judge John Antoon II. Conduct mediation hearing by 5/3/2016. Lead counsel to coordinate dates. Defendant disclosure of expert report due by 11/25/2015, Plaintiff disclosure of expert report due by 11/25/2015 (MAL) (Entered: 09/21/2015) |
| 09/25/2015 | 32 | NOTICE of mediation conference/hearing to be held on April 6, 2016, 9:00 a.m. before Mike Krasny. (Luchenitser, Alex) (Entered: 09/25/2015) |
| 10/20/2015 | 33 | MOTION for Bradley Girard to appear pro hac vice, Written designation and consent to act by Daniel B. Tilley on behalf of Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. Local Counsel: Daniel B. Tilley. Non-Resident Counsel: Bradley Girard. (Tilley, Daniel) Modified on 10/20/2015 (JET). (Entered: 10/20/2015) |
| 10/20/2015 | 34 | **ENDORSED ORDER granting 33 motion to appear pro hac vice. Provided, all counsel shall register for and use the electronic filing system as adopted by the Court. After this Order, the Clerk will no longer send copies of docket entries by U.S. Mail to counsel in this case. Appearance and participation by more than one attorney at any hearing or trial is subject to the discretion of the presiding judge. Signed by Magistrate Judge David A. Baker on 10/20/2015. (Baker, David)** (Entered: 10/20/2015) |
| 10/22/2015 | 35 | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Bradley Girard, appearing on behalf of David Williamson, et al (plaintiffs) (Filing fee $150 receipt number ORL-48142.) Related document: 33 MOTION for Bradley Girard to appear pro hac vice. (MAL) (MAL). (Entered: 10/22/2015) |
| 02/16/2016 | 36 | NOTICE of Appearance by Cristina Teresa Berrios on behalf of Brevard County (Berrios, Cristina) (Entered: 02/16/2016) |
| 03/01/2016 | 37 | **ORDER for Diana E. Yuan to comply with the administrative procedures regarding electronic filing. Signed by Judge John Antoon II on 3/1/2016. (copy mailed to Diana E. Yuan)(AKJ)** (Entered: 03/01/2016) |
| 03/01/2016 | 38 | NOTICE of compliance by Brevard County (Yuan, Diana) (Entered: 03/01/2016) |
| 04/12/2016 | 39 | MEDIATION report Hearing held on April 6, 2016. PARTIALLY RESOLVED (Krasny, Mike) Modified on 4/12/2016 (MAL). Modified on 4/26/2017 (SPM). (Entered: 04/12/2016) |
| 04/28/2016 | 40 | Unopposed MOTION for leave to file Motion for Summary Judgment in Excess of 25 Pages by Brevard County. (Knox, Scott) Modified on 4/29/2016 (JET). (Entered: |

| | | |
|---|---|---|
| | | 04/28/2016) |
| 04/29/2016 | 41 | **ENDORSED ORDER granting 40 Unopposed Motion for Leave to File a Motion for Summary Judgment in Excess of Twenty-Five Pages. The parties may file summary judgment motions of twenty-eight pages or fewer. Signed by Judge John Antoon II on 4/29/2016. (EK)** (Entered: 04/29/2016) |
| 04/29/2016 | 42 | NOTICE of filing Amended DEPOSITION of Andy Anderson by Brevard County (Attachments: # 1 Deposition transcript, # 2 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 43 | NOTICE of filing Amended DEPOSITION of Curt Smith by Brevard County (Attachments: # 1 Deposition transcript, # 2 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 44 | NOTICE of filing Amended DEPOSITION of Mary Bolin Lewis by Brevard County (Attachments: # 1 Deposition transcript, # 2 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 45 | NOTICE of filing Amended DEPOSITION of Trudie Infantini by Brevard County (Attachments: # 1 Deposition Transcript, # 2 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 46 | NOTICE of filing DEPOSITION of Robin Fisher by Brevard County (Attachments: # 1 Deposition Transcript, # 2 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 47 | NOTICE of filing DEPOSITION of Chuck Nelson by Brevard County (Attachments: # 1 Deposition and exhibits, # 2 Exhibit Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 48 | NOTICE of filing DEPOSITION of Jim Barfield by Brevard County (Attachments: # 1 Deposition and Exhibits, # 2 Exhibit Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 04/29/2016 | 49 | NOTICE of filing DEPOSITION of Ronald Gordon by Brevard County (Attachments: # 1 Deposition Transcript, # 2 Errata Signed Correction Sheet, # 3 Exhibit with Index) (Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 04/29/2016) |
| 05/02/2016 | 50 | NOTICE of filing DEPOSITION of Chase Hansel by Brevard County (Attachments: # 1 Deposition transcript, # 2 Errata Sheet, # 3 Exhibit with Index, # 4 Exhibit)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 05/02/2016) |
| 05/02/2016 | 51 | NOTICE of filing DEPOSITION of Jeffery Koeberl by Brevard County (Attachments: # 1 Deposition transcript, # 2 Errata Sheet, # 3 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 05/02/2016) |
| 05/02/2016 | 52 | NOTICE of filing DEPOSITION of Keith Becher by Brevard County (Attachments: # 1 Deposition Transcript, # 2 Errata Sheet, # 3 Exhibit with Index)(Yuan, Diana) Modified on 5/2/2016 (JET). (Entered: 05/02/2016) |
| 05/02/2016 | 53 | DEPOSITION of David Williamson taken on 03/08/2016 by Brevard County. . (Attachments: # 1 Deposition transcript, # 2 Deposition transcript, # 3 Errata, # 4 |

| | | |
|---|---|---|
| | | Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Yuan, Diana) Modified on 5/3/2016 (JET). (Entered: 05/02/2016) |
| 05/03/2016 | 54 | MOTION for summary judgment by Brevard County. (Attachments: # 1 Exhibit Index, # 2 Exhibit 1 - Whitten, # 3 Exhibit 2 - RFA, # 4 Exhibit 3A - Grammich, # 5 Exhibit 3B - Grammich)(Knox, Scott) (Entered: 05/03/2016) |
| 05/03/2016 | 55 | MOTION for summary judgment by All Plaintiffs. (Attachments: # 1 Exhibit (Table of Contents for Appendix of Exhibits), # 2 Exhibit (Appendix pages 1-265, containing Exhibits 1-19), # 3 Exhibit (Appendix pages 266-329, containing Exhibits 20-29), # 4 Exhibit (Appendix pages 330-536, containing Exhibit 30), # 5 Exhibit (Appendix pages 537-94, containing Exhibits 31-33), # 6 Exhibit (Appendix pages 595-703, containing Exhibits 34-52), # 7 Exhibit (Appendix pages 704-1018, containing Exhibits 53-83), # 8 Exhibit (Appendix pages 1019-89, containing Exhibits 84-110), # 9 Exhibit (Appendix pages 1090-1149, containing Exhibits 111-133))(Luchenitser, Alex) (Entered: 05/03/2016) |
| 05/03/2016 | 56 | REQUEST for oral argument re 55 MOTION for summary judgment by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Luchenitser, Alex) (Entered: 05/03/2016) |
| 05/03/2016 | 57 | NOTICE of Physical Filing in Support of Motion re 55 MOTION for summary judgment by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson (Luchenitser, Alex) Modified on 5/4/2016 (JET). FLASH DRIVE RECEIVED IN THE CLERK'S OFFICE AND PUT IN A FOLDER ON THE SHELF. (Entered: 05/03/2016) |
| 05/09/2016 | 58 | SUPPLEMENT re 54 MOTION for summary judgment *Supplemental Inadvertently Omitted Footnote References* by Brevard County. (Knox, Scott) (Entered: 05/09/2016) |
| 06/06/2016 | 59 | RESPONSE to Motion re 55 MOTION for summary judgment filed by Brevard County. (Knox, Scott) Modified on 6/7/2016 (JET). (Entered: 06/06/2016) |
| 06/06/2016 | 60 | RESPONSE in Opposition re 54 MOTION for summary judgment *(of Brevard County)* filed by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Attachments: # 1 Exhibit (Appendix pages 1150-1204, containing Exhibits 134-146), # 2 Exhibit (Appendix pages 1205-1237, containing Exhibits 147-153), # 3 Exhibit (Appendix pages 1238-1273, containing Exhibits 154-163))(Luchenitser, Alex) Modified on 6/7/2016 (JET). (Entered: 06/06/2016) |
| 06/06/2016 | 61 | NOTICE of Physical Filing (in the form of a USB flash drive containing video and audio recordings) in Support of Opposition Brief by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson re 60 Response in Opposition to Motion *(Notice )* (Luchenitser, Alex) Modified on 6/7/2016 (JET). Modified on 6/9/2016 (LMM). **USB flash drive filed separately in folder on shelf** (Entered: 06/06/2016) |

| | | |
|---|---|---|
| 06/23/2016 | 62 | REPLY to 60 Response to Motion re 54 MOTION for summary judgment filed by Brevard County. (Knox, Scott) Modified on 6/24/2016 (JET). (Entered: 06/23/2016) |
| 06/23/2016 | 63 | REPLY to 59 Response to Motion re 55 MOTION for summary judgment filed by All Plaintiffs. (Luchenitser, Alex) Modified on 6/24/2016 (JET). (Entered: 06/23/2016) |
| 07/12/2016 | 64 | Unopposed MOTION to Appear Telephonically *(to Permit Pretrial-Statement Preparation Meeting to Occur by Telephonic or Video Conference)* by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Luchenitser, Alex) Motions referred to Magistrate Judge David A. Baker. (Entered: 07/12/2016) |
| 07/13/2016 | 65 | **ENDORSED ORDER granting 64 Motion to Appear Telephonically. Provided there are no disputes. Should there be disputes, counsel must meet in person. Signed by Magistrate Judge David A. Baker on 7/13/2016. (Baker, David)** (Entered: 07/13/2016) |
| 08/15/2016 | 66 | NOTICE of hearing: Telephone Conference set for 8/23/2016 at 10:00 AM in Orlando Courtroom 6 B before Judge John Antoon II. Counsel shall provide the Courtroom Deputy Clerk, Anita Justin, by 12 PM on 8/22/2016 a number in which to reach counsel for the conference call. Counsel may contact Ms. Justin by calling 407-835-4204.(AKJ) (Entered: 08/15/2016) |
| 08/15/2016 | 67 | MOTION for miscellaneous relief, specifically Reschedule Telephone Conference set for 8/23/2016 at 10:00 AM by Brevard County. (Knox, Scott) (Entered: 08/15/2016) |
| 08/16/2016 | 68 | **ORDER granting 67 Defendant's Uncontested Motion Requesting Status Conference Hearing Be Rescheduled. The telephonic status conference previously scheduled for Tuesday, August 23, 2016, at 10:00 a.m. is RESCHEDULED for Wednesday, August 24, 2016, at 10:00 a.m. No later than 12 noon on August 23, 2016, counsel shall provide the Courtroom Deputy Clerk, Anita Justin, with the telephone number at which they can be reached for the status conference. Counsel may contact Ms. Justin by calling 407-835-4204. Signed by Judge John Antoon II on 8/16/2016. (EK)** (Entered: 08/16/2016) |
| 08/16/2016 | | Reset hearing: Telephonic Status Conference set for 8/24/2016 at 10:00 AM before Judge John Antoon II. (CLB) (Entered: 08/17/2016) |
| 08/24/2016 | 69 | Minute Entry. Proceedings held before Judge John Antoon II: TELEPHONE STATUS CONFERENCE held on 8/24/2016. Case will be resolved by the court on the Motions for Summary Judgment. Court relieves counsel from all other deadlines contained in the case management and scheduling order. Court will grant request for oral argument (Doc. No. 56 ) and schedule oral argument on the Motions for Summary Judgment for September 1, 2016 at 10:00 AM (notice to follow). Case is removed from the October, 2016 trial term. Court Reporter: Sandy Tremel (AKJ) (Entered: 08/24/2016) |
| 08/24/2016 | 70 | NOTICE of hearing on motion re 54 MOTION for summary judgment , 55 MOTION for summary judgment . Motion Hearing set for 9/1/2016 at 10:00 AM in Orlando Courtroom 6 B before Judge John Antoon II. (counsel mailed/emailed)(AKJ) (Entered: 08/24/2016) |

| | | |
|---|---|---|
| 08/24/2016 | 71 | Unopposed MOTION to Reschedule Summary-Judgment Hearing by All Plaintiffs. (Luchenitser, Alex) Modified on 8/25/2016 (CLB). (Entered: 08/24/2016) |
| 08/25/2016 | 72 | **ORDER granting 71 Plaintiffs' Unopposed Motion to Reschedule Summary Judgment Hearing and cancelling September 1, 2016 oral argument. Hearing will be reset by separate notice. Signed by Judge John Antoon II on 8/25/2016. (EK)** (Entered: 08/25/2016) |
| 08/26/2016 | 73 | NOTICE rescheduling hearing on motions - re 54 MOTION for summary judgment , 55 MOTION for summary judgment . Motion Hearing reset for 10/5/2016 at 10:00 AM in Orlando Courtroom 6 B before Judge John Antoon II. (counsel mailed/emailed)(AKJ) (Entered: 08/26/2016) |
| 09/23/2016 | 74 | NOTICE of supplemental authority re 54 MOTION for summary judgment by Brevard County. (Knox, Scott) (Entered: 09/23/2016) |
| 09/23/2016 | 75 | Corrected NOTICE of supplemental authority re 54 MOTION for summary judgment by Brevard County. (Knox, Scott) Modified on 9/26/2016 (JET). (Entered: 09/23/2016) |
| 09/26/2016 | 76 | Joint MOTION for leave to file out of time Stipulation of Facts Regarding Cross-Motions for Summary Judgment by All Parties. (Attachments: # 1 Stipulation of Facts Regarding Cross-Motions for Summary Judgment)(Luchenitser, Alex) Modified on 9/27/2016 (JET). (Entered: 09/26/2016) |
| 09/26/2016 | 77 | **ORDER granting 76 Joint Motion By All Parties for Leave to File Out of Time Stipulation of Facts Regarding Cross-Motions for Summary Judgment and directing the parties to re-file the Stipulation of Facts attached to their motion as a separate docket entry in the electronic record as soon as practicable. Signed by Judge John Antoon II on 9/26/2016. (EK)** (Entered: 09/26/2016) |
| 09/26/2016 | 78 | STIPULATION of facts regarding cross-motions re 55 MOTION for summary judgment and 54 MOTION for summary judgment by All Parties. (Luchenitser, Alex) Modified on 9/27/2016 (JET). (Entered: 09/26/2016) |
| 10/03/2016 | 79 | Case Reassigned to Magistrate Judge Daniel C. Irick. New case number: 6:15-cv-1098-ORL-28-DCI. Magistrate Judge David A. Baker no longer assigned to the case. (EJS) (Entered: 10/03/2016) |
| 10/04/2016 | 80 | Emergency MOTION to Appear Telephonically *at October 5 summary-judgment hearing* by All Plaintiffs. (Luchenitser, Alex) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 10/04/2016) |
| 10/04/2016 | 81 | Minute Entry. Proceedings held before Judge John Antoon II: denying 80 Motion to Appear Telephonically; TELEPHONE CONFERENCE held on 10/4/2016. Court Reporter: Suzanne L. Trimble (AKJ) (Entered: 10/04/2016) |
| 10/05/2016 | 82 | Minute Entry. Proceedings held before Judge John Antoon II: MOTION HEARING held on 10/5/2016 re 55 MOTION for summary judgment filed by Space Coast Freethought Association, Keith Becher, Ronald Gordon, Humanist Community of the Space Coast, Jeffery Koeberl, David Williamson, Chase Hansel, Central Florida Freethought Community, 54 MOTION for summary judgment filed by Brevard |

| | | County. Within 10 days parties are to provide court with edited version of stipulation with correct citations in WORD format. By October 28, 2016, parties are to file simultaneous briefs as stated in open court. Court Reporter: Suzanne L. Trimble (AKJ) (Entered: 10/05/2016) |
|---|---|---|
| 10/11/2016 | 83 | Amended STIPULATION of facts (with corrected citations) regarding cross-motions 55 MOTION for summary judgment , and 54 MOTION for summary judgment filed by All Parties. (Luchenitser, Alex) Modified on 10/12/2016 (JET). (Entered: 10/11/2016) |
| 10/28/2016 | 84 | Supplemental MEMORANDUM in support re 54 Motion for summary judgment filed by Brevard County. (Knox, Scott) Modified on 10/31/2016 (JET). (Entered: 10/28/2016) |
| 10/28/2016 | 85 | PLAINTIFF'S Supplemental BRIEF >(ordered by Court concerning use of statements by individual Commissioners) re 55 MOTION for summary judgment , 54 MOTION for summary judgment <i filed by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Luchenitser, Alex) Modified on 10/31/2016 (JET). (Entered: 10/28/2016) |
| 11/01/2016 | 86 | NOTICE of supplemental authority re 55 MOTION for summary judgment , 54 MOTION for summary judgment by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Attachments: # 1 Supplemental Authority)(Luchenitser, Alex) (Entered: 11/01/2016) |
| 11/16/2016 | 87 | ***STRICKEN*** NOTICE of unavailability of counsel by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson from 11/21/2016 to 11/28/2016. (Luchenitser, Alex) Modified on 11/18/2016 (JET). STRICKEN PER ORDER 88 . (Entered: 11/16/2016) |
| 11/17/2016 | 88 | **ORDER to strike 87 Notice of unavailability filed by Plaintiffs. Signed by Judge John Antoon II on 11/17/2016. (BRS)** (Entered: 11/17/2016) |
| 02/16/2017 | 89 | NOTICE of supplemental authority re 55 MOTION for summary judgment , 54 MOTION for summary judgment *(Bormuth v. County of Jackson)* by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Attachments: # 1 Supplemental Authority) (Luchenitser, Alex) (Entered: 02/16/2017) |
| 03/08/2017 | 90 | NOTICE of supplemental authority re 55 MOTION for summary judgment , 54 MOTION for summary judgment *(grant of rehearing en banc in Bormuth v. County of Jackson)* by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Luchenitser, Alex) (Entered: 03/08/2017) |

| 03/10/2017 | 91 | **NOTICE OF HEARING: a telephonic status conference will take place on Wednesday, March 15, 2017 at 9:30 a.m.; Counsel are directed to call 1-888-684-8852, access code 4135515 and security code 031517 for the conference. Signed by Judge John Antoon II on 3/10/2017. (BRS)** (Entered: 03/10/2017) |
| 03/10/2017 | | Set hearing: Telephonic Status Conference set for 3/15/2017 at 09:30 AM in Orlando Courtroom 6 B before Judge John Antoon II (RMF) (Entered: 03/13/2017) |
| 03/15/2017 | 92 | Minute Entry. Proceedings held before Judge John Antoon II: TELEPHONE CONFERENCE held on 3/15/2017. Court will allow supplemental briefing on free speech component. Limited to 10 pages Plaintiffs' due on 3/31/17, defendant due 15 days thereafter, Plaintiff will be allowed a reply brief limited to 3 pages due 4/28/17. Court Reporter: Suzanne L. Trimble (AKJ) (Entered: 03/15/2017) |
| 03/17/2017 | 93 | TRANSCRIPT of Defendant's and Plaintiffs' Motions for Summary Judgment held on 10/5/16 before Judge John Antoon II. Court Reporter Suzanne L. Trimble, trimblecourtreporter@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 4/7/2017, Redacted Transcript Deadline set for 4/17/2017, Release of Transcript Restriction set for 6/15/2017. (SLT) (Entered: 03/17/2017) |
| 03/17/2017 | 94 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Suzanne L. Trimble. (SLT) (Entered: 03/17/2017) |
| 03/31/2017 | 95 | PLAINTIFF'S BRIEF re 55 MOTION for summary judgment , 54 MOTION for summary judgment *(supplemental brief ordered by Court concerning Plaintiffs' free-speech claim)* filed by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Luchenitser, Alex) (Entered: 03/31/2017) |
| 04/17/2017 | 96 | DEFENDANT'S BRIEF re 55 MOTION for summary judgment , 95 Brief - Plaintiff, 54 MOTION for summary judgment *on Plaintiffs' Free Speech Claim* filed by Brevard County. (Knox, Scott) (Entered: 04/17/2017) |
| 04/18/2017 | 97 | NOTICE OF FILING CORRECTED BREVARD COUNTY SUPPLEMENTAL SUMMARY JUDGMENT BRIEF re 55 MOTION for summary judgment , 95 Brief - Plaintiff, 54 MOTION for summary judgment *on Plaintiffs' Free Speech Claim* filed by Brevard County. (Attachments: # 1 Main Document CORRECTED BC Supp Brief 04_17_17)(Knox, Scott) Modified on 4/19/2017 (SPM). (Entered: 04/18/2017) |
| 04/28/2017 | 98 | REPLY to Response to Motion re 55 MOTION for summary judgment , 54 MOTION for summary judgment *(supplemental reply brief on free-speech claim)* filed by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, |

