# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 08, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 17-15769-FF
Case Style: David Williamson, et al v. Brevard County
District Court Docket No: 6:15-cv-01098-JA-DCI

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15769
_____

D.C. Docket No. 6:15-cv-01098-JA-DCI

DAVID WILLIAMSON,
CHASE HANSEL,
KEITH BECHER,
RONALD GORDON,
JEFFERY KOEBERL,
CENTRAL FLORIDA FREETHOUGHT COMMUNITY,
SPACE COAST FREETHOUGHT ASSOCIATION,
HUMANIST COMMUNITY OF THE SPACE COAST,

Plaintiffs - Counter Defendants - Appellees,

versus

BREVARD COUNTY,

Defendant - Counter Claimant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 8, 2019)

Before MARCUS, GRANT and HULL, Circuit Judges.

MARCUS, Circuit Judge:

Like many local governments, the Brevard County Board of County Commissioners opens its meetings with a religious invocation. These opening prayers are the subject of this litigation. A group of Secular Humanists and atheists challenge them as violating the Establishment Clause, arguing that the County has wrongfully barred them from offering invocations of their own.

Legislative prayers occupy a unique position in the framework of Establishment Clause jurisprudence, primarily because, as the Supreme Court put it, an "unambiguous and unbroken history of more than 200 years" leaves "no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." Marsh v. Chambers, 463 U.S. 783, 792 (1983). The invocation of Divine guidance in a public body charged with making laws is not a "step toward establishment [of religion]; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." Id. Even though the government is generally prohibited from entangling itself in religious judgments or promoting religious belief, our courts have repeatedly upheld prayer at the opening of government meetings because of this long national tradition. Even sectarian prayer, presented in the language of a particular sect and even addressed to a particular deity, has been upheld as consonant with the Establishment Clause.

Every step of the way, though, the courts have made clear that there are limits.
Thus, the opportunity for prayer at the start of a legislative session may not be
"exploited to proselytize or advance any one, or to disparage any other, faith or
belief." Id. at 794–95.  In this Circuit, we determine whether the opportunity has
been exploited by applying a three-factor test that considers the identity of the
invocation speakers, the process by which they are selected, and the nature of the
prayers they deliver.  Atheists of Fla., Inc. v. City of Lakeland, 713 F.3d 577, 591
(11th Cir. 2013).

In this case, Brevard County has selected invocation speakers in a way that
favors certain monotheistic religions and categorically excludes from consideration
other religions solely based on their belief systems.  Brevard County's process of
selecting invocation speakers thus runs afoul of the Establishment Clause.  As it
stands, members of the Brevard County Board of Commissioners have plenary
authority, on a rotating basis, to invite whomever they want to deliver invocations,
with no consistent standards or expectation of inclusiveness.  From their testimony,
it is abundantly clear that most if not all of the Commissioners exercise their
discretion in a way that discriminates among religions based on their beliefs,
favoring some but not all monotheistic and familiar religious sects over those faiths
that fall outside the "mainstream."  Moreover, some religions are scrutinized by the
Commissioners more closely, and others are even categorically excluded from

consideration.  Secular humanists are far from the only group viewed with disfavor.  Thus, for example, some of the Commissioners and former Commissioners have testified unambiguously that they would not allow deists, Wiccans, Rastafarians, or, for that matter, polytheists to deliver prayers, and that they would have to think long and hard before inviting a Hindu, a Sikh, or a follower of a Native American religion.  Nothing could be clearer from this record than that more than a few of the Commissioners rejected speakers based squarely on the nature of the religious beliefs they held.

The Resolution that the Commission passed in response to the plaintiffs' requests to offer invocations only confirms our understanding that Brevard County's process of selecting invocation speakers is unconstitutional.  As the Resolution notes, "individual Board members have predominantly selected clerics from monotheistic religions and denominations -- including Christian, Jewish and Muslim -- to present the invocation."  But it does not stop there.  The Resolution adds that the Board "in recognition of the traditional positive role faith-based monotheistic religions have historically played in the community," typically offers the cleric an opportunity to share upcoming events or other information about their religious group before the invocation.

The discriminatory procedure for selecting invocation speakers followed in Brevard County is unconstitutional and it must be rejected.  As a result, we have no

occasion to reach further constitutional questions, including whether atheists and secular humanists must be allowed to deliver non-theistic invocations. Brevard County's current legislative prayer practices violate the command of the First Amendment. We need go no further today than to say this: in selecting invocation speakers, the Commissioners may not categorically exclude from consideration speakers from a religion simply because they do not like the nature of its beliefs.

## I.

Brevard County is a political subdivision of Florida. Its legislative and governing body is the Brevard County Board of County Commissioners ("the Board"). The Board has five members ("the Commissioners"), each elected from a different single-member district. Its meetings are open to the public, carried live on cable television, and streamed online. They typically begin each session with a religious invocation. Other than the opening invocations, agenda items at Board meetings are secular in nature ("with extremely rare exceptions," we are told).

Invocation speakers are invited for the specific purpose of making an opening prayer; they are typically volunteer clerics invited by staff members of the Commissioners. The five Commissioners take turns inviting the speakers. The work of contacting and scheduling speakers is generally done by County staff, using County phones or email services and the staff are paid by the County. Sometimes they have trouble finding someone to give the invocation so they fall

5

back on holding a moment of silence instead.  Commissioners and their staff do not review drafts of the invocations before they are given.  At meetings, the invocation is usually the second item on the Board's printed agenda, following the "Call to Order."  Typically the Commissioner who has invited the speaker will make an introduction, and the Board will ask the audience to stand "for a prayer and the Pledge of Allegiance."

All of the invocations given before the Brevard County Board from January 1, 2010 through March 15, 2016 had at least some theistic content.  That is, they all expressed a "belief in the existence of a god or gods."  Webster's Third New International Dictionary 2370 (2002) ("theism").  More than that, they all contained specifically monotheistic content, meaning that they were in line with "the doctrine or belief that there is but one God."  Id. at 1464 ("monotheism"). During this roughly six-year period, invocations preceded 195 Board meetings. All but seven of them were given by Christians or contained Christian content, including five by Catholic clerics and one each by Latter-Day Saints and Eastern Orthodox speakers.  Of the seven non-Christian invocations, six were given by Jewish Rabbis, and one was a "generally monotheistic" invocation given by an Officer from the City of Melbourne in Brevard County.  Often, but not always, invocations are given by clerics who are leaders of their religious congregations. Invocations have also been given by police officers, congressional staffers, a state

judge, the Commissioners themselves, their staff, and a lay leader of the Church of Latter-Day Saints.