| | | |
|---|---|---|
| | | Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Attachments: # 1 Appendix (supplemental appendix, containing Exhibits 164-67 (pages A1274-85)))(Luchenitser, Alex) (Entered: 04/28/2017) |
| 05/01/2017 | 99 | NOTICE of supplemental authority re 54 and 55 MOTIONS for summary judgment by Plaintiffs. (Attachments: # 1 First Supplemental Authority, # 2 Second Supplemental Authority)(Luchenitser, Alex) Modified on 5/2/2017 (SPM). (Entered: 05/01/2017) |
| 06/30/2017 | 100 | Fifth NOTICE of supplemental authority re 55 MOTION for summary judgment , 54 MOTION for summary judgment by All Plaintiffs. (Attachments: # 1 Supplemental Authority: Matal v. Tam)(Luchenitser, Alex) Modified on 7/3/2017 (JET). (Entered: 06/30/2017) |
| 07/18/2017 | 101 | NOTICE of supplemental authority re 55 MOTION for summary judgment , 54 MOTION for summary judgment *(Plaintiffs' sixth notice, concerning Lund v. Rowan County en banc decision)* by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Attachments: # 1 Supplemental Authority)(Luchenitser, Alex) (Entered: 07/18/2017) |
| 08/14/2017 | 102 | Unopposed MOTION for Bradley Girard to withdraw as attorney by All Plaintiffs. (Girard, Bradley) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 08/14/2017) |
| 08/14/2017 | 103 | **ENDORSED ORDER granting 102 Unopposed Motion to Withdraw as Attorney. Attorney Bradley Girard is hereby withdrawn and terminated as counsel in this case. Signed by Magistrate Judge Daniel C. Irick on 8/14/2017. (Irick, Daniel)** (Entered: 08/14/2017) |
| 09/08/2017 | 104 | NOTICE of supplemental authority re 55 MOTION for summary judgment , 54 MOTION for summary judgment *(Plaintiffs' seventh notice, concerning Bormuth v. County of Jackson en banc decision)* by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson. (Attachments: # 1 Supplemental Authority)(Luchenitser, Alex) (Entered: 09/08/2017) |
| 09/30/2017 | 105 | **ORDER granting in part and denying in part 54 Motion for Summary Judgment; granting in part and denying in part 55 Motion for Summary Judgment; and directing the parties to file their settlement agreement no later than October 13, 2017. Signed by Judge John Antoon II on 9/30/2017. (Attachments: # 1 Appendix Resolution 2015-101) (EK)** (Entered: 09/30/2017) |
| 10/05/2017 | 106 | Unopposed MOTION for Extension of Time to File motion or petition for attorney's fees, taxable costs, and nontaxable expenses *from 14 days after entry of judgment to 60 days after entry of judgment* by All Plaintiffs. (Luchenitser, Alex) (Entered: 10/05/2017) |
| 10/06/2017 | 107 | **ORDER granting 106 Unopposed Motion for Extension of Time to Move for Attorney's Fees and Costs. Signed by Judge John Antoon II on 10/5/2017. (EK)** |

| | | |
|---|---|---|
| | | (Entered: 10/06/2017) |
| 10/12/2017 | 108 | Unopposed MOTION for Cristina Berrios to withdraw as attorney by Brevard County. (Berrios, Cristina) Motions referred to Magistrate Judge Daniel C. Irick. (Entered: 10/12/2017) |
| 10/12/2017 | 109 | Unopposed MOTION for Extension of Time to October 27, 2017, to File proposed language for the final judgment and the parties' settlement agreement as to damages *(from October 13, 2017 to October 27, 2017, for all parties)* by All Plaintiffs. (Luchenitser, Alex) Modified on 10/13/2017 (SPM). (Entered: 10/12/2017) |
| 10/13/2017 | 110 | **ENDORSED ORDER granting 108 Motion to Withdraw as Attorney. Attorney Cristina Teresa Berrios is hereby terminated and withdrawn as counsel in this case. Signed by Magistrate Judge Daniel C. Irick on 10/13/2017. (Irick, Daniel)** (Entered: 10/13/2017) |
| 10/16/2017 | 111 | **ORDER granting 109 Unopposed Motion for Extension of Time to File; setting new deadline of November 13, 2017; and directing the Clerk to administratively close this file. Signed by Judge John Antoon II on 10/16/2017. (EK)** (Entered: 10/16/2017) |
| 11/13/2017 | 112 | Joint MOTION for entry of final judgment *filed by all parties* by All Plaintiffs. (Attachments: # 1 Proposed Final Judgment, # 2 Settlement Agreement Concerning Damages)(Luchenitser, Alex) Modified on 11/14/2017 (SPM). (Entered: 11/13/2017) |
| 11/27/2017 | 113 | **ORDER re 112 Joint MOTION By All Parties for Entry of Final Judgment. The parties shall inform the Court by December 11, 2017, whether they object to any of the Court's suggested modifications. Signed by Judge John Antoon II on 11/27/2017. (Attachments: # 1 Edited proposed judgment)(EK)** (Entered: 11/27/2017) |
| 11/29/2017 | 114 | NOTICE by Keith Becher, Central Florida Freethought Community, Ronald Gordon, Chase Hansel, Humanist Community of the Space Coast, Jeffery Koeberl, Space Coast Freethought Association, David Williamson re 113 Order *(Joint Notice by All Parties That They Do Not Object to Court's Modifications to Proposed Final Judgment)* (Luchenitser, Alex) (Entered: 11/29/2017) |
| 11/29/2017 | 115 | **FINAL JUDGMENT. Signed by Judge John Antoon II on 11/29/2017.(EK)** (Entered: 11/29/2017) |
| 11/29/2017 | 116 | **ORDER directing the Clerk to lift the administrative closure of this case and then to close the case. Signed by Judge John Antoon II on 11/29/2017. (EK)** (Entered: 11/29/2017) |
| 12/28/2017 | 117 | NOTICE of Appearance by Michael J. Roper on behalf of Brevard County (Roper, Michael) (Entered: 12/28/2017) |
| 12/28/2017 | 118 | NOTICE of Appearance by Frank Mari on behalf of Brevard County (Mari, Frank) (Entered: 12/28/2017) |
| 12/28/2017 | 119 | NOTICE OF APPEAL as to 115 Order on motion for judgment, 105 Order on motion for summary judgment by Brevard County. Filing fee not paid. (Mari, Frank) (Entered: |

| | | 12/28/2017) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/29/2017 09:15:34 | | | |
| **PACER Login:** | ux4656:4033087:3956495 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 6:15-cv-01098-JA-DCI |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

DAVID WILLIAMSON, CHASE HANSEL,
KEITH BECHER, RONALD GORDON,
JEFFERY KOEBERL, CENTRAL
FLORIDA FREETHOUGHT
COMMUNITY, SPACE COAST
FREETHOUGHT ASSOCIATION and
HUMANIST COMMUNITY OF THE
SPACE COAST,

      Plaintiffs,

v.

      Case No: 6:15-cv-1098-Orl-28DCI

BREVARD COUNTY,

      Defendant.

_____

## ORDER

The Board of County Commissioners of Brevard County, Florida, holds regular meetings to conduct the business of the county, and it begins its meetings with invocations delivered by citizens. But the County has a policy and practice barring certain citizens from giving the invocation based on those citizens' religious beliefs.

The Plaintiffs in this case primarily assert that the County's invocation practice violates the Establishment Clause of the First Amendment of the United States Constitution. They also bring claims under the Free Exercise and Free Speech Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and Article I, Sections 2 and 3 of the Florida Constitution. Plaintiffs seek injunctive and declaratory relief as well as money damages. The case is before the Court on the parties' cross-motions for summary judgment, and as set forth below, both motions are granted in

part and denied in part.

## I.     Factual and Procedural Background[1]

### A.     The Parties

This case was brought by eight Plaintiffs—five individuals and three organizations. The individual Plaintiffs—David Williamson, Chase Hansel, Keith Becher, Ronald Gordon, and Jeffrey Koeberl—identify themselves as atheists, and all but Gordon also identify themselves as Secular Humanists. (ASOF ¶ 85). The American Humanism Association describes Humanism as "a progressive philosophy of life that, without theism and other supernatural beliefs, affirms our ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater good of humanity." (Id. ¶ 86). Becher, Koeberl, and Williamson are ordained as Humanist clergy by the Humanist Society; all three are Humanist Celebrants, and Koeberl is also a Humanist Chaplain. (Id. ¶ 93).

Plaintiffs do not profess a belief in the existence of God. (Id. ¶ 209). Their beliefs are strongly held, having a place in their lives equal to the significance of theistic beliefs in the lives of monotheists. (Id. ¶ 91). They consider their beliefs to be a religion. (Id. ¶ 92). Four of the individual Plaintiffs are residents of Brevard County; Williamson lives in neighboring Seminole County. (Id. ¶ 83). Hansel and Gordon own homes in Brevard County and pay property taxes there. (Id. ¶ 84).

The three organizational Plaintiffs are the Humanist Community of the Space Coast

---

[1] The facts are not in dispute. After the Court heard oral argument on the parties' cross-motions for summary judgment (Docs. 54 & 55), the parties submitted a 67-page, 301-paragraph Amended Stipulation of Facts Regarding Cross-Motions for Summary Judgment (Doc. 83). The factual background is taken largely from that Amended Stipulation of Facts, though other record evidence is also cited herein. References to the Amended Stipulation of Facts are indicated by "ASOF" followed by the paragraph number(s).

2

(HCSC), the Space Coast Freethought Association (SCFA), and the Central Florida Freethought Community (CFFC), all of which "are organizations for nontheists" whose members are principally atheists, agnostics, Humanists, and other nontheists. (Id. ¶¶ 94– 95). HCSC and SCFA are headquartered in Brevard County, where most of their members live. (Id. ¶ 96). CFFC is headquartered in Seminole County, but some of its members reside in Brevard County. (Id.). Plaintiff Gordon is a member of SCFA, (id. ¶ 101), and the other individual Plaintiffs are leaders of the organizational Plaintiffs,[2] (id. ¶¶ 98–99).

Defendant Brevard County is a political subdivision of the State of Florida that had a population of nearly 550,000 in 2010. (Id. ¶ 1; Doc. 53-8 at 50). The County is known as Florida's Space Coast because of the presence of NASA and the Kennedy Space Center. (Doc. 53-8 at 37). The Brevard County Board of County Commissioners (the Board) is the legislative and governing body of the County. (ASOF ¶ 2). The Board has five Commissioners, each of whom represents, and is elected by, voters residing in one of five numbered single-member districts that make up the County. (Id. ¶ 8). Pursuant to a state statute, "[t]he county commissioners shall sue and be sued in the name of the County." (Id. ¶ 9; § 125.15, Fla. Stat.).

## B.   Board Meetings

The Board meets regularly—typically more than once per month—to discuss issues, hear from citizens, and carry out its responsibilities. (ASOF ¶ 10). The meetings are conducted in a boardroom that is approximately sixty feet wide and seventy feet deep and

---

[2] Specifically, Becher is President and Organizer of HCSC and a member of the boards of directors of all three organizational Plaintiffs. (ASOF ¶ 98). Hansel is President of SCFA and a member of its board of directors. (Id.). Koeberl is Vice-President and Co-Organizer of HCSC and a member of its board and SCFA's board. (Id.). Williamson is the founder and Chair of CFFC and a member of its board. (Id.).

3

has 196 seats for audience members and a total capacity of 270.[3] (Id. ¶¶ 10, 18, & 22). During Board meetings, the five Commissioners, the County Manager, and the County Attorney sit on a raised dais facing the audience; the number of attendees varies from fewer than ten to a full house. (Id. ¶¶ 20–21, 27). Board meetings proceed according to printed agendas, are open to the public, are carried live on cable television, are available for public viewing on the Board's website, and can be watched live on a television in a lobby just outside the boardroom entrance. (Id. ¶¶ 12–13). During its meetings, the Board sometimes considers and votes on matters that affect only one person or a small group of people. (Id. ¶ 30).

Board meetings typically begin with a call to order that is then followed by: an invocation; the pledge of allegiance; "resolutions, awards, and presentations"; consent agenda items; and other scheduled matters, including at least one "Public Comment" period.[4] (Id. ¶¶ 35, 64, & 141–43). During the "resolutions, awards, and presentations" segment of the meetings, individuals or groups are recognized for contributions they have made to the community, and children sometimes appear before the Board to be honored or to watch those who are being honored. (Id. ¶¶ 36–39). Generally, those who attend the "resolutions, awards, and presentations" segment are also present in the boardroom during the invocation. (Id. ¶¶ 38 & 42). Ordinarily, there are more people at the beginning of Board meetings than at the end; usually, some attendees leave before the "Public

---

[3] The parties note in their stipulated facts that the Board also holds "workshop" meetings and other special meetings outside the boardroom described in the text. (ASOF ¶ 15). Those meetings are not opened with an invocation and are not at issue in this lawsuit. (Id. ¶¶ 16–17).

[4] As explained later in this Order, the Board changed the timing and number of Public Comment periods during the timeframe of the events at issue in this case.

4

Comment" segment. (Id. ¶ 145).

## C.   Invocations and Selection of Invocation Speakers in the County

Board meetings "are typically opened with a religious invocation" that is "generally,

but not always, given by a cleric from the faith-based community."   (Id. ¶¶ 14, 56).

Invocation speakers are unpaid volunteers invited by an individual Commissioner or his or

her staff; the five Commissioners take turns inviting speakers according to an annual

schedule assigning that task for each meeting. (Id. ¶¶ 43, 45, & 49; Anderson Dep., Doc.

42, at 12–13; see also 2013–2014 Invocation and Pledge Schedule, Pls.' Ex. 64[5]).   On

occasion, the assigned Commissioner has difficulty finding someone to give an opening

invocation or a scheduled speaker does not show up, and on those occasions either a

Commissioner gives the invocation, a member of the audience is permitted to give the

invocation, or a moment of silence is held in lieu of the invocation. (ASOF ¶¶ 50–51 & 203;

see also, e.g., Pls.' Exs. 30 & V2[6] (transcript and video of Dec. 15, 2015 and Mar. 15, 2016

invocations) (pastor did not show up and a commissioner gave the invocation); Pls.' Exs.

29, 30, & V2 (speaker list, transcript, and video of Mar. 9, 2010 invocation) (reverend did

---

[5] References to Plaintiffs' Exhibits 1 through 163 are to the exhibits filed with
Plaintiffs' summary judgment motion and their response to the County's motion.  Exhibits
1–133 are attachments to their motion (Doc. 55), and Exhibits 134–163 are attachments to
their response (Doc. 60).

[6] In addition to Exhibits 1 through 163, Plaintiffs have submitted two USB flash drives
containing video and audio evidence, and those exhibits are numbered V1 through V18.
(See Notices of Physical Filing, Docs. 57 & 61).  Exhibits V1 through V13 are contained on
the USB flash drive that was filed with the first Notice of Physical Filing (Doc. 57), and
Exhibits V14 through V18 are contained on the USB flash drive that was filed with the
second Notice of Physical Filing (Doc. 61).  Exhibit V2 contains all available videos of
invocations given at Board meetings between March 19, 2010, and March 15, 2016, and
Exhibit V14 contains all available videos of invocations given at Board meetings between
March 29, 2016, and May 26, 2016.  (See Pls.' App. of Exs., Doc. 55-1, at 14 (listing and
describing Pls.' Ex. V2); Pls.' App. of Suppl. Exs., Doc. 60-1, at 5 (listing and describing
Pls.' Ex. V14)).

not show up and a Commissioner's assistant gave the invocation); Pls.' Exs. 30 & V2 (transcript and video of Sept. 13, 2011 invocation) (unidentified audience member gave invocation when no one was scheduled); Pls.' Exs. 30 & V2 (transcript and video of Aug. 19, 2014 invocation) (moment of silence observed when pastor did not arrive on time to meeting)).

Not all invited speakers are clergy; non-clergy who have delivered opening invocations include police officers, staff members of a Congressman's office, a state judge, aides to the Commissioners, and a lay leader of the Church of Jesus Christ of Latter-day Saints. (ASOF ¶ 57). Chaplains of hospitals, a baseball team, the Brevard County Sheriff's Office, and a city police department have also given invocations. (Id. ¶ 59).

The selected invocation speaker's name, along with the name of the organization he or she represents, often appears on the meeting agenda. (Id. ¶ 65; see also July 7, 2015 Agenda, Doc. 54-2 at 6). The Commissioner who invites the speaker typically introduces the speaker. (ASOF ¶ 66). Some Board Chairpersons ask the audience to stand up for the invocation "out of respect for the religion of the person giving the invocation." (Id. ¶¶ 67–68). Other Chairpersons merely stand up and the other Commissioners and the audience generally follow suit and stand as well, though on occasion some audience members do not stand. (Id. ¶¶ 69–72).

The invocation speaker stands at a lectern at the front of the boardroom and usually, but not always, faces the Commissioners rather than the audience.[7] (Id. ¶ 76; see Pls.'

---

[7] During one invocation, the invited clergyman, after remarking, "Not quite sure where I need to face; my congregation [gesturing to the audience] or my choir [gesturing to the Board members]," faced the audience while giving his invocation. (See Pls. Ex. V2 (Mar. 3, 2016)). Another speaker, a chaplain, asked which way he should face, and the Chairwoman instructed him to face the Board. (See Pls.' Exs. 30 & V2 (Sept. 16, 2014)).

6

Exs. V2 & V14 (videos of invocations at Board meetings)). The inviting Commissioner often encourages the invocation speaker to tell the audience about his or her house of worship or organization and its activities before giving the invocation itself. (ASOF ¶ 77). After the invocation is given, a Commissioner usually leads the audience in the Pledge of Allegiance, and after the Pledge the inviting Commissioner thanks the invocation speaker for giving the invocation. (Id. ¶¶ 78–79).

Neither the Commissioners nor their staffs review drafts of invocations before they are given. (Id. ¶ 52). From January 1, 2010, through March 15, 2016, 195 invocations were given at Board meetings, and all but seven of those were given by Christians or contained Christian content. (Id. ¶ 53). Six of the seven "non-Christian" invocations were given by Jews, and the other was "generally monotheistic." (Id. ¶ 54). All 195 invocations "had at least some theistic content," (id. ¶ 60), and "[t]o the parties' knowledge, all the opening invocations delivered at [Board] meetings have appealed to or invoked a divine authority," (id. ¶ 204).

## D.    Requests to Give an Invocation and the Board's Reactions

On May 5, 2014, the United States Supreme Court issued its opinion in Town of Greece v. Galloway, 134 S. Ct. 1811 (2014), upholding against an Establishment Clause challenge the invocation practice employed at town board meetings in the town of Greece, New York; that town's practice also involved invocations given by invited speakers. At that time, the five Commissioners in Brevard County were Chairwoman Mary Bolin Lewis and Commissioners Andy Anderson, Robin Fisher, Trudie Infantini, and Chuck Nelson. Four days after the Town of Greece decision, on May 9, 2014, Plaintiff Williamson, as Founder and Chair of Plaintiff CFFC, sent a letter to Chairwoman Lewis noting the decision and requesting the opportunity to offer invocations at Brevard County Board meetings. (ASOF

7

¶ 112; May 9, 2014 Letter, Pls.' Ex. 43). Williamson wrote to Chairwoman Lewis again two

months later, stating in a July 22, 2014 letter that he had not received a response to his

May 9 letter and demanding that the County permit a member of CFFC to deliver an

invocation and "ensure its selection procedures for invocations comport with the

Constitutions of Florida and the United States." (ASOF ¶ 113; July 22, 2014 Letter, Pls.'

Ex. 44).

Williamson's second letter did prompt a response from the Board, but it was not the

response he had hoped for. Before responding, the Board considered a proposed letter to

Williamson that was attached to the agenda for its August 19, 2014 meeting. During that

meeting, after hearing comments from Williamson and others, the Board unanimously

approved the sending of the pre-drafted response letter.[8] (ASOF ¶¶ 114–15; Pls.' Ex. V3

(video excerpt of Aug. 19, 2014 Board meeting)). The letter thanked Williamson and CFFC

for their request but then stated:

> The Invocation portion of the agenda is an opening prayer presented by members of our faith community. The prayer is delivered during the ceremonial portion of the County's meeting and typically invokes guidance for the County Commission from the highest spiritual authority, a higher authority which a substantial body of Brevard constituents believe to exist. The invocation is also meant to lend gravity to the occasion, to reflect values long part of the County's heritage and to acknowledge the place religion holds in the lives of many private citizens in Brevard County.
>
> Your website leads us to understand your organization and its members do not share those beliefs or values which, of course, is your choice under the laws of the United States. However, this Commission chooses to stand by the tradition of opening its meetings in a manner acknowledging the beliefs of a large segment of its constituents. . . .

(ASOF ¶ 117; Aug. 19, 2014 Letter, Pls.' Ex. 46).

---

[8] Incidentally, the pastor who was scheduled to give the invocation at the August 19, 2014 Board meeting was late, and in lieu of an invocation a moment of silence was observed. (See Pls.' Exs. 30 & V2 (Aug. 19, 2014 invocation)).