The plaintiffs in this case are five individuals and three organizations. All five individual plaintiffs -- David Williamson, Chase Hansel, Keith Becher, Ronald Gordon, and Jeffery Koeberl -- identify as atheists and four of them also identify as Secular Humanists; all of them live in Brevard County, except for one who lives in Seminole County. According to the American Humanism Association, "Humanism is a progressive philosophy of life that, without theism and other supernatural beliefs, affirms our ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater good of humanity." Amended Stipulation of Facts Regarding Cross-Motions for Summary Judgment ("ASOF"), Doc. 83 at ¶ 86. Three of the Secular Humanist plaintiffs have been ordained as humanist clergy by the Humanist Society. The parties agree that the plaintiffs' beliefs "are strongly held and very important to them, having a place in their lives equal to the significance that theistic beliefs have in the lives of Christians, Jews, and adherents of other monotheistic faiths." Id. at ¶ 91. They also agree that "[a]ll the individual plaintiffs view their atheistic or Humanist beliefs as a 'religion' as defined under the law" and for Establishment Clause purposes. Id. at ¶ 92.

In 2014, plaintiff David Williamson sent the Board two letters on letterhead from the Central Florida Freethought Community ("CFFC") -- one in May, and

one in July.  The first explained that the CFFC was "a local educational organization of more than two hundred members" and that "[o]ne of the organization's objectives is to educate the public on the need for equal treatment of non-believers and the value of Humanism; a world view which relies on reason and science as the best decision-making tools humankind has at its disposal."  Doc. 55-6 at 66.  The letter cited recent Supreme Court precedent requiring, in Williamson's view, that "a government's prayer practice must be 'nondiscriminatory' and it must make reasonable efforts to include invocations from all members of the community, regardless of their faith," and cited cases in which humanism had been treated as a religion under the First Amendment.  Id. "Therefore," Williamson wrote, "**we respectfully request the opportunity to offer invocations at your meetings**."  Id. (emphasis in original).  The second letter noted that the Board had failed to respond to the first one, and repeated the same arguments at greater length, concluding with a "demand that Brevard County permit a member of [the Central Florida Freethought Community] to deliver an invocation."  See id. at 69–71.

In August of 2014, the Board responded explaining the purpose and tradition of invocations before Board meetings and telling the CFFC and Williamson that their proposal would not fit within the County Commission's tradition.  The response read, in part, this way:

The invocation portion of the agenda is an opening prayer presented by members of our faith community.  The prayer is delivered during the ceremonial portion of the County's meeting and typically invokes guidance for the County Commission from the highest spiritual authority, a higher authority which a substantial body of Brevard constituents believe to exist.  The invocation is also meant to lend gravity to the occasion, to reflect values long part of the Country's heritage and to acknowledge the place religion holds in the lives of many private citizens in Brevard County.

Your website leads us to understand your organization and its members do not share those beliefs or values which, of course, is your choice under the laws of the United States. . . .

You or your Brevard members have the opportunity to speak for three minutes on any subject involving County business during the Public Comment portion of our meeting. . . . As a practical matter, there are no restrictions on what is said during those three minutes. . . . During that segment, members of your organization are free to speak their views and beliefs, or even a closing supplication.

Doc. 55-6 at 86–87.

Over the course of the next year, various humanists, atheists, and outside groups with interests in the issue communicated with the Board.  Plaintiff Ronald Gordon exchanged emails with Commissioner Trudie Infantini informing her that he was an atheist and offering to give an invocation.  Reverend Ann Fuller, a humanist community minister associated with the Unitarian Universalist Church of Brevard, likewise offered to give an invocation.  The Anti-Defamation League sent a letter to the Board expressing concern with its policies; the Board responded with a letter rejecting the suggestion that it ought to allow a humanist invocation: "[Y]our suggestion to allow atheists to provide the invocation would, in fact, show

hostility toward the faith-based community . . . ."  Americans United for

Separation of Church and State ("AU") sent two letters, in January and May 2015,

cosigned in each instance by the Freedom From Religion Foundation ("FFRF"),

the ACLU, and the ACLU of Florida.

The Board responded by adopting a resolution, Resolution 2015-101, on

July 7, 2015: "A Resolution of the Brevard County Board of County

Commissioners . . . Adopting A Formal Policy Relating to Traditional Ceremonial

Pre-Meeting Prayer" ("the Resolution").  Doc. 55-7; see also ASOF ¶ 131.  The

Resolution began by noting the requests the Board had received and by observing

that the Board had not adopted a formal policy relating to pre-meeting prayer.  The

Board chose to codify a policy that was "not hostile to faith-based religions and

[did] not endorse secular humanism or non-belief over traditional faith-based

religions comprised of constituents who believe in God."  Doc. 55-7 at 3.

The bulk of the Resolution's text comes in its "findings" section, which first

recounts the County's tradition of pre-meeting invocations and provides some

demographic data, but then proceeds to scrutinize the websites of the FFRF, AU,

and CFFC.  The Resolution highlights so-called "Godless quotes" posted on the

organizations' sites, the organizations' stated goals concerning the separation of

church and state, and, for CFFC, its "strategic[]" attempts at "offend[ing] faith-

based religions in open forums in order to pressure the local government into

closing the forum or censoring the content and exposing itself to liability."  Id. at

3–10.  The Resolution offers that allowing the humanists and atheists to speak only

during the public comment period "reflects a longstanding practice of the Board to

provide a limited public forum under the Public Comment section," which is not

subject to censorship.  Id. at 11.

The Resolution presented a series of "conclusions" based on its findings,

including that: "supplanting traditional ceremonial pre-meeting prayer . . . with an

'invocation' by atheists, agnostics or other persons represented by or associated

with FFRF and [AU] could be viewed as County hostility toward monotheistic

religions" because "displacing representatives of the minority faith-based

monotheistic community . . . could be viewed as . . . Board endorsement of Secular

Humanist and Atheist principles."  Id. at 11–12.  This was the case, the Board said,

because of "the overwhelmingly secular nature of the Board's business meeting

following the invocation" and because of "evidence suggesting that the requesting

organizations are engaged in nothing more than a carefully orchestrated plan to

promote or advance principles of Secular Humanism through the displacement or

elimination of ceremonial deism traditionally provided by monotheistic clerics

giving pre-meeting prayer."  Id. at 12.

Finally, the Resolution adopted an amendment governing opening

invocations:

> Secular invocations and supplications from any organization whose precepts, tenets or principles espouse or promote reason, science, environmental factors, nature or ethics as guiding forces, ideologies, and philosophies that should be observed in the secular business or secular decision making process involving Brevard County employees, elected officials, or decision makers including the Board of County Commissioners, fall within the current policies pertaining to Public Comment and must be placed on the Public Comment section of the secular business agenda.  Pre-meeting invocations shall continue to be delivered by persons from the faith-based community in perpetuation of the Board's tradition for over forty years.

Id. at 12–13.  Thus, as stipulated by the parties, the Resolution "adopted a formal policy that allows the traditional faith-based invocation prior to the beginning of the Board's secular business agenda and subsequent 'secular invocations' during the Public Comment section of that secular agenda."  ASOF ¶ 133 (quotations omitted).

This lawsuit was filed in the Middle District of Florida the same day the Board passed Resolution 2015-101, and the complaint was amended the following month to add details about the Resolution itself.  The Amended Complaint raised six claims, alleging violations of the First Amendment's Establishment, Free Speech, and Free Exercise Clauses (Counts I, II, and III); the Fourteenth Amendment's Equal Protection Clause (Count IV); and the Equal Protection and Establishment Clauses of the Florida Constitution (Count V and VI).  The Amended Complaint sought declaratory and injunctive relief, along with damages, fees, and costs.  After extensive discovery, both sides moved for summary

judgment.  On September 30, 2017, the district court entered an order granting summary judgment to the plaintiffs on almost every issue -- technically granting in part and denying in part both motions, but awarding a clear victory to the plaintiffs.