8

The Board's August 19 letter went on to explain that although Williamson and CFFC members would not be permitted to deliver an invocation at the beginning of Board meetings, they could address the Board for three minutes during the Public Comment portion of the meetings, which as of that date was held at the end of each meeting. (Aug. 19, 2014 Letter ("This Commission respectfully takes issue with the claim that members of your organization are being excluded from presenting their viewpoint at County Commission meetings. You or your Brevard members have the opportunity to speak for three minutes on any subject involving County business during the Public Comment portion of our meeting."); ASOF ¶ 141). The letter noted that in the past, during the Public Comment portion of the meeting the Board had "listened to Bible readings; political points of view of all varieties; and some of our citizens' sharpest critiques and criticisms of County staff and the County Commission, among other things." (Aug. 19, 2014 Letter).

During discussion of the issue at the August 19, 2014 meeting, several of the Commissioners commented. Commissioner Anderson stated: "For you to say that Christianity isn't under attack, I'd like you to look over at Iraq right now and let me know if Christianity is not under attack"; "I need all the prayer in my life I can get to get through these meetings"; and "I just never understood the concept on—and this is no personal slight to anybody—how you could possibly be offended by something that you do not believe exists. I just never understood that." (ASOF ¶¶ 177–79; Pls.' Ex. V3 (video excerpt of Aug. 19, 2014 Board meeting)). In addressing how speakers are chosen, Commissioner Infantini stated: "My staff and I, we search—I mean I don't have any specific religion—we will go anywhere to find somebody. No, not anywhere. Okay, correct, not anywhere. Not anywhere. There are certain places." (ASOF ¶ 182; Pls.' Ex. V3 (video excerpt of Aug.

9

19, 2014 Board meeting)). And after seconding the motion to approve the response letter, Commissioner Fisher stated: "I think the Public Comment section . . . will give them an opportunity to speak, we are opening the Commission up to that, . . . when I looked at their website one of the things I noticed was it wasn't so much about prayer as it was about trying to separate . . . state and church, and if that's the issue, state and church, then I think the Public Comment section of the agenda is probably the best place anyway." (Pls.' Ex. V3 (video excerpt of Aug. 19, 2014 Board meeting)).

In August and September 2014, Plaintiff Gordon emailed Commissioner Infantini, asking that a member of CFFC be allowed to deliver an invocation and stating that he was a Brevard County atheist who was willing to give an invocation. (ASOF ¶ 118; Pls.' Ex. 47). Commissioner Infantini did not accept Gordon's offer. (ASOF ¶ 118).

On August 21, 2014, Brevard County resident Reverend Ann Fuller emailed all five Commissioners, stating that she was "ordained clergy" and a "known humanist in the community" and requesting "an opportunity to give an invocation at an upcoming board meeting." (Id. ¶ 119). Reverend Fuller explained that she had "served Brevard County humanists as a Community Minister since 2006 affiliated with the [Unitarian Universalist] Church of Brevard." (Id.). That same day, Commissioner Infantini responded in an email that stated in part: "I am willing to have most anyone offer an invocation. However, by definition, an invocation is seeking guidance from a higher power. Therefore, it would seem that anyone without a 'higher power' would lack the capacity to fill that spot. . . . Further, I welcome 'freethinkers[,]' being the only 'freethinker' on the board. It just doesn't seem like the invocation is the correct place for it is all." (Id. ¶ 120).

On August 28, 2014, the Board received a letter from the Anti-Defamation League

10

objecting to the Board's decision on the issue of nontheistic invocations and suggesting

that the Board's "decision to prohibit an atheist from delivering an invocation would most

likely violate the standards set forth in the U.S. Supreme Court's recent decision in" Town

of Greece. (ASOF ¶ 121; Anti-Defamation League Letter, Pls.' Ex. 48). At its November

6, 2014 meeting, the Board unanimously approved a response letter to be sent to the Anti-

Defamation League attempting to explain the Board's practice of excluding nontheists.

(ASOF ¶ 122; November 6, 2014 Letter, Pls.' Ex. 49). That November 6 response letter

stated in part:

> [Y]our suggestion to allow atheists to provide the invocation would, in fact,
> show hostility toward the faith-based community—as evidenced by the
> content on social media webpages maintained by [CFFC] and the Freedom
> from Religion Foundation . . . . Therefore, this Board has no desire to follow
> your suggested action since that action could be easily construed, either
> overtly or by implication, as evidencing vicarious disdain, scorn or disrespect
> for the beliefs of our faith-based community.
>
> . . . It follows that the Board's decision to avoid hostility toward the faith-based
> community precludes any claim of discrimination. Indeed, if your
> characterization of secular humanism as a religion is valid, modifying the
> county's time-honored pre-meeting tradition by affording a secular humanist
> the opportunity to recite a secular "prayer" during the faith-based invocation
> portion of the Board's agenda could be perceived as [] endorsing a specific
> religion—*secular humanism*—in violation of the Establishment Clause
> because all Board actions at the meeting held following such a *secular
> "prayer"* invariably involve an underlying *secular purpose*. Atheists or secular
> humanists are still afforded an opportunity to speak their thoughts or
> supplications during the secular business portion of the agenda under "public
> comment."

(ASOF ¶ 124; Nov. 6, 2014 Letter, Pls.' Ex. 49) (emphasis in original). Thus, the Board

maintained its stance that atheists and Secular Humanists could speak only during the

Public Comment period and could not give the opening invocation.

Prior to December 16, 2014, the Public Comment segment of a Board meeting

occurred at the end of the meeting. (ASOF ¶¶ 141–42). But on that date, the Board

11

adopted a resolution—Resolution No. 14-219—moving up the first thirty minutes of the Public Comment section so that it occurs after the "consent agenda" section and before the "public hearings" section of each regular Board meeting. (Id. ¶ 142; Mins. of Dec. 16, 2014 Board Meeting, Pls.' Ex. 33; see also, e.g., Agenda for July 7, 2015 Board Meeting, Ex. A to Whitten Aff., Doc. 54-2). Under that December 16 resolution, if the Public Comment section is not concluded within thirty minutes, the remainder occurs "at the conclusion of business specified on the regular commission agenda." (ASOF ¶ 143).

The terms of Commissioners Lewis and Nelson ended in November 2014, and at that time new Commissioners Curt Smith and Jim Barfield began their terms. (Id. ¶ 150). On January 26, 2015, the then-legal Director for Americans United for Separation of Church and State sent a letter to all five Commissioners with the subject line "Nontheists' Delivery of Opening Invocations." (Id. ¶ 125; Jan. 26, 2015 Letter, Pls.' Ex. 50). The letter noted that "requests from nontheists have been denied on the ground that belief in a higher power is a precondition to offering the invocation" and stated that "[i]n light of the recent change in the Board's leadership, we write on behalf of several national legal organizations"—Americans United for Separation of Church and State, the Freedom From Religion Foundation,[9] the ACLU of Florida, and the ACLU Program on Freedom of Religion and Belief—"to ask that you reconsider this limitation." (ASOF ¶¶ 125–26; Jan. 26, 2015 Letter, Pls.' Ex. 50). The letter requested that Plaintiff Williamson, non-party Reverend Ann Fuller, and Plaintiff Hansel be added to the roster of invocation givers and granted the opportunity to give an opening invocation at a Board meeting. (ASOF ¶ 127; Jan. 26, 2015 Letter, Pls.' Ex. 50).

---

[9] Plaintiff CFFC is a Freedom From Religion Foundation chapter. (ASOF ¶ 207).

Neither the Board nor any individual Commissioner responded to the January 26 letter, (ASOF ¶ 128), and on May 26, 2015, the same four organizations sent another letter to all five Commissioners, (id. ¶ 129; May 26, 2015 Letter, Pls.' Ex. 51). In that letter, the organizations requested that one of the five individual Plaintiffs or another representative of one of the three organizational Plaintiffs be permitted to deliver nontheistic invocations at a Board meeting. (ASOF ¶ 129; May 26, 2015 Letter, Pls.' Ex. 51). The County Attorney responded to the letter on May 28, 2015, advising that the Board's next meeting was on July 7, 2015, and that the attorney would present the letter to the Board at that time and seek a response. (ASOF ¶ 130; May 28, 2015 Letter, Pls.' Ex. 52).

At its July 7, 2015 meeting, the Board "responded to the May 26, 2015 letter by adopting Resolution 2015-101." (ASOF ¶ 131; Resolution 2015-101, Doc. 53-8 at 34 through 93[10]). Resolution 2015-101, which is attached as an appendix to this Order, is eleven pages long and consists of five "whereas clauses" followed by thirty-nine numbered paragraphs of "findings" and "conclusions"; it concludes with an amendment to the Board's Operating Procedures. In the whereas clauses, the Resolution notes: the Board's "longstanding tradition of calling for an invocation before commencing a regular meeting at which the secular business of the County will be reviewed and acted upon"; the Board's prior responses to requests from atheists, which "identified an informal policy addressing the issue of pre-meeting prayer"; that the Board had "not yet enacted a formal policy

---

[10] Resolution 2015-101 appears in several places in the record, including as an exhibit (Docs. 24-3 through 24-11) to the County's original Answer (Doc. 24) and as Exhibit 77 to the deposition of Plaintiff Williamson (Doc. 53-8 at 34 through 93). The parties represent in their Amended Stipulation of Facts that the version that is Exhibit 77 to Williamson's deposition is a true and correct copy with all exhibits attached to it, and the Court accordingly refers to that version. (See ASOF ¶ 131).

relating to pre-meeting prayer"; that Board members had received letters requesting "the Board to allow . . . atheists, agnostics and secular humanists to give a pre-meeting prayer at a regular Board meeting"; and that "the Board wishes to formalize a policy on invocations that is not hostile to faith-based religions and that does not endorse secular humanism or non-belief over traditional faith-based religions comprised of constituents who believe in God." (Resolution 2015-101 at 1, Doc. 53-8 at 35).

The "findings" paragraphs in Resolution 2015-101 recount the County's tradition of pre-meeting invocations; provide demographic data regarding Brevard County, including that only 34.9% of the County's total population "claimed to be adherents to any religious faith" in 2010; describe a webpage of the Freedom From Religion Foundation, with whom CFFC is noted to be affiliated, that includes "Godless quotes," as well as a webpage of Americans United for Separation of Church and State that "makes clear the organization's calculated goal" to eliminate activity that it considers violative of its "views of what the principles of separation of church and state should be"; examine Secular Humanism; and discuss CFFC's Facebook page, on which CFFC "strategically seeks to offend faith-based religions in open forums in order to pressure the local government into closing the forum or censoring the content and exposing itself to liability." (Resolution 2015-101 at 1–9, Doc. 53-8 at 35–43).

The resolution then states "conclusions" based on the findings, including that: "yielding . . . by supplanting traditional ceremonial pre-meeting prayer . . . with an 'invocation' by atheists, agnostics or other persons represented or associated with [the Freedom From Religion Foundation] or [Americans United for Separation of Church and State] could be viewed as County hostility toward monotheistic religions whose theology

14

and principles currently represent the minority view in Brevard County"; that allowing the requesting organizations to give an invocation and "displac[e] representatives of the minority faith-based monotheistic community . . . could be viewed as . . . Board endorsement of Secular Humanist and Atheist principles" because of "the overwhelmingly secular nature of the Board's business meeting following the invocation" and "evidence suggesting that the requesting organizations are engaged in nothing more than a carefully orchestrated plan to promote or advance principles of Secular Humanism through the displacement or elimination of ceremonial deism [sic] [11] traditionally provided by monotheistic clerics giving pre-meeting prayers"; that "[a]ll of the organizations seeking the opportunity to provide an invocation have tenets or principles paying deference to science, reason and ethics, which, in most cases, are the disciplines the Board must consider, understand and utilize when acting upon secular items presented for consideration during the Board's secular business agenda" and that "deferring consideration or presentation of a secular humanist supplication during the Public Comment portion of the agenda immediately after the consent agenda . . . does not deny or unreasonably restrict the opportunity of the requesting parties to present their Secular Humanist or atheistic

---

[11] The word "deism" appears to be a clerical error in the resolution. "Deism" is "a movement or system of thought advocating natural religion, emphasizing morality, and in the 18th century denying the interference of the Creator with the laws of the universe." Merriam Webster's Collegiate Dictionary (10th ed. 1993). Scholars have noted that "[m]any of our founding fathers, including Thomas Paine, Thomas Jefferson, [and] Benjamin Franklin, . . . were flat-out deists, and many others, such as John Adams, James Madison, Alexander Hamilton, James Monroe, and George Washington, were at least partial deists." Geoffrey V. Stone, The World of the Framers: A Christian Nation?, 56 UCLA L. Rev. 1, 7 (Oct. 2008). In light of the deposition testimony of several Commissioners that they would not allow a deist to give an invocation, (see, e.g., Doc. 43 at 12; Doc. 44 at 9; Doc. 46 at 11; & Doc. 48 at 10), it is likely that "theism"—"belief in the existence of a god or gods," Merriam Webster's Collegiate Dictionary (10th ed. 1993)—was the word that was intended in this sentence of Resolution 2015-101.

15

invocations, supplications, instruction, petitions for redress of grievances or comments."

(Resolution 2015-101 at 9–10, Doc. 53-8 at 43–44).

The amendment portion of Resolution 2015-101 adds a new section to the Board's

Operating Procedures and provides:

> In view of the requests by secular, humanist, atheist and Secular Humanist organizations to provide a secular, Secular Humanist or an atheist invocation, the Board hereby clarifies the intent of the Board's existing policies allowing Public Comment to include individual or representative comments intended to instruct the Board; to petition for redress of grievances; to comment upon matters within the control, authority and jurisdiction of the Board; and to comment on matters that are relevant to business of the County Commission, as well as matters upon which the Board has traditionally expressed a position for the betterment of the community interest. Secular invocations and supplications from any organization whose precepts, tenets or principles espouse or promote reason, science, environmental factors, nature or ethics as guiding forces, ideologies, and philosophies that should be observed in the secular business or secular decision making process involving Brevard County employees, elected officials, or decision makers including the Board of County Commissioners, fall within the current policies pertaining to Public Comment and must be placed on the Public Comment section of the secular business agenda. Pre-meeting invocations shall continue to be delivered by persons from the faith-based community in perpetuation of the Board's tradition for over forty years.

(Resolution 2015-101 at 10–11, Doc. 53-8 at 44–45). Thus, as stipulated by the parties,

the resolution "adopted a formal policy that allows the traditional faith-based invocation

prior to the beginning of the Board's secular business agenda and subsequent 'secular

invocations' during the Public Comment section of that secular agenda." (ASOF ¶ 133

(further internal quotation omitted)). None of the Plaintiffs has ever delivered a "secular

invocation" during the Public Comment segment of a Board meeting. (Id. ¶ 149).

### E.   **This Lawsuit**

After the Board passed Resolution 2015-101, Plaintiffs filed this lawsuit. (Compl.,

Doc. 1). In their six-count Amended Complaint (Doc. 28), Plaintiffs allege violations of: the

Establishment Clause of the First Amendment to the U.S. Constitution (Count I); the Free

16

Exercise Clause of the First Amendment (Count II); the Free Speech Clause of the First

Amendment (Count III); the Equal Protection Clause of the Fourteenth Amendment (Count

IV); Article I, Section 2 of the Florida Constitution (Count V); and Article I, Section 3 of the

Florida Constitution (Count VI). (Doc. 28 at 66–71). The Amended Complaint seeks an

injunction, a declaratory judgment, and damages. (Id. at 72–74). However, at mediation

the parties resolved the issue of damages. (See Mediation Report, Doc. 39). Plaintiffs'

counsel explained during oral argument on the parties' cross-motions for summary

judgment that at mediation the parties reached a settlement on what the amount of the

damages should be if the Plaintiffs prevail on the merits and that the Court should allow

the parties to file their settlement agreement with the Court if it finds in favor of Plaintiffs.

(See Hr'g Tr., Doc. 93, at 32–33). The parties agree that no facts are in dispute and that

this case may be appropriately resolved on their cross-motions.[12] (See Mins., Doc. 69).

## II.   Analysis[13]

### A.   Establishment Clause (Count I)

Plaintiffs' primary claim is under the Establishment Clause of the First Amendment,

---

[12] In addition to the declarations, depositions, voluminous exhibits, several notices of supplemental authority, and the Amended Stipulation of Facts (Doc. 83), the pertinent filings are: the County's Motion for Summary Judgment (Doc. 54); Plaintiffs' Motion for Summary Judgment (Doc. 55); the County's Notice of Filing Supplemental Inadvertently Omitted Footnote References (Doc. 58); the County's Response to Plaintiffs' Motion for Summary Judgment (Doc. 59); Plaintiffs' Opposition to the County's Motion for Summary Judgment (Doc. 60); the County's Reply regarding its motion (Doc. 62); Plaintiffs' Reply regarding its motion (Doc. 63); the County's Supplemental Memorandum of Law (Doc. 84); Plaintiffs' Supplemental Brief (Doc. 85); Plaintiffs' Supplemental Summary-Judgment Brief on Their Free-Speech Claim (Doc. 95); the County's Corrected Supplemental Summary Judgment Brief on Plaintiffs' Free Speech Claim (Doc. 97-1); and Plaintiffs' Supplemental Summary-Judgment Reply Brief on Their Free-Speech Claim (Doc. 98).

[13] In some of its filings the County asserts, albeit cursorily, that Plaintiffs lack standing to bring one or more of their claims. (See, e.g., Doc. 54 at 19 (asserting that "none of the Plaintiffs has standing to sue for coercion because none has alleged a concrete and particular injury in fact"); id. at 21 (arguing lack of standing because "Plaintiffs

17

which provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. This clause, like the other clauses of the First Amendment, applies to the states and their subdivisions via the Fourteenth Amendment. See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940); accord Sch. Dist. of Abington Twp. v. Pennsylvania, 374 U.S. 203, 215–16 (1963).

Plaintiffs contend that the County's invocation practice violates the Establishment Clause in three ways: by purposefully discriminating based on religious beliefs; by entangling public officials in religious judgments; and by coercing audience members to take part in religious exercises. The County, on the other hand, maintains that its invocation practice "conforms to Establishment Clause principles promulgated by the U.S. Supreme Court." (Doc. 54 at 1). Each side asserts that Supreme Court jurisprudence—especially the Court's 2014 decision in Town of Greece v. Galloway—supports its position.

### Marsh v. Chambers and Town of Greece v. Galloway

Although Establishment Clause claims are typically analyzed using one of several formal "tests" established by the Supreme Court for such claims—such as the coercion test,[14] the endorsement test,[15] or the Lemon test[16]—the Supreme Court has declined to

---

cannot show an injury that can be redressed by a favorable decision from this Court"); Doc. 62 at 7 (averring that Plaintiffs lack standing because their injuries are "self-created" and because of "their inability to give a religious prayer"). These contentions are without merit. The Court is satisfied that Plaintiffs have standing to pursue their claims, and the County's arguments go to the merits of Plaintiffs' claims rather than to the issue of standing.

[14] See, e.g., Lee v. Weisman, 505 U.S. 577 (1992).

[15] See, e.g., Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989).

[16] See Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971) (establishing three-part test providing that to pass muster under the Establishment Clause, (1) a statute "must have a secular legislative purpose," (2) the statute's "principal or primary effect must be one that neither advances nor inhibits religion," and (3) "the statute must not foster 'an excessive government entanglement with religion'" (quoting Walz v. Tax Comm'n, 397 U.S. 664, 674

18

apply any of those tests in the context of legislative prayer. But relying on other principles, the Supreme Court has addressed legislative prayer in two landmark cases—Marsh v. Chambers, 463 U.S. 783 (1983), and Town of Greece—and those decisions inform this Court's analysis here.

At issue in Marsh was the prayer practice of the Nebraska Legislature. That body opened each of its sessions with a prayer given by a chaplain who was paid with public funds and chosen every two years by the Executive Board of the Legislative Council. By the time the case made its way to the Supreme Court, the same Presbyterian minister had served as chaplain for nearly twenty years. Although some of the minister's earlier prayers "were often explicitly Christian," the minister "removed all references to Christ after a 1980 complaint from a Jewish legislator." 463 U.S. at 793 n.14. The plaintiff—a member of the legislature and a Nebraska taxpayer—brought an Establishment Clause challenge, seeking to enjoin the prayer practice.[17] The district court found no violation of the Establishment Clause from the prayers themselves but concluded that the paying of the chaplain with public funds did violate the clause. Chambers v. Marsh, 504 F. Supp. 585 (D. Neb. 1980). On appeal, the Eighth Circuit applied the Lemon test, found that the Nebraska practice failed all three prongs of that test, and prohibited Nebraska from continuing to engage in the prayer practice. Chambers v. Marsh, 675 F.2d 228 (8th Cir. 1982).

The Supreme Court reversed, finding—without applying Lemon or any other formal

---

(1970))).