The district court's opinion began with the Establishment Clause.  For starters, it found for the plaintiffs on the theory that the County had engaged in purposeful religious discrimination.  The court concluded that the Establishment Clause requires members of all sects to be invited to offer invocations.  The Brevard County Board, however, unlawfully limited the opportunity to pray "based on the beliefs of the would-be prayer giver."  The trial court ruled similarly that the prayer regime authorized by the County wrongfully entangled the Commissioners in making religious judgments based on the belief systems of various religions.

As for the Free Exercise claim, again the district court found for the plaintiffs.  By allowing invocations only by volunteers who believed in "a higher power," the court reasoned, the County created a religious test for participation in government affairs, thereby violating the freedom of conscience guaranteed by the Free Exercise Clause.  As for the Free Speech claim, the trial court again ruled in favor of the plaintiffs because they were denied the opportunity to participate in a government activity on account of their beliefs or affiliations.  As for Equal Protection, the plaintiffs also succeeded because the County treated its citizens differently on account of their religious beliefs without a "compelling" reason for

doing so.  The court rejected Brevard County's claim that by allowing a humanist

invocation it would necessarily have evinced hostility toward religion.  The

plaintiff's Equal Protection claim raised under the Florida Constitution prevailed

for much the same rationale; and their Florida Establishment Clause claim

succeeded in large measure for the same reasons they prevailed on the federal

Establishment Clause claim.[1]

The district court also entered a declaratory judgment that the County's

policy violated the Establishment, Free Exercise, Free Speech, and Equal

Protection Clauses of the U.S. Constitution and the Establishment and Equal

Protection Clauses of the Florida Constitution.  Finally, the trial court permanently

enjoined the enforcement of the County's regime including its policies found in

Resolution 2015-101.  If the County were to continue the practice of opening its

meetings with an invocation, it was required by the trial court to adopt a new

policy allowing each of the plaintiffs the opportunity to make a secular invocation

---

[1] The district court ruled, however, that the plaintiffs' Florida Establishment Clause claim failed
in part.  Florida's Constitution contains a "no-aid provision" not found in the federal
Establishment Clause.  Florida's Blaine Amendment, as it was commonly known, provides
among other things that "[n]o revenue of the state or any political subdivision or agency thereof
shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or
religious denomination or in aid of any sectarian institution."  Fla. Const. art. I, § 3.  The
plaintiffs had argued that the County was using tax dollars to fund the invocation practice in
violation of this constitutional bar, but the district court found only "incidental" costs and
insufficient evidence supporting the claim.  Thus, summary judgment was granted to the County.
However, the plaintiffs have dropped their appeal of the district court's ruling on this aspect of
their Florida Establishment Clause claim.

and, indeed, to allow each individual plaintiff to deliver an invocation within

fifteen months.[2]

> This timely appeal followed.

---

[2] To be more precise, the district court ordered the following injunctive relief:

6. Based on the foregoing, the Court hereby issues a permanent injunction:

a. prohibiting the County from continuing the unconstitutional invocation practices set forth in Brevard County Board of County Commissioners ("Board") Resolution 2015-101.  Specifically, the County may not:

(i) require theistic content in opening invocations; or

(ii) "impose[] a categorical ban on Plaintiffs and other nontheists as givers of opening invocations at its Board meetings" (Order at 34) or otherwise discriminate against Plaintiffs or other nontheists in selecting speakers to deliver opening invocations at Board meetings.

b. mandating that, if the County continues opening its Board meetings with invocations, its invocation practices and any new invocation policy that it may adopt shall:

(i) conform with the principles set forth in this Final Judgment;

(ii) provide the Individual Plaintiffs (David Williamson, Chase Hansel, Keith Becher, Ronald Gordon, and Jeffery Koeberl) and representatives of the Organizational Plaintiffs (Central Florida Freethought Community, Space Coast Freethought Association, and Humanist Community of the Space Coast) with opportunities to deliver secular opening invocations at Board meetings on a schedule that is equivalent to that afforded to individuals and organizational representatives delivering religious opening invocations; and (iii) ensure that each of the Individual Plaintiffs receives a reasonable opportunity to deliver an opening invocation at a Board meeting within fifteen months of the later of (1) the date of entry of this Final Judgment; or (2) if the Board temporarily refrains from opening its meetings with invocations starting with the date of entry of this Final Judgment, the date upon which the Board resumes opening its meetings with invocations. After each Individual Plaintiff delivers his initial opening invocation, however, nothing in this Final Judgment shall be construed to require the County to schedule him to deliver opening invocations every fifteen months; instead, the schedule for any subsequent opening invocation by any Plaintiff shall be set in accordance with subsection 6(b)(ii) above.

II.

"We review a grant of summary judgment de novo, applying the same standard as the district court.  In conducting this analysis, we view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law' Fed. R. Civ. P. 56(a).  The movant bears the burden of presenting pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." Procaps S.A. v. Patheon, Inc., 845 F.3d 1072, 1079 (11th Cir. 2016) (citations and quotations omitted).  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  We review the grant of injunctive relief for abuse of discretion. Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1216 (11th Cir. 2000).

III.

A.

The Establishment Clause decrees that "Congress shall make no law respecting an establishment of religion," but we have struggled mightily over the

16

years to explain just what these words mean.  U.S. CONST. amend. I; see Everson v. Bd. of Ed. of Ewing Twp., 330 U.S. 1, 15 (1947) (incorporating the clause against the states via the Fourteenth Amendment).  The Supreme Court has moved away from attempting to divine "a grand unified theory" of the clause, in favor of "a more modest approach that focuses on the particular issue at hand and looks to history for guidance."  Am. Legion v. Am. Humanist Ass'n, No. 17-1717, 2019 WL 2527471, at *16 (U.S. June 20, 2019) (plurality opinion).  Justice Alito, writing for four Justices, has said its cases "involving prayer before a legislative session are an example" of this approach.  Id.

We know that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  Larson v. Valente, 456 U.S. 228, 244 (1982).  To that end, the Supreme Court has long "adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'"  Id. at 246 (quoting Everson, 330 U.S. at 15). Simply stated, "[t]he government must be neutral when it comes to competition between sects."  Zorach v. Clauson, 343 U.S. 306, 314 (1952); see also Epperson v. State of Ark., 393 U.S. 97, 103–04 (1968).

This "principle of denominational neutrality" is a central requirement of the Establishment Clause.  Larson, 456 U.S. at 246.  At the same time, though, we

know that the Establishment Clause does not require that the state extirpate all

references to religion or religious symbols from the public life of this nation.