[17] It is not clear from the court opinions whether the plaintiff in Marsh was the legislator who complained about references to Christ in the prayers. The district court opinion describes him as "a non-Christian member of the legislature." Chambers v. Marsh, 504 F. Supp. 585, 591 n.14 (D. Neb. 1980).

test—that neither the prayers themselves nor the use of public funds to pay the chaplain violated the Establishment Clause. The Marsh Court noted that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country" and that throughout this country's history "the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." 463 U.S. at 786. After tracing the history of legislative prayer and noting that the First Congress selected a chaplain to open each session with prayer, the Court concluded that "[t]his unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause from a practice of prayer similar to that now challenged." Id. at 791.

The Marsh Court explained:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country. As Justice Douglas observed [in Zorach v. Clauson, 343 U.S. 306, 313 (1952)], "[w]e are a religious people whose institutions presuppose a Supreme Being."

Id. at 792 (citation omitted). The Court rejected the plaintiff's contention that the Establishment Clause was violated due a minister of only one denomination having been selected for sixteen years. Perceiving no "suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church," the Court concluded that "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive, . . . his long tenure does not in itself conflict with the Establishment Clause." Id. at 793–94.

Nor was the Marsh Court troubled by the fact that the prayers given in the Nebraska

20

Legislature were in the Judeo-Christian tradition. The Court explained that "[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to advance any one, or to disparage any other, faith or belief" and that under those circumstances "it is not for [the Court] to embark on a sensitive evaluation or to parse the content of a particular prayer." Id. at 794–95.

The Supreme Court took up the issue of legislative prayer again in 2014 in Town of Greece. In the town of Greece, New York, for some time prior to 1999 the town board began its monthly board meetings with a moment of silence. But in 1999, a newly elected town supervisor began inviting local clergymen to deliver invocations at the beginnings of meetings. "The prayer was intended to place town board members in a solemn and deliberative frame of mind, invoke divine guidance in town affairs, and follow a tradition practiced by Congress and dozens of state legislatures." 134 S. Ct. at 1816. Prayer givers in Greece were unpaid volunteers, and the town "followed an informal method for selecting prayer givers"—a town employee called congregations listed in a local directory until she found an available minister for that month's meeting. Id. And "[t]he town eventually compiled a list of willing 'board chaplains' who had accepted invitations and agreed to return in the future." Id. The town "at no point excluded or denied an opportunity to a would-be prayer giver," and "[i]ts leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation." Id. The town did not review the prayers in advance or provide guidance on tone or content; "[t]he town instead left the guest clergy free to compose their own devotions." Id. From 1999 to 2007, all of the participating minsters were Christian, and "[s]ome of the ministers spoke in a distinctly Christian idiom." Id.

21

The two plaintiffs in Town of Greece—one Jewish, the other an Atheist[18]—attended town board meetings to address issues of local concern, and they took offense to the prayers and the pervasive Christian themes in them. Id. at 1817. After the plaintiffs complained, the town invited a Jewish layman and the chairman of a Baha'i temple to give prayers; additionally, a Wiccan priestess requested and was given a chance to give an invocation. Id. The plaintiffs nevertheless filed suit, alleging that the town's prayer practice violated the Establishment Clause. They sought not to end the practice but to limit the prayers to "nonsectarian" prayers—"inclusive and ecumenical" prayers referring only to a "generic God" and "not identifiable with any one religion." Id. at 1817 & 1820.

After the district court upheld the practice and the Second Circuit reversed, the Supreme Court reversed the appellate court, finding that the town's invocation practice passed muster under the Establishment Clause. The Court began by discussing Marsh, noting that "Marsh is sometimes described as 'carving out an exception' to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to 'any of the formal "tests" that have traditionally structured' this inquiry." 134 S. Ct. at 1818 (quoting Marsh, 463 U.S. at 796 & 813 (dissenting opinion of Brennan, J.)). "The Court in Marsh found those tests unnecessary because history supported the conclusion that legislative invocations are compatible with the Establishment Clause." Id. The Town of Greece Court noted that like Congressional prayer, the practice of local legislative bodies opening their meetings with prayer also "has historical precedent," id. at 1819, but the Court emphasized that "Marsh must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical

---

[18] See Galloway v. Town of Greece, 732 F. Supp. 2d 195, 196 (W.D.N.Y. 2010).

22

foundation" and explained that Marsh "teaches instead that the Establishment Clause must be interpreted by reference to historical practices and understandings," id. (internal quotation and citation omitted).

The Supreme Court then turned to "whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures." Id. The plaintiffs made two arguments: first, that Marsh does not countenance sectarian prayers, and second, that the town's practice was coercive because the setting and nature of the town meetings "create social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending [those who] sponsor the prayer and will vote on matters citizens bring before the board." Id. at 1820. The Supreme Court rejected both of these contentions.

First, the Court concluded that "insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases." Id.[19] The Town of Greece Court explained that Marsh upheld the Nebraska legislative prayers "because our history and tradition have shown that prayer in this limited context could 'coexis[t] with the principles of disestablishment and religious freedom'" rather than "because they espoused only a generic theism." Id. (alteration in original) (quoting Marsh, 463 U.S. at 786). The Marsh Court did not "imply the rule that prayer violates the Establishment Clause any time it is given in the name of a figure deified

---

[19] Prior to Town of Greece, some courts had held that only "nonsectarian" legislative prayers were permissible under the Establishment Clause. See, e.g., Wynne v. Town of Great Falls, S.C., 376 F.3d 292 (4th Cir. 2004); accord Joyner v. Forsyth Cty., N.C., 653 F.3d 341 (4th Cir. 2011). The Eleventh Circuit, however, did not, pre-Greece, read Marsh as authorizing only nonsectarian prayers. See generally Pelphrey v. Cobb Cty., 547 F.3d 1263 (11th Cir. 2008).

23

by only one faith or creed," id. at 1821, and "[t]o hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact," id. at 1822.[20]

The Town of Greece Court emphasized that "[o]ur government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior" and that "[g]overnment may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may prescribe a religious orthodoxy." Id. And "[o]nce it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." Id. at 1822–23.

Although the Town of Greece Court rejected the notion that legislative prayer must be nonsectarian, it did "not imply that no constraints remain on its content." Id. at 1823. "The relevant constraint derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage." Id. "Prayer that is solemn and respectful in tone, that invites lawmakers to reflect

---

[20] In holding that legislative prayer need not be nonsectarian in order to remain within the confines of the Establishment Clause, the Town of Greece Court receded from dictum in County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989). See Town of Greece, 134 S. Ct. at 1821 (finding some statements in County of Allegheny "irreconcilable with the facts of Marsh and with its holding and reasoning" and explaining that "Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content").

24

upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function." Id.

The Town of Greece Court also rejected the Second Circuit's conclusion that the town violated the Establishment Clause "by inviting a predominantly Christian set of ministers to lead the prayer." Id. at 1824. Noting that "[t]he town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one," the Court emphasized that "[s]o long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." Id.; see also id. at 1831 (Alito, J., concurring) ("I would view this case very differently if the omission of . . . synagogues [from the list of congregations] were intentional.").

Second, the Town of Greece Court addressed plaintiffs' assertions that the prayer practice was unconstitutionally coercive. The plaintiffs asserted "that the public may feel subtle pressure to participate in prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable ruling," id. at 1825, arguing that prayer in the setting of a town board meeting "differs in fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation," id. at 1824–25. Though no rationale garnered a majority of votes, five justices rejected the plaintiffs' coercion argument.

### Application

In view of this precedent, this Court must assess Plaintiffs' Establishment Clause

25

claim. Plaintiffs assert that the County's invocation practice is distinguishable from the practice approved in Town of Greece, while the County maintains that its practice is consistent with the facts of, and principles established in, that case. As set forth below, the facts of this case indeed distinguish it from Town of Greece, and the overwhelming evidence of purposeful discrimination and "impermissible purpose" here demonstrates the constitutional infirmity in the County's invocation practice.

        *1. Purposeful Discrimination*

Although the County contends that its invocation practice passes constitutional muster under Town of Greece, the Supreme Court's opinion in that case cannot be read to condone the deliberate exclusion of citizens who do not believe in a traditional monotheistic religion from eligibility to give opening invocations at County Board meetings. Neither Town of Greece nor any other binding precedent supports the County's arguments, and none of the County's asserted justifications for its practice holds water.

The Town of Greece Court upheld an invited-speaker invocation practice that resulted in the prayers being given predominantly by Christians, but in doing so it repeatedly emphasized the inclusiveness of the town's practice. There was no evidence in that case that the town leaders intended to exclude anyone from participation in the giving of invocations; in fact, there was evidence to the contrary. "The town at no point excluded or denied an opportunity to a would-be prayer-giver." 134 S. Ct. at 1816. That invitees were solely Christian was not the product of intentional discrimination but instead due merely to the fact that the speakers were selected from a directory of the town's religious organizations. The Supreme Court expressly noted a lack of evidence of "an aversion or bias on the part of town leaders against minority faiths," and, on the contrary, there was evidence of "a policy of nondiscrimination" with regard to who was allowed to

give the invocation. Id. at 1824. Similarly, thirty years earlier, the Marsh Court noted lack of evidence of "impermissible motive" in the repeated reappointment of the same chaplain.

And after Marsh but six years prior to Town of Greece, the Eleventh Circuit—in a decision entirely consistent with Town of Greece—found that an invocation practice violated the Establishment Clause where there was evidence of intentional discrimination in the selection of invocation speakers. In that case, Pelphrey v. Cobb County, 547 F.3d 1263 (11th Cir. 2008), two county commissions allowed volunteer religious leaders to offer invocations at the commissions' meetings on a rotating basis. The Eleventh Circuit agreed with the district court's finding that the invocation practice of one of the two commissions was unconstitutional during two years of the time period at issue because of the way in which speakers were selected, finding that "the selection procedures [in those two years] violated the 'impermissible motive' standard of Marsh." 547 F.3d at 1281. The Pelphrey court noted that the "impermissible motive" standard "prohibits intentional discrimination," id., and during the two years at issue, the employee who selected speakers for one of the commissions "'categorically excluded' certain faiths from the list of potential invocation speakers," id. at 1282.[21] The Eleventh Circuit "agree[d] with the district court that the categorical exclusion of certain faiths based on their beliefs is unconstitutional." Id.

Marsh, Town of Greece, and Pelphrey thus make clear that while legislative prayer—even sectarian legislative prayer—is, as a general matter, constitutional, intentional discrimination and improper motive can take a prayer practice beyond what the Establishment Clause permits. Cf. Lund v. Rowan Cty., N.C., 863 F.3d 268, 278 (4th Cir.

---

[21] That practice was evidenced by a "long and continuous line through certain categories of faiths" in the phone book that the employee used to compile the list of potential speakers. Pelphrey, 547 F.3d at 1282.

27

2017) (en banc) ("Marsh and Town of Greece, while supportive of legislative prayer, were measured and balanced decisions. . . . Town of Greece told the inferior federal courts . . . to grant local governments leeway in designing a prayer practice that brings the values of religious solemnity and higher meaning to public meetings, but at the same time to recognize that there remain situations that in their totality exceed what Town of Greece identified as permissible bounds."). The undisputed facts of the case at bar establish that the bounds of the clause have been exceeded in Brevard County.

The facts here differ in significant ways from those in Town of Greece. In Greece, "a minister or layperson of any persuasion, including an atheist, could give the invocation." Id. at 1816. "[A]ny member of the public [wa]s welcome . . . to offer an invocation reflecting his or her own convictions." Id. at 1826. And when the plaintiffs complained about the pervasive Christian themes in the prayers, the town responded by inviting non-Christians to give prayers and granted a Wiccan priestess's request for an opportunity to give the invocation. Id. at 1817; accord id. at 1829 (Alito, J., concurring) ("[W]hen complaints were received, the town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation.").

What happens in Brevard County is a far cry from what happens in the town of Greece. Brevard County does not allow everyone to give an invocation. Instead, it limits the prayer opportunity to those it "deems capable" of doing so—based on the beliefs of the would-be prayer giver. And after Plaintiffs requested to give an invocation at a Board meeting, the County responded not with an attitude of inclusion but with an express statement and policy of exclusion. Cf. Lund, 863 F.3d at 282 ("By opening its prayer

28

opportunity to all comers, the town [of Greece] cultivated an atmosphere of greater tolerance and inclusion. Rowan County regrettably sent the opposite message.").

With regard to the County's "policy," Resolution 2015-101—the resolution that the Board passed in July 2015 in response to Plaintiffs' repeated requests to give an invocation—is neither a novel statement of the County's position with regard to "nonbelievers" giving invocations nor a complete invocation policy. The resolution merely codifies the County's previously existing practice of denying nontheists an opportunity to give an invocation and relegating them to the Public Comment portion of Board meetings— a practice described in the August 19, 2014 letter (Pls.' Ex. 46) from the Board to Plaintiff Williamson. And although the resolution concludes with the statement that "Pre-meeting invocations shall continue to be delivered by persons from the faith-based community in perpetuation of the Board's tradition for over forty years," (Resolution 2015-11 at 11), the resolution does not define "faith-based community" or explain how invocation givers are invited or selected. Thus, at issue here is not just Resolution 2015-101 but the County's actual, overall invocation practice, which is evidenced by the events of this case, the text of the resolution itself, and statements made by the Commissioners in their depositions and elsewhere.[22]

_____

[22] The Court asked the parties whether it was appropriate to consider the deposition testimony and other statements of the Commissioners, and the parties briefed that issue. (See Docs. 84 & 85). The County (despite citing Commissioner deposition testimony in its own summary judgment filings, (see, e.g., Doc. 59 at 10)), took the position that the Court could properly consider only statements made prior to or contemporaneous with Resolution 2015-101, but the Court disagrees. The Supreme Court and the Eleventh Circuit have relied on statements of legislators in gauging motive and intent. See, e.g., Wallace v. Jaffree, 472 U.S. 38, 57 (1985) (considering district court testimony of legislator); Church of Scientology Flag Serv. Org. v. City of Clearwater, 2 F.3d 1514, 1530 (11th Cir. 1993) (considering materials including newspaper articles, that "tend[ed] to show sectarian motivation"). This Court finds an even more compelling basis for doing so here than in

29

When Plaintiff Williamson wrote to the Board in 2014 requesting an opportunity to give an invocation, the Board eventually responded with a letter that the Commissioners approved at the August 19, 2014 meeting. As earlier noted, that letter stated in part: that the invocation was "an opening prayer presented by members of our faith community"; that the invocation "typically invokes guidance . . . from the highest spiritual authority, a higher authority which a substantial body of Brevard constituents believe to exist"; that CFFC's website "leads [the Board] to understand [that CFFC] and its members do not share those beliefs or values" and that the Board "chooses to stand by the tradition of opening its meetings in a manner acknowledging the beliefs of a large segment of its constituents." (Aug. 19, 2014 Letter, Pls.' Ex. 46). Two days later, Commissioner Infantini responded to a Humanist who requested to give an invocation with an email stating that "by definition, an invocation is seeking guidance from a higher power" and that therefore "anyone without a 'higher power' would lack the capacity to fill that spot." (ASOF ¶¶ 119–20).

And when letters were sent to the Board in January and May 2015 asking that one of the five individual Plaintiffs or another representative of one of the three organizational Plaintiffs be permitted to give an invocation, the Board ultimately responded by passing Resolution 2015-101 at its July 7, 2015 meeting. That resolution states in one of its "whereas" clauses that "the Board wishes to formalize a policy on invocations that is not hostile to faith-based religions and that does not endorse secular humanism or non-belief over traditional faith-based religions comprised of constituents who believe in God."

---

those cases; as noted in the text, this case concerns not only Resolution 2015-101 but also the County's overall invocation policy and practice, and the statements of the Commissioners both before and after passage of Resolution 2015-101 bear on that overall practice.

(Resolution 2015-101 at 1). The resolution then notes that "[o]n a rotating basis, individual Board members have predominately selected clerics from monotheistic religions and denominations—including Christian, Jewish, and Muslim—to present the invocation," (id. at 2), and that "[p]rior to the invocation, in recognition of the traditional positive role faith-based monotheistic religions have historically played in the community, the Board . . . typically . . . offer[s] the cleric the opportunity to tell the Board, meeting attendees and the viewing audience something about their religious organization," (id.).

The resolution then purports to describe the "relevant demographics" of the County, stating that "[i]n Brevard County, the faith-based community is a minority component of the larger majority community [sic] represented by the Board" and that data from the Association of Religious Data Archives indicate that in 2010, only 34.9% of the County's residents claimed to be adherents to any religious faith. (Id.). The "demographics" section of the resolution also notes that the County "is home to a large population of rocket scientists" and a technological university that offers programs in various scientific areas. (Id. at 3).

Three pages of Resolution 2015-101 describe Secular Humanism, noting that the website of the Council on Secular Humanism describes Secular Humanism as "nonreligious" and "espousing no belief in a realm or [sic] beings imagined to transcend ordinary experience" and that Secular Humanism "is philosophically naturalistic." (Id. at 6). Further, the resolution refers to the requesting organizations as wanting to "conduct a pre-meeting invocation by displacing representatives of the minority faith-based monotheistic community which has traditionally given the pre-meeting prayer" and expresses the concern that this "displac[ement]" "could be viewed as . . . Board endorsement of Secular

31

Humanist and Atheist principles." (Id. at 9–10).

In their depositions, the seven Commissioners who served on the Board during 2008 to 2016 were asked about whom they would allow to give an invocation and what the purpose of the invocation is. Several testified that they would "say no" to invocation givers of certain religions or belief systems or that they would "have to look into" or "do more research" about whether to allow those potential speakers to give an invocation. For example, several Commissioners would not allow a Wiccan to give an invocation, (see, e.g., Fisher Dep., Doc. 46, at 10; Smith Dep., Doc. 43, at 10), would "want to do more research to understand what that particular religion was about" before allowing it, (Nelson Dep., Doc. 47, at 8), "guess[e]d" she would allow it, (Infantini Dep., Doc. 45, at 9), or "would probably suggest that they do it during" the Public Comment period, (Lewis Dep., Doc. 44, at 8). Similar testimony was given regarding whether an adherent to a Native American religion would be permitted to give an invocation. (See, e.g., id. at 9 (would "have to think on" traditional Native American religion); (Barfield Dep., Doc. 48, at 10 (unsure about a Native American shaman); Doc. 43 at 11 (would "talk to them" and "see what they had to say")). Others were unsure if they would allow a Muslim to give an invocation, (Doc. 47 at 8; Doc. 44 at 8), and several would not allow a deist[23] to do so, (Doc. 46 at 11; Doc. 44 at 8–9; Doc. 48 at 10; Doc. 43 at 12).

Several Commissioners expressed doubt about allowing a member of a polytheistic religion—including Hinduism—to give an invocation. (See, e.g., Doc. 46 at 11–12; Doc. 44 at 9). One Commissioner would not consider inviting a member of a polytheistic religion or anybody who does not believe in a monotheistic religion. (Doc. 43 at 12). Another

---

[23] See n.11 supra.

testified that he would not invite an adherent of a polytheistic religion because he "just doesn't think that's representative of our community," yet he inexplicably maintained that he would be willing to invite a Hindu. (Doc. 48 at 10).

One Commissioner testified that she has never invited someone she knew not to be a Christian to give an invocation because "[t]he purpose of the prayer or the invocation was in respect to the Christian community." (Doc. 44 at 10–11). That Commissioner explained that she would be willing to invite a believer in any "God-fearing religion" to give an invocation, (id. at 9), and that the invocation is "a long-standing tradition of honoring the Christian community in Brevard County," (id. at 27).

Another Commissioner stated in his deposition that invocations "are reserved for faith-based organizations to introduce their church," and "[i]t gives them an opportunity to promote their church, established church, recognized church." (Doc. 42 at 38). Another said that an invocation is "more for a faith-based monotheological type of situation" where people can speak about whatever they believe. (Doc. 48 at 19). Another explained that he believes in Resolution 2015-101 because he believes "that the long history in this country gives people of the faith-based community the ability to speak and speak freely" and that "the Constitution says we have freedom of religion, not from religion." (Doc. 43 at 21). That same Commissioner explained, "[W]e don't set time aside for non faith-based people to speak during the invocation," (id. at 24), and the Board "endorses faith-based religions," (id. at 27). Additionally, that Commissioner acknowledged saying to a radio station that "[t]he invocation is for worshiping the God that created us," by which he means "[t]he one and only true God"—"[t]he God of the Bible." (Id. at 37; see also Pls.' Ex. V13 (audio recording of radio interview)). He also acknowledged being quoted as saying that

"[i]f they were a religion and they honored the word of God" set forth in "[t]he Holy Bible"
"they would have every opportunity to speak to us during that period that we set aside to
honor God." (Doc. 43 at 38).

This overwhelming, undisputed record evidence clearly demonstrates that the
County's invocation practice runs afoul of the principles set forth in Marsh, Town of Greece,
and Pelphrey. It reveals "impermissible motive" in the selection of invocation givers, Marsh,
463 U.S. at 793, and reflects a "policy of []discrimination," Town of Greece, 134 S. Ct. at
1824, as well as "purposeful discrimination" and "categorical[] exclusion" of certain potential
invocation givers, Pelphrey, 547 F.3d at 1281 & 1282. It also demonstrates that through
its practice, the County has strayed from invocations' traditional purpose.