Thus, for example, most recently the Supreme Court rejected a challenge to a

Christian cross that had stood on public land as a World War I memorial since

1925.  Am. Legion, 2019 WL 2527471, at *4.  In fact, such public practices as the

First Congress's invocation of the "Almighty God" in its resolution urging the

proclamation of a day of Thanksgiving, the display of the Ten Commandments in

the south frieze of the Supreme Court's courtroom, and countless other examples

of religious ornamentation in public buildings suggest that the Establishment

Clause must be read in a manner tolerant of religious expression in public life.  See

Van Orden v. Perry, 545 U.S. 677, 686–690 (2005) (Rehnquist, J.) (plurality

opinion)).

     Most significantly for our purposes, the Supreme Court's interpretation of

the Establishment Clause has expressly permitted the longstanding practice of

opening a legislative session with a prayer.  The First Congress chose in 1789 to

begin its sessions with a prayer in order "to solemnize congressional meetings,

[and] unify[] those in attendance as they pursued a common goal of good

governance."  Am. Legion, 2019 WL 2527471, at *17 (plurality opinion).  "The

passage of time gives rise to a strong presumption of constitutionality," id. at *15,

so the unbroken practice of legislative prayer since the early days of the republic is

the starting point of our analysis.  Since Marsh v. Chambers, 473 U.S. 783 (1983),

legislative prayer has been treated differently in no small measure on account of its

long history and has been found to be constitutional in most cases.  Marsh

presented the first opportunity for the Court to consider legislative prayer,  in the

context of "whether the Nebraska Legislature's practice of opening each legislative

day with a prayer by a chaplain paid by the States violate[d] the Establishment

Clause."  Marsh, 463 U.S. at 784.  It did not, the Court said, in large part because

"historical evidence sheds light not only on what the draftsmen intended the

Establishment Clause to mean, but also on how they thought that Clause applied"

to legislative prayer, "[a] practice authorized by the First Congress."  Id. at 790.

Thus, the Court upheld legislative prayer "without subjecting the practice to 'any

of the formal "tests" that have traditionally structured' [an Establishment Clause]

inquiry."  Town of Greece v. Galloway, 134 S. Ct. 1811, 1818 (2014) (quoting

Marsh, 463 U.S. at 796 (Brennan, J., dissenting)).

 The Supreme Court explained in Marsh that "[f]rom colonial times through

the founding of the Republic and ever since, the practice of legislative prayer has

coexisted with the principles of disestablishment and religious freedom."  Marsh,

463 U.S. at 786.  The First Congress "authorized the appointment of paid

chaplains" the same week that they agreed on the language of the First

Amendment, and even James Madison, "one of the principal advocates of religious

freedom in the Colonies and a drafter of the Establishment Clause" voted in favor of hiring these chaplains.  Id. at 788 & n.8.  "Clearly," the Court resolved, "the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment"; and, indeed, "the practice of opening sessions with prayer has continued without interruption ever since."  Id. at 788.  "This unique history" of legislative prayer dating to the Founding led the Court "to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to" what was being challenged in Marsh.  Id. at 791.  The Court concluded "that legislative prayer presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education, or tax exemptions for religious organizations."  Id. (citations omitted).

Writing for the Court, Chief Justice Burger ended the Court's general discussion of legislative prayer this way:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society.  To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.  As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being."

Id. at 792 (quoting Zorach, 343 U.S. at 313).

Turning then to the Nebraska Legislature's practices, the Court identified three salient details: a Presbyterian clergyman had been hired to deliver prayers regularly; he was paid from the public fisc; and the prayers were "in the Judeo-Christian tradition." Id. at 793. This minister had made explicitly Christian prayers, but, for the past few years, he made an effort to be "nonsectarian," and not to reference Christ specifically. Id. at 793 n.14. The Court saw no cause for concern since it did not think "that choosing a clergyman of one denomination advances the beliefs of a particular church." Id. at 793. Indeed, the evidence showed that it was "his performance and personal qualities," not his Presbyterianism, that motivated his retention. Id.

The Court went further in Town of Greece v. Galloway, 134 S. Ct. 1811 (2014), explicitly permitting sectarian prayer. Greece, New York, had an informal method of selecting volunteer prayer-givers to open town board meetings, which entailed calling up congregations and, eventually, working from a list of chaplains who had done it before. Id. at 1816. "The town at no point excluded or denied an opportunity to a would-be prayer giver" and "[i]ts leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation." Id. Nonetheless, all of the participating ministers from 1999 to 2007 had been Christian, a reflection of the fact that nearly all the congregations in town

were Christian.  Id.  The two plaintiffs had attended town board meetings and took

issue with the "distinctly Christian idiom" used in pre-meeting prayers.  Id. at

1816–17.  After one of the plaintiffs raised the issue with the board, "a Jewish

layman and the chairman of the local Baha'i temple" were invited to give opening

prayers, and a "Wiccan priestess" requested and was granted an opportunity as

well.  Id. at 1817.  Notwithstanding the increasing diversity of the prayers, the

plaintiffs sued, alleging that Greece had violated the Establishment Clause by

"preferring Christians over other prayer givers and by sponsoring sectarian prayers,

such as those given 'in Jesus' name.'"  Id.  They sought "an injunction that would

limit the town to 'inclusive and ecumenical' prayers that referred only to a 'generic

God' and would not associate the government with any one faith or belief."  Id.

This presented a new question for the Court: whether prayer that reflected

the language and beliefs of a specific religion -- typically Christianity -- "fit[]

within the tradition long followed in Congress and the state legislatures," which

Marsh had endorsed.  Id. at 1819.  In Marsh, the chaplain had characterized his

prayers as "nonsectarian" and "Judeo Christian," and the Court had no occasion to

consider the content of the prayers.  Marsh, 463 U.S. at 793 n.14, 794–95.

In Galloway, the Court determined that sectarian prayer was consistent with

the First Amendment.  See Galloway, 134 S. Ct. at 1820.  "Marsh [had] nowhere

suggested that the constitutionality of legislative prayer turns on the neutrality of

its content." Id. at 1821.  Once again, the Court relied heavily on historical

antecedents in giving meaning to the Establishment Clause.  It explained "that the

Establishment Clause must be interpreted 'by reference to historical practices and

understandings' and that the decision of the First Congress to 'provid[e] for the

appointment of chaplains only days after approving language for the First

Amendment demonstrates that the Framers considered legislative prayer a benign

acknowledgment of religion's role in society.'"  Am. Legion, 2019 WL 2527471,

at *16 (plurality opinion) (quoting Galloway, 134 S. Ct. at 1811).  The Court

specifically noted that sectarian prayers had been accepted, and that today,

Congress "acknowledges our growing diversity not by proscribing sectarian

content but by welcoming ministers of many creeds," like Buddhism, Judaism,

Islam, and Hinduism.  Id. at 1820–21.  The challengers wanted prayers addressed

"only to a generic God," but, "[t]he law and the Court could not draw this line."

Id. at 1822.  The Court explained that "even seemingly general references to God

or the Father might alienate nonbelievers or polytheists."  Id.  Perfectly inclusive

prayer was unrealistic, the Court said, and it would be "unwise to adopt" the

plaintiffs' "next-best option" of allowing only generic prayer that was "acceptable

to the majority, even if [it would] exclude some."  Id.  This kind of rule would

make the First Amendment "a majority rule," would turn courts into "supervisors

and censors of religious speech" and "would involve government in religious matters to a far greater degree."  Id.