The County cannot and does not deny that it has imposed a categorical ban on
Plaintiffs and other nontheists as givers of opening invocations at its Board meetings.
Nevertheless, the County describes its invocation practice as "purposefully inclusive"
rather than exclusive, (see Doc. 59 at 7–8 & 20), and it attempts to justify its practice on
several bases. None of these asserted justifications, however, withstands analysis.

*"Invocations Must Invoke A Higher Power"*

The County attempts to defend its exclusion of Plaintiffs as invocation-givers by
imposing a "theism" requirement for invocations. As is apparent from evidence already
discussed, the County maintains that an invocation must be "religious" and "invoke a higher
power" and that because the Plaintiffs are not "religious" and do not believe in a higher
power they are "not qualified" to give an opening invocation at Board meetings. The Court
rejects this asserted justification or the County's policy and practice of exclusion.

As Plaintiffs note, the Supreme Court and other courts have recognized atheism

34

and Humanism as religions entitled to First Amendment protection. See, e.g., Torcaso v. Watkins, 367 U.S. 488, 495 n.11 (1961) (noting that "[a]mong religions in this country which do not teach what would generally be considered a belief in the existence of God [is] . . . Secular Humanism"); Glassroth v. Moore, 335 F.3d 1282, 1294 (11th Cir. 2003) ("The Supreme Court has instructed us that for First Amendment purposes religion includes non-Christian faiths and those that do not profess a belief in the Judeo-Christian God; indeed, it includes the lack of any faith."). To this, the County responds that atheism and Humanism are not necessarily religions "for all purposes," (see Doc. 93 at 52), and insists that an invocation is "an appeal to divine authority" that Plaintiffs are "incapable" of offering.

The County's assertion that a pre-meeting, solemnizing invocation necessarily requires that a "higher power" be invoked is an overly narrow view of an invocation. The County relies largely on the Supreme Court's description in Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000), of "invocation" as "a term that primarily describes an appeal for divine assistance." 530 U.S. at 306–07. But, as Plaintiffs counter, "'primarily' does not mean 'exclusively,'" (Doc. 60 at 5), and the Santa Fe Court also noted that the purpose of the message there was "to solemnize the event" and, in striking down a prayer practice as improperly encouraging religious messages at high school football games, "[a] religious message is the most obvious method of solemnizing an event," id. at 306; "most obvious" does not mean "exclusive" either.

And Town of Greece, though addressing whether "sectarian" religious prayer is permissible in the legislative setting rather than whether a legislative invocation necessarily is religious, suggests that there is no such requirement. There, the Court noted that the invocation in that town was—apparently as described by the parties—"intended to place

town board members in a solemn and deliberative frame of mind, invoke divine guidance in town affairs, and follow a tradition practiced by Congress and dozens of state legislatures," 134 S. Ct. at 1816 (record citation omitted). The Supreme Court noted in Town of Greece that "[a]s practiced by Congress since the framing of the Constitution, legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." Id. at 1818. These purposes and effects may have bases in monotheistic religions, but they are not necessarily dependent on "religion." In discussing permissible constraint on the content of legislative prayer, the Town of Greece Court stated that an opening invocation "is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage," id. at 1823—again, functions that do not necessitate religious references—and the Court then explained that "[p]rayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function," id.

Other aims of legislative prayer identified in Town of Greece include "to elevate the purpose of the occasion and to unite lawmakers in their common effort." Id. And while the Court did note that "[t]he tradition reflected in Marsh permits chaplains to ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths," id., it then stated that "[t]hese religious themes provide particular means to universal ends," id., suggesting that religiously themed invocations are but one method of achieving the overarching goal of solemnizing governmental proceedings. The Court further noted that prayers offered to Congress "vary in their degree of religiosity" but "often seek peace for the Nation, wisdom for its lawmakers, and justice of its people, values that count as

36

universal and that are embodied not only in religious traditions, but in our founding documents and laws." Id. And, of course, the Town of Greece Court emphasized that the town would allow anyone, "including an atheist," to "give the invocation." Id. at 1816; accord id. at 1829 (Alito, J., concurring) (noting that the town "would permit any interested residents, including nonbelievers, to provide an invocation"). This suggests that an atheist or other "nonbeliever" is capable of giving an invocation and that an "invocation" need not "invoke a higher power." A recent decision of the en banc Sixth Circuit buttresses this conclusion. See Bormuth v. Cty of Jackson, -- F.3d --, No. 15-1869, 2017 WL 3881973, at *1 (6th Cir. Sept. 6, 2017) (en banc) (upholding commissioner-led legislative prayer practice where each commissioner, "regardless of his religion or lack thereof, is afforded an opportunity to open a session with a short invocation based on the dictates of his own conscience"); id. at *14 (noting that the county's "prayer policy permits prayers of any—or no—faith") (emphasis removed).

Moreover, as earlier noted, on those occasions when a speaker is not scheduled in Brevard County or does not show up, either a moment of silence is observed or an audience member is solicited to give an invocation. Obviously, a moment of silence does not invoke "a higher power" or anything else. And when audience members fill in for an absent speaker, they apparently do not have their beliefs vetted before being permitted to speak. These facts only further emphasize the differential treatment to which Plaintiffs have been subjected in Brevard County. The record also reflects that Plaintiffs and other nontheists have given invocations before other governmental bodies and have even been invited back. Those invocations do not "invoke a higher power," yet they fit within the purposes described in Town of Greece—to solemnize the meeting, "lend gravity to the

37

occasion and reflect values long part of the Nation's heritage." 134 S. Ct. at 1823.[24]

---

[24] Examples of these invocations include the following:

Martin County is a diverse community representing a wide spectrum of religious, secular, political, ethnic, and racial perspectives. Despite our diversity we are united by the democratic principles of equal treatment for all as contained in our Constitution and Bill of Rights. We are also united in our desire to develop policies and legislation for the benefit of Martin County and its residents.

We come to this meeting with divergent points of view that need to be discussed and carefully evaluated to ensure that wise decisions are made. While we may believe that our perspectives on issues like All Aboard Florida or the Indian River Lagoon are preferable, it is important that we express ourselves in ways that demonstrate respect for others as we plant the seeds of cooperation that are necessary for us to work together for the common good.

Let us be guided by reason and compassion in our quest to solutions for life's problems. Should we find ourselves becoming displeased over what someone has said it can be helpful to remember that harsh words don't educate others about our points of view. They only create tension and interfere with decision making.

Let us be guided by the advice that Aristotle offered the world twenty-four hundred years ago when he said, "We should conduct ourselves towards others as we would have them act towards us.

(Invocation given by Joe Beck at the June 17, 2014 Meeting of the Martin County, Florida Board of County Comm'rs, Pls.' Ex. 14 at 23). And:

Through the millennia we as a society have learned the best way to govern the people is for the people to govern themselves. Today, in this tradition, we travel from our homes and businesses across the county; citizens, staff, and those elected converge on this chamber to work as one community united and indivisible by nearly every measure. Each of us arrives as individuals with unique ideas and experiences but all with a need or, in a spirit of goodwill, to fulfill the needs of others.

Citizens request assistance and offer their concerns and we are ever grateful for their interest and for their trust in the process. Staff provides invaluable expertise in their particular field and we truly appreciate their continued service. Elected officials listen, debate, and choose the path forward for us all out of a sincere desire to serve and honor the people of Osceola County while shaping its future. We all offer our thanks in that often thankless task.

When we leave this chamber this evening let us carry with us this same spirit of service and goodwill tomorrow and every day that follows.

This is how we assemble to serve and to govern, ourselves.

(Invocation given by David Williamson at the June 16, 2014 Meeting of the Osceola County, Florida Board of County Comm'rs, Pls.' Ex. 14 at 24).

Furthermore, in holding that legislative prayer was not required to be "nonsectarian" in order to pass constitutional muster, the Supreme Court emphasized in Town of Greece that "government may not seek to define permissible categories of religious speech" and that "[o]nce it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates." Id. at 1822. The Court explained that "[t]o hold that invocations must be nonsectarian would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech." Id. And, "[o]ur Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior." Id.

For a governmental entity to require, or attempt to require, "religious" content in invocations is, in effect (or, at best, but a step removed from) that entity composing prayers for public consumption or censoring the content of prayers—in contravention of the principles set forth in the Town of Greece. Here, the County is attempting to require that God be mentioned in invocations by limiting the sphere of invocation givers to those who believe—or who the County thinks believe—in one God. This practice cannot be squared with controlling precedent, and the County's invocation practice cannot be defended based on a "religiosity" requirement.

*The Minority and the Majority*

The County also argues that it is not discriminating against a minority because atheists and secularists are a "clear majority" and "religious adherents . . . are the statistical minority in Brevard County." (Doc. 59 at 13). This contention touches on a confusing and sometimes conflicting theme in the record evidence and the County's filings—the notion of

39

a "majority" versus a "minority." At times, the County casts the facts as if the "faith-based community" is an endangered and oppressed minority in the County, while at others it relies on the "substantial" number of monotheists in the County as part of its justification for rejecting Plaintiffs' requests to give an invocation. (See, e.g., Aug. 19, 2014 Letter from Board to Plaintiffs Williamson and CFFC, Pls.' Ex. 46 (referring to "a higher authority which a **substantial body** of Brevard constituents believe to exist" and stating that "this Commission chooses to stand by the tradition of opening its meetings in a manner acknowledging the beliefs of a **large segment** of its constituents" (emphasis added)); Resolution 2015-101 at 2 ("In Brevard County the faith-based community is a minority component of the . . . community represented by the Board . . . ."); id. at 9 (stating that allowing atheist invocations "could be viewed as County hostility toward monotheistic religions whose theology and principles currently represent the minority view in Brevard County"); id. (referring to "displacing representatives of the minority faith-based monotheistic community"); Cty.'s Resp. Mem., Doc. 59, at 7 (referring to the County as one "where 94% of persons with a religious affiliation belong to Christian congregations"); id. at 13 ("[T]his case does not involve discrimination against a minority faith because atheists, as a subset of secularists[,] are members of a clear majority when compared to the number of people who regularly attend religious services. It is religious adherents . . . who are the statistical minority in Brevard County."); id. at 16 (referring to "faith-based" invocators as "representing a substantial body—though a minority—of constituents" and noting that "the County Commission currently governs an overwhelmingly secular community"); id. at 18 (referring to the Board as "placed in the tenuous position of governing a secular county"); id. at 19 (referring to the County's "minority faith-based community")).

40

Although the County attempts to ascribe relevance to the statistical breakdown of "religious adherents" versus "those who attend religious services" versus "nonbelievers," it is not germane to Establishment Clause analysis whether a particular segment of the County's population is the majority or minority. "The First Amendment is not a majority rule . . . ." Town of Greece, 134 S. Ct. at 1822; see also McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 884 (2005) (O' Connor, J., concurring) ("[W]e do not count heads before enforcing the First Amendment."); Doe v. Pittsylvania Cty., Va., 842 F. Supp. 2d 906, 927 (W.D. Va. 2012) ("The Bill of Rights exists to protect the rights of individuals from popular tyranny."). In sum, the County's vacillating assertions regarding majorities and minorities do not advance its cause here.

## The Public Comment Period

The County next insists that it has not denied Plaintiffs the opportunity to give an invocation because it allows nontheists to give a "secular invocation" during the Public Comment portion of Board meetings—which the County describes as "an alternative and comparable opportunity." (Doc. 62 at 3).[25] The County maintained at oral argument that anyone can give an invocation and "[i]t's just a matter of where [and when] they're gonna give it"—at the beginning of the meeting or during Public Comment. (Hr'g Tr., Doc. 93, at 49). This argument fails.

First of all, the County's argument that an "invocation"—"secular" or otherwise—given during the Public Comment period is comparable to an opening, pre-meeting invocation is unpersuasive. A pre-meeting invocation is given before the meeting starts

---

[25] The County also argues that it created separate "limited public forums" in its invocation period and Public Comment periods. That contention is addressed in the next subsection of this Order.

41

and serves to solemnize the entire meeting. That is its purpose. The Town of Greece Court noted the invocation's "place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage." 134 S. Ct. at 1823. Here, Plaintiffs are not seeking to discuss their beliefs in a Public Comment setting but to participate in the solemnizing function that is afforded to others at the outset of meetings; they "want to give invocations that call on the kinds of nontheistic higher authorities and values approved in [Town of Greece], such as the U.S. Constitution, democracy, equality, cooperation, fairness, and justice." (Doc. 60 at 4).

The County cites Town of Greece in support of its Public Comment justification, but in doing so it distorts the Supreme Court's opinion. The County relies on the statement that in the town of Greece, "any member of the public is welcome **in turn** to offer an invocation reflecting his or her own convictions." 134 S. Ct. at 1826 (emphasis added). In the County's view, this "in turn" language means that the Supreme Court did not "say it has to be at the beginning of the meeting, as long as they have an opportunity to do it." (Hr'g Tr., Doc. 93, at 50).

But the County's argument that "in turn" supports the validity of its practice of allowing "separate invocations" during different parts of a meeting fails. First of all, this "in turn" language is from the discussion of coercion in Justice Kennedy's plurality opinion in Town of Greece—not from the part of the opinion that addresses the requirement of a policy of nondiscrimination with regard to inviting invocation-givers. In context, the sentence reads: "Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially

where, as here, any member of the public is welcome **in turn** to offer an invocation reflecting his or her own convictions." 134 S. Ct. at 1826 (emphasis added). Moreover, Town of Greece did not involve bifurcated invocation-presentation periods, and there is no basis to infer that Justice Kennedy was using "in turn" to refer to different parts of a meeting. In context, it is clear that Justice Kennedy was referring to an opportunity to give an invocation at the beginning of a future meeting rather than during a later "Public Comment" period or other section of the agenda after a meeting is already underway and has been solemnized.

In attempting to justify its "bifurcated invocation periods," the County also seizes on language from Town of Greece referring to the need for a court to make "inquiry into the prayer opportunity as a whole." Id. at 1824 (citing Marsh, 453 U.S. at 794–95). The County argues that "as a whole," it "affords an invocation opportunity to the Plaintiffs." (Doc. 54 at 24). Again, however, the County takes language from Town of Greece out of context. The "prayer opportunity as a whole" language appears in the Supreme Court's discussion of the plaintiffs' assertions regarding the allegedly disparaging content of some of the prayers given there. In that vein, the Court explained:

> Although these two remarks strayed from the rationale set out in Marsh, they do not despoil a practice that **on the whole** reflects and embraces our tradition. Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. Marsh, indeed, requires an inquiry into **the prayer opportunity as a whole**, rather than into the contents of a single prayer.

134 S. Ct. at 1824 (emphasis added). Here, although the County has conceded that some of the invocations at its meetings have crossed the line into proselytizing, (see Hr'g Tr., Doc. 93, at 57), Plaintiffs' claims are not based on the content of the prayers, and Plaintiffs are not arguing this aspect of Town of Greece. The "prayer opportunity as a whole"

43

language in Town of Greece does not lend viability to the County's requiring separation of "religious invocations" from "secular invocations," the latter being relegated to the Public Comments portions of the meeting.

Furthermore, as a factual matter the County's description of two "separate but comparable" invocation periods—one for "religious invocations" at the outset of the meeting and one for "secular invocations" during Public Comment is belied by the record in this case. It is undisputed that the Public Comment period is indeed not reserved for secular invocations but is open to discussion of any subject involving County business, and a "Christian prayer" would be permitted both at the beginning of the meeting and during Public Comment. (ASOF ¶ 148). Thus, "religious" invocators have multiple opportunities to speak, whereas "secular invocations" can only be given during Public Comment.

*Limited Public Forums and "Avoiding an Establishment Clause Violation"*

The County also attempts to justify its invocation practice by asserting that the invocation period is a "limited public forum" as to which the County has defined the permissible content.[26] And the County avers that in creating these separate forums, it was trying to *avoid* an Establishment Clause violation because allowance of atheist or Secular Humanist invocations would show hostility toward monotheism or "faith-based" religions and because it is trying to avoid "a pattern of proselytizing secular invocations." These arguments are also rejected.

_____

[26] The County argues that "[l]ike Greece, the Brevard policy allows atheists to present invocations in a separate limited public forum during the Public Comment section of the agenda." (Doc. 54 at 18–19). The County's likening of its policy to the invocation practice in Greece is puzzling. Greece's practice did not involve separate invocation "forums," and there, anyone—including an atheist—could give an invocation at the beginning of a meeting.

44

The County asserts that it has created two limited public forums—one for "religious invocations" and one for "secular invocations." As stated by the County, "under [its] policy, only members of the faith-based community are permitted to give the invocation during the limited public forum set aside by the Commission solely for the purpose of recognizing the faith-based community prior to the commencement of the secular business meeting." (Doc. 54 at 16). And, says the County, it has created not one but "two limited public forums for secular invocations" during the two Public Comment periods. (Id. at 17).

Plaintiffs urge that the invocation portion of a meeting is not a limited public forum and that even if it is, the County has engaged in impermissible viewpoint discrimination by excluding nontheists from it. The Court agrees with Plaintiffs on the latter point and thus need not resolve the first.

"[W]hen the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001). "The State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" Id. (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)) (alteration in original). But "[t]he State's power to restrict speech . . . is not without limits. The restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum.'" Id. (citations omitted) (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806 (1985)).

The County insists that its restrictions are viewpoint neutral, but this Court disagrees. The County discriminates among invocation speakers on the basis of viewpoint, and its restriction on invocation givers is not reasonable in light of the purpose of the

45

invocation. Thus, even if the pre-meeting invocation period is a limited public forum, this viewpoint discrimination renders the County's practice unconstitutional.

The County tries to define its proposed forum as available "to members of the faith-based community capable and desirous of delivering faith-based religious invocations," (Doc. 54 at 23), and asserts that Plaintiffs' "secular invocations" "do not fit within the limitations of the limited public forum established for [these] religious invocations." (Id.). Again, however, the purpose of an invocation is to solemnize a meeting, "lend gravity to the occasion," and "reflect values long part of the Nation's heritage." Town of Greece, 134 S. Ct. at 1823. The County declares that *its* purpose for the invocations is to "recogni[ze] the contribution of the faith-based community to the county," (ASOF ¶ 199), (and the Commissioners themselves described the purpose in various ways, including to "worship[] . . . the one and only true God, the God of the Bible" and "to honor God", Doc. 43 at 37–38) and then tries to justify exclusion of nontheists using its "faith-based" requirement. But exclusion of nontheists—who, as discussed earlier, are indeed "capable" of providing an invocation within the meaning of Town of Greece—is impermissible viewpoint discrimination.

The County argues that its creation of different forums was attempt to avoid an Establishment Clause violation rather than to commit one. The County asserts that allowing nontheistic invocations would send a message of hostility toward "believers" and that because nontheistic invocations are secular and the Board's meeting agendas deal with secular business, allowing secular invocations would violate the Establishment Clause by "establishing" secularism. This argument is baseless. The Court simply cannot fathom how the County would be committing an Establishment Clause violation or showing hostility

46

toward anyone by allowing Plaintiffs to give an invocation at the beginning of a Board meeting. "While the Supreme Court has recognized that 'the State may not establish a "religion of secularism" in the sense of affirmatively opposing or showing hostility to religion, thus 'preferring those who believe in no religion over those who do believe,' that Court also has made it clear that the neutrality commanded by the establishment clause does not itself equate with hostility towards religion." Smith v. Bd. of Sch. Comm'rs of Mobile Cty., 827 F.2d 684, 692 (11th Cir. 1987) (citations omitted) (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 225 (1963)). As noted earlier, moments of silence are sometimes observed in lieu of a "religious invocation," and the County does not claim that such silence represents hostility toward religion—nor could it. Indeed, obviously the County need not have any kind of invocation practice at all, and not having one could not reasonably be construed as hostility toward the "religious."

The County's argument regarding "avoiding a pattern of proselytization" is also misguided. This argument is based on the County's assertion that because Plaintiffs or affiliates of Plaintiffs have posted on websites invocations that are hostile to theistic religions, it must refuse to allow them to give an invocation in order to avoid running afoul of Town of Greece. Here, however, the County is mixing apples and oranges. The portion of Town of Greece that the County relies upon here pertained to the plaintiffs' reliance, in support of their "nonsectarian" argument—on "invocations that disparaged those who did not accept the town's prayer practice." 134 S. Ct. at 1824. The Court then acknowledged a few invocations that strayed in their content from what Marsh approved, but the Court held that "[a]bsent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer

47

will not likely establish a constitutional violation." Id.