Before Galloway was decided, two panels of this Court had reached the same conclusion -- that sectarian prayer was permitted -- and had worked out a clear doctrinal structure with which to evaluate legislative prayer cases.  In Pelphrey v. Cobb County, 547 F.3d 1263 (11th Cir. 2008) and again in Atheists of Florida, Inc. v. City of Lakeland, 713 F.3d 577 (11th Cir. 2013), we considered challenges brought against local governments that opened their meetings with sectarian prayers -- again, mostly Christian in both instances.  See Atheists of Fla., 713 F.3d at 582–83; Pelphrey, 547 F.3d at 1267–68.  Unlike in today's case, the plaintiffs in those cases did not ask for permission to give opening prayers themselves; they were simply challenging the then-current regimes.  We upheld the prayer regime in Atheists of Florida.  713 F.3d at 596.  We likewise upheld the then-current practice in Pelphrey, 547 F.3d at 1277–78, but also determined that an earlier practice in Cobb County, Georgia had been unconstitutional, id. at 1278–1279.

Both cases required us to review what Marsh had to say about the outer limits of permissible prayer practices.  In Marsh, the Court told us that "[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance

any one, or to disparage any other, faith or belief." Marsh, 463 U.S. at 794–95.

Galloway would later rely on this same language. See Galloway, 134 S. Ct. at

1821–22 (quoting this language from Marsh). To determine whether "the prayer

opportunity has been exploited" in violation of Marsh, we developed a three-factor

test, derived from the district court's analysis in Pelphrey. See Pelphrey, 547 F.3d

at 1277–78. We would consider first "the identity of the invocational speakers,"

then "the selection procedures employed" and finally "the nature of the prayers."

Id.

    We found no problem with the identities of the speakers in Pelphrey or in

Atheists of Florida, even though the facts of both cases had revealed a

predominantly Christian set of prayer-givers. In Pelphrey we ruled that this was

acceptable because, notwithstanding the Christian majority, Jewish, Unitarian, and

Muslim speakers had also given invocations and the speakers had represented "a

wide cross-section of the County's religious leaders." Id. at 1277. In Atheists of

Florida, we discerned no constitutional problem because using "primarily but not

exclusively Christian" speakers "reflect[ed] the religious makeup of Lakeland and

the surrounding county" -- again a Jewish cantor and a Muslim Imam had also

given invocations. Atheists of Fla., 713 F.3d at 592.

    The second factor -- selection procedures -- has required analysis of more

complicated facts. In Pelphrey, the then-current speaker-selection procedures did

not betray any impermissible motive.  The County had "compiled the list of potential speakers from various sources and included diverse religious institutions, including a mosque and three synagogues."  Pelphrey, 547 F.3d at 1278.  These included "the Yellow Pages, the internet, and business cards," and speakers for each week were selected at random.  Id. at 1267.  The county administrator in charge of choosing from the list "testified that she did not exclude religious institutions based on their beliefs."  Id. at 1278.  In Atheists of Florida, we could find no constitutional problem with a similar selection procedure that involved finding congregations in the Yellow Pages and online along with allowing overlooked congregations to apply and with consulting the local chamber of commerce.  Atheists of Fla., 713 F.3d at 592.

Not every procedure we've considered, however, has passed constitutional muster.  In Pelphrey we also held that a selection procedure employed for some time by the Cobb County Planning Commission violated the Establishment Clause.  Pelphrey, 547 F.3d at 1282.  This Commission drew invitees from entries for "Churches" in a particular phone book.  Id. at 1267.  But someone had drawn "a long and continuous line" through certain subcategories of Churches, "including 'Churches–Islamic,' 'Churches–Jehovah's Witnesses,' 'Churches–Jewish,' and 'Churches–Latter Day Saints.'"  Id. at 1282.  No representatives of these faiths had been invited to speak during the time period that this particular phone book was

being used.  Id.  We affirmed the district court's determination that this "categorical exclusion of certain faiths based on their beliefs [was] unconstitutional."  Id.

    We did not have any reason to analyze the third factor -- the content of the prayers -- in either Pelphrey or Atheists of Florida.  In Pelphrey, we declined to evaluate the prayers' content because "there [was] no clear error in the findings that the prayers . . . were not exploited to advance one faith or belief."  Id. at 1278.  In Atheists of Florida, we likewise noted that no evidence of prayers that advanced or disparaged a religion was presented and declined to review the content of the prayers.  Atheists of Fla., 713 F.3d at 592–93.  In both instances, we highlighted the Supreme Court's strong caution that the courts ought to avoid becoming involved in reviewing or approving specific prayers.  See id. at 592 ("[I]t is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." (quoting Marsh, 463 U.S. at 795)); Pelphrey, 547 F.3d at 1278 ("The federal judiciary has no business in 'composing official prayers . . . to recite as any part of a religious program carried on by government . . . .'" (quoting Lee v. Weisman, 505 U.S. 577, 588 (1992))).

    Galloway was decided after our decisions in Pelphrey and Atheists of Florida.  It tended to confirm our reading of Marsh and was entirely consistent with the principles animating our three-factor test.  Like our decisions, Galloway

allowed a rotating set of volunteer invocation-givers that primarily came from one

sect -- Christianity -- "[s]o long as the town maintain[ed] a policy of

nondiscrimination." Galloway, 134 S. Ct. at 1824. Galloway also noted that the

town had made "reasonable efforts to identify all of the congregations located

within its borders" and welcomed them. Id. The "policy of nondiscrimination"

that Galloway required can be found by looking, as we had, to the procedures by

which the prayer-givers are selected. As we had suggested, Galloway says that the

courts should avoid scrutinizing the content of prayers, but that the content may

matter "[i]f the course and practice over time shows that the invocations denigrate

nonbelievers or religious minorities, threaten damnation, or preach conversion."

Id. at 1823; see id. at 1822–23. So long as prayers are arranged and delivered in

nondiscriminatory ways, explicitly sectarian prayer "serves [the] legitimate

function" of "lend[ing] gravity to the occasion and reflect[ing] values long part of

the Nation's heritage." Id. at 1823.

The state of our law, then, is clear at least about this much: local

governments have significant freedom to conduct legislative prayers at the start of

their sessions, even prayers that are explicitly sectarian and predominantly

Christian. They may even employ a single cleric from only one denomination to

deliver their invocations. But there is an exception to this: local governments

violate the Constitution if they organize and conduct their prayers in a way that

discriminates against other religious beliefs.  The three-factor test drawn from

Pelphrey is our Circuit's method of reviewing legislative prayer regimes for

discrimination, and, so far, only one regime has failed the test -- the Cobb County

Planning Commission's discontinued practice of drawing speakers from a list that

"categorically excluded specific faiths."  Pelphrey, 547 F.3d at 1282.

B.