The relevant pattern is the pattern that might appear over time in the governmental venue, not a pattern of statements by would-be invocation givers outside the invocation forum. That Town of Greece instructs that assessment of the pattern of invocations given at a government meeting may sometimes be called for to determine whether a prayer practice has crossed the line to disparaging or proselytizing does not mean that the County is justified in denying Plaintiffs the opportunity to give an invocation based on website contents or past invocations—most of which occurred prior to Town of Greece [27]— especially not where, as here, Plaintiffs have repeatedly attested in sworn declarations that they understand the purpose of an invocation and will not proselytize or disparage, (see, e.g., Williamson Decl., Pls'. Ex. 7, ¶ 25; Second Williamson Decl., Pls'. Ex. 138, ¶ 4). The County's alleged concern about "allowing such patterns to manifest" is not realistic; Plaintiffs are not seeking to give an invocation at every meeting, and surely if they crossed the line once they would not be invited back, so no "pattern" could emerge. Moreover, Plaintiffs have countered with evidence of disparaging and proselytizing comments made in sermons or on the Internet by those whom the County has allowed to give "religious invocations." (See Pls.' Exs. 147–163, V14–18). So long as an invocation giver—whether nontheistic or theistic—does not disparage or proselytize during the invocation itself, the County need not be concerned. Again, the relevant "pattern" is the pattern at the meetings,

---

[27] Plaintiff Williamson explains in his Second Declaration that before Town of Greece, he "sometimes advocated against the inclusion of invocations" at local government meetings but that he recognizes that the Supreme Court has ruled that invocations are permissible. (Second Williamson Decl., Pls.' Ex. 138, ¶ 2). Abiding by Town of Greece, he and CFFC no longer seek to end invocations but "to receive treatment equal to that of the theists and theistic organizations who are welcome to present opening invocations." (Id. ¶ 3).

not outside them.

### Conclusion as to Intentional Discrimination

In sum, the County's attempted justifications for its policy and practice ring hollow. The County's reliance to support its position is misplaced. Both Marsh and Town of Greece establish that theistic invocations are permissible in legislative prayer, but they did not establish that a governmental entity may require theistic content in invocations. Indeed, Town of Greece made clear that an invocation giver must be permitted to give an invocation as his conscience dictates, limited only by a prohibition on proselytizing and disparaging. And although the cases speak of permissible effects of theistic invocations, permissible effects are not the same as permissible purposes for an invocation in the first instance. By straying from the historical purpose of an invocation and intentionally discriminating against potential invocation-givers based on their beliefs, the County runs afoul of the Establishment Clause. Plaintiffs are thus entitled to summary judgment on this claim.

### 2. Entanglement

Plaintiffs also argue that the County's invocation policy violates the Establishment Clause because it excessively entangles the County with religion. Plaintiffs note that Resolution 2015-101 includes "a five-page dissection of the beliefs of Secular Humanists and organizations affiliated with" Plaintiffs, (Doc. 55 at 19), and that the Commissioners testified in their depositions that they would "have to examine" the beliefs of various other groups before deciding whether to allow a representative of that group to give an invocation, (id.).

In support of their entanglement argument, Plaintiffs cite Lemon v. Kurtzman, 403 U.S. 602 (1971), which established a three-part test for Establishment Clause cases, one part of which examines whether a law fosters "an excessive government entanglement with

49

religion," id. at 612; Hernandez v. Comm'r, 490 U.S. 680, 696–97 (1989), which applied the Lemon test; and Town of Greece. As noted earlier, in Marsh and Town of Greece the Supreme Court declined to apply the Lemon test in the legislative prayer context, and to the extent Plaintiffs are urging application of all or part of that test here, this Court declines to formulaically apply it.

Nevertheless, entanglement remains relevant to Establishment Clause analysis even when legislative prayer is involved. In rejecting the argument that the town of Greece violated the Establishment Clause "by inviting a predominantly Christian set of ministers to lead the prayer," the Town of Greece Court noted that a "quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach." 134 S. Ct. at 1824 (alteration in original) (internal quotations and citation omitted). As made plain by the discussion of Plaintiffs' purposeful discrimination argument above, the County is clearly entangling itself in religion by vetting the beliefs of those groups with whom it is unfamiliar before deciding whether to grant permission to give invocations.

### 3. Coercion

Next, Plaintiffs assert that the County's invocation practice violates the Establishment Clause by coercing participation in religious exercises. Plaintiffs base this argument on the fact that "Commissioners regularly direct audience members to rise for invocations . . . in the coercive environment of meetings in a small boardroom that are sometimes attended by [fewer] than ten people" and "go on to vote on issues, such as zoning variances, that may greatly affect attendees, who may need to address the Board

50

about those items." (Doc. 55 at 21). The County denies that its practice is coercive. Again, both sides rely on Town of Greece in support of their positions.

In arguing coercion in Town of Greece, the plaintiffs contended "that prayer conducted in the intimate setting of a town board meeting differs in fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation." 134 S. Ct. at 1824–25. In the town board meeting setting, on the other hand, "[c]itizens attend . . . to accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests, such as the granting of permits, business licenses, and zoning variances." Id. at 1825. In light of these differences, the plaintiffs argued "that the public may feel subtle pressure to participate in the prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable ruling." Id. In Greece, "board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, [but] they at no point solicited similar gestures by the public"; although audience members were sometimes "asked to rise for the prayer," the plurality noted that those requests to rise "came not from town leaders but from the guest ministers." Id. at 1826.

As earlier noted, the Town of Greece plaintiffs' coercion argument was rejected by a divided Court, with no majority rationale. The plurality—Justices Kennedy and Alito and Chief Justice Roberts—was "not persuaded that the town of Greece, through the act of offering a brief, solemn, and respectful prayer to open its monthly meetings, compelled its citizens to engage in a religious observance," but it emphasized that "[t]he inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the

51

audience to whom it is directed." Id. at 1825 (plurality opinion). Although it found no coercion on the facts of Town of Greece, the plurality noted that "[t]he analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity."[28] Id. at 1826. And while the Town of Greece plaintiffs stated in declarations that the prayers offended them and made them "feel excluded and disrespected," the plurality held that "[o]ffense . . . does not equate to coercion." Id.

Concurring with the plurality's conclusion that the town's invocation practice was not coercive, Justice Thomas, joined by Justice Scalia, noted that historically, coercion meant "'coercion of religious orthodoxy and of financial support *by force of law and threat of penalty.*'" Id. at 1837 (Thomas, J., concurring) (emphasis in original) (quoting Lee v. Weisman, 505 U.S. 577, 640 (1992)). "Thus," said Justice Thomas, "to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts— not the 'subtle coercive pressures' allegedly felt by respondents in this case." Id. at 1838. Justices Thomas and Scalia agreed with the plurality's conclusion that "[o]ffense . . . does not equate to coercion" and noted that they "would simply add . . . that '[p]eer pressure, unpleasant as it may be, is not coercion' either." Id. (alterations in original) (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 49 (2004)).

Here, Plaintiffs focus their coercion argument on the fact that from 2010–2016,

---

[28] Plaintiffs do not allege that they were "singled out . . . for opprobrium" or that the Board members "indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." Their coercion argument is based only on the requests from Commissioners to stand for the invocation.

sometimes—indeed, more often than not—a Commissioner in Brevard County asked the

audience to stand before the invocation was given, followed by the Pledge of Allegiance.[29]

In addition to noting the "coercive environment" of the boardroom, Plaintiffs urge that the

presence of children at some of the meetings supports their coercion argument, citing Doe

v. Indian River Sch. Dist., 653 F.3d 256, 275–80 (3d Cir. 2011), a case involving prayer at

school board meetings. In Doe, the Third Circuit reiterated "the Supreme Court's

observation that students are particularly vulnerable to peer pressure in social context." Id.

at 277 (citing Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 311–12 (2000)).

Regardless of whether Justice Kennedy's plurality opinion or Justice Thomas's

Town of Greece concurrence governs the coercion issue,[30] on the facts of this case the

---

[29] The parties phrased their stipulated facts regarding the audience being asked to stand in terms of Chairpersons—suggesting that some Chairpersons ask the audience to stand and some do not, as a matter of individual practice or habit. (See ASOF ¶ 67 ("[S]ome Board chairpersons ask the audience to stand for a prayer and the Pledge of Allegiance.")). However, the Court's review of the transcripts and videos of the invocations given from 2010 through May 2016 reveals that: during a clear majority of those invocations, a Commissioner asked the audience to stand; individual Commissioners were inconsistent in whether they asked the audience to stand; and every Commissioner asked the audience to stand on at least two occasions, with several doing so much more frequently. (See Pls.' Exs. 30, 144, V2, & V14). There is, however, a noticeable change in the regular practice beginning in 2016: only once (on March 29, 2016) did a Commissioner ask the audience to stand from January 2016 through May 26, 2016—the date of the last transcript and video in the record. (See Pls.' Exs. 30, 144, V2, & V14). This lawsuit was filed in July 2015.

[30] Even though Justice Kennedy's opinion on coercion garnered three votes and Justice Thomas's only two, Justice Kennedy's plurality opinion is not necessarily controlling on the coercion issue. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " Marks v. United States, 430 U.S. 188, 193 (1977) (alteration in original) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)). Judges have disagreed as to whether Justice Kennedy's plurality opinion or Judge Thomas's concurrence constitutes the "narrowest grounds" on the coercion issue. See, e.g., Bormuth v. Cty. of Jackson, No. 15-1869, -- F.3d --, 2017 WL 3881973, at *15 & n.10 (6th Cir. Sept. 6, 2017) (en banc) (finding it unnecessary to resolve the issue but noting division among

Court cannot find that any of the Plaintiffs was subjected to unconstitutional coercion under either rationale. The evidence does not support a finding of "actual legal coercion," and many of the arguments made here—including the notion that a municipal board meeting setting is different from a state legislature setting—were noted by Justice Kennedy in the plurality opinion. Analyzing the specific facts here, this Court does not conclude that the occasional presence of children or the fact that requests to stand—for both the invocation and the Pledge of Allegiance that followed—were often made by Commissioners, without more, amounts to unconstitutional coercion, especially where the two Plaintiffs—adults— who have attended Board meetings did not feel so pressured that they actually stood if asked to do so. See, e.g., Williamson Dep., Doc. 53-1, at 44–45 (testimony that Williamson was filling out a comment card at the time of the invocation, had not yet taken a seat, and did not recall whether the audience was asked to stand for the invocation during meeting

---

Sixth Circuit judges about which opinion is narrowest, with at least three judges viewing Judge Thomas's opinion as narrowest); id. at *15 (Rogers, J., concurring) (discussing the issue and concluding that Justice Thomas's opinion is not controlling); Smith v. Jefferson Cty. Bd. of Sch. Comm'rs, 788 F.3d 580, 602 n.9 (6th Cir. 2015) (Batchelder, J., concurring in part) (concluding that Justice's Kennedy's plurality opinion "is controlling on the lower courts, as it is narrower than the accompanying two-justice concurring opinion); Lund v. Rowan County, 837 F.3d 407, 426-28 (4th Cir. 2016) (panel opinion) (mentioning the different rationales of the Town of Greece coercion opinions and then applying Justice Kennedy's opinion without mentioning "narrowest grounds" analysis), rev'd on other grounds on reh'g en banc, 863 F.3d 268 (2017); Fields v. Speaker of the Pa. House of Representatives, Civ. Action No. 1:16-CV-1764, 2017 WL 1541665, at *13 (M.D. Pa. Apr. 28, 2017) (concluding that Justice Kennedy's "three-Justice plurality represents the narrowest grounds to" the coercion ruling); see also Elmbrook Sch. Dist. v. Doe, 134 S. Ct. 2283, 2285 (2014) (Scalia, J., dissenting from denial of certiorari petition) ("It bears emphasis that the original understanding of the kind of coercion that the Establishment Clause condemns was far narrower than the sort of peer-pressure coercion that this Court has recently held unconstitutional . . . ." (citing Justice Thomas's Town of Greece concurrence)). In the instant case, the parties did not brief the issue of which coercion opinion is controlling. Because this Court reaches the same conclusion under either opinion, it need not determine which opinion constitutes the "narrowest grounds."

he attended); Becher Dep., Doc. 52-1, at 12–13 (testimony that Becher attended several meetings, did not stand up when asked to stand for the invocations, and had no business on the agenda before the Board at those meetings). And to the extent Plaintiffs were offended, "[o]ffense . . . does not equate to coercion." 134 S. Ct. at 1826 (plurality opinion); id. at 1838 (Thomas, J., concurring) ("The majority properly concludes that 'offense . . . does not equate to coercion.'" (emphasis in original)). Thus, insofar as Plaintiffs' Establishment Clause claim is based on coercion, the claim fails.

## B. Other Federal Constitution Claims

In addition to their Establishment Clause claim, Plaintiffs also bring claims under the Free Exercise and Free Speech Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Some courts have held that challenges to legislative prayer practices are appropriately analyzed only under the Establishment Clause and that claims under other clauses are not viable in this context. Although the County does not rely on that proposition in defending against these "other clause" claims,[31] the Court will nevertheless discuss it before proceeding to analyze Plaintiffs' Free Exercise, Free Speech, and Equal Protection claims.

Before Town of Greece, the Fourth Circuit twice found legislative prayer claims subject to analysis only under the Establishment Clause. In Simpson v. Chesterfield Cty. Bd. of Supervisors, 404 F.3d 276 (4th Cir. 2005), a Wiccan who requested but was denied an opportunity to give an invocation sued under all four of the clauses asserted in the instant case. In affirming the district court's grant of summary judgment on the plaintiff's

---

[31] The County does not defend these claims on any basis other than the "avoidance of an Establishment Clause violation" argument discussed and rejected elsewhere in this Order.

free exercise, free speech, and equal protection claims, the Fourth Circuit "agree[d] with the district court's determination that the speech in th[at] case was government speech 'subject only to the proscriptions of the Establishment Clause.'" 404 F.3d at 288 (quoting the district court decision). The district court had noted that "[t]he invocation is not intended for the exchange of views or other public discourse" or "for the exercise of one's religion" and that "the Board may regulate the content of what is or is not expressed when it 'enlists private entities to convey its own message.'" Simpson v. Chesterfield Cty. Bd of Supervisors, 292 F. Supp. 2d 805, 819 (E.D. Va. 2003), quoted in Simpson, 404 F.3d at 288.

Three years after Simpson, the Fourth Circuit again addressed the issue in Turner v. City Council of the City of Fredericksburg, Va., 534 F.3d 352 (2008), cert. denied, 555 U.S. 1099 (2009). There, the city council began each meeting with an opening prayer delivered by one of the Council's elected members, and the council required that prayers be nondenominational and not invoke Jesus Christ. One of the council members, wanting to pray in the name of Jesus Christ, was denied his turn to give a prayer and filed suit, claiming that the "nondenominational" requirement violated the Establishment, Free Exercise, and Free Speech Clauses. The Fourth Circuit concluded that the prayers were government speech, that the plaintiff "was not forced to offer a prayer that violated his deeply-held religious beliefs," and that instead "he was given the chance to pray on behalf of the government." Id. at 356. The Turner court thus found no violation of any of the clauses. Id.

In addition to the Fourth Circuit's Simpson and Turner opinions, several district court decisions have addressed the viability of legislative prayer claims grounded in clauses

56

other than the Establishment Clause. In Atheists of Fla., Inc. v City of Lakeland, 779 F. Supp. 2d 1330 (M.D. Fla. 2011) (Kovachevich, J.), atheists sued to enjoin a prayer practice involving invocations given by religious ministers, asserting claims under the Establishment, Free Speech, and Equal Protection Clauses. The district court found that the Establishment Clause claim survived the defendants' motion to dismiss. 779 F. Supp. 2d at 1340–41. However, with regard to the free speech and equal protection claims, the plaintiffs conceded that the prayers involved were "government speech" and the court, relying on Simpson, concluded that as such, the prayers at issue were "'subject only to the proscriptions of the Establishment Clause." Id. at 1342 (quoting Simpson, 404 F.3d at 288); see also id. ("The proper analytical device in this case is the Establishment Clause, and not the Equal Protection or Free Speech [C]lauses . . . . Plaintiffs' concession that the prayers at issue here are government speech is simultaneously a recognition that the Establishment Clause, and the Establishment Clause only, governs the conduct at issue in this case.").

And in Coleman v. Hamilton Cty., Tenn., 104 F. Supp. 3d 877 (E.D. Tenn. 2015), the plaintiffs challenged a legislative prayer practice under both the Establishment Clause and the Equal Protection Clause.[32] Citing Simpson and Atheists of Florida without discussion, the Coleman court concluded that "legislative prayer cases . . . are subject to analysis only under the Establishment Clause of the First Amendment, and not under the Equal Protection Clause of the Fourteenth Amendment." 104 F. Supp. 3d at 891.

---

[32] The Coleman court noted at the summary judgment stage of the case that the plaintiffs also attempted to argue a free speech claim, but the court did not allow that challenge because plaintiffs had not pleaded a free speech claim. See 104 F. Supp. 2d at 884 & n.9. The court also found the pleading of the equal protection claim to be "vague" but concluded that it failed even if deemed sufficiently asserted. Id. at 890–91.

57

The most recent discussion of this issue appears in Fields v. Speaker of the Pennsylvania House of Representatives, Civil Action No. 1:16-CV-1764, 2017 WL 1541665 (M.D. Pa. Apr. 28, 2017). The Pennsylvania House of Representatives opens its sessions with an invocation delivered by either a House member or a guest chaplain; guest chaplains, according to an internal rule, must be "member[s] of a regularly established church or religious organization," and the Speaker interprets that rule as excluding "non-adherents" and "nonbelievers" from "the guest chaplain program." 2017 WL 1541665, at *1. After nontheists requested and were denied an opportunity to give an invocation, they—represented by the same counsel as Plaintiffs here—brought claims under the same four constitutional clauses at issue in this case.

In its April 28, 2017 order, the Fields district court granted in part and denied in part the defendants' motion to dismiss, finding that the Establishment Clause claim was plausibly pleaded but dismissing the claims under the other clauses. The Fields court noted that because "courts generally regard legislative prayer as 'government speech,'" they "have thus declined to entertain legislative prayer challenges cast under the Free Speech, Free Exercise, and Equal Protection Clauses." 2017 WL 1541665, at *14 (citing Simpson, Turner, Coleman, Atheists of Florida, and Coleman). The court rejected the plaintiffs' assertion that cases construing legislative prayer as government speech either predated Town of Greece or "fail[e]d to account for" Town of Greece. The Fields court also rejected the plaintiffs' argument that legislative prayer is "hybrid speech," id., and it "join[ed] the unanimous consensus of courts . . . to conclude that legislative prayer is subject to review under the Establishment Clause alone," id.

Having considered these cases, Town of Greece, the facts of this case, and the

manner in which Plaintiffs couch their claims, this Court is not persuaded that legislative prayer claims are necessarily subject to analysis under only the Establishment Clause. Instead, the viability of the various potential causes of action depends on the circumstances of each case and the nature of the claim being asserted. In some cases, an Establishment Clause claim may indeed be the only available type of challenge—under facts like those in Town of Greece, for example. There, the plaintiffs did not seek to give an invocation themselves; they only attempted to have the court limit the content of the "sectarian" prayers to which they were subjected at town meetings.   They only brought an Establishment Clause claim, and it is hard to imagine how they could have framed a free exercise, free speech, or equal protection claim on those facts. And if there had been an Establishment Clause violation, that violation would seemingly have run to all upon whom an unconstitutional prayer practice was imposed.

Where, however, a claimant both objects to the prayer practice as establishing and imposing religion on citizens and, as here, is denied the opportunity to give an invocation while others are invited or allowed to do so, other types of constitutional claims may indeed be independently viable.   In other words, when a governmental entity opens up the invocation opportunity to volunteers and then discriminates among those volunteers on an impermissible basis, an additional type of violation is not necessarily foreclosed even where an Establishment Clause claim is presented.

Thus, although the County does not raise this argument, to the extent that these other cases are not distinguishable on their facts or as not surviving Town of Greece— which prohibits discrimination in selection of speakers, and does not bar sectarian references, and prohibits proselytizing and disparaging—this Court respectfully disagrees

59

with them and other cases categorically limiting legislative prayer cases to only Establishment Clause analysis under all circumstances. One caveat to this, of course, is that a claimant may not avoid the holdings of Town of Greece merely by casting claims in terms of a different Constitutional clause. For example, a claimant cannot, after Town of Greece, insist on a right to say whatever he or she wants—such as proselytizing or disparaging remarks—at an invocation under the guise of a right to free speech or free exercise of religion; Town of Greece forbids such comments because of the limited purpose of an invocation. Plaintiffs do not attempt any such avoidance here—instead focusing on the fact that they have been treated differently than other invocation-givers during the selection process—and the Court will examine Plaintiffs' other federal constitutional claims on their merits.

### 1. Free Exercise Clause (Count II)

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I, cl. 2. Plaintiffs claim in Count II that the County violates this provision by making adoption or profession of a religious belief a precondition for taking part in governmental affairs.[33] This argument has merit.