Turning to the facts of this case, we agree with the district court that Brevard

County's method of selecting invocation speakers, as evinced by Resolution 2015-

101 and by extensive deposition testimony taken from its County Commissioners,

is in violation of the Establishment Clause.  We do not share the entirety of the

district court's reasoning, which used Pelphrey's three-factor test only in the

broadest sense, and which reached further difficult constitutional questions that

need not be answered for the resolution of this case.  We review legal

determinations in a summary judgment order de novo, see Procaps S.A., 845 F.3d

at 1079, and we review the district court's decision by re-applying the governing

principles we set out in Pelphrey.  Just like in Pelphrey and Atheists of Florida, we

can discern no constitutional problem with the identities of the speakers selected,

and we have no occasion to review the content of the prayers actually given.  The

County's process of selecting invocation speakers, though, has run afoul of the

Establishment Clause.

To begin with the simpler factors, the identities of the prayer-givers, viewed in relation to the community's religious demographics, appear consistent with what we have approved in the past.  Of the 195 invocations given between 2010 and early 2016, there were 188 by Christians, six by Jews, and one that was "generally monotheistic."  We have found no Establishment Clause problems presented when local governments mostly invited Christian volunteer invocation-givers, so long as this was reasonably reflective of the community's demographics and did not advance a single faith.  See Atheists of Fla., 713 F.3d at 592; Pelphrey, 547 F.3d at 1277.  On that score, the parties' Amended Stipulation of Facts cites to data collected by the Association of Religious Data Archives ("ARDA").  This data shows that, out of 414 congregations in Brevard County, over 350 are Christian. Inviting, as we've suggested, "a wide cross-section of the County's religious leaders" would, therefore, result in primarily Christian prayers.[3]  See Pelphrey, 547 F.3d at 1277 (quoting Simpson v. Chesterfield Cty. Bd. of Supervisors, 404 F.3d 276, 285 (4th Cir. 2005)).

And just like in Pelphrey and Atheists of Florida, we have no occasion to engage the third factor of the test -- the content of the prayers.  "In Pelphrey, this

---

[3] ARDA data do not include any of the Secular Humanist congregations discussed in this lawsuit. There has been no suggestion, however, that more than a few such groups exist in Brevard County.  The cross-section of religious leaders would still be overwhelmingly Christian even if they had been included.

Court stated that 'we read <u>Marsh</u> . . . to forbid judicial scrutiny of the content of prayers absent evidence that the legislative prayers have been exploited to advance or disparage a religion.'"  <u>Atheists of Fla.</u>, 713 F.3d at 592 (quoting <u>Pelphrey</u>, 547 F.3d at 1274).  Moreover, the plaintiffs have not so much as even suggested that the prayers offered regularly disparaged or proselytized particular belief systems. <u>Galloway</u> explains that the content of legislative prayers is only a problem when the government allows "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose."  134 S. Ct. at 1824.  In <u>Galloway</u>, there were moments of concern during a few invocations.  <u>Id.</u> ("One guest minister characterized objectors as a 'minority' who are 'ignorant of the history of our country,' while another lamented that other towns did not have 'God-fearing' leaders.").  The Court said that "[a]lthough these two remarks strayed from the rationale set out in <u>Marsh</u>, they [did] not despoil a practice that on the whole reflects and embraces our tradition."  <u>Id.</u>  The plaintiffs here have not even alleged this much, since their argument lies elsewhere, and so we have even less reason to look at the content of the prayers given in Brevard County.

This leaves the second factor -- the selection procedures -- for analysis.  For starters, Brevard County lacks any sort of written policy, comprehensive or otherwise, describing how volunteer invocation-givers are selected.  Resolution 2015-101 tells us something, but not much, about how the process works; the

deposition testimony of seven current and former Commissioners tells us more.  A

careful review of the Resolution and the testimony makes clear that the Board's

procedures for inviting speakers to give invocations cannot be squared with the

Establishment Clause because the current practice reposes in each of the

Commissioners plenary discretion, which they have used to discriminate on the

basis of religious beliefs, favoring some monotheistic religions over others and

disfavoring and excluding -- at least -- religions that are polytheistic, pantheistic, or

otherwise outside of the "mainstream."[4]  Moreover, some of the Commissioners

set a higher bar, if not an insurmountable one, for religions that they were

unfamiliar with or for those that they knew of but did not particularly like or

prefer.  This is plainly at odds with the core of the Establishment Clause -- neither

the states nor the federal government may favor one religious denomination over

another.  Larson, 456 U.S. at 244.

As a starting point, we can look to Resolution 2015-101, which suggests

favoritism for monotheistic religions, and only some of them at that, and sets no

standards or regimented procedures for Commissioners to follow as they invite

invocation speakers.  In precious little detail, the Resolution reveals that "a

ceremonial invocation in the form of a short prayer" has been given before Brevard

---

[4] We do not say anything one way or the other about Secular Humanism or other non-theistic
belief systems.  See infra Part IV.

County Board meetings for at least forty-four years, and says that "individual Board members" select speakers "[o]n a rotating basis."  Resolution at 1–2.  The parties' Amended Stipulation of Facts confirms that "Commissioners' offices take turns inviting speakers, following a rotation system."  While the Resolution says nothing further about the selection procedures, the Resolution is explicit in its preference for monotheistic religions.  It says that clerics giving invocations are "typically" afforded the opportunity to speak about their organizations and explains that this exchange occurs, "in recognition of the traditional positive role faith-based monotheistic religions have historically played in the community." Resolution at 2 (emphasis added).  Again, this suggests a more favorable attitude toward monotheistic religions than toward others.

At the end of the Resolution, the Board codifies a new policy.  Leaving altogether to one side, for the moment, the plaintiffs' humanist belief systems, the plain language of this section of the Resolution facially discriminates between religions.  It bars "[s]ecular invocations and supplications from any organization whose precepts, tenets or principles espouse or promote" not just "reason" and "science" but also "environmental factors, nature" and even "ethics."  Id. at 10.  At the very least, "environmental factors" and "nature" play a significant role in shaping some traditional Native American religions, not to mention some newer religions like Wicca.  "Ethics" is an even more curious inclusion.  Many if not

most religions -- including Christianity and Judaism -- place "ethics" among their basic "precepts, tenets or principles."

Since the Resolution contains so few details about the actual procedures of selecting invocation speakers, we must turn to the deposition testimony provided by the Commissioners.  Their testimony is illuminating; it reflects that the members put into practice the monotheistic preference endorsed in their written Resolution, and shows that members of the Board had no standards to apply, and minimal procedures to follow, as they invited speakers to give invocations. Moreover, their testimony reveals quite starkly that many members of the Board exercised this plenary discretion in plainly unconstitutional ways.

Turning to the record is nothing out of the ordinary in legislative prayer cases.  In Pelphrey, too, we looked to County employees' testimony to discern the selection procedures in the absence of a written policy.  Pelphrey, 547 F.3d at 1267–68; see also, e.g., Galloway, 134 S. Ct. at 1824 (providing examples, from the record, of prayers delivered in the Town of Greece); Marsh, 463 U.S. at 793 n.14 (citing the Chaplain's deposition testimony).  In all, seven Commissioners were deposed in this case.  Five of them were the Commissioners who passed Resolution 2015-101 in the summer of 2015, and the two others had served on the Board in the preceding year, during the relevant period when some of the plaintiffs were communicating with Board members about giving invocations.  Each of the

Commissioners was asked about the purpose of the invocation practice and, notably, about how the selection process worked, both in general and in their offices specifically. They were each then asked whether they would invite speakers ascribing to particular religions or types of religions to give invocations.