Plaintiffs primarily rely on Torcaso v. Watkins, 367 U.S. 488 (1961), in support of this claim. In that case, the plaintiff was appointed as a notary public in Maryland "but was refused a commission to serve because he would not declare his belief in God." 367 U.S. at 489. The Maryland Constitution prohibited "religious tests"—"other than a declaration of

---

[33] Plaintiffs do not argue in this claim that they have the right to say whatever they want if given an opportunity to give an invocation, and they do not seek to run afoul of the constraints imposed in Town of Greece on what can be said during an invocation. They instead limit this claim to the "religious test" theory described in Torcaso. It is on this basis—and this basis only—that this Court finds that they prevail.

belief in the existence of God"—as a requirement for a qualification for office. Id. The plaintiff filed suit, bringing claims under the First and Fourteenth Amendments. The Supreme Court held that the "test oath" required of plaintiff "unconstitutionally invade[d]" his "freedom of belief and religion and therefore [could not] be enforced against him." Id. at 495; see also McDaniel v. Paty, 435 U.S. 618, 626–27 (1978) (describing Torcaso as a free exercise case).

Although, as earlier discussed, legislative prayer occupies a unique place in Supreme Court jurisprudence, under Torcaso and the circumstances of this case the Court finds that the County's invocation practice violates not only the Establishment Clause but the Free Exercise Clause as well. By opening up its invocation practice to volunteer citizens but requiring that those citizens believe in "a higher power" before they will be permitted to solemnize a Board meeting, the County is violating the freedom of religious belief and conscience guaranteed by the Free Exercise Clause. Plaintiffs thus prevail on this claim.

## 2. Free Speech Clause (Count III)

Plaintiffs allege in Count III that the County's invocation practice violates the Free Speech Clause of the First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I, cl. 3. Plaintiffs assert that the Free Speech Clause "prohibits government from denying citizens opportunities to take part in governmental activities based on their beliefs or affiliations," and that the County bars Plaintiffs from giving invocations based on their nontheistic beliefs and affiliations.[34] (Doc.

---

[34] As with their free exercise claim, Plaintiffs do not argue in their free speech claim that they have the right to say whatever they want during an invocation, instead couching this claim in terms of being denied an opportunity to participate based on their beliefs or affiliations. In this sense, their freedom of speech claim has merit.

61

55 at 22–23).

Cases cited by Plaintiffs support their "belief and affiliation" argument. See, e.g., Branti v. Finkel, 445 U.S. 507, 516–17 (1980) (noting that "the First Amendment prohibits dismissal of a public employee solely because of his private political beliefs"); Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc., 133 S. Ct. 2321 (2013); see also Cuffley v. Mickes, 208 F.3d 702, 707 (8th Cir. 2000) (concluding the state violated the Ku Klux Klan's free speech right by prohibiting it from participating in the state's adopt-a-highway program based on its beliefs and advocacy); Wishnatsky v. Rovner, 433 F.3d 608 (8th Cir. 2006) (upholding the plaintiff's claim that denial of representation by public defender based on the plaintiff's beliefs was a violation of his free speech right). Thus, Plaintiffs are entitled to summary judgment on their Free Speech Clause claim.

### 3. Equal Protection Clause (Count IV)

In their fourth and final federal claim, Plaintiffs assert that the County's invocation practice violates the Equal Protection Clause of the Fourteenth Amendment, which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Plaintiffs contend that the County's practice violates this clause because the County is treating citizens differently based on their religious beliefs. The Court agrees.

It is clear from the undisputed evidence that in selecting invocation speakers, the County is categorizing its citizens along religious lines—both by dividing, in Resolution 2015-101, "religious" citizens from "secular" citizens, and by dividing, in practice, "monotheistic, faith-based" citizens from all other citizens. Plaintiffs correctly note that religion is a suspect classification under the Equal Protection Clause. See, e.g., Burlington N. R.R. Co. v. Ford, 504 U.S. 648, 651 (1992); City of New Orleans v. Dukes, 427 U.S.

297, 303 (1976). Thus, strict scrutiny applies to the County's practice, and it can withstand an equal protection challenge only if it is "narrowly tailored to achieve a compelling interest." See Miller v. Johnson, 515 U.S. 900, 920 (1995). As correctly argued by Plaintiffs, the County's practice does not satisfy strict scrutiny.

Plaintiffs note that in Resolution 2015-101, the County attempts to justify its policy of excluding them from the invocation practice by citing a desire to recognize "faith-based monotheistic religions," to avoid "displacing . . . the minority faith-based monotheistic community" or appearing "hostil[]e toward monotheistic religions," and to avoid an appearance of approving atheism or Secular Humanism. (See Resolution 2015-101 ¶¶ 5, 36, & 37). These interests are not by any means "compelling." And a neutral policy that allowed citizens of all belief systems to provide an opening invocation would not, as argued by the County, convey a message of endorsement or hostility. Accordingly, Plaintiffs prevail on their federal equal protection claim.

## C.    Florida Constitution (Counts V and VI)

### 1.    Art. I, Section 2 (Count V)

In their fifth claim, Plaintiffs allege a violation of Article I, Section 2 of the Florida Constitution, which provides in part that "[a]ll natural persons . . . are equal before the law" and that "[n]o person shall be deprived of any right because of . . . religion." This clause is construed like the Equal Protection Clause of the U.S. Constitution. See, e.g., Palm Harbor Special Fire Control Dist. v. Kelly, 516 So. 2d 249, 251 (Fla. 1987). For the reasons discussed in the preceding section with regard to Count IV, Plaintiffs prevail on Count V as well.

### 2.    Art. I, Section 3 (Count VI)

Finally, Plaintiffs allege violations of Article I, Section 3 of the Florida Constitution.

This section, titled "Religious freedom," provides, among other things,[35] that "[t]here shall be no law respecting the establishment of religion" and that "[n]o revenue of the state or any political subdivision thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution." Fla. Const. art. I, § 3. Plaintiffs assert violations of both of these parts of section 3—the establishment clause and the "no-aid" clause. (See Doc. 55 at 25).

### a.  Florida Establishment Clause

The Florida Establishment Clause and the federal Establishment Clause have nearly identical wording and are interpreted in the same manner by courts. See, e.g., Todd v. State, 643 So. 2d 625, 628 & n.3 (Fla. 1st DCA 1994); see also Bush v. Holmes, 886 So. 2d 340, 344 (Fla. 1st DCA 2004) (en banc) ("[T]he first sentence of article I, section 3 is synonymous with the federal Establishment Clause in generally prohibiting laws respecting the establishment of religion."). Plaintiffs make the same arguments with regard to the Florida Establishment Clause as they do with respect to the federal clause. For the reasons stated earlier in this order in the discussion of Plaintiff's claim under the

---

[35] This section provides in full:

> Religious freedom.—There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.

Fla. Const. art. I, § 3. Although this section contains a free exercise clause ("There shall be no law . . . prohibiting or penalizing the free exercise [of religion]."), Plaintiffs do not include a free exercise claim among their Florida constitutional challenges. Instead, they rely only on the establishment, equal protection, and "no-aid" clauses. (See Doc. 55 at 25–26; Hr'g Tr., Doc. 93, at 4–5).

64

Establishment Clause of the U.S. Constitution in Count I, to the extent Count VI is based on the Establishment Clause of the Florida Constitution Plaintiffs likewise prevail in part.

### b.   Florida "No-Aid" Clause

The "no-aid" clause of section 3—which provides that "[n]o revenue of the state or any political subdivision thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution"—"imposes 'further restrictions on the state's involvement with religious institutions than [imposed by] the Establishment Clause.'" Council for Secular Humanism, Inc. v. McNeil, 44 So. 3d 112, 119 (Fla. 1st DCA 2010) (alteration in original) (quoting Holmes, 886 So. 2d at 344). The no-aid clause "contains a broad prohibition against the expenditure of state revenues." Holmes, 886 So. 2d at 359.

Plaintiffs contend that the County violates the no-aid clause by "using tax dollars to fund an invocation practice that prefers monotheism over atheism, Humanism, and other religions." (Doc. 55 at 25). Plaintiffs rely on the fact that "[t]he Commissioners use County resources funded with taxpayer dollars—such as email, mail, and phones—to invite and communicate with invocators." (Id. at 3). Additionally, Plaintiffs note that invocation-givers sometimes "orally give the audience promotional information about their houses of worship before delivering their invocations." (Id.)

In Atheists of Florida, Inc. v. City of Lakeland, 713 F.3d 577 (11th Cir. 2013), a case in which administrative employees contacted potential invocation speakers from a list of religious leaders, the plaintiffs argued that the time and expense of printing and mailing invitations to the speakers constituted an impermissible expenditure "in aid of" religion. The City estimated that the annual cost of updating the list and mailing out invitations was $1200 to $1500. The Eleventh Circuit concluded that based on the record before it, the

65

plaintiffs did not demonstrate that the city's expenditures on arranging invocational speakers resulted in a direct or indirect pecuniary benefit to any group or showed that any religious organization received financial assistance from the city to promote and advance its theological views. 713 F.3d at 596. Although Plaintiffs argue that Atheists of Florida is distinguishable and that here, the County used public funds to advance religion, Atheists of Florida weighs against Plaintiffs' no-aid clause claim. Clearly there is no payment of funds to any church or sect here, and Plaintiffs have not presented any evidence or estimate of how much it cost the County to use existing email and telephone systems to contact potential invocation speakers.

Plaintiffs have cited no case—and the Court has found none—where an incidental cost incurred by a public entity sufficed to give rise to a violation of the no-aid clause. This issue is, of course, a matter of Florida law, and if the Supreme Court of Florida has not spoken on the topic at issue, this Court "must predict how [that] court would decide" the question presented. Molinos Valle Del Ciabo, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011).

This Court's research uncovered a Supreme Court of Florida case that lends some guidance here. In Southside Estates Baptist Church v. Board of Trustees, School Tax District No. 1, in and for Duval County, 115 So. 2d 697 (Fla. 1959), the court rejected a no-aid clause claim involving incidental costs incurred by a municipal entity. There, the school district's Board of Trustees allowed several churches to use school buildings on Sundays. The plaintiffs argued that such use of the school buildings "constitute[d] an indirect contribution of financial assistance to a church" in violation of the predecessor provision to

66

the current no-aid clause,[36] 115 So. 2d at 698, and that "regardless of how small the amount of money might be, . . . if anything of value can be traced from the public agency to the religious group, the Constitution has been thereby violated," id. at 699. The Board countered that the record did not "reveal any direct expenditure of public funds" and that "any indirect expense to the public because of depreciation resulting from use by the churches is of such small consequence that the law should refuse to notice it." Id.

The Supreme Court of Florida took note "of [the plaintiffs'] insistence that the use of the building is something of value and that the wear and tear is an indirect contribution from the public treasury," id., but concluded that it "might here properly apply the maxim De minimis non curat lex," id., which translates to "The law does not concern itself with trifles," Black's Law Dictionary (10th ed. 2014). The Court continued: "Nothing of substantial consequence is shown and we see no reason to burden this opinion with a discussion of trivia." Id. at 699–700. See also Holmes, 866 So. 2d at 356 ("[N]o disbursement was made from the public treasury in [Southside], a fact which significantly distinguishes it from the instant case" (in which a scholarship program authorized state funds to be paid to sectarian schools)).

In light of the Southside court's refusal to find a use of public funds from incidental expense due to use of buildings, and in the absence of any case finding a no-aid clause

---

[36] The provision at issue in Southside was Section 6 of the Declaration of Rights of the 1885 Florida Constitution, which provided that "No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution." The constitution was revised in 1966–68. See generally Bush v. Holmes, 886 So. 2d 340, 348–351 (Fla. 1st DCA 2004) (tracing the history of the no-aid clause and noting that the current clause is "much the same as under section 6 of the 1885 Constitution").

67

violation in similar circumstances, this Court concludes that the Supreme Court of Florida would not find a violation of the no-aid clause on the facts of this case. Thus, to the extent that Count VI of the First Amended Complaint is grounded in the no-aid clause of the Florida Constitution, Plaintiffs' motion for summary judgment is denied and the County's motion for summary judgment is granted.

## III. Conclusion

As the Fourth Circuit recently noted in Lund, "[t]he great promise of the Establishment Clause is that religion will not operate as an instrument of division in our nation." 863 F.3d at 272. Regrettably, religion has become such an instrument in Brevard County. The County defines rights and opportunities of its citizens to participate in the ceremonial pre-meeting invocation during the County Board's regular meetings based on the citizens' religious beliefs. As explained above, the County's policy and practice violate the First and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 3 of the Florida Constitution.

It is **ORDERED** as follows:

1.     Defendant's Motion for Summary Judgment (Doc. 54) is **GRANTED in part** and **DENIED in part** as set forth in this Order.

2.     Plaintiffs' Motion for Summary Judgment (Doc. 55) is **GRANTED in part and DENIED in part** as set forth in this Order.

3.     No judgment shall be entered at this time. Instead, in accordance with the parties' prior agreement,[37] **on or before October 13, 2017**, the parties shall file their

---

[37] During oral argument on parties' cross-motions for summary judgment, Plaintiffs' counsel reminded the Court that at mediation the parties reached a settlement agreement as to the amount of damages and that that agreement allows the parties to file it with the Court if Plaintiffs prevail on the merits. (See Hr'g Tr., Doc. 93, at 32–33; see also Mediation

settlement agreement as to damages along with proposed language for the final judgment,

including but not limited to language regarding injunctive relief and incorporation of the

parties' settlement agreement into the final judgment.

**DONE** and **ORDERED** in Orlando, Florida, on September _30_, 2017.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

Appendix: Brevard County Resolution 2015-101 (without attachments)

Report, Doc. 39, at 2).

69

Resolution No. 2015- 101

A RESOLUTION OF THE BREVARD COUNTY BOARD OF COUNTY
COMMISSIONERS AMENDING THE BOARD OPERATING
PROCEDURES SET FORTH IN RESOLUTION 05-332, AS AMENDED
BY RESOLUTION 14-219; ADOPTING A FORMAL POLICY RELATING
TO TRADITIONAL CEREMONIAL PRE-MEETING PRAYER.

WHEREAS, the Board of County Commissioners in Brevard County has
had a longstanding tradition of calling for an invocation before commencing a
regular meeting of the County Commission at which the secular business of the
County will be reviewed and acted upon; and

WHEREAS, the Board has previously responded in writing to requests
made by atheists seeking to perform a pre-meeting prayer and, in so doing, has
identified an informal policy addressing the issue of pre-meeting prayer; and

WHEREAS, the Board has not yet enacted a formal policy relating to pre-
meeting prayer; and

WHEREAS, Board members have received a joint letter from Americans
United for Separation of Church and State (AUSCS), The Freedom from Religion
Foundation (FFRF), the ACLU of Florida, and the ACLU Program on Freedom of
Religion and Belief (collectively called "the ACLU) in behalf of specifically
named individuals who are held out to be atheists, agnostics or secular humanists
and that letter requests the Board to allow the named atheists, agnostics and
secular humanists to give a pre-meeting prayer at a regular Board meeting; and

WHEREAS, the Board wishes to formalize a policy on invocations that is
not hostile to faith-based religions and that does not endorse secular humanism or
non-belief over traditional faith-based religions comprised of constituents who
believe in God;

NOW, THEREFORE, BE IT RESOLVED by the Board of County
Commissioners of Brevard County, Florida:

Section 1.  Findings:

<u>Brevard County Tradition of Pre-meeting Invocations</u>

1.  For at least the past forty-four years, the Brevard County Board of County
Commissioners has observed the tradition of calling for a ceremonial invocation in the
form of a short prayer delivered prior to the commencement of the Board's business
agenda at regular meetings of the Board.  (See Board Minutes attached as Exhibit A)

1

2.     The invocation is not part of the Board's business agenda, an agenda that invariably involves entirely secular business presented to and acted upon by the Board.

3.     All regular meetings of the Board of County Commissioners are open to the public and televised.

4.     On a rotating basis, individual Board members have predominately selected clerics from monotheistic religions and denominations—including Christian, Jewish and Muslim—to present the invocation.

5.     Prior to the invocation, in recognition of the traditional positive role faith-based monotheistic religions have historically played in the community, the Board through one or more of its member, typically interacts with the presenting cleric by offering the cleric the opportunity to tell the Board, meeting attendees and the viewing audience something about their religious organization, which may include the organization's location and ongoing and future programs or events that might be of interest to the community at large.

6.     Virtually all invocations and opportunities to speak afforded to clerics during the invocation segment prior to a regular meeting last less than five minutes.

## Relevant Demographics in Brevard County

7.     In Brevard County the faith-based community is a minority component of the larger majority community represented by the Board of County Commissioners.

8.     According to *The Association of Religious Data Archives* (ARDA), *County Membership Report, Brevard County*, in 2010 the population of Brevard County was 543,376.[1] (See attached Exhibit B)

9.     According to the ARDA report, cited above, out of the 543,376 people living in Brevard County in 2010, only 189,430 people (including church members, their children and others who regularly attend services) claimed to be adherents to any religious faith, which was 34.9% of the County's total population.[2] (See attached Exhibit B)

10.     According to *City Data.com*, as of 2002, Brevard County religious adherents represented 39.4% of the total population in Brevard County,[3] as compared to a 50.2% average for all counties in the United States. (See attached Exhibit C)

11.     According to *The Association of Statisticians for American Religious Bodies*, in the year 2000, the percent of population claimed by all religious groups in Brevard County was between 35% and 44.9%.[4] (See attached Exhibit D)

---

[1] *Excerpt from:* The Association of Religious Data Archives: County Membership Report, Brevard County, 2010 http://www.thearda.com/rcms2010/r/c/12/rcms2010_12009_county_name_2010.asp ; (retrieved June 18, 2015)
[2] The Association of Religious Data Archives: County Membership Report, Brevard County, 2010 http://www.thearda.com/rcms2010/r/c/12/rcms2010_12009_county_name_2010.asp ; (retrieved June 18, 2015)
[3] Brevard County, Florida (FL) Religion Statistics Profile - Palm Bay, Melbourne, Titusville. Merritt Island, Rockledge, http://www.city-data.com/county/religion/Brevard-County-FL.html (retrieved June 18, 2015)

2

DSRA 000003

12.     Brevard County is known as Florida's Space Coast due to the presence of NASA and the world-renowned Kennedy Space Center. The County's major industries are aerospace related and include such high profile companies as Lockheed-Martin, Boeing, Northrup Grumman and Embraer.

13.     Brevard County is the home to a large population of rocket scientists including aerospace and aviation engineers; mechanical engineers; computer engineers; biological scientists and environmental scientists. Brevard County is also home to the only independent technological university in the Southeast, Florida Institute of Technology which offers programs and research in rocket science, biological science, marine biology, aerospace and mechanical engineering, environmental science, physics, space science, civil engineering, aeronautical science and aviation, and computer science.

## The Request

14.     In behalf of specifically named individuals who are held out to be atheists, agnostics and, or Secular Humanists, the Freedom from Religion Foundation (FFRF) has joined together with Americans United for the Separation of Church and State (AUSCS) and the ACLU to present a written request to the Board members asking that the specifically named atheists, agnostics and Secular Humanists be allowed to present a pre-meeting prayer.

15.     With one exception, the named individuals are members of Humanist Community of the Space Coast—the avowed purpose of which is to advance secular values and secular humanism—the Central Florida Freethought Community and, or the Space Coast Freethought Association. (See attached Exhibit E)

16.     The Central Florida Free Thought Community is affiliated with the Freedom from Religion Foundation and American Humanist Association (AHA). (See: http://cflfreethought.org/)

17.     The Humanist Community of the Space Coast is affiliated, under sponsorship, with the Central Florida Free Thought Community and the American Humanist Association (AHA). (See attached Exhibit F)

18.     FFRF sponsors a webpage that invites persons to sign up for the opportunity to post "Your Godless quotes" on a "cyberboard campaign" designed to allow participants to proclaim that they are "a freethinker and why". (See attached Exhibit G)

19.     Apparently, the FFRF staff then selects certain "Godless quotes" to post on their website at their www.ffrf.org/out/staffpicks page of that website. Many of the quotes selected for the FFRF "staffpicks" page are openly scoffing, mocking, demeaning, extremely hostile and even hateful toward traditional faith-based monotheistic religions,

---

[4] "Percent of Population Claimed by All Religious Groups: Adherents as Percent of Population". *The Association of Statisticians for American Religious Bodies.* http://www.rcms2010.org/maps2000/005.jpg (retrieved June 18, 2015)

3

such as those that are represented before the Board during the invocation presented at any regular Board meeting. Examples of these quotes posted as of June 21, 2015, (attached as Composite Exhibit H), include:

    a. "Religion is the most devastating weapon ever used against humanity";

    b. "Superman is objectively better than Jesus, because Superman will save you whether you believe in him or not."

    c. "God-The most vengeful, jealous, pernicious, unloving dead beat Dad ever. Who also has superpowers to see and hear everything you do. Really? Who wants to sign up for that?"

    d. "The Bible is just a story. It's not even a very good one."

    e. "The church is a charity in precisely the same way that a tapeworm is a weight loss program."

    f. "I am a nonbeliever because there is historical and empirical proof that all religions are evil."