The Commissioners' testimony concerning the purpose of holding invocations reflected the same preference for monotheism that we found in the text of Resolution 2015-101 and a preference for Christianity specifically at the expense and to the exclusion of other religions. One former Commissioner, who had been on the Board when the plaintiffs first requested the opportunity to deliver an invocation, said the opening invocation was "a long-standing tradition of honoring the Christian community in Brevard County," and that allowing atheists or humanists to deliver invocations "would be a dishonor to the Christian community." A Commissioner who voted on Resolution 2015-101 confirmed that he had been quoted in the press as saying that "[t]he invocation is for worshipping the God that created us," and clarified that he was referring to "The one and only true God. The God of the Bible." Another agreed that "allowing Christian invocations show[s] the board's support for Christianity."

All the Commissioners confirmed that speakers were selected on a rotating basis, and none of the Commissioners described any sort of formalized policy for how their office went about choosing who they would invite when it was their turn.

Several suggested that they focused on congregations in their districts, one said he "assum[ed]" that his staff would "Google or look in the Yellow pages," another said he had "a list of local ministers" that he inherited from a previous Commissioner and that clerics were added to the list based on "[j]ust [the] personal relationship [he] might have with that person."  Still another said he focused on inviting speakers who "are really part of the community."  A former Commissioner who had not voted on Resolution 2015-101 said that her office had "a list of those [speakers] who had done it before and [her office] added to it different churches that [she] was aware of."  She noted that in her district she had "a lot of new churches being established" and that, in adding churches to the list, she would consider "[t]heir availability and their community activity."  None of this general testimony about the selection process amounts to a violation of the Establishment Clause; it does, however, reflect the lack of consistent standards and the plenary authority granted to each Commissioner.

The way this plenary authority was exercised is at the core of the Establishment Clause problem in Brevard County.  Only one Commissioner testified consistently that he would invite anyone who had a "recognized church" in his district, regardless of the specifics of their belief system.  Every other Commissioner or former Commissioner indicated that the specific religious beliefs of a prospective invocation-giver would have a real impact on whether they would

36

be invited or permitted to give an invocation or excluded from consideration.  The

Commissioners took religious beliefs into account in three ways: framing the

purpose of the invocation, scrutinizing belief systems, and categorically excluding

certain religions.  These are not firm categories -- these practices flowed from one

another and overlapped.  Not every Commissioner considered religious beliefs in

each of these ways, but six out of the seven considered prospective invocation-

givers' beliefs in some way when deciding who could deliver an invocation and

who could not.

Some described the invocation as being meant for only certain types of

religions.  One said that invocations could only come from religions that "look to a

higher authority for spiritual guidance."  Another said that the invocation was

"more for a faith-based monotheological [*sic*] type of situation" and that a speaker

who was not "a monotheistic type of person" could not give an invocation, even if

he was "[a]ctive in the community" and "[h]elping in the community" because this

speaker would not "represent the faith-based community or faith of people within

the community."  A former Commissioner said she would allow any religion, so

long as it was "a God-fearing religion."

In other instances, Commissioners indicated that speakers from certain

religions would be subjected to some sort of closer scrutiny, even if they might

ultimately be allowed to offer invocations.  One Commissioner said that, if

37

approached by a Sikh or a practitioner of a Native American religion, he'd have to

"see what they had to say."  Another would "ask more questions" of a Hindu, and

wasn't sure about a polytheist generally.  Still another would "have to see what

was presented" by a practitioner of a polytheistic religion before allowing them to

offer a prayer, and would "have to think on" religions he wasn't familiar with.  Of

only slightly less concern were those responses from Commissioners that appear to

suggest reluctance or lack of certainty about certain religions, like "I guess I would

[invite a Wiccan]" from one Commissioner or "I guess I would have [been willing

to invite a Muslim]" from another.

Most troubling and plainly unconstitutional were the statements by

numerous Commissioners that certain religions or types of religions would be

flatly banned from giving an invocation.  Four of the seven Commissioners,

including three of the five who voted on the Resolution, stated affirmatively that

they would not allow representatives of certain religions to give an invocation.

One said he would not allow a Wiccan, and two more said they probably would

not.  A Rastafarian would have received the same set of responses.  Rastafarianism

is a monotheistic and Abrahamic religion that evolved in Jamaica in the 1930s and

focused on belief in the divinity of Ethiopian Emperor Haile Selassie.  See

Monique Bedasse, Rasta Evolution: The Theology of the Twelve Tribes of Israel,

40 J. Black Studies 960, 960 (2010).  Two Commissioners said they would not

allow a polytheist to deliver an invocation, even though they had each said they would allow a Hindu.  Hinduism, of course, is a polytheistic religion.  See Klaus K. Klostermaier, A Survey of Hinduism 15–16 (3d ed. 2007) ("The long history, the vastness, and the heterogeneity of Hinduism offer enormous challenges to each and every description of the tradition."  At the same time, though, "[a]ll observers—including Hindus themselves—would describe Hinduism as polytheistic.").

Finally, these same four Commissioners would bar a deist from delivering an invocation.  "Deism" refers to "a rationalistic movement of the 17th and 18th century whose adherents generally subscribed to a natural religion based on human reason and morality, on the belief in one God who after creating the world and the laws governing it refrained from interfering with the operation of those laws, and on the rejection of every kind of supernatural intervention in human affairs." Webster's Third New International Dictionary 2370 (2002) (emphasis added).  A bar on deism would exclude Thomas Jefferson, Benjamin Franklin, John Adams, and many others among our Nation's Founders from the opportunity to deliver an invocation before the Brevard County Board of Commissioners.

These depositions confirm that the selection process entails a grant of plenary authority to each Commissioner on a rotating basis, and that nearly all of the Commissioners exercised that authority in a way that categorically excludes

some religions and places additional burdens on others based on the content of
their religious beliefs.  They favor familiar monotheistic religions over other
monotheistic religions that seem unfamiliar.  (Thus, by example, one
Commissioner's response when asked whether he would invite a Rastafarian was:
"Don't have any idea what that is.  But I would say no.")  The preferences evinced
by their answers confirm what the Resolution's text suggests: that many members
of the Board view the prayer opportunity in Brevard County as an opportunity
reserved only for adherents of monotheistic religions, and only for some of them.
Resolution at 2.  In fact, the opportunity in practice is even narrower than the text
suggests, since some monotheistic, and even Abrahamic religions, like
Rastafarianism, are subject to more scrutiny than Christianity or Judaism, if not
outright blackballing.