20.    FFRF has engaged in this cyberboard campaign at least back to September of 2014 where other hostile quotes were posted at www.ffrf.org/out/stack/stack/2/. The same types of scoffing, mocking and hostile comments appeared on that page. (See Composite Exhibit I) Examples of those statements (the first of which omits the full spelling of a common epithet) include:

    a. "Your God is an a_____, for the Bible tells me so."

    b. "Ditch God belief and re-join the real world."

    c. "I view religion like cancer. Just because a bunch of people have it doesn't make it a good thing."

    d. "How can I be good without God? I am not a socio-path."

    e. "History shows that as scientific knowledge increases, the need for the super natural decreases."

21.    Americans United for Separation of Church and State (AUSCS) operates and maintains a website that makes clear the organization's calculated goal to aggressively monitor local governments with the express intent of eliminating any activity the AUSCS considers to violate their views of what the principles of separation of church and state should be, including their view of pre-meeting invocation protocols and prayers that do not conform to the AUSCS interpretation of such principles. (See attached Exhibit J )

22.    Exhibit J also demonstrates that AUSCS's website evidences the intent to create extensive political pressure on local government elected officials in an effort to make the tradition of pre-meeting prayer such an inflammatory and controversial political issue that local officials will be intimidated into either capitulating to the organization's views on pre-meeting invocations or eliminating such invocations altogether.

23.    The AUSCS website content shown in Exhibit J also demonstrates that the organization's strategies include political, legal and judicial attacks against local

4

governments and local government officials that do not adhere or submit to the AUSCS
interpretation of separation of church and state principles including the organization's
views on who should be able to present an pre-meeting prayer at a regular public meeting
of the local government governing body.

24.     In the past, FFRF and its affiliate, Central Florida Freethought Community
(CFFC), have engaged in a strategy of asserting the organizations view of issues
involving the separation of church and state through litigation with local governments
who do not share their views.

25.     An example is the FFRF and CFFC collaboration to challenge local
government policies relating to the inclusion of the religious community, a recent case
being the FFRF suit against the Orange County school board where the FFRF sought to
prevent tables set up for the passive distribution of Bibles in Orange County Schools.
FFRF responded with a letter asking the school board to stop the practice, and then asked
to distribute materials that are critical of the Bible. When the school board refused to
allow FFRF materials to be distributed, FFRF sued. While the suit was pending FFRF
contacted The Satanic Temple (TST)[5] —the Tenets of which include "compassion and
empathy towards all creatures in accordance with reason" and "[b]eliefs should conform
to our best scientific understanding of the world. We should take care never to distort
scientific facts to fit our beliefs." TST then approached the School Board with the
demand to distribute Satanic Temple literature. David Williamson—one of the persons
seeking to give an invocation before this Board—labelled this strategy "Lucien's Law."
Andrew Seidel, the lawyer for FFRF and signatory to the letter before this Board,
describes Lucien's Law as follows:

"Lucien's Law states that governments will either (1) close open forums when The
Satanic Temple asks to speak, or (2) censor The Satanic Temple, thereby opening itself to
legal liability. It is "like the nuclear option of church/state separation cases." By

---

[5] According to its website, the fundamental tenets of TST are:

- One should strive to act with compassion and empathy towards all creatures in accordance with reason;
- the struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions;
- one's body is inviolable, subject to one's own will alone;
- the freedoms of others should be respected, including the freedom to offend;
- to willfully and unjustly encroach upon the freedoms of another is to forgo your own;
- beliefs should conform to our best scientific understanding of the world. We should take care never to distort scientific facts to fit our beliefs;
- people are fallible. If we make a mistake, we should do our best to rectify it and resolve any harm that may have been caused;
- every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.
www.thesatanictemple.com/?page_id=15

5

DSRA 000006

November 2014, it became clear that the school board was going to choose option #1 and close the forum, which they eventually did in February 2015."[6]

Mr. Seidel subsequently noted that: "From the first letter we sent in January 2013, we made it clear we were trying to "halt all distributions" from the bible to atheist literature." [7]  (See attached Composite Exhibit K)

### Secular Humanism

26.     The stated purpose of the signatory organizations and named representatives seeking to deliver an invocation is to advance secular humanism and the humanist view of separation of church and state.

27.     The Council on Secular Humanism website asserts that "Secular humanism is *nonreligious*."

28.     The Council on Secular Humanism website describes Secular Humanism in the following terms:

#### A comprehensive, nonreligious lifestance

Secular humanism is comprehensive, touching every aspect of life including issues of values, meaning, and identity. Thus it is broader than atheism, which concerns only the nonexistence of god or the supernatural. Important as that may be, there's a lot more to life ... and secular humanism addresses it.

Secular humanism is nonreligious, espousing no belief in a realm or beings imagined to transcend ordinary experience.

Secular humanism is a lifestance, or what Council for Secular Humanism founder Paul Kurtz has termed a eupraxsophy: a body of principles suitable for orienting a complete human life. As a secular lifestance, secular humanism incorporates the Enlightenment principle of individualism, which celebrates emancipating the individual from traditional controls by family, church, and state, increasingly empowering each of us to set the terms of his or her own life.

#### A naturalistic philosophy

Secular humanism is philosophically *naturalistic*. It holds that nature (the world of everyday physical experience) is all there is, and that reliable knowledge is best obtained when we query nature using the scientific method. Naturalism asserts that supernatural

---

[6] Seidel, Andrew. "What I Learned from Fighting Back Against Public School Bible Distributions". Patheos.com, *Friendly Atheist Blog* (http://www.patheos.com/blogs/friendlyatheist/2015/05/05/what-i-learned-from-fighting-back-against-public-school-bible-distributions/ )

[7] Ibid.

6

entities like God do not exist, and warns us that knowledge gained without appeal to the natural world and without impartial review by multiple observers is unreliable.

### A cosmic outlook rooted in science

Secular humanism provides a *cosmic outlook*—a world-view in the broadest sense, grounding our lives in the context of our universe and relying on methods demonstrated by science. Secular humanists see themselves as undesigned, unintended beings who arose through evolution, possessing unique attributes of self-awareness and moral agency.

### A consequentialist ethical system

Secular humanists hold that ethics is *consequential*, to be judged by results. This is in contrast to so-called command ethics, in which right and wrong are defined in advance and attributed to divine authority. "No god will save us," declared *Humanist Manifesto II* (1973), "we must save ourselves." Secular humanists seek to develop and improve their ethical principles by examining the results they yield in the lives of real men and women.[8]

29.     Three of the five persons seeking to perform nontheistic invocations are represented as being ordained Humanist Celebrants and, in one case, a Humanist Chaplain. All three of these individuals are also represented as being Secular Humanists

30.     CFFC-affiliated speakers giving invocations at other local government meetings have exploited the opportunity to proselytize and advance their own beliefs while disparaging the beliefs of faith-based religions. (See Composite Exhibit L). For example, speakers have said:

a.     "When an invocation takes on the form of public prayer, it is also a violation of the very principles upon which our country and Constitution were founded. Although we are dismayed that the practice of public prayer by governing bodies charged with representing all citizens still continues in violation of the Constitution . . ." (Composite Exhibit L, sub-exhibit #1)

b.     "I speak in the name of the overwhelming majority, including anyone I've ever met who do not want their government to decide for them regarding anything regarding religion or any gods. I speak as well for those political leaders who despair that success in politics cannot be achieved without hypocritical piety . . . I invoke all of these people to urge Chairman Samuel S. Olens, Commissioner Helen Golen, Commissioner Bob Ott . . . to please avoid the arrogance of thinking you can or ever should express any religious beliefs other than your own. . . For any of you who are made uncomfortable by my remarks . . . [p]lease join me in urging that the Cobb County commissioners and planning commissioners cease to open their meetings

---

[8] "What is Secular Humanism"; https://www.secularhumanism.org/index.php/3260

DSRA 000008

      with public religious invocations of any kind." (Composite Exhibit L, sub-exhibit #2).

  c.  "I would prefer that the practice of invocations be discontinued . . . I ask that you do not look upward for guidance from some higher power which is most likely an outgrowth of our own fear of mortality . . . It's important to remember that you don't need a god to hop, to care, to love, or to live. And we certainly don't need one to help conduct city business." (Composite Exhibit L, sub-exhibit #3).

  d.  "People in the later ages eventually became obsessed with power and greed, driven by their beliefs that their higher powers were better than any others . . . Put it simply as, 'My Sky Cake is better that [sic] your Sky Baklava." (Composite Exhibit L, sub-exhibit #4).

  e.  "[F]or the bounty of logic, reason, and science, we simply thank the atheists, agnostics, Humanists . . . Let us, above all, love one another, not to obtain mythical rewards for ourselves now, hereafter, or based on superstitious threats of eternal damnation, but rather, embrace secular-based principles of morality . . . And so we pray. So what?" (Composite Exhibit L, sub-exhibit #5)

  f.  "When we need to find wisdom, let's look to the documents of government, the Constitution . . . the Bill of Rights, and yes, the first amendment which in one sentence provides for the separation between church and state . . . In the face of adversity, we need not look above for answers . . ." (Composite Exhibit L, sub-exhibit # 6)

    31.  According to Defendant CFFC's own Facebook page, it strategically seeks to offend faith-based religions in open forums in order to pressure the local government into closing the forum or censoring the content and exposing itself to liability. In a post by CFFC on its Facebook page, it asked the question: "Should Atheists be More Confrontational When Giving Secular Invocations at Government Meetings?" and linked to the eponymous article posted on "The Friendly Atheist" blog. Composite Exhibit M. In the article, the writer says: "What is the purpose of these secular invocations? We want to get rid of them altogether." (Composite Exhibit M, p.4). He goes on to say "when atheists are granted the chance to lead invocations, we have an opportunity to put the Christian majority in a very uncomfortable place. Why should we squander it?" (Composite Exhibit M, p.4).

    32.  In a prior Board-approved letter responding to CFFC founder David Williamson's request to deliver a Humanist invocation at the beginning of a regular Board meeting, the Board promulgated an informal policy allowing secular humanists or atheists to present any supplication, redress of grievances or proposed instruction to the Board on matters relating to County business—including instruction about their views relating to pre-meeting prayer, as well as their philosophy—during the public comment

8

portion of the secular agenda where secular business is reviewed and acted upon by the Board. (See attached Composite Exhibit N)

33.    The letter to Mr. Williamson reflects a longstanding practice of the Board to provide a limited public forum under the Public Comment section of its business agenda at regular meetings of the Board, which occurs twice during the course of a regular meeting—once after the consent portion of the business agenda has been acted upon and a second time at the end of the meeting. The limited public forum during Public Comment implements Article I, section 5 of the Florida Constitution which provides that "the people shall have the right…to instruct their representatives, and to petition for redress of grievances".

34.    The Board has not and does not censor or restrict what is said during Public Comment agenda as long as it relates to matters within the broad range of subjects identified in the Public Comment Policy set forth in this Resolution. The Board does restrict each Public Comment speaker to three minutes of speaking time.

35.    The underlying policy for the Public Comment section of the business agenda is set forth in Resolution 14-219. In accordance with that policy, "[p]ersons speaking under the public comment portion of the agenda may address topics or issues under the jurisdiction or control of the County Commission or that are relevant to business of the County Commission" and "to those items where the Board has traditionally expressed a position for the betterment of the community interest." The Board's existing policy notes that "it is the policy of the Board of County Commissioners to respect minority views as well as differing opinions conclusions backgrounds and beliefs." The underlying purpose for the policy is the Board's finding "that input from differing perspectives enriches public discussion and helps to build a better consensus."[9]

### Conclusions

36.    Based upon findings 1 through 37, above, the Board finds that yielding to FFRF and AUSCS views by supplanting traditional ceremonial pre-meeting prayer before the Board's secular business agenda at regular Board meetings—a segment reserved for the acknowledgement and interaction with the county's faith-based community—with an "invocation" by atheists, agnostics or other persons represented by or associated with FFRF and AUSCS could be viewed as County hostility toward monotheistic religions whose theology and principles currently represent the minority view in Brevard County. The Board concludes that such action may be deemed to violate the Constitution of the State of Florida.

37.    Based upon findings 1 through 37, the organizations requesting the substitution of Secular Humanists or atheists to conduct a pre-meeting invocation by displacing representatives of the minority faith-based monotheistic community which has

[9] Brevard County Resolution 2014-219

9

traditionally given the pre-meeting prayer, could be viewed as the Board endorsement of
Secular Humanist and Atheist principles in view of:

      a.   the overwhelmingly secular nature of the Board's business meeting
           following the invocation; and

      b.   the evidence suggesting that the requesting organizations are engaged in
           nothing more than a carefully orchestrated plan to promote or advance
           principles of Secular Humanism through the displacement or elimination
           of ceremonial deism traditionally provided by monotheistic clerics giving
           pre-meeting prayers.

      38.    All of the organizations seeking the opportunity to provide an invocation
have tenets or principles paying deference to science, reason and ethics, which, in most
cases, are the disciplines the Board must consider, understand and utilize when acting
upon secular items presented for consideration during the Board's secular business
agenda.

      39.    Therefore, the Board finds that deferring consideration or presentation of a
secular humanist supplication during the Public Comment portion of the agenda
immediately after the consent agenda—which is the first item on the secular business
agenda is acted upon—does not deny or unreasonably restrict the opportunity of the
requesting parties to present their Secular Humanist or atheistic invocations,
supplications, instruction, petitions for redress of grievances or comments, all of which
can be presented during the portion of the agenda reserved for secular business matters.

Section 2. Amendment of Resolution 05-332.

      Resolution 05-332, as amended by Resolution 14-219, is hereby amended
by adding a new section 9.1(c) to read as follows:

      "(c) The Board's findings and conclusions set forth in the Resolution
Adopting a Formal Policy Relating to Traditional Ceremonial Pre-Meeting
Prayer, enacted on July 7, 2015, are hereby incorporated into this policy. In view
of the requests by secular, humanist, atheist and Secular Humanist organizations
to provide a secular, Secular Humanist or an atheistic invocation, the Board hereby
clarifies the intent of the Board's existing policies allowing Public Comment to
include individual or representative comments intended to instruct the Board; to
petition for redress of grievances; to comment upon matters within the control,
authority and jurisdiction of the Board; and to comment on matters that are
relevant to business of the County Commission, as well as matters upon which the
Board has traditionally expressed a position for the betterment of the community
interest. Secular invocations and supplications from any organization whose
precepts, tenets or principles espouse or promote reason, science, environmental
factors, nature or ethics as guiding forces, ideologies, and philosophies that should
be observed in the secular business or secular decision making process involving

10

Brevard County employees, elected officials, or decision makers including the Board of County Commissioners, fall within the current policies pertaining to Public Comment and must be placed on the Public Comment section of the secular business agenda. Pre-meeting invocations shall continue to be delivered by persons from the faith-based community in perpetuation of the Board's tradition for over forty years."

Done and Resolved, this 7th day of July, 2015.

Brevard County Board of County Commissioners

By:_____

Rollin Fisher, Chairman
(as approved by the Board on July 7, 2015)

Attest:

Scott Ellis, Clerk

DSRA 000012

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID WILLIAMSON, CHASE
HANSEL, KEITH BECHER,
RONALD GORDON, JEFFERY
KOEBERL, CENTRAL FLORIDA
FREETHOUGHT COMMUNITY,
SPACE COAST FREETHOUGHT
ASSOCIATION, and HUMANIST
COMMUNITY OF THE SPACE
COAST,

      Plaintiffs,

v.

BREVARD COUNTY,                    Case No. 6:15-cv-1098-Orl-28DCI

      Defendant.

---

## FINAL JUDGMENT

Pursuant to the reasoning set forth in the Order filed on September 30, 2017 in this case (Doc. No. 105, henceforth "Order"), final judgment is hereby entered:

1. In favor of plaintiffs David Williamson, Chase Hansel, Keith Becher, Ronald Gordon, Jeffery Koeberl, Central Florida Freethought Community, Space Coast Freethought Association, and Humanist Community of the Space Coast (collectively, "Plaintiffs") on their first claim for relief, except for the coercion claim, on which final judgment is entered in favor of defendant Brevard County ("the County").

2. In favor of Plaintiffs on their second, third, fourth, and fifth claims for relief.

1

3.  In favor of Plaintiffs on their sixth claim for relief, except for the coercion claim and the "no-aid" claim, on which final judgment is entered in favor of the County.

4.  Pursuant to 28 U.S.C. § 2201 and Fla. Stat. § 86.021, the Court hereby issues a declaratory judgment that the County's policy and practice of selecting opening invocation speakers violates the Establishment, Free Exercise, Free Speech, and Equal Protection Clauses of the U.S. Constitution and the Establishment and Equal Protection Clauses of the Florida Constitution because it discriminates against nontheists (atheists, agnostics, Humanists, and others who do not believe in God).

5.  The Court hereby finds that:

a.  "[T]he Supreme Court and other courts have recognized atheism and Humanism as religions entitled to First Amendment protection."  Order at 34-35.

b.  "The County's assertion that a pre-meeting, solemnizing invocation necessarily requires that a 'higher power' be invoked is an overly narrow view of an invocation."  Order at 35.

c.  The County "limits the prayer opportunity to those it 'deems capable' of doing so — based on the beliefs of the would-be prayer giver."  Order at 28.  In so doing, "the County discriminates among invocation speakers on the basis of viewpoint."  Order at 45.

d.  "[T]he County's invocation practice runs afoul of the principles set forth in *Marsh* [*v. Chambers*, 463 U.S. 783 (1983)], *Town of Greece* [*v. Galloway*, 134 S. Ct. 1811 (2014)], and *Pelphrey* [*v. Cobb County*, 547 F.3d 1263 (11th Cir. 2008)].  It reveals 'impermissible motive' in the selection of invocation givers . . . and reflects 'a

2

policy of []discrimination' . . . as well as 'purposeful discrimination' and 'categorical[] exclusion' of certain potential invocation givers." Order at 34 (citations omitted).

6. Based on the foregoing, the Court hereby issues a permanent injunction:

    a. prohibiting the County from continuing the unconstitutional invocation practices set forth in Brevard County Board of County Commissioners ("Board") Resolution 2015-101. Specifically, the County may not:

        (i) require theistic content in opening invocations; or

        (ii) "impose[] a categorical ban on Plaintiffs and other nontheists as givers of opening invocations at its Board meetings" (Order at 34) or otherwise discriminate against Plaintiffs or other nontheists in selecting speakers to deliver opening invocations at Board meetings.

    b. mandating that, if the County continues opening its Board meetings with invocations, its invocation practices and any new invocation policy that it may adopt shall:

        (i) conform with the principles set forth in this Final Judgment;

        (ii) provide the Individual Plaintiffs (David Williamson, Chase Hansel, Keith Becher, Ronald Gordon, and Jeffery Koeberl) and representatives of the Organizational Plaintiffs (Central Florida Freethought Community, Space Coast Freethought Association, and Humanist Community of the Space Coast) with opportunities to deliver secular opening invocations at Board meetings

3

on a schedule that is equivalent to that afforded to individuals and

organizational representatives delivering religious opening invocations; and

(iii) ensure that each of the Individual Plaintiffs receives a reasonable

opportunity to deliver an opening invocation at a Board meeting within fifteen

months of the later of (1) the date of entry of this Final Judgment; or (2) if the

Board temporarily refrains from opening its meetings with invocations

starting with the date of entry of this Final Judgment, the date upon which the

Board resumes opening its meetings with invocations. After each Individual

Plaintiff delivers his initial opening invocation, however, nothing in this Final

Judgment shall be construed to require the County to schedule him to deliver

opening invocations every fifteen months; instead, the schedule for any

subsequent opening invocation by any Plaintiff shall be set in accordance with

subsection 6(b)(ii) above.

7. The Court hereby incorporates into this Judgment the parties' Mediation Partial

Settlement Agreement dated April 6, 2016 and filed November 13, 2017 (Doc. No. 112-2)

and specifically orders as follows:

a. The County shall pay Plaintiffs as compensatory damages the total sum of

$60,000.00, to be divided among Plaintiffs in accordance with an agreement among

them.

b. The County shall make the $60,000 payment plus any accruable post-

judgment interest to Plaintiffs' counsel, Americans United for Separation of Church

and State (or to such other of the plaintiffs' counsel as the plaintiffs may designate),

via a lump-sum certified check, cashier's check, or wire transfer, within thirty days of
entry of judgment in this case or issuance of the mandate by the highest reviewing
appellate court, whichever is later.

      c. This judgment does not resolve the issue of attorney's fees and costs. In
accordance with the parties' agreement and the Court's separate order dated October
6, 2017 (Doc. No. 107), the deadline for Plaintiffs to file a motion or petition for
attorney's fees, taxable costs, and non-taxable expenses shall be sixty days after the
date of entry of judgment.

      8. The Court retains jurisdiction to enforce (if necessary) this judgment.

IT IS SO ORDERED AND ADJUDGED.

By: _____      Date: _November 29, 2017_
     John Antoon II
     United States District Judge