     The Commission's procedures for selecting speakers are thus in sharp
conflict with the Establishment Clause.  To be clear, the constitutional problem is
not that the Commission lacked a formal, written policy or that the selection of
speakers was left to the discretion of individual Commissioners.  The issue lies in
how the Commissioners exercised their discretion in practice.  Brevard County's
haphazard selection process categorically excludes certain faiths -- some
monotheistic and apparently all polytheistic ones -- based on their belief systems.
Most Commissioners do not appear to have employed belief-neutral criteria in

selecting which invocation-givers to invite.  Their comments "reflect an aversion or bias on the part of [county] leaders against minority faiths."  <u>Id.</u> at 1824.  In <u>Galloway</u>, the Court said that a predominantly Christian set of prayer-givers could be constitutional, "[s]o long as the town maintains a policy of nondiscrimination."  <u>Id.</u>  On any fair examination of the lengthy summary judgment record, we cannot say the Board has done that here.  Commissioners consciously held and acted upon views about which religions and types of religious beliefs were the right kind for invocations and which were not.  This means that "the prayer opportunity has been exploited to proselytize or advance" not one religion as <u>Marsh</u> anticipated, but a class of religions to the exclusion of many others.  <u>Marsh</u>, 463 U.S at 794–95.

The fact that there is little to no evidence of discriminatory content in the invocations actually given in Brevard County cannot save the speaker selection procedure as it stands today.  We rejected just this argument in <u>Pelphrey</u>, explaining that <u>Marsh</u> had considered selection procedures before approving of legislative prayer.  <u>See</u> <u>Pelphrey</u>, 547 F.3d at 1281–82 (citing <u>Marsh</u>, 463 U.S. at 793–95).  The Establishment Clause provides no safe harbor based on end results because an impermissible motive in the selection process may taint the whole scheme.  In <u>Marsh</u>, the Court said that, while "[t]he Court of Appeals was concerned that [the chaplain's] long tenure ha[d] the effect of giving preference to his religious views," the Supreme Court was not concerned because "the evidence

indicate[d] that he was reappointed because his performance and personal qualities were acceptable." Marsh, 463 U.S. at 793. "Absent proof that the chaplain's reappointment stemmed from an impermissible motive," the Court concluded "that his long tenure [did] not in itself conflict with the Establishment Clause." Id. at 793–94. The bottom line is that the selection process mattered.

The cases following Marsh have treated selection procedures as highly probative of whether the prayer opportunity has been exploited. Here and in Pelphrey, instead of a hiring process, we have a process of inviting and bringing in volunteers that change week-to-week. In Pelphrey, it was unconstitutional to "categorically exclude[] certain faiths" by working from a list of volunteers that excluded whole classes of congregations. Pelphrey, 547 F.3d at 1282. In Galloway, the plaintiffs did not criticize the selection procedure, which was decidedly ecumenical. See Galloway, 134 S. Ct. at 1816. Justice Alito's concurrence, though, underscored the relevance of motive and selection procedures. See id. at 1830–31 (Alito. J., concurring). He observed that, in Galloway, the town leaders had made an honest mistake in failing to realize that many residents attended synagogues just outside the city limits and that the leaders of those congregations ought to have been on their list. Id. This did not require invalidation of the prayer regime, but the case would have been viewed "very differently if the omission of these synagogues were intentional." Id. at 1831.

As in <u>Pelphrey</u>, we have far more than enough evidence about the selection procedures in Brevard County to reach a conclusion about whether the "prayer opportunity has been exploited."  <u>Marsh</u>, 463 U.S. at 794.  It has been, both through the written policies described and outlined in Resolution 2015-101 and even more clearly through the Board's practices of picking and choosing which religions to invite and which to reject.  The Resolution facially draws distinctions between preferred monotheistic religions and disfavored others.  The selection procedures as practiced take religious beliefs into account, again favoring some creeds over others.  By discriminating on the basis of religion in these two ways, the County has violated the Establishment Clause.  The practice of legislative prayer "begun by the First Congress stands out as an example of respect and tolerance for differing views [and] an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans."  <u>Am. Legion</u>, 2019 WL 2527471, at *18 (plurality opinion).  The County has failed to follow this model and it has run afoul of the First Amendment.  We, therefore, affirm in part the district court's decision, although not all of its reasoning, nor the sweep of its holdings or the breadth of its injunction.

IV.

We need not and do not reach any further questions presented in this case,

including whether the County is obliged to allow the individual or organizational

plaintiffs -- atheists and Secular Humanists -- the opportunity to deliver an

invocation at the start of one of its board meetings.[5]  We vacate the district court's

injunction, except insofar as it prohibits the County from continuing the present

speaker-selection practices and procedures as explained by the Commissioners and

as embodied in Resolution 2015-101.  The trial court's injunction goes too far and

says too much.  Again, all that we hold today is that the Board's current invocation

speaker selection procedures are unlawful.  The Commissioners have favored some

religions over others, and barred those they did not approve of from being

---

[5] The Court of Appeals for the D.C. Circuit recently ruled that the Chaplain of the U.S. House of Representatives was not obligated to provide a self-professed atheist the opportunity to deliver a "nonreligious prayer" because, regardless of whether he was denied the opportunity on account of being an atheist or because he was going to deliver a nonreligious prayer, "the House permissibly limits the opening prayer to religious prayer" and the atheist's prayer would not have qualified by these terms.  See Barker v. Conroy, 921 F.3d 1118, 1132 (D.C. Cir. 2019).  The Court of Appeals explained that limiting the opening invocation to religious prayer "fit 'within the tradition long followed in Congress and the state legislatures.'"  Id. at 1130 (quoting Galloway, 134 S. Ct. at 1846).  Legislative prayer -- a "sui generis context," for Establishment Clause purposes -- "can be both religious and consistent with the Establishment Clause," given the long historical practice.  Id. at 1131.  The court therefore rejected the atheist's demand that he be allowed to give a nonreligious opening prayer.

But we need not reach the analogous question here.  Even while accepting that invocations can permissibly be limited to religious prayers, the D.C. Circuit noted that "the Court has warned against discriminating among religions or tolerating a pattern of prayers that proselytize or disparage certain faiths or beliefs."  Id.  That discrimination among religions and religious beliefs is plainly present in the record before us in this case.

considered.  This plainly violates the principle of denominational neutrality found at the heart of the Establishment Clause.  On remand, the district court may recraft its injunctive relief in a manner consistent with this opinion.

Since the County may return to the drawing board and formulate new policies about how to begin the meetings of the Board of Commissioners, we have no reason to interrogate any further claims raised by the plaintiffs.  "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988); see also Camreta v. Greene, 563 U.S. 692, 705 (2011); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346–47 (1935) (Brandeis, J., concurring) (laying out "a series of rules under which [the Supreme Court] has avoided passing upon a large part of all the constitutional questions pressed upon it for decision").

The law is abundantly clear that the County may allow sectarian prayer at the start of its legislative sessions, just as the Supreme Court approved prayer in Marsh and again in Galloway, and as we have in Pelphrey and in Atheists of Florida.  But the County may not employ a discriminatory selection process in doing so.  Accordingly, we affirm the judgment of the district court in part, vacate in part, and remand for further proceedings consistent with this opinion.

**AFFIRMED in part, VACATED in part, and REMANDED.**